## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS,[*]                                    )
c/o Louis J. Ebert                                   )
Rosenberg Martin Greenberg, LLP                      )
25 South Charles Street, 21st Floor                  )
Baltimore, Maryland 21201                            )
(Baltimore City, Maryland)                           )
                                                     )
      Plaintiff,             )
                                                     )
    v.                           )          Case No. 20-cv-_____
                                                     )
UNIVERSITY OF MARYLAND MEDICAL SYSTEM                 )
    CORPORATION,                 )
250 W. Pratt St.,                                    )
Baltimore, Maryland 21201                            )
(Baltimore City, Maryland)                           )
                                                     )
UMSJ HEALTH SYSTEM, LLC                              )
7601 Osler Drive,                                    )
Towson, Maryland 21204                               )
(Baltimore County, Maryland), and                    )
                                                     )
UNIVERSITY OF MARYLAND ST. JOSEPH                    )
MEDICAL CENTER, LLC,                                 )
7601 Osler Drive,                                    )
Towson, Maryland 21204                               )
(Baltimore County, Maryland),                        )
                                                     )
      Defendants.            )
_____      )

## **COMPLAINT**

    Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons") brings this action against

Defendant University of Maryland Medical System Corporation ("UMMS"), and its wholly

---

[*] Plaintiff moves, through a forthcoming motion, to waive his obligation under Local Rule 102.2(a) to provide an address, on the basis of his objectively reasonable fear that publicizing his home address would subject him to harassment (potentially including violence) and threats. *See Edgar v. Coats*, No. GJH-19-985, 2020 WL 1890509, at *10 (D. Md. Apr. 16, 2020).

owned subsidiaries, Defendants UMSJ Health System, LLC ("UMSJ LLC") and University of

Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC"), for violations of the

Establishment Clause of the First Amendment to the United States Constitution, the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution, and Section

1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557").

## **INTRODUCTION**

1.      UMMS, through its wholly owned subsidiaries UMSJ LLC and St. Joseph LLC

(collectively, "Defendants"), owns and operates a hospital in Towson, Maryland under the name

of University of Maryland St. Joseph Medical Center.  Defendants are instrumentalities of the

State of Maryland and subject to the First Amendment's Establishment Clause and the

Fourteenth Amendment's Equal Protection Clause.  But, in violation of those constitutional

obligations, Defendants operate University of Maryland St. Joseph Medical Center as a Catholic

institution, guided by "Catholic health care values" and bound by the "Ethical and Religious

Directives for Catholic Health Care Services" established by the U.S. Conference of Catholic

Bishops (the "Catholic Directives").[1]

2.      Plaintiff Jesse Hammons is a man who is transgender.  As part of Mr. Hammons's

medically necessary treatment relating to his diagnosis of gender dysphoria, Mr. Hammons's

surgeon scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical

Center on January 6, 2020.  But approximately 7–10 days before Mr. Hammons's scheduled

---

[1] *About UM SJMC*, University of Maryland St. Joseph Medical Center, http://www.umms.org/
sjmc/about (last accessed July 14, 2020).  The hospital website links directly to the Catholic
Directives, which are available at http://www.usccb.org/about/doctrine/ethical-and-religious-
directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf
(last accessed July 14, 2020).

operation, Defendants canceled the surgery based on a discriminatory and unconstitutional application of Catholic religious doctrine.

3.     According to the administrators of University of Maryland St. Joseph Medical Center, Mr. Hammons could not receive his medical treatment at the hospital because, in the view of the administrators, Mr. Hammons's treatment would violate Catholic religious doctrine, as announced in the Catholic Directives.  The Catholic Directives state that Catholic hospitals may not perform procedures that induce sterility unless "their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  Catholic Directives p.19, ¶ 53.  The stated basis for this rule is the Catholic teaching that Catholic health care organizations are not permitted to engage in "immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization." *Id.* p.25, ¶ 70.

4.     Hysterectomies are procedures that induce sterility.  On information and belief, however, University of Maryland St. Joseph Medical Center routinely performs hysterectomies when they are medically necessary to treat a diagnosed condition other than gender dysphoria. When they canceled Mr. Hammons's medically necessary surgery, Defendants thus treated Mr. Hammons—as a man who is transgender—differently from non-transgender patients who require medically necessary hysterectomies for other medical conditions.

5.     An instrumentality of the state may not operate a Catholic hospital or deny medical care to transgender patients based on Catholic religious beliefs.  By invoking Catholic religious doctrine as a basis for canceling Mr. Hammons's medically necessary surgery, Defendants violated the Establishment Clause of the First Amendment.  And by subjecting Mr.

Hammons to different and unequal treatment, Defendants also violated the Equal Protection Clause of the Fourteenth Amendment and Section 1557 of the Affordable Care Act.

<u>**JURISDICTION AND VENUE**</u>

6.     This Court has subject matter jurisdiction over this action pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), and the Court has personal jurisdiction over the Defendants because Defendants each hold themselves out as corporations under the laws of the State of Maryland; because they each reside in this District; and because a substantial part of the events or omissions giving rise to this action occurred and are occurring in this District.

<u>**PARTIES**</u>

8.     Plaintiff Jesse Hammons resides in Baltimore, Maryland.

9.     UMMS is a "nonprofit, nonstock corporation" in the State of Maryland.  Md. Code Educ. § 13-302(7).  UMMS was created by statute.  *See id.* § 13-301, *et seq*.  All of the voting members of its Board of Directors are appointed by the Governor of Maryland.  *Id.* § 13-304(b).  According to its authorizing statute, UMMS is intended to serve "the highest public interest" and its purposes "are essential to the public health and welfare" of the State.  *Id.* § 13-302(4).  UMMS's offices are located at 250 W. Pratt St., Baltimore, Maryland 21201.

10.     UMSJ LLC is a wholly owned subsidiary of UMMS.  UMSJ LLC was organized on or about February 12, 2013, by the then-General Counsel of UMMS, Megan M. Arthur, as Authorized Person.  According to its articles of incorporation, the company was "organized and shall be operated exclusively (i) in furtherance of the charitable, scientific and educational purposes of, (ii) for the benefit of, (iii) to perform the functions of and (iv) to carry out the purposes of: University of Maryland Medical System Corporation."  On information and belief,

UMMS created UMSJ LLC for the sole purpose of owning and operating University of Maryland St. Joseph Medical Center.  At its inception, UMSJ LLC's principal office was located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's offices).  Now its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the hospital's address).

11.     Defendant St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC.  St. Joseph LLC was organized under the name "Northeastern Maryland Regional Health System, LLC" on or about April 25, 2012, by then-General Counsel of UMMS, Megan M. Arthur, as Authorized Person.  According to its articles of incorporation, among the stated "charitable purposes" of this new entity was "[t]o maintain a hospital in northeastern Maryland."  On or about August 1, 2012, the new entity's name was changed to its present name: University of Maryland St. Joseph Medical Center, LLC.  On information and belief, UMMS created this entity for the sole purpose of purchasing the existing St. Joseph hospital.  At its inception, St. Joseph LLC's principal office was located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's offices).  Now, its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the address of the hospital).

12.     St. Joseph LLC owns and operates a hospital known as University of Maryland St. Joseph Medical Center located at 7601 Osler Drive, Towson, Maryland 21204.  University of Maryland St. Joseph Medical Center holds itself out as "an integral member of UMMS."

13.     On information and belief, University of Maryland St. Joseph Medical Center adheres to the Catholic Directives in administering care pursuant to a written agreement with UMMS.  University of Maryland St. Joseph Medical Center advertises that it provides treatment

in accordance with its "core values" of "[r]everence" and "[r]espect for all people as God's loved children."[2]

14.     On information and belief, UMMS, UMSJ LLC, and St. Joseph LLC receive federal funds.

## FACTUAL ALLEGATIONS

**Maryland Creates UMMS as a Quasi-Private Corporation While Retaining State Control**

15.     Under Maryland law, the public University System of Maryland (the "University") is designated as "an instrumentality of the State and a public corporation" and "an independent unit of State government."  Md. Code Educ. § 12-102(a).  For almost a century, from 1897 to 1984, the University operated the University of Maryland Medical Center and referred to it as "University Hospital."

16.     In 1984, the Maryland General Assembly passed a statute transferring the assets and liabilities of the University of Maryland Medical Center to a new corporation called the "University of Maryland Medical System Corporation"—UMMS.  *See id.* § 13-301, *et seq.*

17.     The statute declared UMMS to be an independent corporation and not a State agency, and the statute provided that UMMS "is not subject to any provisions of law affecting only governmental or public entities."  *Id.* § 13-303(a)(2).  Nevertheless, the statute reaffirmed that the new UMMS would continue to serve the same governmental purposes that it had served for nearly one hundred years when University Hospital was operated by a unit of State government.  To that end, the statute's legislative findings declared:

> (1) The purposes of the medical system are to provide medical care of the type unique to University medical facilities for the citizens of the State and region and,

---

[2] *About UM SJMC*, University of Maryland St. Joseph Medical Center, http://umms.org/sjmc/about (last accessed July 14, 2020).

in accomplishing this objective, to provide a clinical context for education and research conducted by the faculty of the University;

(2) The purposes extend to all citizens of the State, particularly regarding health care needs which only an academic medical institution can adequately meet such as extensive tertiary care, major shock trauma treatment, and sophisticated surgical techniques;

(3) The purposes also include rendering comprehensive health care to the community naturally served by University Hospital to assure its availability to citizens of that community;

(4) These purposes separately and collectively serve the highest public interest and are essential to the public health and welfare, but must be realized in the most efficient manner and at the lowest cost practicable and consistent with these purposes[.]

*Id.* § 13-302.

18.     The statute specifically required that UMMS "[s]hall provide for and maintain . . . comprehensive services for patient populations naturally served by University Hospital, including uncompensated care and outpatient care," and "[s]hall maintain, create, and develop specialty care services . . . to meet the needs of the State and region." *Id.* § 13-303(c).

19.     The statute also included a nondiscrimination provision, which stipulated that "[t]he Board of Directors shall operate the medical system without discrimination based upon race, creed, sex, or national origin." *Id.* § 13-303(d).

20.     Under the statute, the State of Maryland continues to exercise ultimate authority and control over the governance of UMMS.  By statute, the Governor appoints all voting members on UMMS's Board of Directors, two of whom must be nominated by the President of the Senate and Speaker of the House of Delegates, respectively. *Id.* § 13-304(b) & (c)(5).  The Governor also fills any vacancies on the Board. *See id.* § 13-304(d)(4).  In addition, the corporation could not exist until its articles of incorporation were approved by the Board of Public Works, a State agency. *Id.* § 13-303(a)(1).

21.     Further, if the University Board of Regents and the Board of Public Works

determine that UMMS has failed to realize the purposes set forth in its enacting statute, they

have the power to terminate UMMS.  *See id.* § 13-311(c).

22.     In light of these facts, Maryland's highest court has authoritatively determined

that "UMMS is an instrumentality of the State."  *Napata v. Univ. of Md. Med. Sys. Corp.*, 12

A.3d 144, 151 (Md. 2011).

23.     The State of Maryland's own website recognizes that UMMS is an

instrumentality of the State:

> Although it established the University of Maryland Medical Center (UMMS) as an
> ostensibly private corporation, the General Assembly ensured that the State would
> continue to play a prominent role in the System's governance when it required that
> the UMMS's articles of incorporation and the initial transfer of assets from the State
> be approved by the Board of Public Works, that the voting members of the Board
> be Governor's appointees, and that there be continuing operational coordination
> between UMMS and the University.   In addition, it required that the Center
> continue as a teaching hospital for the University of Maryland [a unit of the State]
> and that it enter annual contracts with the University with limited authority to
> establish nonprofit or for-profit subsidiaries (98 Opinions of the Attorney General
> 114, November 21, 2003).[3]

24.     For these and other reasons, UMMS is an instrumentality of the State of Maryland

for purposes of the state action doctrine, making the guarantees of the First and Fourteenth

Amendments to the United States Constitution binding on UMMS.  *See Lebron v. Nat'l R.R.*

*Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold that where, as here, the Government

creates a corporation by special law, for the furtherance of governmental objectives, and retains

---

[3] *University of Maryland Medical System Corporation*, Maryland Manual On-line,
https://msa.maryland.gov/msa/mdmanual/25ind/priv/html/medf.html (last accessed July 14,
2020).

for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.").

## UMMS Acquires St. Joseph Hospital and Agrees to Maintain the Hospital's "Catholic Identity"

25.     On information and belief, St. Joseph Hospital was originally founded by the Sisters of St. Francis of Philadelphia and operated as a private Catholic hospital until 2012.[4] From 1996 to 2012 it was operated by Catholic Health Initiatives, a consortium of three Catholic health care systems and 10 congregations.[5]

26.     In or about early 2012, Catholic Health Initiatives began searching for financial assistance as a result of a series of lawsuits and other difficulties that left the hospital in financial distress,[6] losing $3 million a month, and its very survival in jeopardy.[7]  Catholic Health Initiatives put the hospital up for sale.[8]  UMMS expressed interest in acquiring the hospital and bringing it into the University of Maryland system.[9]  Merger negotiations began.

27.     A sticking point in the negotiations was whether the hospital would continue to be run as a Catholic institution.[10]  Historically, the hospital had adhered to the Catholic Directives in

---

[4] *UM SJMC History and Heritage*, University of Maryland, St. Joseph Medical Center, http://www.umms.org/sjmc/about/history-heritage (last accessed July 14, 2020).

[5] *Id.*

[6] Andrea K. Walker, *St. Joseph Eyes Merger with Non-Catholic Hospital System*, The Baltimore Sun (Feb. 27, 2012).

[7] Andrea K. Walker, *UMMS To Close on St. Joseph Dec. 1*, The Baltimore Sun (Nov. 15, 2012).

[8] *Id.*

[9] *Id.*

[10] Melody Simmons, *Cardinal 'Disappointed' with Decision of St. Joseph's Medical Center in Towson*, Daily Record (March 23, 2012).

administering care.[11]  The Catholic Church, even as it sought to divest itself of the hospital, was

adamant that the hospital should continue to follow the Catholic Directives under its new

ownership.[12]

28.     The Catholic Directives, developed and published by the U.S. Conference of

Catholic Bishops, reflect Catholic religious ideals pertaining to health care.  The Catholic

Directives state that health care must "respect the sacredness of every human life from the

moment of conception until death," Catholic Directives at p.8, and "must be animated by the

Gospel of Jesus Christ and guided by the moral tradition of the Church," *id.* at p.8, ¶ 1.  They

also state that "Catholic health care services must adopt these Directives as policy" and "require

adherence to them within the institution as a condition for medical privileges and employment."

*Id.* at p.9, ¶ 5.

29.     The Catholic Directives prohibit certain types of care that would ordinarily be

available to patients in secular facilities, including other hospitals in the UMMS system.  For

example, the Catholic Directives specifically prohibit a rape victim from receiving treatments

"that have as their purpose or direct effect the removal, destruction, or interference with the

implantation of a fertilized ovum."  *Id.* at p.15, ¶ 36.  The directives also ban abortion in all

cases, without exception.  *Id.* at p.18, ¶ 45.  In addition, though they permit married couples to

"limit the number of their children by natural means," the Catholic Directives entirely bar

"contraceptive interventions that either in anticipation of the marital act, or in its accomplishment

or in the development of its natural consequences, have the purpose, whether as an end or a

means, to render procreation impossible."  *Id.* at p.16 (internal quotation marks omitted).

---

[11] Melody Simmons, *Catholic Directives Play Key Role in St. Joseph Sale to University of Maryland Medical System*, Daily Record (Apr. 1, 2012).

[12] *Id.*

30.     As relevant to Mr. Hammons, the Catholic Directives state that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted," with a lone exception: "Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id.* at p.19, ¶ 53.

31.     A central focus during negotiations with UMMS was whether the hospital would continue to impose the Catholic Directives on its patients and staff under new ownership.[13] Church law forbade the sale of the hospital to a non-Catholic entity unless officials from the Archdiocese of Baltimore and the Vatican itself provided their approval.[14]  Cardinal O'Brien, the head of the Archdiocese of Baltimore at the time, expressed disappointment about UMMS's selection as the purchaser of the hospital and promised the Church would "do everything possible in the months and years ahead" to keep the hospital a fundamentally Catholic institution.[15]

32.     On information and belief, as a condition to closing the deal, UMMS signed a written agreement with the Catholic Church promising to continue running the hospital as a Catholic institution and to continue operating under the Catholic Directives.[16]  Archbishop Lori, who had recently succeeded Cardinal O'Brien as head of the Baltimore Diocese, told the press

---

[13] Melody Simmons, *Catholic Directives Play Key Role in St. Joseph Sale to University of Maryland Medical System*, Daily Record (Apr. 1, 2012).

[14] Melody Simmons, *Archdiocese of Baltimore Blesses St. Joseph Sale*, Daily Record (Nov. 26, 2012).

[15] Melody Simmons, *Cardinal 'Disappointed' with Decision of St. Joseph's Medical Center in Towson*, Daily Record (March 23, 2012).

[16] Andrea K. Walker, *St. Joseph Under New Ownership As of Today*, The Baltimore Sun (Dec. 1, 2012).

that the agreement "will ensure that St. Joseph's will continue this long tradition of providing faith-filled care throughout this new chapter in the hospital's storied history."[17]

33.     In or about December of 2012, UMMS formally acquired the hospital for over $200 million.[18]

**The State of Maryland Operates the Hospital as a Catholic Institution**

34.     Since the acquisition, UMMS and its subsidiaries have continued to operate University of Maryland St. Joseph Medical Center as a Catholic institution, just as when the hospital was owned and operated by a private religious entity.  For example, the hospital's website advertises that it is a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services."[19]

35.     While it continues to be operated as a religious institution, University of Maryland St. Joseph Medical Center derives substantial benefits from being purchased by, and publicly associated with, an arm of the Maryland State government.  University of Maryland St. Joseph Medical Center advertises itself an "integral member of University of Maryland Medical System."

36.     As alleged above, St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC.  On information and belief, USMJ LLC and St. Joseph LLC are corporate alter egos.  On information and belief, they share a common Board of Directors and a common management structure.  Both entities—in separate public filings with the State and Federal governments—

---

[17] Melody Simmons, *Archdiocese of Baltimore Blesses St. Joseph Sale*, Daily Record (Nov. 26, 2012).

[18] Meredith Cohn*, A Remedy and Rebirth*, The Baltimore Sun (Dec. 1, 2013).

[19] *About UM SJMC*, University of Maryland St. Joseph Medical Center, http://umms.org/sjmc/about (last accessed July 14, 2020).

have held themselves out as owning and operating the University of Maryland St. Joseph Medical Center.

37.     UMMS and its officials are pervasively entwined with the management and governance of UMSJ LLC and St. Joseph LLC, such that the activity of these entities is State action.  By way of example, UMMS is entitled to elect one or more board members of the governing body of both entities.  Their financial books are maintained in the care of S. Michelle Lee, UMMS's Chief Financial Officer.  And, every decision "must be approved by UMMS."[20] On information and belief, that includes the decision to impose the Catholic Directives on the hospital's patients and staff, a direct consequence of which was the cancellation of Mr. Hammons's scheduled surgery.

38.     Moreover, the personnel involved in the creation of the ostensibly private subsidiaries of UMMS and the purchase of the hospital were UMMS personnel.  Corporate charter documents of both USMJ LLC and St. Joseph LLC were executed by the then-General Counsel of UMMS, Megan M. Arthur.  Ms. Arthur also served as resident agent of St. Joseph LLC until her retirement from UMMS in the wake of the recent Healthy Holly scandal, involving self-dealing by the UMMS board of directors.[21]  Now, UMMS's Office of General Counsel serves as the resident agent of St. Joseph LLC (and the Senior Associate Counsel for UMMS, Adil Daudi, is listed as the General Partner of UMSJ LLC on the corporate filing with the Maryland Secretary of State effecting that change).

---

[20] UMSJ Health System LLC, Form 8879-EO, 2017, http://hscrc.state.md.us/Documents/public-interest/IRS%20990%20-%202017/FY18_UMSJHS_FORM%20990.pdf (last accessed July 14, 2020).

[21] This scandal involved a variety of self-dealing payments, including one for a half a million dollars paid by UMMS to the former Baltimore mayor for her self-published "Healthy Holly" children's books.  *See generally* Luke Bradwater, *Report Blames Ex-CEO of UMM: Consultant's Review Finds More No-Bid, Self-Dealing Practices*, The Baltimore Sun (June 13, 2019).

39.     The Article of Transfer memorializing the purchase of the hospital from the Catholic Church was signed by Robert Chrencik as Authorized Agent for the Transferee St. Joseph LLC.  At the time, Mr. Chrencik was the President and CEO of UMMS.  (He later resigned in the fallout of the Healthy Holly scandal.)

40.     This pervasive entwinement between UMMS, UMSJ LLC, St. Joseph LLC, and University of Maryland St. Joseph Medical Center means that the actions of UMSJ LLC and St. Joseph LLC are the actions of UMMS, which is an instrumentality the State of Maryland.

**Transgender Individuals and Gender Dysphoria**

41.     Gender identity is a well-established medical concept, referring to one's deeply felt sense of oneself as belonging to a particular gender.  Although the precise origins of each person's gender identity are not fully understood, experts agree that it likely results from a combination of biological factors as well as social, cultural, and behavioral factors.  The medical consensus is that gender identity, regardless of its precise etiology, is deeply rooted and cannot be voluntarily changed.

42.     Typically, people who are designated female at birth based on their external anatomy go on to identify as girls or women, and people who are designated male at birth go on to identify as boys or men.  For transgender individuals, however, their gender identity differs from the sex assigned to them at birth.

43.     Transgender men are men who were assigned "female" at birth, but have a male gender identity.  Transgender women are women who were assigned "male" at birth, but have a female gender identity.

44.     Being transgender is not a mental disorder.  People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely

because of their transgender status.  But transgender people may require treatment for "gender

dysphoria," the diagnostic term for the clinically significant emotional distress experienced as a

result of the incongruence of one's gender with their assigned sex and the physiological

developments associated with that sex.  Gender dysphoria is a serious medical condition codified

in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") and International

Classification of Diseases ("ICD-10").  The criteria for diagnosing gender dysphoria are set forth

in the DSM-V (302.85).

45.     The widely accepted standards of care for treating gender dysphoria are published

by the World Professional Association for Transgender Health ("WPATH").  The WPATH

standards of care have been recognized as the authoritative standards of care by the leading

medical organizations and the U.S. Department of Health and Human Services.

46.     Under the WPATH standards, medically necessary treatment for gender dysphoria

may require medical steps to affirm one's gender identity and transition from living as one

gender to another.  This treatment, often referred to as transition-related care, may include

hormone therapy, surgeries (sometimes called "sex reassignment surgery" or "gender affirming

surgery"), and other medical services that align an individual's body with their gender identity.

47.     Under the WPATH standards, the exact medical treatment varies based on the

individualized needs of the person.  Under each patient's treatment plan, the goal is to enable the

individual to live all aspects of their life consistent with their gender identity, thereby eliminating

the distress associated with the incongruence.

48.     Hysterectomy is surgery to remove a patient's uterus.  In addition to treating

gender dysphoria, hysterectomies are performed to treat a number of health conditions, including

uterine fibroids, endometriosis, pelvic support problems, abnormal uterine bleeding, chronic

pelvic pain, and gynecological cancer.[22]  A patient can no longer become pregnant after undergoing a hysterectomy.[23]  Thus, hysterectomy is an inherently sterilizing procedure, regardless of the reason for which it is performed.  According to the U.S. Department of Health and Human Services, hysterectomy is the second-most common surgery, after a Caesarean section, among women in the United States.[24]

49.     Transgender men often require a hysterectomy as a gender-affirming surgical treatment for gender dysphoria.  The United States Transgender Discrimination Survey in 2015, which surveyed almost 28,000 transgender people, found that 14% of transgender men surveyed had undergone a hysterectomy, and 57% wanted to undergo a hysterectomy.[25]  According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures such as hysterectomy, are effective, safe, and medically necessary.

50.     In the past, public and private insurance companies excluded coverage for transition-related care based on the assumption that such treatments were cosmetic or experimental.  Today, however, transition-related surgical care is routinely covered by public and private insurance programs, including Medicare and Maryland Medicaid.  The American Medical Association, the American Psychological Association, the American Psychiatric

---

[22] *Hysterectomy*, American College of Obstetricians and Gynecologists (March 2015), http://www.acog.org/Patients/FAQs/Hysterectomy#what (last accessed July 14, 2020).

[23] *Id.*

[24] *Hysterectomy*, Office on Women's Health, U.S. Dept. of Health & Human Services (2014), http://www.womenshealth.gov/a-z-topics/hysterectomy (last accessed July 14, 2020).

[25] S.E. James, J.L. Herman, S. Rankin, M. Keisling, L. Mottet, & M. Anafi, *The Report of the 2015 U.S. Transgender Survey*, Washington, D.C.: National Center for Transgender Equality, 101 (2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%Report%20-%20FINAL%201.6.17.pdf (last accessed July 14, 2020).

Association, the American College of Obstetricians and Gynecologists, and other major medical organizations have issued policy statements and guidelines supporting healthcare coverage for transition-related care as medically necessary under contemporary standards of care.

**Mr. Hammons's Medically Necessary Treatment for Gender Dysphoria**

51.    Plaintiff Jesse Hammons is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female.

52.    In accordance with the WPATH Standards of Care, Mr. Hammons's treating physicians recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria.  Mr. Hammons satisfied all of the criteria for a medically necessary hysterectomy under the WPATH Standards of Care.[26]

53.    Mr. Hammons scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.

54.    In planning for his surgery, Mr. Hammons underwent pre-operative blood tests, an echocardiogram, and other health screenings with his treating physician.  Mr. Hammons scheduled the surgery to be performed during a break from school and arranged to take off time from work for his surgery and recovery.

55.    Like many transgender people, Mr. Hammons experiences anxiety and increased dysphoria when discussing any of his anatomical characteristics that are typically associated with

---

[26] Those criteria are: (a) Two referral letters from qualified mental health professionals; (b) Persistent, well documented gender dysphoria; (c) Capacity to make a fully informed decision and to consent for treatment; (d) Age of majority in a given country; (e) If significant medical or mental health concerns are present, they must be well controlled; and (f) Twelve continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

his sex assigned at birth.  In planning for his surgery, he worked hard over several months to mentally prepare himself for the experience.

56.     Approximately 7–10 days before Mr. Hammons's surgery was scheduled to take place, University of Maryland St. Joseph Medical Center's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, ordered the surgery canceled.  Dr. Cunningham told Mr. Hammons's surgeon that he could not perform Mr. Hammons's hysterectomy because the surgery conflicted with the hospital's Catholic religious beliefs and the Catholic Directives.

57.     The Catholic Directives generally prohibit medical treatments that are primarily intended to induce sterilization, but authorize such procedures "when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." Catholic Directives p.19, ¶ 53.  Dr. Cunningham told Mr. Hammons's surgeon that, according to University of Maryland St. Joseph Medical Center's religious beliefs, Mr. Hammons's gender dysphoria did not qualify as a sufficient medical reason to authorize the procedure.

58.     Dr. Cunningham also told Mr. Hammons's surgeon that performing the hysterectomy and removing an otherwise healthy organ would violate the Catholic Directives' command to preserve the "functional integrity" of the human body.  *Id.* at p.14, ¶ 29.  But the Catholic Directives state that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available." *Id.*  For example, surgeons at University of Maryland St. Joseph Medical Center remove otherwise healthy tissue to prevent cancer or other diseases.  University of Maryland St. Joseph Medical Center also authorizes surgeons to perform purely cosmetic surgeries.  Dr. Cunningham, nevertheless, told Mr. Hammons's surgeon that University of Maryland St. Joseph Medical

Center did not consider Mr. Hammons's gender dysphoria to be a valid basis under the Catholic

Directives to justify disrupting the body's "functional integrity."

59.     When he learned that University of Maryland St. Joseph Medical Center had

canceled his medically necessary surgery, Mr. Hammons felt shocked, angry, afraid, and

devastated.  Mr. Hammons felt that he was being told his health and well-being were not worthy

of being protected, and he felt angry that the hospital—which is part of his own State

government—was using other people's religious beliefs to deny him the medical treatment he

needed.

60.     Mr. Hammons was not able to have his hysterectomy performed until June 24,

2020.  As a result of the rescheduling, Mr. Hammons had to spend more money on an additional

round of pre-operative tests; he had to spend another six months experiencing gender dysphoria

without the therapeutic benefits of the surgery; and he had to spend another six months carrying

the stress and anxiety of having to mentally prepare himself for the surgery all over again.

## COUNT I

### VIOLATION OF THE ESTABLISHMENT CLAUSE

61.     Plaintiff re-alleges paragraph 1-60 as if fully set forth herein.

62.     As alleged above, Defendants are instrumentalities of the State of Maryland for

purposes of the First Amendment (incorporated against the states via the Fourteenth

Amendment).

63.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and

declaratory relief for violations of the Establishment Clause of the First Amendment.

64.     Although UMMS is an instrumentality of the state bound by the First

Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because,

among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency,

political subdivision, public body, public corporation, or municipal corporation" and declared

that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or

public entities." Md. Code Educ. § 13-303(a)(2). That "statutory disavowal of [a quasi-private

corporation's] agency status deprives [it] of sovereign immunity from suit." *Lebron*, 513 U.S. at

392.

66. Any judgment against UMMS would not be paid by the State: "Obligations of

[UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of

the University or the State." Md. Code Educ. § 13-310.

66. By purchasing the St. Joseph hospital and signing an agreement to operate the

hospital as a Catholic institution and in accordance with the Catholic Directives, UMMS has

violated the Establishment Clause by, among other things, (a) creating an impermissible fusion

of governmental and religious functions; (b) impermissibly delegating government authority to

be exercised in accordance with religious criteria; (c) impermissibly endorsing religion;

(d) taking government action that has the primary purpose and effect of advancing religion;

(e) creating unconstitutional governmental entanglement with religion; (e) favoring one set of

religious beliefs over others; and (f) impermissibly coercing individuals to act in accordance with

particular religious beliefs.

67. As a result of Defendants' violations of the Establishment Clause, Plaintiff Jesse

Hammons suffered an injury in fact when University of Maryland St. Joseph Medical Center

canceled his medically necessary surgery to treat gender dysphoria based on the Catholic

Directives.

68.     Defendants are liable for their violation of Mr. Hammons's rights under the Establishment Clause pursuant to 42 U.S.C. § 1983.

## COUNT II

### VIOLATION OF THE EQUAL PROTECTION CLAUSE

69.     Plaintiff re-alleges paragraph 1-68 as if fully set forth herein.

70.     As alleged above, Defendants are instrumentalities of the State of Maryland for purposes of the Equal Protection Clause of the Fourteenth Amendment.

71.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and declaratory relief for violations of the Equal Protection Clause of the Fourteenth Amendment.

72.     Although UMMS is an instrumentality of the state bound by the Fourteenth Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because, among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency, political subdivision, public body, public corporation, or municipal corporation" and declared that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or public entities."  Md. Code Educ. § 13-303(a)(2).  That "statutory disavowal of [a quasi-private corporation's] agency status deprives [it] of sovereign immunity from suit."  *Lebron*, 513 U.S. at 392.

73.     Any judgment against UMMS would not be paid by the State: "Obligations of [UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of the University or the State."  Md. Code Educ. § 13-310.

74.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender.

75.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

76.     Because the need to undergo gender transition is a defining aspect of being transgender, discrimination based on whether surgery is part of gender transition is discrimination against transgender individuals as a class.

77.     Because gender transition inherently transgresses gender stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on gender nonconformity.

78.     Discrimination based on the fact that a person is transgender or needs to undergo gender transition is discrimination that would not occur but for the person's sex.  *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020).

79.     Defendants discriminated against Mr. Hammons on the basis of sex, which is subject to heightened scrutiny under the Equal Protection Clause.

80.     Defendants discriminated against Mr. Hammons on the basis of transgender status, which is independently subject to heightened scrutiny under the Equal Protection Clause.

     a.   People who are transgender, as a class, have historically been subject to discrimination.

     b.   People who are transgender, as a class, have a defining characteristic that bears no relation to an ability to perform or contribute to society.

     c.   People who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

d.  People who are transgender, as a class, are a minority with relatively little political power.

81.  Defendants' discrimination against Mr. Hammons was not narrowly tailored to serve a compelling governmental interest.

82.  Defendants' discrimination against Mr. Hammons was not substantially related to an important governmental interest.

83.  Defendants' discrimination against Mr. Hammons did not rationally further any legitimate governmental interest and was grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender.

84.  Defendants are liable for their violation of Mr. Hammons's rights under the Equal Protection Clause pursuant to 42 U.S.C. § 1983.

## COUNT III

### VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT

85.  Plaintiff re-alleges paragraph 1-84 as if fully set forth herein.

86.  Section 1557 provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).

87.  Section 1557's prohibition on sex discrimination is enforceable by a private right of action.

88.  On information and belief, Defendants receive Federal financial assistance and are, therefore, subject to Section 1557's prohibition on sex discrimination.

89.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender, and thus discriminated against Mr. Hammons on the basis of sex.

90.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

91.     Because gender transition inherently transgresses sex stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on sex under Section 1557.

92.     Discrimination based on a person's transgender status or need to undergo gender transition is discrimination that would not occur but for the person's sex in violation of Section 1557.  *See Bostock*, 140 S. Ct. 1731.

93.     Pursuant to Section 1557's private right of action, Defendants are liable for their violation of Mr. Hammons's rights under Section 1557.

## **REQUESTED RELIEF**

For the foregoing reasons, Plaintiff respectfully requests the following relief:

A.     Declaratory relief, including a declaration that Defendants violated Mr. Hammons's rights under the Establishment Clause, the Equal Protection Clause, and Section 1557;

B.     Compensatory damages in an amount to be determined at trial;

C.     Nominal damages;

D.     Plaintiff's reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

E.     Such other relief as the Court deems just and proper.

Date: July 16, 2020

Respectfully submitted,

*/s/ Louis J. Ebert*
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice* forthcoming)
Jonah M. Knobler (*pro hac vice* forthcoming)
Andrew D. Cohen (*pro hac vice* forthcoming)
Abigail E. Marion (*pro hac vice* forthcoming)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
jknobler@pbwt.com
acohen@pbwt.com
amarion@pbwt.com

Joshua A. Block (*pro hac vice* forthcoming)
Leslie Cooper (*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*