**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JESSE HAMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-2088-ELH |
| | ) | |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN
<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS ..........................................................................2

LEGAL STANDARD..................................................................................6

ARGUMENT ..............................................................................................7

I.      MR. HAMMONS HAS ESTABLISHED ARTICLE III STANDING ...............................7

      A.    Mr. Hammons's Injuries Are Fairly Traceable to Defendants' Conduct...............8

            1.    Defendants Directly Caused Mr. Hammons's Injuries ..............................8

            2.    Mr. Hammons's Surgeon Did Not Break the Chain of Causation............. 9

      B.    The Requested Relief Will Redress Mr. Hammons's Injuries...............................13

II.     DEFENDANTS CAN BE HELD LIABLE UNDER SECTION 1983 ...........................13

      A.    UMMS Is a State Actor.......................................................................14

            1.    UMMS Fulfills the Criteria Set Out in *Lebron* ...................................... 14

            2.    Because UMMS Satisfies *Lebron*, the Close Nexus Test Is Irrelevant ...................................................................................... 17

      B.    UMMS Does Not Enjoy Sovereign Immunity.......................................................19

            1.    The State of Maryland Has Stripped UMMS of Sovereign Immunity........................................................................................ 19

            2.    UMMS Is Not an Arm of the State for Eleventh Amendment Purposes ...................................................................................... 21

             3.    UMMS Is a "Person" Under 42 U.S.C. § 1983 ....................................... 22

III.    MR. HAMMONS HAS ALLEGED A VIABLE ESTABLISHMENT CLAUSE CLAIM................................................................................................22

IV.   DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES THE EQUAL PROTECTION CLAUSE.........................................................................29

      A.    The Hospital Singles Out Transgender Patients' Surgeries to Treat Gender Dysphoria for Different and Unequal Treatment....................................29

      B.    St. Joseph's Policy Against Providing Medically Necessary Surgery for Transgender Patients with Gender Dysphoria Facially Discriminates Based on Sex and Transgender Status ..................................................30

V.     DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES SECTION 1557 OF THE AFFORDABLE CARE ACT...................................................34

CONCLUSION...........................................................................................35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Evac EMS, Inc. v. Cheatham,*
  910 F.3d 751 (4th Cir. 2018) ....................................................................7, 10, 11

*Am. Legion v. Am. Humanist Ass'n,*
  139 S. Ct. 2067 (2019)................................................................................23

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)......................................................................................7

*Barghout v. Bureau of Kosher Meat & Food Control,*
  66 F.3d 1337 (4th Cir. 1995) ......................................................................24

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
  512 U.S. 687 (1994)........................................................................24, 25, 27

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)......................................................................................6

*Bennett v. Spear,*
  520 U.S. 154 (1997)................................................................................10, 11

*Bostock v. Clayton Cty.,*
  140 S. Ct. 1731 (2020)...................................................................33, 34, 35

*Boyden v. Conlin,*
  341 F. Supp. 3d 979 (W.D. Wis. 2018) .....................................................33, 34

*Bradfield v. Roberts,*
  175 U.S. 291 (1899).................................................................................28, 29

*Buxton v. Kurtinitis,*
  862 F.3d 423 (4th Cir. 2017) ......................................................................26

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v.
  Martinez,* 561 U.S. 661 (2010) ..................................................................32

*Commack Self-Serv. Kosher Meats, Inc. v. Weiss,*
  294 F.3d 415 (2d Cir. 2002)........................................................................24

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) ........................................................................9

*Daniel v. Paul,*
  395 U.S. 298 (1969)....................................................................................12

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................7

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .............................................................2, 7

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ...................................................................6

*Faulkner v. Jones*,
   51 F.3d 440 (4th Cir. 1995) ...................................................................31

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) .................................................32

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) ...............................................................................32

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ........................................... *passim*

*Hack v. President & Fellows of Yale Coll.*,
   237 F.3d 81 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v.
   Sorema N.A.*, 534 U.S. 506 (2002) .......................................................15

*Harter v. Vernon*,
   101 F.3d 334 (4th Cir. 1996) .................................................................22

*Hartmann v. Calif. Dept. of Corr. & Rehab.*,
   707 F.3d 1114 (9th Cir. 2013) .................................................................7

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) ...............................................................................12

*Herron v. Fannie Mae*,
   861 F.3d 160 (D.C. Cir. 2017) ...............................................................17

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994) .................................................................................22

*Horvath v. Westport Library Ass'n*,
   362 F.3d 147 (2d Cir. 2004) ...................................................................18

*Hutto v. S.C. Ret. Sys.*,
   773 F.3d 536 (4th Cir. 2014) ....................................................19, 21, 22

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
   Johnson Controls, Inc.*, 499 U.S. 187 (1991) .......................................35

*Kadel v. Folwell,*
   446 F. Supp. 3d 1 (M.D.N.C. 2020) ........................................................31, 33, 34

*Kerpen v. Metro. Washington Airports Auth.,*
   907 F.3d 152 (4th Cir. 2018) ....................................................................15, 16, 18

*Lambeth v. Bd. of Comm'rs of Davidson Cty.,*
   407 F.3d 266 (4th Cir. 2005) ..................................................................................28

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ..................................................................................12

*Lange v. Houston Cty.,*
   No. 5:19-cv-392, 2020 WL 6372702 (M.D. Ga. Oct. 30, 2020) ...........................32

*Larkin v. Grendel's Den, Inc.,*
   459 U.S. 116 (1982).........................................................................................24, 28

*Larson v. Valente,*
   456 U.S. 228 (1982).................................................................................................24

*Lawrence v. Texas,*
   539 U.S. 558 (2003).................................................................................................32

*Lawson v. Union Cty. Clerk of Court,*
   828 F.3d 239 (4th Cir. 2016), *as amended* (July 8, 2016) ....................................21

*Lebron v. Nat'l R.R. Passenger Corp.,*
   513 U.S. 374 (1995)......................................................................................... *passim*

*Lee v. Weisman,*
   505 U.S. 577 (1992).................................................................................................25

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971)......................................................................................... *passim*

*Libertarian Party of Va. v. Judd,*
   718 F.3d 308 (4th Cir. 2013) ..............................................................................8, 11

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)...............................................................................................7, 8

*Lund v. Rowan Cty.,*
   863 F.3d 268 (4th Cir. 2017) ......................................................................23, 26, 28

*Mackey v. Dorsey,*
   104 Md. App. 250 (Md. 1995) ..................................................................................9

*Md. Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020), *as amended* (Aug. 31, 2020)....................................................8

*McCreary Cty. v. ACLU of Ky.*,
   545 U.S. 844 (2005)....................................................................................................24, 26

*MedSense, LLC v. Univ. Sys. of Md.*,
   420 F. Supp. 3d 382 (D. Md. 2019)........................................................................20

*Mellen v. Bunting*,
   327 F.3d 355 (4th Cir. 2003) ....................................................................................27

*Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*,
   855 F.3d 573 (4th Cir. 2017) ................................................................15, 16, 17, 18

*Moore v. Williamsburg Reg'l Hosp.*,
   560 F.3d 166 (4th Cir. 2009) ..............................................................................17, 18

*Mueller v. Allen*,
   463 U.S. 388 (1983)....................................................................................................28

*Myers v. Loudoun Cty. Pub. Sch.*,
   418 F.3d 395 (4th Cir. 2005) ....................................................................................25

*Napata v. Univ. of Md. Med. Sys. Corp.*,
   417 Md. 724 (Md. 2011)........................................................................................16, 20

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003)....................................................................................................33

*NVR, Inc. v. Harry A. Poole, Sr. Contractor, Inc.*,
   No. ELH–14–00241, 2014 WL 2215857 (D. Md. May 28, 2014) ...........................7

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
   804 F.3d 646 (4th Cir. 2015) ....................................................................................22

*Pac. Shores Properties, LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ..................................................................................32

*Philips v. Pitt Cty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ....................................................................... *passim*

*Plessy v. Ferguson*,
   163 U.S. 537 (1896)....................................................................................................14

*Prescott v. Rady Children's Hosp. San Diego*,
   265 F. Supp. 3d 1090 (S.D. Cal. 2017)....................................................................34

*Rich v. William Penn Life Ins. Co. of New York*,
    No. GLR-17-2026, 2018 WL 4599675 (D. Md. Sept. 25, 2018)............................13

*Rose v. Harloe Mgmt. Corp.*,
    No. GLR-16-761, 2017 WL 193295 (D. Md. Jan. 17, 2017) ..................................23

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)........................................................................................30

*Sierra Club v. Dept. of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ...................................................................................8

*Simon v. E. Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976)...............................................................................................12

*Smith v. Jefferson Cty. Bd. of Sch. Commissioners*,
    788 F.3d 580 (6th Cir. 2015) ................................................................................28

*Snider Int'l Corp. v. Town of Forest Heights*,
    906 F. Supp. 2d 413 (D. Md. 2012) ......................................................................13

*Spacco v. Bridgewater Sch. Dep't*,
    722 F. Supp. 834 (D. Mass. 1989) ........................................................................24

*Sprauve v. W. Indian Co.*,
    799 F.3d 226 (3d Cir. 2015)......................................................................15, 16, 18

*Stone v. Trump*,
    356 F. Supp. 3d 505 (D. Md. 2018) ......................................................................31

*Toomey v. Arizona*,
    No. CV-19-00035-TUC-RM, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ..............31, 32, 34

*Tovar v. Essentia Health*,
    342 F. Supp. 3d 947 (D. Minn. 2018) ...................................................................34

*United States v. Va.*,
    518 U.S. 515 (1996)........................................................................................30, 33

*Walz v. Tax Commission*,
    397 U.S. 664 (1970)..............................................................................................26

*Weinreb v. Xerox Business Services, LLC Health & Welfare Plan*,
    323 F. Supp. 3d 501 (S.D.N.Y. 2018), *adhered to on denial of reconsideration
    sub nom.*, *Weinreb v. Xerox Business Services*, No. 16-cv-6823, 2020 WL
    4288376 (S.D.N.Y. July 27, 2020) ........................................................................30

*Wernsing v. Thompson*,
    423 F.3d 732 (7th Cir. 2005) ................................................................13

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    No. 3:17-cv-719, 2020 WL 2813402 (E.D. Va. May 30, 2020) ...............18

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989).................................................................................22

*Wood v. Arnold*,
    915 F.3d 308 (4th Cir. 2019) ................................................................26

*Wynne v. Town of Great Falls, S.C.*,
    376 F.3d 292 (4th Cir. 2004) ...........................................................23, 24

## Statutes

20 U.S.C. § 1681 ........................................................................................34

42 U.S.C. § 1983 ............................................................................... *passim*

42 U.S.C. § 18116 ............................................................................. *passim*

Md. Code Educ. § 13-301 .......................................................................4, 15

Md. Code Educ. § 13-302 .................................................................4, 15, 17

Md. Code Educ. § 13-303 .................................................................. *passim*

Md. Code Educ. § 13-304 .................................................................4, 15, 17

Md. Code Educ. § 13-310 ...........................................................................21

## Other Authorities

Fed. R. Civ. P. 12(b)(1)...............................................................................6

Fed. R. Civ. P. 12(b)(6)...........................................................................6, 7

H.R.Rep. No. 914, 88th Cong., 1st Sess., 18 ..............................................12

Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108
    Georgetown L.J. 167 (2020) ..................................................................32

S. Rep. No. 872, 88th Cong., 2d Sess., 16 ..................................................12

Plaintiff Jesse Hammons respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss (ECF No. 39, "MTD") submitted by Defendants University of Maryland Medical System Corporation, UMSJ Health System, LLC, and University of Maryland St. Joseph Medical Center, LLC (collectively, "Defendants").

## PRELIMINARY STATEMENT

The government has no business owning a Catholic hospital or discriminating against transgender patients based on Catholic religious doctrine. But for almost ten years, the University of Maryland Medical System ("UMMS"), and its wholly owned subsidiaries, UMSJ Health System, LLC ("UMSJ LLC") and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC")—state actors bound by the First and Fourteenth Amendments—have operated the University of Maryland St. Joseph Medical Center ("St. Joseph" or the "Hospital") as a Catholic institution. Citing Catholic religious doctrine, the Hospital discriminated against Mr. Hammons earlier this year by canceling his medically necessary hysterectomy related to his diagnosis of gender dysphoria. The Hospital will provide hysterectomies when they are medically necessary to treat *other* medical conditions, but the Hospital refuses to perform the same surgery for transgender patients like Mr. Hammons when it is medically necessary to treat gender dysphoria.

Defendants' Motion to Dismiss suggests that UMMS has been operating under the misapprehension that it is a purely private entity, unconstrained by constitutional requirements. But the Supreme Court's decision in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), makes clear that UMMS is, in fact, part of the Maryland government and bound by its constitutional obligations under the First and Fourteenth Amendments. *Lebron* established a simple three-part test for determining when the Constitution applies to an ostensibly private corporation created by the government: "Where, as here, the Government [1] creates a

1

corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government." *Id.* at 400. *Lebron* also made clear that such an ostensibly private corporation is *not* protected from suit by the government's sovereign immunity. Even though the government cannot disavow a government corporation's constitutional *obligations*, the government can disavow that corporation's entitlement to the *benefits* of sovereign immunity through a statutory "disclaimer of agency status." *Id.* at 392.

Defendants do not—and cannot—dispute that UMMS satisfies all three elements of *Lebron*'s test. Defendants are, therefore, state actors. And, as state actors, Defendants are flagrantly violating the Establishment Clause and Equal Protection Clause by operating a Catholic hospital and discriminating against transgender patients based on Catholic religious doctrine. Defendants' discrimination against Mr. Hammons also violates Section 1557 of the Affordable Care Act, which prohibits any hospital receiving federal funding from discriminating on the basis of sex and transgender status.

Defendants' Motion to Dismiss fails to rebut these controlling legal principles. Instead, Defendants make a variety of factual assertions that are either legally irrelevant under *Lebron* or that conflict with the allegations of the Complaint. Because *Lebron* controls this case, and because the well-pled allegations of the Complaint state claims upon which relief can be granted, Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

Plaintiff Jesse Hammons is a man who is transgender. Compl. ¶ 2 (ECF No. 1).[1] This

---

[1] On a motion to dismiss, the well-pled allegations of the Complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

means he was assigned "female" at birth, but has a male gender identity.  Compl. ¶¶ 41-43, 51.

Transgender people may require treatment for gender dysphoria, a serious medical condition

involving clinically significant emotional distress, experienced as a result of the incongruence of

their gender identity with their assigned sex and the physiological developments associated with

that assigned sex.[2]  Compl. ¶ 44.  The widely accepted standards of care for treating gender

dysphoria provide that treatment may require medical steps—such as hormone therapy or

surgery—to affirm one's gender identity and transition from living as one gender to another.

Compl. ¶¶ 45-46.  Depending on the patient, medically necessary treatment (sometimes called

"gender-affirming care" or "transition-related care") may also include a hysterectomy, a

procedure which removes the patient's uterus.  Compl. ¶¶ 47-49.

In Mr. Hammons's case, his physicians, acting in accordance with the applicable

standards of care, recommended a hysterectomy as a medically necessary treatment for gender

dysphoria.  Compl. ¶ 52.  The procedure was scheduled to be performed on January 6, 2020,

during a break from Mr. Hammons's school, when Mr. Hammons was able to arrange to take off

time from work for his surgery and recovery.  Compl. ¶¶ 53, 54.  In planning for his surgery,

Mr. Hammons underwent various health screenings with his treating physician.  Compl. ¶ 54.  In

addition, Mr. Hammons worked diligently over several months to prepare himself mentally for

the experience.  Compl. ¶ 55.

Mr. Hammons's surgeon scheduled the procedure to be performed at St. Joseph.  Compl.

¶¶ 2, 53.  St. Joseph is owned and operated by Defendant UMMS, through its wholly owned

subsidiaries Defendant UMSJ LLC and Defendant St. Joseph LLC.  Compl. ¶¶ 1, 9-13.  UMMS,

---

[2] The Fourth Circuit recently reviewed and analyzed these concepts in *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594-97 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

in its present form, was created by the State of Maryland by statute in 1984.  Compl. ¶ 16; Md.
Code Educ. § 13-301, *et seq*.  The statute declared UMMS to be an independent corporation and
"not . . . a State agency."  Compl. ¶ 17; Md. Code Educ. § 13-303(a)(2).  At the same time, the
statute reaffirmed that UMMS would serve "the highest public interest" by providing healthcare
to the public, and mandated that UMMS would "meet the needs of the State and region."  Compl.
¶¶ 17-18; Md. Code Educ. §§ 13-302 & 13-303.  The statute also provided that the Governor
would appoint all voting members on UMMS's Board of Directors.  Compl. ¶¶ 20-21; Md. Code
Educ. § 13-304.

UMMS bought St. Joseph in 2012.  Compl. ¶ 33.  St. Joseph had historically operated as
a private Catholic institution, and adhered to the "Ethical and Religious Directives for Catholic
Health Care Services" established by the U.S. Conference of Catholic Bishops (the "Catholic
Directives") in administering care.  Compl. ¶¶ 25-27.[3]  When UMMS purchased St. Joseph in
2012, UMMS signed an agreement with the Catholic Church promising to run the Hospital in
accordance with the Catholic Directives.  Compl. ¶¶ 27, 31-32.  Defendants continue to operate
St. Joseph in accordance with the Catholic Directives through today.  Compl. ¶ 34.  At present,
the Hospital's website advertises both its religious nature and its affiliation with the government:
It proclaims that St. Joseph is a "Catholic acute care hospital that observes the [Catholic
Directives]," and provides a link directly to the Catholic Directives, while simultaneously
underscoring that the Hospital is an "integral member of University of Maryland Medical
System."  Compl. ¶¶ 1, 34, 35.

---

[3] *See* About UM SJMC, University of Maryland St. Joseph Medical Center, http://www.umms.org/sjmc/about (last
accessed October 12, 2020).  The Catholic Directives are available at https://www.usccb.org/about/doctrine/ethical-
and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf (last
accessed October 12, 2020).

The Catholic Directives proclaim that they are "animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church."  Compl. ¶¶ 1, 28.  They reflect Catholic religious ideals pertaining to healthcare, which prohibit certain types of care that would ordinarily be available to patients in secular facilities.  Compl. ¶¶ 28-29.  For example, the Catholic Directives prohibit rape victims from receiving any treatment that may "interfer[e] with the implantation of a fertilized ovum," ban abortions without exception, and generally forbid the use of contraception.  Compl. ¶ 29.

As relevant here, the Catholic Directives bar sterilization procedures "unless their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  Compl. ¶ 30.  The Catholic Directives also command that the "functional integrity" of the human body be preserved, except that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available."  Compl. ¶ 58.  When applying these directives, the Hospital does not prohibit *all* procedures that result in sterilization or that remove health body tissue.  For example, the Hospital provides hysterectomies when they are medically necessary to treat certain medical conditions, and surgeons at the Hospital will remove otherwise healthy tissue to prevent cancer or other diseases.  Compl. ¶¶ 57-58.  Purely cosmetic surgeries have also been performed at the Hospital.  Compl. ¶ 58.

About a week before Mr. Hammons's surgery was scheduled to take place, St. Joseph's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, ordered the surgery canceled.  Compl. ¶ 56.  Dr. Cunningham banned the surgery because it conflicted with the Hospital's Catholic religious beliefs.  Compl. ¶¶ 56-58.  Dr. Cunningham explicitly informed Mr. Hammons's surgeon that, according to the Hospital's religious beliefs, Mr.

Hammons's gender dysphoria did not qualify as a sufficient medical reason to authorize a sterilization procedure under the Catholic Directives.  Compl. ¶ 57.  Dr. Cunningham also stated that the Hospital did not consider Mr. Hammons's gender dysphoria to be a valid basis under the Catholic Directives to justify disrupting the body's "functional integrity."  Compl. ¶ 58.  Even though the Hospital provides hysterectomies when they are medically necessary to treat *other* medical conditions, Dr. Cunningham refused to allow Mr. Hammons's surgeon to perform the same when it is medically necessary to treat gender dysphoria.  Compl. ¶¶ 57, 58.

Defendants' prohibition of Mr. Hammons's medically necessary care caused Mr. Hammons to suffer significant damages.  Compl. ¶¶ 59, 60.  As a result of the cancelation, Mr. Hammons was not able to have his hysterectomy performed until June 24, 2020.  Compl. ¶ 60. Because of this delay, Mr. Hammons had to spend more money on an additional round of pre-operative tests; he had to spend another six months experiencing gender dysphoria without the therapeutic benefits of the surgery; and he had to spend another six months carrying the stress and anxiety of having to mentally prepare himself for the surgery all over again.  Compl. ¶ 60.

On July 16, 2020, Mr. Hammons filed this suit, for violations of the Establishment Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557").  Compl. ¶¶ 61-93.

## LEGAL STANDARD

A motion to dismiss under Federal Rule Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

A complaint cannot be dismissed under Rule 12(b)(6) unless it fails to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see*

*also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *NVR, Inc. v. Harry A. Poole, Sr. Contractor, Inc.*, No. ELH–14–00241, 2014 WL 2215857, at \*2 (D. Md. May 28, 2014) (quoting *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)).

## ARGUMENT

## I.   MR. HAMMONS HAS ESTABLISHED ARTICLE III STANDING

The allegations in the Complaint demonstrate that Mr. Hammons has Article III standing for his claims.  "To have standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (cleaned up); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  The Complaint satisfies each of these requirements.  First, Mr. Hammons suffered an injury in fact in the form of financial harm, as well as significant emotional and physical strain.  Compl. ¶¶ 59, 60.  Second, his injuries are fairly traceable to Defendants, who instituted the policy of adhering to the Catholic Directives, and who directly ordered the cancelation of his surgery based on those religious views.  Compl. ¶¶ 56-58.  Third, his injuries are redressable through an award of monetary damages.  Compl. at 24-25.

Defendants do not dispute that Mr. Hammons suffered an injury in fact.  Nor could they.  Mr. Hammons suffered, *inter alia*, financial harm, "a classic and paradigmatic form of injury in fact," fulfilling this requirement.  *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir.

7

2018).  But Defendants argue that Mr. Hammons has not satisfied the traceability and redressability prongs of standing.  The facts alleged in the Complaint, however, plainly suffice to meet both criteria.

### A.      Mr. Hammons's Injuries Are Fairly Traceable to Defendants' Conduct

#### 1.      <u>Defendants Directly Caused Mr. Hammons's Injuries</u>

To satisfy traceability, "there must be a causal connection between the injury and the [defendant's] conduct."  *Id.* at 760 (quoting *Lujan*, 504 U.S. at 560).  Traceability does not require the challenged action to be "the sole or even immediate cause of th[e] injury."  *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020), *as amended* (Aug. 31, 2020) (quoting *Sierra Club v. Dept. of the Interior*, 899 F.3d 260, 283-84 (4th Cir. 2018)).  A defendant's action need only be "at least in part responsible" for the plaintiff's injury.  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013).

Traceability is easily met here.  As set out in the Complaint, Defendants agreed to operate St. Joseph as a Catholic institution, in accordance with the Catholic Directives.  Compl. ¶ 32. The Hospital's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, canceled Mr. Hammons's surgery *because* of the Catholic Directives.  Compl. ¶ 56.  Dr. Cunningham told Mr. Hammons's surgeon that the procedure conflicted with the Hospital's Catholic religious beliefs and the Catholic Directives—specifically, she stated that, according to St. Joseph's religious beliefs, gender dysphoria did not qualify as a sufficient medical reason to authorize a sterilization procedure, or to permit a compromise of the "functional integrity" of the body under the Catholic Directives.  Compl. ¶¶ 56-58.

By imposing the Catholic Directives on the Hospital, and subsequently ordering that Mr. Hammons's surgery be canceled because of those religious views, Defendants "caused directly"

the injuries that flowed from the delayed procedure—namely, the costs associated with new pre-operative tests, and the emotional toll of deferred treatment. *Cooksey v. Futrell*, 721 F.3d 226, 438 (4th Cir. 2013). Thus, traceability is satisfied.

### 2. Mr. Hammons's Surgeon Did Not Break the Chain of Causation

Misstating the facts, Defendants try to evade responsibility for their conduct by relying on the actions of Mr. Hammons's surgeon. Defendants argue that Mr. Hammons's injuries "stem directly from his surgeon's mis-scheduling a procedure that he knew could not be performed at St. Joseph," and Defendants are simply not part of the "direct causal chain." MTD at 10. Defendants are wrong for at least five reasons.

*First*, Defendants' argument about "severing" the causal chain makes no sense on its own terms. A defendant arguing that the causal chain has been severed typically argues that the actions of a third party intervened between the time that the defendant acted and the time that the plaintiff was injured. *See Mackey v. Dorsey*, 104 Md. App. 250, 270 (Md. 1995) (argued before Hollander, J.) ("When more than one act . . . is arguably responsible for an injury, the question presented is whether the second . . . act constitutes a sufficient break in the chain of causation so that it super[s]edes the first, thereby terminating its role in the chain of causation."). But in this case, Defendants point to the alleged actions of Mr. Hammons's surgeon that occurred *before* Defendants injured Mr. Hammons by canceling his surgery. Even if the causal chain had been severed at some earlier point in time, Defendants picked the chain back up again and *were the final actors in the causal chain* who ordered Mr. Hammons's surgery canceled. Compl. ¶¶ 56-58.

*Second*, to the extent that Defendants are attempting to separate UMMS's decision to sign an agreement maintaining the Hospital's Catholic identity from the ultimate injury caused by

9

administrators at St. Joseph, that argument fares no better.  Without Defendants' imposition and enforcement of the Catholic Directives on the Hospital's patients and staff, it would not be possible to "mis-schedule" transition-related care at the Hospital.  *See Air Evac*, 910 F.3d at 760 ("The effect of the state's chosen course of action must be considered as an integrated whole."); *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) ("While . . . it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, *that does not exclude injury produced by determinative or coercive effect upon the action of someone else*.") (cleaned up; second emphasis added).  Thus Mr. Hammons's injuries would not have occurred absent Defendants' imposition of the Catholic Directives on the Hospital's operations.

*Third*, Defendants' argument rests on the false premise that Mr. Hammons's surgeon "knew" that the surgery could not be performed at St. Joseph, and "mis-scheduled" it to take place there.  This is factually incorrect: Mr. Hammons surgeon did not know that the surgery would be barred—and no allegations supporting such an assertion appear in the Complaint.[4]  In their attempt to obfuscate the relevant facts, Defendants suggest that Mr. Hammons's surgeon should have known that St. Joseph would not allow the procedure because of his familiarity with

---

[4] Other instances of Defendants misstating applicable facts abound.  For example, Defendants incorrectly assert that after the scheduled procedure was canceled in January 2020, Mr. Hammons "voluntarily delayed" the procedure until June 2020.  MTD at 7 & n.15, 11 n.16.  Again, there are no allegations to this effect in the Complaint.  To the contrary, the Complaint alleges that Mr. Hammons "*was not able* to have his hysterectomy performed until June 24, 2020."  Compl. ¶ 60 (emphasis added).  Defendants also cite an article outside the Complaint as purportedly showing that Mr. Hammons voluntarily delayed the procedure.  MTD at 7 & n.1 (citing Samantha Schmidt, *Transgender Man Sues University of Maryland Hospital After It Canceled His Hysterectomy*, WASH. POST (July 17, 2020), https://www.washingtonpost.com/dc-mdva/2020/07/17/transgender-hysterectomy-lawsuit-maryland/).  Even if this material were appropriately considered on a motion to dismiss, it does not indicate voluntary delay: The article reports that Mr. Hammons was initially forced to "wait to reschedule the surgery until his next break from school, in mid-May," and then his surgeon further "postponed [the procedure] because of the pandemic."  Schmidt, *Transgender Man Sues*, WASH. POST.  Rescheduling the surgery for his first available date and then being forced to wait further still because of a global health crisis hardly amounts to "voluntarily delay[ing]" the procedure.  MTD at 7 & n.15.

the Catholic Directives, or his relationship with the Hospital.  The Catholic Directives, however, *permit* sterilization procedures such as hysterectomies "when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available"; they similarly condone treatments that disrupt the "functional integrity" of the human body, if the treatment would "maintain the health or life of the person when no other morally permissible means is available."  Compl. ¶¶ 30, 57-58.  Mr. Hammons's surgery fits comfortably within both provisions, as a medically necessary procedure to treat a serious medical condition. Accordingly, there is no basis to presume that Mr. Hammons's surgeon knew that St. Joseph would have barred Mr. Hammons's procedure.

*Fourth*, by attempting to remove themselves from the "direct causal chain," MTD at 10, Defendants "wrongly equate injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation," *Libertarian Party of Va.*, 718 F.3d at 316 (quoting *Bennett*, 520 U.S. at 168-69) (cleaned up).  As courts have repeatedly explained, a defendant's conduct need not "be the last link in the causal chain" to satisfy traceability, *Air Evac*, 910 F.3d at 760, because traceability does not look to "the stringent proximate cause standard, derived from principles of tort law," *Libertarian Party of Va.*, 718 F.3d at 315-16.[5]

*Fifth*, at bottom, Defendants' argument is that Mr. Hammons simply should have realized that his medically necessary care would be considered inappropriate at St. Joseph—and that he should have known to go elsewhere.  But it is no defense to discrimination to argue that the victim should have realized that they were not welcome.  Indeed, the very purpose of

---

[5] As noted above, even if proximate causation were required, this standard would be met: Defendants themselves *were the final actors in the causal chain*, who ordered Mr. Hammons's surgery canceled.  Compl. ¶¶ 56-58.

antidiscrimination laws is to address the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (quoting H.R.Rep. No. 914, 88th Cong., 1st Sess., 18); *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 291-92 (1964) (Goldberg, J., concurring) ("[D]eprivation of personal dignity . . . surely accompanies denials of equal access to public establishments.  Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public.") (quoting S. Rep. No. 872, 88th Cong., 2d Sess., 16).

Attempting to buttress their "mis-scheduling" claim, Defendants also contend that their imposition of the Catholic Directives amounts only to "regulation" of the surgeon, with no direct impact on Mr. Hammons.  MTD at 10.  This argument is meritless.  Defendants specifically ordered that *Mr. Hammons's surgery* be canceled, and thus directly curtailed his access to care.  Compl. ¶¶ 56-58.  The two cases that Defendants cite in support of their "regulation" argument—*Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) and *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012)—in fact cement this point:

- In *Simon*, indigent plaintiffs alleged that a specific tax regulation "encouraged" hospitals to deny them service; the Supreme Court held that it was "purely speculative whether the denials of service specified in the complaint fairly [could] be traced" to the challenged regulation or "instead result[ed] from decisions made by the hospitals without regard to the tax implications."  *Simon*, 426 U.S. at 43.  Here, by contrast, there is no uncertainty about the reason why Mr. Hammons was denied care: Defendants specifically cited the Catholic Directives when they ordered Mr. Hammons's surgery be canceled.  Compl. ¶¶ 56-58.

- Similarly, in *Lane*, would-be handgun purchasers challenged regulations affecting distributors, complaining that the regulations made purchases more expensive; the Fourth Circuit found that any increased price was too far removed from the regulations, noting that "[n]othing in the challenged legislation or regulations directs [distributors] to impose such charges."  *Lane*, 703 F.3d at 674.  Quite the opposite is

> true here: Defendants literally did "direct" the cancelation of Mr. Hammons's
> surgery, pursuant to the challenged policy of adhering to the Catholic Directives. *Id.*;
> *see also* Compl. ¶¶ 56-58.

Thus Defendants' attempt to cast themselves as mere "regulators" conflicts with the controlling

allegations in the Complaint, and should be disregarded.

### B.      The Requested Relief Will Redress Mr. Hammons's Injuries

Mr. Hammons has also established that his injuries are redressable.  Mr. Hammons

alleges financial and other injuries, and seeks compensatory damages.  Compl. ¶ 60, p.24.

Defendants assert that "[f]orcing St. Joseph to abandon its Catholic legacy would . . . not redress

injuries that his surgeon caused."  MTD at 12.  But Mr. Hammons is not seeking injunctive relief

"[f]orcing St. Joseph to abandon its Catholic legacy."  Instead, he is seeking damages, and

"injuries compensable in monetary damages can always be redressed by a court judgment."

*Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005); *see also Snider Int'l Corp. v. Town of*

*Forest Heights*, 906 F. Supp. 2d 413, 422–23 (D. Md. 2012)  (where "complaint prays for

damages [and] a declaration that defendants have deprived plaintiffs of their due process rights,"

"plaintiffs' alleged injuries would be redressed by defendants' payment of monetary damages");

*Rich v. William Penn Life Ins. Co. of New York*, No. GLR-17-2026, 2018 WL 4599675, at *6 (D.

Md. Sept. 25, 2018) ("A favorable decision . . . would compensate [plaintiffs] for the financial

losses they suffered, establishing the redressability prong.").

## II.      DEFENDANTS CAN BE HELD LIABLE UNDER SECTION 1983

Defendants next argue that UMMS is not a state actor for purposes of Section 1983

liability, and that, if it is, UMMS would enjoy Maryland's sovereign immunity.[6]  Defendants are

---

[6] Defendants' motion on these points is only relevant to UMMS.  Defendants generally do not differentiate between
UMMS, UMSJ LLC, and St. Joseph LLC.  MTD at 1.  With regard to state action and sovereign immunity, their
arguments discuss only the allegations relevant to UMMS (such as its board      *(note continues on next page)*

wrong on both counts, under *Lebron*, 513 U.S. 374.

**A.      UMMS Is a State Actor**

**1.      UMMS Fulfills the Criteria Set Out in *Lebron***

In *Lebron*, the Supreme Court held that Amtrak, as a "government-created and -controlled corporation[]," was part of the federal government for purposes of the First Amendment. *Id.* at 397.  The Court began by observing:

> It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.  On that thesis, *Plessy v. Ferguson*, 163 U.S. 537 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak.

*Id.*  The Court then examined several of Amtrak's attributes.  First, Amtrak was "created by a special statute, explicitly for the furtherance of federal governmental goals"—specifically, to benefit "the public convenience and necessity," and to serve certain transportation-related benchmarks.  *Id.*; *id.* at 384.  In addition, "six of the corporation's eight externally named directors . . . are appointed directly by the President of the United States," giving the federal government "control" over Amtrak, "as a policymaker."  *Id.* at 385, 399.  The Court found these factors sufficient for constitutional restrictions to attach, summarizing in a clear test: "We hold that where, as here, the Government [1] creates a corporation by special law, [2] for the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a

---

composition and creation statute), rather than the other two actors.  And, throughout this section, Defendants consistently refer to a singular entity—"a private corporation"—rather than three separate corporate entities.  MTD at 12-15.  As a result, Defendants have not made any motion on these points relevant to UMSJ LLC or St. Joseph LLC.  In any event, because UMMS is a state actor under *Lebron*, and because it is pervasively entwined with UMSJ LLC and St. Joseph LLC, *see* Compl. ¶¶10-11, 36-40, the actions of UMSJ LLC and St. Joseph LLC are "fairly attributable to the State," thus satisfying the under color of law requirement of Section 1983.  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 181-82 (4th Cir. 2009) (cleaned up).  And, given that they are incorporated as separate entities, UMSJ LLC and St. Joseph LLC have an even weaker to claim to sovereign immunity than UMMS—which, as discussed below, fails.  Thus, all Defendants are subject to suit under Section 1983, and do not enjoy sovereign immunity.

majority of the directors of that corporation, the corporation is part of the Government." *Id.* at 399.[7]

Because *Lebron*'s three-part test applies both to federally created entities and state-created ones, a corporation that satisfies *Lebron*'s three-part test is a state actor for purposes 42 U.S. § 1983. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 185-86 (4th Cir. 2009) (recognizing *Lebron*'s three-part framework); *Sprauve v. W. Indian Co.*, 799 F.3d 226, 230 (3d Cir. 2015) (applying *Lebron* to determine whether entity is "subject to claims under the United States Constitution and under section 1983"); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 83–84 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("*Lebron* . . . set forth a three-prong standard [to determine if] the corporation [will] be deemed a government entity for the purpose of the state action requirement.").

UMMS plainly satisfies these criteria. First, the State of Maryland created UMMS by special law. Compl. ¶ 16; Md. Code Educ. § 13-301, *et seq*. Second, the State of Maryland provided that UMMS would further governmental objectives by serving "the highest public interest," and "meet[ing] the needs of the State and region," by providing healthcare to Maryland citizens and community members. Compl. ¶¶ 17-18; *see also* Md. Code Educ. § 13-302(4) & 13-303(c)(2). Third and finally, the Governor of Maryland has the sole authority to appoint *all* voting members (rather than a simple majority as was the case in *Lebron*), and fill any vacancies, on UMMS's Board of Directors. Compl. ¶ 20; Md. Code Educ. § 13-304(b)-(d). Accordingly, applying *Lebron* here, UMMS qualifies as a state actor under Section 1983. *See Lebron*, 513

---

[7] The Fourth Circuit has sometimes described this as a two-part test assessing whether an entity is "both created and controlled" by government, with the first two requirements—created by a special law, in furtherance of government purposes—merged into a single prong. *Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 158 (4th Cir. 2018); *Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 (4th Cir. 2017).

U.S. at 399; *cf. Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 736-37 (Md. 2011) (holding that, for certain state law purposes, "[t]hese facts compel the conclusion that UMMS is an instrumentality of the State").

Incredibly, Defendants assert that "*Lebron* is not determinative of, *or even relevant to*, whether or not [UMMS] is a state actor."  MTD at 15 (emphasis added).  In making this argument, Defendants make no attempt to discuss the actual holding of *Lebron*.  Instead, they vaguely assert that *Lebron* shouldn't be followed,[8] and raise several purported factual distinctions: (1) UMMS allegedly holds greater independence from Maryland than did Amtrak from the federal government; (2) Maryland owns "no stock" in UMMS; and (3) UMMS enjoys no "attributes of sovereignty," "namely, eminent domain powers."  MTD at 15.

None of these proffered distinctions is relevant under *Lebron*.  The relevant governmental control in *Lebron* is determined exclusively based on whether the government appoints a majority of the corporation's board of directors, not based on governmental interference in daily operations, stock ownership, eminent domain powers, or any other criteria.  *See Lebron*, 513 U.S. at 399; *Sprauve*, 799 F.3d at 233-34 (collecting cases regarding board appointments and *Lebron*); *cf. Kerpen v. Metro. Washington Airports Auth., 907 F.3d 152, 159 (4th Cir. 2018)* (*Lebron* test not satisfied where "the federal government appoints just three out of seventeen members of [entity]'s Board of Directors") (internal quotation marks omitted).  Here, *all* of UMMS's voting Board members are appointed by the Governor, rather than the simple majority

---

[8] Oddly, Defendants contend that the Fourth Circuit has placed only "limited reliance" on *Lebron*, and "has only invoked *Lebron* twice in the twenty five years since it was decided."  MTD at 15 & n.18.  In fact, the Fourth Circuit has "invoked" *Lebron* on more than two occasions—in their brief, Defendants themselves cite three*: Philips*, 572 F.3d 176, *Kerpen*, 907 F.3d 152, and *Meridian Investments*, 855 F.3d 573.  In any event, as these cases attest, *Lebron* continues to be binding precedent.  Any paucity of authority is due to the atypicality of *Lebron*-compliant government entities—not any disavowal of *Lebron*.

appointed by the President for Amtrak.  Compl. ¶ 20; Md. Code Educ. § 13-304(b)-(d); *Lebron*, 513 U.S. at 397-99.  As to stock, UMMS is a "nonstock corporation," Md. Code Educ. §§ 13-302(7) & 13-303(m), and, in any event, the Supreme Court in *Lebron* explicitly described stock ownership as a type of "temporary control" that does not much affect the determination, *Lebron*, 513 U.S. at 398; *see also Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp., 855 F.3d 573, 579 (4th Cir. 2017)* (applying *Lebron* and explaining that, "[t]he Supreme Court has long held that, when the government acquires an ownership interest in a corporation, it acts—and is treated—as any other shareholder").  And eminent domain was not even discussed in *Lebron*, let alone a basis for its holding.

Because UMMS satisfies each element of *Lebron*'s three-part test, *Lebron* controls here.

### 2.    Because UMMS Satisfies *Lebron*, the Close Nexus Test Is Irrelevant

Instead of applying the three-part test established by *Lebron*, Defendants argue that Mr. Hammons must show that UMMS meets the "close nexus" test for state action test applied in *Philips*, 572 F.3d 176, and *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166 (4th Cir. 2009).  The "close nexus" test and the *Lebron* test, however, are separate and alternative paths for satisfying Section 1983's color of law requirement—which is why the *Philips* court analyzed them both as "alternate ground[s]."  *Philips*, 572 F.3d at 185.  The "close nexus" test considers whether "*a private entity's action* . . . may fairly be treated as that of the State itself."  *Moore*, 560 F.3d at 179 (emphasis added).  By contrast, *Lebron* analyzes whether an entity is "by its very nature, what the Constitution regards as the Government."  *Lebron*, 513 U.S. at 392.  It is "unnecessary to traverse th[e] difficult terrain" of the "close nexus" test when a corporation "is not a private entity but Government itself."  *Id.* at 378; *accord Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (where claim is based on *Lebron*, it is not necessary to "'traverse the

difficult terrain' of the state action doctrine") (quoting *Lebron*, 513 U.S. at 378); *see also White Coat Waste Project v. Greater Richmond Transit Co.*, No. 3:17-cv-719, 2020 WL 2813402, *19-24 (E.D. Va. May 30, 2020) (finding that entity satisfied close nexus test and, "[i]n the alternative," that entity "qualifies as a government actor under" *Lebron*).  For purposes of this motion, satisfaction of the *Lebron* test suffices for the case to proceed against Defendants.

For these same reasons, Defendants miss the mark in arguing that Mr. Hammons must plead not only that the government appointed UMMS's board, but also that those appointees were specifically involved in canceling Mr. Hammons's surgery.  Again, "pursuant to *Lebron*," it is the government's "authority to appoint" board members—not their specific roles in the challenged decision—"that is relevant to the state action inquiry."  *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004); *see also Kerpen*, 907 F.3d at 159 (considering composition of the board—and not the board's actions—in applying *Lebron*); *Meridian Investments*, 855 F.3d at 579 (same); *Sprauve*, 799 F.3d at 233-34 (same).  Defendants lean heavily on *Philips* and its analysis of the specific roles of various state actors in the challenged decision.  But Defendants fail to note that this discussion related to the *"close nexus"* test, *not* the *Lebron* test.  *See Philips*, 572 F.3d at 183-84.  In its *Lebron* discussion, the *Philips* court made no mention that such facts would bear on the analysis, instead reasoning only that the entity did not comport with *Lebron* because it "was not created by special statute."  *Id.* at 185-86.[9]  In any event, Mr. Hammons *has* alleged that UMMS's board was specifically involved in the adoption of the Catholic Directives at the Hospital, Compl. ¶ 37, and that an officer of the

---

[9] Similarly, in *Moore*, there was no indication that the entity was created by a special statute (though its assets were transferred in accordance with various provisions of South Carolina law).  *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 179 (4th Cir. 2009).  Nor was the *Lebron* test invoked.  *Moore*, therefore, sheds no light on the *Lebron* inquiry or this case.

Hospital ordered the surgery canceled, based on the Hospital's religious beliefs, Compl. ¶¶ 56-58.

**B.      UMMS Does Not Enjoy Sovereign Immunity**

Defendants further contend that, if UMMS is a state actor, then, *ipso facto*, Mr. Hammons's claims are barred by the Eleventh Amendment and the State's sovereign immunity. "[S]overeign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). Not only have Defendants failed to meet their burden, but their sovereign immunity argument is foreclosed by *Lebron* itself.

**1.      The State of Maryland Has Stripped UMMS of Sovereign Immunity**

In arguing that UMMS is entitled to sovereign immunity, Defendants, once more, fail to address *Lebron*, which explained that Amtrak was part of the government, but was *not* entitled to sovereign immunity.  In *Lebron*, the Court considered the effect of a statute providing that Amtrak "will not be an agency or establishment of the United States."  *Lebron*, 513 U.S. at 391. The Court explained that the legislature, by enacting such a disavowal of a corporation's governmental status, can deprive the corporation "of all those inherent powers and immunities of Government agencies that it is within the power of [the legislature] to eliminate"—and, further, that such a disavowal is "assuredly dispositive" of those matters.  *Id.* at 392.  But the legislature cannot disavow the corporation's "status as a [g]overnment entity for purposes of determining the constitutional rights of citizens affected by its actions."  *Id.*  As a result, even though the Court held that Amtrak was part of the government for purposes of the First Amendment, it also explained there can be "no doubt . . . that the statutory disavowal of Amtrak's agency status deprives [it] of sovereign immunity from suit."  *Id.*

19

Here, the State of Maryland has issued precisely such a statutory disavowal: The State proclaimed that UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation and is not subject to any provisions of law affecting only governmental or public entities."  Compl. ¶¶ 64, 72; Md. Code Educ. § 13-303(a)(2).  Because this disavowal is "assuredly dispositive of [UMMS]'s status as a Government entity for purposes of matters that are within [Maryland]'s control," there can be "no doubt" that UMMS does not enjoy the Eleventh Amendment immunity of the State.  *Lebron*, 513 U.S. at 392; *cf. MedSense, LLC v. Univ. Sys. of Md.*, 420 F. Supp. 3d 382, 391 (D. Md. 2019) (finding that—unlike UMMS—the University System of Maryland and University of Maryland *do* enjoy sovereign immunity because the "Maryland legislature specifically defined [the University System of Maryland] as an 'instrumentality of the State,' governing 'constituent institutions' of higher education," and explicitly named the University of Maryland as such a "constituent institution") (cleaned up).

In *Napata*, the Maryland Court of Appeals performed a similar analysis regarding UMMS and the implications of Section 13-303(a)(2).  It expressly found that UMMS was an "instrumentality of the state" for purposes of Maryland's Public Information Act.  *Napata*, 417 Md. at 739-40.  But it also found that Section 13-303(a)(2) stripped UMMS of certain state-instrumentality attributes (specifically, application of the Public Information Act), "because [Section 13-303(a)(2)] expressly exempts [UMMS] from laws affecting only public entities."  *Id.* The Maryland legislature has the power to exempt UMMS from such state-law "matters that are within [Maryland]'s control," but Maryland has no similar power under *Lebron* to exempt UMMS from "the constitutional rights of citizens affected by its actions." 513 U.S. at 392.

2.    **UMMS Is Not an Arm of the State for Eleventh Amendment Purposes**

Even if the State of Maryland had not stripped UMMS of sovereign immunity with Section 13-303(a)(2), Defendants' argument that any state actor would necessarily enjoy sovereign immunity under the Eleventh Amendment, subject only limited exceptions (such as consent, or an *Ex Parte Young* suit for injunctive relief), MTD at 16, is profoundly incorrect. Rather, sovereign immunity attaches only "if, in the entity's operations, the state is the real party in interest, in the sense that the named party is the alter ego of the state." *Hutto*, 773 F.3d at 542 (cleaned up). This "differentiates arms or alter egos of the state from mere political subdivisions of the State such as counties or municipalities, which, though created by the state, operate independently and do not share the state's immunity." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 250 (4th Cir. 2016) (cleaned up), *as amended* (July 8, 2016). "In analyzing whether entities . . . are arms of the State [for purposes of sovereign immunity], the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." *Hutto*, 773 F.3d at 543 (cleaned up). "If . . . the State treasury will not be liable for a judgment, sovereign immunity applies only where the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* (cleaned up).

Despite bearing the burden on this issue, Defendants do not so much as mention these criteria. And their own recitation of facts confirms that UMMS "must pay all obligations and judgments out of its own assets"—meaning that no judgment against UMMS would be paid by the State of Maryland. MTD at 5 (citing Md. Code Educ. § 13-310). Accordingly, by Defendants' own admission, the "most important consideration" in this analysis demonstrates

that UMMS is not an arm of the state for sovereign immunity purposes. *Hutto*, 773 F.3d at 543; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49 (1994) ("[T]he state treasury factor is the most important factor to be considered," and is "generally accorded . . . dispositive weight."); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 667-68 (4th Cir. 2015) (finding that instrumentality lacked Eleventh Amendment sovereign immunity, despite state-appointed board, largely because of its "financial independence"). Thus, UMMS plainly cannot avail itself of the State's sovereign immunity here.

### 3.     UMMS Is a "Person" Under 42 U.S.C. § 1983

For the same reasons that Defendants are not protected by sovereign immunity, Defendants are also "persons" under 42 U.S.C. § 1983. The Supreme Court held in *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), that "a State is not a person within the meaning of § 1983." *Id.* at 64. But the Court expressly confined its decision "only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70. As a result, "[o]nce the Eleventh Amendment inquiry is complete, there is no need to consider 'personhood.'" *Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996). "If an official or entity is not immune from suit under the Eleventh Amendment that official or entity *is* a 'person' subject to suit under § 1983." *Id.* (emphasis in original).

Here, UMMS is not protected by sovereign immunity both because Maryland has disavowed UMMS's status as state agency and because judgments against UMMS are not paid by the state treasury. Thus UMMS is a "person" subject to Section 1983.

## III.   MR. HAMMONS HAS ALLEGED A VIABLE ESTABLISHMENT CLAUSE CLAIM

The Complaint alleges egregious violations of the Establishment Clause. Defendants are state actors, who own and operate a hospital in accordance with religious principles. Compl.

22

¶¶ 9-13, 32, 34-40, 56-58.  They are applying religious beliefs against their patients, such as Mr. Hammons, to deny them medically necessary care.  Compl. ¶¶ 32, 56-58.  They are interpreting Catholic religious teachings to mandate which medical procedures accord with their religious faith—and which do not.  Compl. ¶¶ 56-58.  And they are proudly proclaiming the entanglement between church and state that this arrangement entails: The Hospital website advertises St. Joseph as both an "integral member of University of Maryland Medical System" and a "Catholic acute care hospital that observes the [Catholic Directives]."  Compl. ¶¶ 34-35.  The website then *links directly* to the Catholic Directives, which are developed and published by The U.S. Conference of Catholic Bishops, and which set out the various strictures to provide healthcare "animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church."  Compl. ¶¶ 1, 28.

Defendants are "thus elbow-deep in the activities banned by the Establishment Clause." *Lund v. Rowan Cty.*, 863 F.3d 268, 281 (4th Cir. 2017) (en banc) (cleaned up).  If there were any remaining doubt, the Complaint sets out all the different ways in which Defendants are violating of Establishment Clause under Supreme Court precedent.  Compl. ¶ 66.[10]

*First*, Mr. Hammons has adequately alleged that Defendants impermissibly fused governmental and religious functions, and delegated government authority to a religious entity.

---

[10] In their motion to dismiss, Defendants only address the viability of Establishment Clause claims proceeding under the framework reflected in the *Lemon* test.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  Defendants have waived any argument to the other grounds for liability explicitly set out in the Complaint by neglecting to address them in their moving brief, and thus have necessarily failed to show that dismissal of those grounds is appropriate. *See Rose v. Harloe Mgmt. Corp.*, No. GLR-16-761, 2017 WL 193295, at *6 n.3 (D. Md. Jan. 17, 2017) ("In their Reply Brief, Defendants also argue that the Complaint does not state a claim for constructive fraud because it is based on Defendants' alleged promises of future action.  By failing to raise and argue this point in their initial Motion, Defendants waived it."); *see also Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 302 n.8 (4th Cir. 2004) (noting variety of Establishment Clause tests beyond *Lemon* test); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2080-81 (2019) (noting instances where *Lemon* test was not applied).  As to the theories that Defendants do address, their arguments are unavailing.

Delegation of "governmental power to religious institutions[] inescapably implicates the Establishment Clause." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982); *see also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 710 (1994) (Blackmun, J., concurring) (noting disagreement about whether such violations proceed under *Lemon* test or independent framework). Defendants have committed themselves to providing healthcare that will "at all times be consistent with the teachings of the Roman Catholic Church," as reflected in the Catholic Directives. *Spacco v. Bridgewater Sch. Dep't*, 722 F. Supp. 834, 844-45 (D. Mass. 1989) (holding that town lease with similar provision violated Establishment Clause) (cleaned up). And their adherence to the Catholic Directives "inevitably requires the intimate involvement of members of that faith, and the leaders of that faith, in discerning the applicable standard." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1343-44 (4th Cir. 1995) (finding that law defining Kosher foods by "Orthodox rules" violated Establishment Clause); *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 429 (2d Cir. 2002) (same). Further, in *Larkin*, the Supreme Court found an Establishment Clause violation where Massachusetts enabled a church to "veto" liquor licenses. 459 U.S. at 127-28. Here, Defendants have effectively granted a healthcare veto to the Catholic Church, since Defendants will forbid treatments banned by or deemed inconsistent with the Catholic Directives.

*Second*, Plaintiffs have adequately alleged that Defendants have violated "[t]he clearest command of the Establishment Clause," by failing to maintain "governmental neutrality." *Larson v. Valente*, 456 U.S. 228, 244, 246 (1982). This "fundamental principle," *Wynne v. Town of Great Falls*, 376 F.3d 292, 299 (4th Cir. 2004), requires that "the government may not favor one religion over another, or religion over irreligion," *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 875 (2005). Here, Defendants impermissibly favored Catholicism over other faiths. As

alleged by Plaintiffs, Defendants have explicitly declared a government-run hospital to be a Catholic entity and have adopted Catholic doctrine to govern its operations.  They routinely enforce that religious doctrine against their employees and patients, and, accordingly, refused Mr. Hammons's medical care because Catholic teachings prohibit it.  Thus, UMMS has not treated Catholicism "simply as one of many [religions] eligible for equal treatment under a general law"; it has provided a special status for a Catholic hospital without any "assurance that the next similarly situated group seeking a [hospital] of its own will receive one."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist.*, 512 U.S. at 703.  "The anomalously case-specific nature of [UMMS]'s exercise of state authority in creating this [hospital] for a religious community leaves the [c]ourt without any direct way to review such state action for the purpose of safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion."  *Id.*

*Third*, by mandating adherence to Catholic teachings, Defendants are coercing doctors and patients to support religious practices.  "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise."  *Lee v. Weisman*, 505 U.S. 577, 587 (1992).  Even "subtle coercive pressure" and "indirect coercion" may be unconstitutional.  *Id.* at 592; *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005).  Here, Defendants have mandated that doctors adhere to Catholic teachings, and barred patients—such as Mr. Hammons—from receiving medically necessary care that is deemed to conflict with Catholic teachings.  As a result, Defendants have unconstitutionally coerced participation in Catholic practice of medicine.

*Finally*, Defendants are violating the Establishment Clause under the *Lemon* test from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  Under the *Lemon* test, government action

violates the Establishment Clause unless it complies with three separate commands: "First, [it] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster an excessive government entanglement with religion." *Id.* (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674 (1970)) (cleaned up). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Buxton v. Kurtinitis*, 862 F.3d 423, 432 (4th Cir. 2017). Defendants' actions fail all of them.

The well-pled allegations in the Complaint show that Defendants acted "with the ostensible and predominant purpose of advancing religion." *McCreary Cty*, 545 U.S. at 860. Defendants adopted the Catholic Directives at St. Joseph in an effort to fulfill the Catholic Church's wishes when purchasing the Hospital from the Church, and canceled Mr. Hammons's surgery because of their adherence to these Catholic views. Defendants argue that such practices served the secular purpose of enabling the Hospital to stay in operation. But, as the allegations of the Complaint establish, Defendants have sought to keep the Hospital not simply as a functioning healthcare facility, but as a religious institution. *See* Compl. ¶¶ 1, 34.

The well-pled allegations also show that the "primary effect" of Defendants' adherence to the Catholic Directives is literally to "advance[]" Catholicism's teachings in the practice of medicine. *Wood v. Arnold*, 915 F.3d 308, 316 (4th Cir. 2019) (quoting *Moss*, 683 F.3d at 608). Defendants themselves, as state actors, instituted a policy of following religious dictates in the provision of healthcare at a state facility—and canceled Mr. Hammons's medically necessary surgery based on those religious beliefs. *See Lund*, 863 F.3d at 278-83 (holding that "lawmaker-led prayer" in county meetings raised particular Establishment Clause concerns because "the prayer-giver was the state itself," and that "promot[ion] of Christianity" as the "preferred system

26

of belief" violated the Establishment Clause (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 581 (2014)) (cleaned up)).  In addition, the Hospital's adherence to the Catholic Directives "clearly identif[ies] the government with a particular faith."  *Id.* at 280.  The Hospital proudly advertises its devotion on its website, which promotes St. Joseph as both an "integral member of University of Maryland Medical System" and a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services," while linking directly to the Catholic Directives.  Compl. ¶¶ 1, 28, 34-35.  Thus "a reasonable, informed observer would understand that 'the practice under review in fact conveys a message of endorsement' . . . of a religion."  *Wood*, 915 F.3d at 316 (quoting *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003)).  While Defendants argue that any procedure banned at St. Joseph may be obtained at another UMMS facility, this does not detract from their explicit embrace of Catholicism at St. Joseph.  Nor does it account for harm that their adherence to religious teachings causes to patients, such as Mr. Hammons, who must confront discrimination at St. Joseph when they are barred from receiving medically necessary care based on Defendants' religious ideals.

For the final prong of the *Lemon* test, the well-pled allegations of the Complaint show that Defendants' actions "created an excessive entanglement between government and religion." *Id.* at 318 (cleaned up).  Defendants are government actors, who are "defining" the available care at a state facility "by a religious test," *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist.*, 512 U.S. at 702—specifically, "the moral tradition of the Church," Compl. ¶ 28.  Because of state actors' continued involvement with the enforcement of Catholic religious practices at the Hospital, this case involves precisely "[t]he kind of excessive entanglement of government and religion precluded by *Lemon*[, which] is characterized by 'comprehensive, discriminating, and continuing state surveillance' of religious exercise" or "pervasive monitoring or other maintenance by

27

public authorities" of religious practices. *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 273 (4th Cir. 2005) (quoting *Lemon*, 403 U.S. at 619; citing *Mueller v. Allen*, 463 U.S. 388, 403 (1983)) (cleaned up).

Defendants contend that the Catholic belief structure of the Hospital amounts to a mere "interaction" with a religious organization, MTD at 18, but such a characterization grossly understates the ongoing and pervasive effect of the Catholic Directives on the administration of care at the Hospital. Defendants continuously mandate adherence to those religious teachings, and prohibit patients such as Mr. Hammons from receiving medically necessary care at the Hospital as a result. "Ordinary human experience and a long line of cases teach that few entanglements could be more offensive to the spirit of the Constitution." *Larkin*, 459 U.S. at 127.

In addition, Defendants' reliance on *Bradfield v. Roberts*, 175 U.S. 291 (1899), and *Smith v. Jefferson Cty. Bd. of Sch. Commissioners*, 788 F.3d 580 (6th Cir. 2015), is entirely misplaced. Both cases concerned agreements between government and private religiously affiliated organizations—not government actors *themselves* promoting religious adherence. *Bradfield*, 175 U.S. at 297 (agreement with religiously-affiliated hospital for funding); *Smith*, 788 F.3d at 593 (contract between school board and religious school for alternative education). This distinction is critical. *See Lund*, 863 F.3d at 278-81, 286 (holding that "lawmaker-led prayer" in county meetings raised particular Establishment Clause concerns because "the prayer-giver was the state itself," and "serious harms arise when the power and prestige of government is placed behind a particular religious belief" (cleaned up)). Further, in both *Bradfield* and *Smith*, the courts took pains to emphasize the secular nature of the religiously-affiliated institutions' operations. *Smith*, 788 F.3d at 594 (alternative education program at issue was "consistently run in a secular

manner"); *Bradfield*, 175 U.S. at 298-99 ("[T]here is nothing sectarian in the corporation"; "[t]here is no allegation that its hospital work is confined to members of that church or that in its management the hospital has been conducted so as to violate its [secular] charter in the smallest degree."). Here, by contrast, Defendants proudly operate the Hospital under the edicts of Catholic teachings, and refuse to provide care on overtly religious grounds.

For all these reasons, Mr. Hammons has stated a valid claim under the Establishment Clause for which relief can be granted.

## IV. DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES THE EQUAL PROTECTION CLAUSE

### A. The Hospital Singles Out Transgender Patients' Surgeries to Treat Gender Dysphoria for Different and Unequal Treatment

As alleged in the Complaint, St. Joseph canceled Mr. Hammons's necessary surgery based on a facially discriminatory policy against providing medically necessary surgery for gender dysphoria. The Complaint specifically alleges that the Hospital "did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies." Compl. ¶¶ 75, 90. The Hospital provides hysterectomies when they are medically necessary to treat other conditions, but refuses to provide those same hysterectomies when they are medically necessary to treat gender dysphoria. *See* Compl. ¶¶ 57-58.

Ignoring these factual allegations, Defendants falsely assert that Mr. Hammons "does not allege that St. Joseph interpreted, intended to apply, or applied the [Catholic Directives'] gender-neutral guidance against sterilization procedures and those impacting the integrity of the human body in any discriminatory way." MTD at 20. But such discrimination is *exactly* what Mr. Hammons alleges. The Complaint alleges that the Hospital routinely performs hysterectomies and other surgeries resulting in sterilization or loss of "functional integrity" if those surgeries are medically necessary to treat conditions other than gender dysphoria. Compl. ¶¶ 57-58. The

Complaint also alleges that the Hospital routinely performs surgeries that remove healthy tissue even when the surgery is purely cosmetic.  Compl. ¶ 58.  And the Complaint alleges that "Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria."  Compl. ¶¶ 75, 90.  There is nothing "conclusory" about those allegations, MTD at 21, and, for purposes of Defendants' motion to dismiss, they must be accepted as true.[11]

### B.  St. Joseph's Policy Against Providing Medically Necessary Surgery for Transgender Patients with Gender Dysphoria Facially Discriminates Based on Sex and Transgender Status

Under Fourth Circuit precedent, discrimination based on sex and transgender status is presumptively unconstitutional and subject to heightened scrutiny under the Equal Protection Clause.  *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020).  Applying heightened scrutiny, Defendants bear the burden of proof to demonstrate that their discrimination serves an important governmental interest and "that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).  "The burden of justification is demanding and it rests entirely on the State."  *United States v. Va.*, 518 U.S. 515, 533 (1996).

Defendants do not assert that discriminating against people who are transgender is

---

[11] These allegations of disparate treatment distinguish this case from *Weinreb v. Xerox Business Services, LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018), *adhered to on denial of reconsideration sub nom.*, *Weinreb v. Xerox Business Services*, No. 16-cv-6823, 2020 WL 4288376 (S.D.N.Y. July 27, 2020).  *See* MTD at 21-22.  The plaintiff in *Weinreb* alleged that an insurance policy discriminated on the basis of sex by denying coverage for the off-label use of fentanyl to treat Global Diffuse Adenomyosis, a disease that affects only women.  The insurance policy denied coverage for *all* off-label use of fentanyl, including for diseases affecting only men and diseases affecting only women.  *Weinreb*, 323 F. Supp. 3d at 517.  By contrast, Mr. Hammons's Complaint alleges that St. Joseph does not have a generally applicable policy against providing surgery that results in sterilization or removes healthy tissue.  St. Joseph provides such surgeries when they are medically necessary for other medical conditions, but singles out medically necessary surgery for transgender patients to treat gender dysphoria for different treatment.

substantially related to an important governmental interest.  Instead, Defendants assert that they cannot be held liable under the Equal Protection Clause unless they acted with discriminatory intent or animus.  MTD at 20.  But allegations of discriminatory motive are not necessary when a policy is discriminatory on its face.  "Although facially neutral statutes which have a discriminatory impact do not violate the Equal Protection Clause unless discriminatory intent can be demonstrated, discriminatory intent need not be established independently when the classification is explicit, as in this case." *Faulkner v. Jones*, 51 F.3d 440, 444 (4th Cir. 1995) (cleaned up).

The Hospital's policy against providing transgender patients medically necessary care for gender dysphoria is discriminatory on its face for at least three reasons.  *First*, the policy discriminates based on sex: discriminating between transgender patients who require hysterectomies for gender dysphoria and patients who require hysterectomies for other medical conditions inherently rests on a sex classification because "the diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned *sex* and *gender* identity." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020).  Had Mr. Hammons' been designated at birth as "a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery." *Toomey v. Arizona*, No. CV-19-00035-TUC-RM, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019).  "[S]uch a policy cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply." *Grimm*, 972 F.3d at 608.

*Second*, the Hospital's policy discriminates against transgender patients: discrimination based on gender "transition clearly discriminates on the basis of transgender identity." *Stone v. Trump*, 356 F. Supp. 3d 505, 513 (D. Md. 2018).  By providing medically necessary

hysterectomies for other medical conditions but excluding medically necessary hysterectomies for gender dysphoria, Defendants' policy "creates a different rule governing the medical treatment of transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wis. 2018). Indeed, an exclusion of health care for gender dysphoria "is directly connected to the incongruence between Plaintiff's natal sex and his gender identity," which is the defining hallmark of being transgender. *Toomey*, 2019 WL 7172144, at *6; *cf. Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010) (declining to distinguish between discrimination based on status of being gay and discrimination based on conduct of having relationships with a same-sex partner); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (explaining the when a "defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group," the discrimination is treated as a facial classification).[12]

---

[12] In a decision that conflicts with the great weight of authority, a district court in the Middle District of Georgia reluctantly reasoned that a health insurance plan excluding coverage for "sex change surgery" did not facially discriminate based on sex. *See Lange v. Houston Cty.*, No. 5:19-cv-392, 2020 WL 6372702, at *10-11 (M.D. Ga. Oct. 30, 2020). The *Lange* court believed at that this result was dictated by *Geduldig v. Aiello*, 417 U.S. 484 (1974), which held that the exclusion of pregnancy-related disabilities from a disability insurance program did not facially discriminate based on sex.

That was error. *Geduldig* predates the Supreme Court's modern equal protection jurisprudence and has not been cited by a majority opinion in an equal protection case since the mid-70s. *See generally* Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108 Georgetown L.J. 167, 208 n.229 (2020). Instead, the Supreme Court's modern cases have recognized that the differential treatment of pregnancy in insurance and employee-leave policies similar to the one at issue in *Geduldig* rests "on the pervasive sex-role   *(note continues on next page)*

*Third*, discriminating against care for gender dysphoria also facially discriminates based on sex stereotyping and gender nonconformity.  "[D]iscrimination against transgender people constitute[s] sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608.  In the context of healthcare, discrimination against transgender patients through the denial of transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex," *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018), and "tethers [transgender patients] to sex stereotypes which, as a matter of medical necessity, they seek to reject," *Kadel*, 446 F. Supp. 3d at 14.  Defendants are willing to provide hysterectomies when they are medically necessary for other conditions, but Defendants refuse to provide those same hysterectomies when they are prescribed to transgender patients for the gender nonconforming purpose of treating gender dysphoria.

Because the Hospital's policy facially discriminates based on sex and transgender status, no additional allegations of discriminatory intent are necessary to state an equal protection claim.  But even if it were necessary to also allege discriminatory intent, the Complaint has plausibly

---

stereotype that caring for family members is women's work," *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 731 (2003), and the Court has made plain that "'[i]nherent differences'' related to the capacity to become pregnant may no longer be cause "for denigration" or "artificial constraints on an individual's opportunity," *United States v. Va.*, 518 U.S. 515, 533-34 (1996).

But even if *Geduldig* were still controlling in the context of pregnancy, its reasoning cannot be extended to this case. The Supreme Court has not distinguished between sex discrimination and discrimination based on transgender status.  To the contrary, the Supreme Court has explicitly recognized that "transgender status [is] inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1742.  In addition, the *Lange* court also restricted its analysis to whether the "sex change surgery" exclusion discriminated based on sex.  But in the Fourth Circuit, discrimination based on transgender status is independently subject to heightened scrutiny.  *See Grimm*, 972 F.3d at 611. As discussed above, denying medically necessary hysterectomies for transgender people with gender dysphoria, while providing those same hysterectomies for non-transgender people with other medical conditions, facially discriminates based on *both* sex and transgender status, and is subject to heightened scrutiny under *Grimm*.

33

alleged that too.  As alleged in the Complaint, Defendants' disparate treatment of transgender people seeking medically necessary hysterectomies for gender dysphoria fails even rational basis review because it "was grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender."  Compl. ¶ 83; *see Toomey*, 2019 WL 7172144, at *9 (holding that exclusion of medically necessary surgery for gender dysphoria raised plausible inference of animus for purposes of motion to dismiss).

## V.   DEFENDANTS' FACIALLY DISCRIMINATORY POLICY VIOLATES SECTION 1557 OF THE AFFORDABLE CARE ACT

For all the same reasons that Defendants' denial of medically necessary care for transgender people violated the Equal Protection Clause, Defendants also violated Section 1557 of the Affordable Care Act.  *See Kadel*, 446 F. Supp. 3d at 14; *Tovar v. Essentia Health,* 342 F. Supp. 3d 947, 952 (D. Minn. 2018); *Boyden*, 341 F. Supp. 3d at 997.  Section 1557 provides that "an individual shall not, on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  The Supreme Court held in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1742 (2020), that discrimination based on transgender status is discrimination based on "sex" for purposes of Title VII.  *Bostock*'s reasoning applies to Title IX, *see Grimm*, 972 F.3d at 616, and by extension to Section 1557.[13]

Defendants do not dispute that they receive federal financial assistance, but they once

---

[13] Because the plain text of Section 1557 prohibits discrimination against transgender patients—including discrimination with respect to care for gender dysphoria—the lawfulness of such discrimination does not depend on the implementing regulations for Section 1557.  *See Tovar v. Essentia Health,* 342 F. Supp. 3d 947, 957 (D. Minn. 2018); *Prescott v. Rady Children's Hosp. San Diego*, 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017).

again assert that they cannot be held liable unless they acted with discriminatory intent.  MTD at 21.  As the Supreme Court explained in *Bostock*, however, when someone discriminates based on transgender status that person "inescapably *intends* to rely on sex in its decisionmaking." *Bostock*, 140 S. Ct. at 1742.  "[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination." *Id.* at 1745-46.  "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

Because the Supreme Court's decision in *Bostock* applies with full force to Title IX, *see Grimm*, 972 F.3d at 616, no further allegations of motive are necessary to establish that Defendant's facially discriminatory policy violates Section 1557.

## CONCLUSION

For these reasons, the Motion should be denied.

Date: November 23, 2020

Respectfully submitted,

*/s/Louis J. Ebert*
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Emily H. Harris (*pro hac vice*)

Jonathan S. Z. Hermann (*pro hac vice*)
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
jknobler@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
eharris@pbwt.com
jhermann@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*