IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS

:

:

v.                                      :   Civil Action No.  DKC 20-2088

UNIVERSITY OF MARYLAND MEDICAL           :
SYSTEM CORPORATION, et al.
:

**MEMORANDUM OPINION**

Presently pending and ready for resolution is the motion for partial reconsideration or, in the alternative, certification of interlocutory appeal filed by Plaintiff Jesse Hammons.  (ECF No. 56).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion will be denied.

**I.   Motion to Reconsider**

A court may grant a motion to reconsider, as relevant here, when the court committed clear error resulting in manifest injustice.  *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).  In particularly graphic language, the Fourth Circuit has described this basis as follows:

> As we have noted on more than one occasion, "[a] prior decision does not qualify for th[e] third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (internal quotation marks,

> citations, and alteration omitted); *see also United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 657 n.6 . (4th Cir. 2015); *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 258 (4th Cir. 2018).

The court's discretion to grant a motion to reconsider is not limitless. *In re Sinclair Broadcast Group, Inc. Securities Litigation*, 473 F.Supp. 3d 529, 535 (D.Md. 2020). A motion to reconsider is not an opportunity to relitigate the court's ruling and "mere disagreement" with a prior decision does not support granting a motion to reconsider. *Id.*

None of Mr. Hammons' several arguments meet this high standard.

Mr. Hammons argues first that the court clearly erred when it described the state action test as "synonymous" with the arm-of-state test. (ECF No. 56, at 5). The use of that single word in a lengthy analysis does not indicate any clear error. First, the court acknowledged that there is overlap between the two tests—that both tests evaluate the nature of the relationship between the government and the corporation in question—and then the court completed the arm-of-state analysis independent from the state action analysis.

Second, Mr. Hammons argues that the court committed an error of misapprehension in interpreting his argument to be that UMMS *waived* sovereign immunity, when instead his argument was that the General Assembly had *deprived* UMMS of sovereign immunity. (ECF No. 56, at 9). The court, however, when finding UMMS possessed sovereign immunity, considered and rejected Mr. Hammons' argument.

The Supreme Court and United States Court of Appeals for the Fourth Circuit are crystal clear that for a court to find that a state government waived sovereign immunity there must be an express waiver. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see FAA v. Cooper*, 566 U.S. 284, 290 (2012) (holding "waiver of sovereign immunity must be 'unequivocally expressed' in statutory text"); *accord Pense v. Maryland Department of Public Safety and Correctional Services*, 926 F.3d 97, 101 (4th Cir. 2019); *Lee-Thomas v. Prince George's Cnty. Public Schools*, 666 F.3d 244, 250-51(stating that a waiver of sovereign immunity occurs "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction" and without recourse to legislative history); *see also Cunningham v. Lester* 990 F.3d 361, 365 (4th Cir. 2021) (citing *Cooper*, 566 U.S. at 290) (recognizing that "the Court explicitly and routinely construes ambiguous text so as to obviate any inference of waiver.").

Despite this clear law, Mr. Hammons argues that *dicta* in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 392 (1995), commands a different result.  In *Lebron*, the Court considered whether Amtrak was a government entity subject to the First Amendment.  Amtrak argued that a provision of its charter, which disclaimed agency status, prevented Amtrak from being considered a government entity, but the Supreme Court disagreed. Justice Scalia reasoned for the Court that, if anything, the disclaimer indicated that Amtrak was a government entity subject to the First Amendment because the disclaimer demonstrated that Congress had the power to impose obligations or confer powers on Amtrak. Justice Scalia then, in *dicta*, further stated "We have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit." *Id.*  The court here is not alone in finding this to be *dicta*.  *See Parrett v. Southeastern Boll Weevil Eradication Foundation, Inc.*, 155 Fed.Appx. 188, 191-92 (6th Cir. 2005); *Wood ex rel. U.S. v. American Institute in Taiwan*, 286 F.3d 526, 531 (D.D.C. 2002).

From this *dicta*, Mr. Hammons argues that the Court created a distinction between when a legislature "waives" sovereign immunity and when a legislature "deprives" an entity of its sovereign immunity, and that, because the state statute creating UMMS has a provision nearly identical to the Congressionally enacted disclaimer in *Lebron,* the General Assembly deprived UMMS of

4

sovereign immunity.  (ECF No. 56-1, at 9).  Regardless of the label, whether waiving, depriving, or stripping sovereign immunity, the action by the legislature must be explicit or express.  The case cited by the Court for the statement about the Amtrak statute depriving it of sovereign immunity, *Sentner v. Amtrak*, 540 F.Supp. 557, 560 (D.N.J. 1982), was deciding whether Amtrak was subject to punitive damages, and stated that instrumentalities of the United States "may not be subject to liability for punitive damages without the express consent of Congress."  The clear law on waiver which has remained consistent pre- and post-*Lebron* requires the close analysis of the precise statute and the context of the purported waiver conducted by the court, and not superficial reliance on *dicta*.  Furthermore, as pointed out in *Pense*, 926 F.3d at 101-02, it may be that a state statute waives sovereign immunity in state court, but not in federal court.  The conclusion that the Maryland statute did not expressly waive sovereign immunity for federal court actions will not be revisited.

    Third, Mr. Hammons turns to the four *Ram Ditta* factors which make up the arm-of-state test.  *Ram Ditta By and Through Ram Ditta v. Maryland Nat. Capital Park & Planning Com'n*, 822 F.2d 456 (4th Cir. 1987).  He argues that UMMS did not mention the *Ram Ditta* factors in its initial motion to dismiss, only discussing the factors in its reply, and thus that the court's evaluation of the

*Ram Ditta* factors was a clear error resulting in manifest injustice because the decision was outside the adversarial issues presented to the court by the parties.  (ECF No. 56-1, at 13).

While a party's failure to raise an issue waives it, trial courts retain discretion to consider untimely made arguments when circumstances are appropriate.  *Clawson v. Fedex Ground Package System, Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006).  Mr. Hammons cites several cases in which a court found an argument waived because it was not raised until the reply.  This case differs from all of those cases, however, because UMMS did not fail to raise an issue (sovereign immunity) but rather failed to state the standard by which the issue would be evaluated (the arm-of-state analysis as evaluated by the *Ram Ditta* factors).  Other cases, such as *Boothe v. Northstar Realty Finance Corp., Inc.*, No. JKB-16-3742, 2019 WL 587419, at *4, n.1 (D.Md. Feb. 13, 2019), find circumstances appropriate to consider an issue fully.

Deciding whether UMMS has sovereign immunity was the adversarial issue presented to the court.  UMMS clearly raised the issue and it had the burden of establishing that it had sovereign immunity.  Mr. Hammons had the opportunity to present full-fledged opposition arguments to the existence of UMMS's sovereign immunity.  Mr. Hammons himself knew the standard by which to adjudicate the existence of sovereign immunity, because he invoked the *Ram Ditta* factor most in his favor when opposing sovereign

immunity (whether the state treasury pays judgments). Evaluating the *Ram Ditta* factors was necessary to completing the arm-of-state analysis and resolving the sovereign immunity issue.

Fourth, Mr. Hammons argues that the court erred in holding that the second and fourth *Ram Ditta* factors weighed in favor of arm-of-state status. Those factors, respectively, are how much autonomy the entity has from the state and how state law treats the entity. *Ram Ditta*, 822 F.2d at 458.

Mr. Hammons' argument primarily relies on the Fourth Circuit's *Oberg* trilogy of cases. *U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575 (4th Cir. 2012) ("*Oberg I*"); *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014) ("*Oberg II*"); *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646 (4th Cir. 2015) ("*Oberg III*"). The court has again reviewed the *Oberg* cases, as well as another Fourth Circuit precedent, *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005), but still concludes that the second factor weighs in favor of sovereign immunity.

When evaluating the second factor, it is appropriate to consider a non-dispositive set of attributes: who appoints the entity's directors or officers, who funds the entity, and whether the state retains a veto over the entity's actions. *Oberg I*, 681 F.3d at 580. Courts also consider whether an entity has the

7

ability to contract, sue and be sued, and purchase and sell property, whether it is represented in legal matters by the state attorney general, and whether the entity has the ability to tax, as the absence of taxation power is a strong indication that the corporation is not an independent one. *Oberg II*, 745 F.3d at 137 (cleaned up); *Maryland Stadium Authority*, 407 F.3d at 264.

At issue in the *Oberg* trilogy was whether Dr. Oberg could sue the Pennsylvania Higher Education Assistance Agency (PHEAA) under the Fraudulent Claims Act, under which only "person[s]" may be sued. *Oberg II*, 745 F.3d at 135. While a state government is not a "person" and thus cannot be sued under the Act, local government corporations (such as counties) and private corporations *are* persons and can be sued under the Act. *Id.* The arm-of-state test articulated in *Ram Ditta* was the appropriate test to determine whether the PHEAA was the state or a person. *Oberg II*, 745 F.3d at 136.

The Fourth Circuit applied the four factors and found the PHEAA sufficiently independent from the State of Pennsylvania to be a "person" for the purposes of the Act at the motion to dismiss stage and again at the summary judgment stage. *Oberg II*, 745 F.3d at 140-41; *Oberg III*, 804 F.3d at 646. In doing so, the Fourth Circuit found the second factor weighed against finding the PHEAA an arm of the state, although the facts "cut both ways." *Oberg II*, 745 F.3d at 139. On one hand, the board of directors was

8

composed of gubernatorial and legislative appointees, the State had some veto power, and the governor's approval was needed for the issuing of notes and bonds.  Ultimately, however, the countervailing aspects, *i.e.,* PHEAA's financial independence—it receives no operational funding from Pennsylvania and is free to enter into contracts, sue and be sued, and engage in real estate transactions in its own name—decisively weighed in favor of finding sufficient autonomy to negate sovereign immunity.  *Id.* at 139.

On the other hand, in *Maryland Stadium Authority*, the Fourth Circuit, using the *Ram Ditta* factors, held that the University System of Maryland was an alter ego of the State of Maryland, and therefore was not a citizen for purposes of diversity jurisdiction. 407 F.3d at 256.  In reaching that conclusion, the Fourth Circuit determined that the second factor weighed in favor of finding the University System an alter ego.  It did so by acknowledging that the University System retained "some operational independence in its day to day activities," but that it was still closely tied to the State because the University's board members are appointed by the Governor, a key indication of state control, and the State retains a veto over many of the University System's actions.  *Id.* at 264.  For example, the University System can only buy and sell real property and enter contracts over $500,000 with the approval of the legislature or Board of Public Works, and the University System is subject to an annual audit.  *Id.*  The University System

9

also needs legislative approval to issue revenue bonds and it lacks the power to tax. *Id.*

UMMS is somewhere between the University System and the PHEAA. All three entities share traits, as befits creations of their respective states: membership of their operating boards is set by their respective governors and legislatures, and they all lack the important taxation power. They differ in who represents them (the Attorney General seemingly only represents the University System) and in their financial independence. Whereas the University System receives an annual appropriation from the State, the PHEAA and UMMS apparently do not.

The University System does, however, have traits in common with UMMS and the PHEAA, such as the independence to form contracts and buy and sell assets. The University System and UMMS are further alike in that Maryland has retained oversight as to how the respective entities conduct their business. While the State must approve what the University System can spend in contracts and real estate sales at a certain value, it prohibits UMMS from competing with the University System for private and federal gifts or grants. *Napata v. University of Maryland Medical System Corp.*, 417 Md. 724, 737 (2011). Moreover, UMMS's annual contracts must be approved by the Regents of the University System. *Id.*

Mr. Hammons argues that UMMS is the same as the PHEAA because Pennsylvania restricts the PHEAA's financial independence by

10

requiring State approval for both expenditures and contracts in excess of $20,000, and Maryland does not impose such oversight on UMMS.  Mr. Hammons is essentially arguing that because a more heavily overseen corporation (PHEAA) was autonomous from the state government, a less heavily overseen corporation (UMMS) must also be found autonomous.  (ECF No. 56-1, at 17); *Oberg III*, 804 F.3d at 673.  That argument ignores the fact that the University System also is subject to less oversight than PHEAA—the University System can enter into contracts and real estate sales without approval of the State as long as they are under $500,000—but was still found to be part of the state by the Fourth Circuit.  *Maryland Stadium Authority*, 407 F.3d at 264.  The comparison Plaintiff attempts thus fails.

Moreover, the University System's continued control over UMMS further indicates that UMMS's autonomy is somewhere between that of UMMS and the PHEAA.  The Fourth Circuit has repeatedly found that universities, including the University System, are part of their state governments under the arm-of-state test.  UMMS was originally part of the University System, and the current iteration of UMMS came into being when it was removed from the University System and given its own structure.  *Napata*, 417 Md. at 728; Md. Code Educ. § 13-302(5)-(6).  Nonetheless, the University System retains control over UMMS—whether that is through the requirement that the Regents of the University System approve UMMS's annual

11

contract or the power to dissolve UMMS. *Napata*, 417 Md. at 737. Moreover, in the event UMMS is dissolved, its assets revert to the State (which provided it with its assets in the first place). *Id.* This continued interrelationship with the University System further indicates that UMMS's autonomy is somewhere between the University System's and the PHEAA's.

Mr. Hammons also argues that the court committed clear error in weighing the holding in *Napata* more heavily than the language of the statute creating UMMS. (ECF No. 56-1, 18). In evaluating the fourth factor courts may look at state law in all its formats, including the holdings of state courts. *Maryland Stadium Authority*, 407 F.3d at 265. While Mr. Hammons may disagree with the way in which the court evaluated state law, mere disagreement is an insufficient basis for the granting of a motion to reconsider. *In re Sinclair*, 473 F.Supp. 3d at 535.[1]

The motion to reconsider is denied.

## II.  Certification of Interlocutory Appeal

Mr. Hammons, in the alternative, asks the court to certify its order granting the motion to dismiss for an interlocutory

---

[1] Mr. Hammons also attempts to argue that the fourth factor should be neutral because UMMS has not invoked sovereign immunity against medical malpractice lawsuits. (ECF No. 56-1, at 19). This argument is similarly unavailing because a state consenting to suit in courts of its own creation or stating its intention to sue or be sued does not waive sovereign immunity. *Lee-Thomas*, 666 F.3d at 251.

appeal.  Generally, certification for an interlocutory appeal is only appropriate for cases where there is a narrow question of pure law whose resolution will be completely dispositive of the litigation, not just where "early review of difficult rulings in hard cases" would be convenient.  *Lynn v. Monarch Recovery Management, Inc.*, 953 F.Supp. 2d 612, 623 (D.Md. 2013).  The court's power to certify an interlocutory order for appeal is found in 28 U.S.C. 1292(b), which permits the court to certify when the "order [1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  The decision to certify is a discretionary one, but that discretion may not be exercised unless all three § 1292(b) factors are present.  *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D.Md. 2015).

The first factor is not present.  For the purposes of § 1292(b), a "question of law" refers to a "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine."  *Butler*, 307 F.R.D. at 452.  The model "controlling question of law" is one that is a "narrow question of pure law whose resolution would be completely dispositive of the litigation."  *Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, at *5 (4th Cir. 1989)(unpublished).  Other questions of law that are "heavily freighted with the necessity of factual assessment" are

13

not suitable for immediate appeal.  Resolving the legal question of sovereign immunity would not be completely dispositive of the litigation.

Neither is the second factor present.  Whether there is a substantial ground for difference of opinion does not refer to a difference of opinion between the parties, or even between the parties and the court, but rather a substantial ground for difference of opinion between *courts*.  *Lynn*, 953 F.Supp. 2d at 6245.  In matters of first impression, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Id.* (quoting *In re Flor*, 79 F.3d 281, 284 (2d. Cir. 1996)) (cleaned up).  As noted in the court's order, relevant case law is scant, and even more so on Mr. Hammons' theory that *Lebron* and the language of the statute in this case "deprive" UMMS of sovereign immunity.  Given the *absence* of cases, it cannot be said there is a difference of opinion between courts.  While Mr. Hammons tries to fabricate a disagreement, by arguing that the court here disagrees with the Supreme Court, this is more clearly a matter of first impression, and matters of first impression, standing alone, are not substantial grounds for a difference of opinion.  (ECF No. 61, at 17).

Finally, the third factor also is not present. Certification "materially advances" litigation when it helps the courts avoid

14

protracted litigation and piecemeal appeals, but simply "speed[ing] up" litigation is an insufficient reason to certify an interlocutory appeal. *Lynn*, 953 F.Supp.2d at 626 (2013). Rather, "in determining whether certification will materially advance the ultimate termination of the litigation, a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Id.* (cleaned up). Certifying an interlocutory appeal here does none of those things. First, interlocutory appeal or not, the need for a trial will remain. Second, an interlocutory appeal, if successful, would not eliminate complex issues and simplify trial, but instead reinstate two claims for trial. Third, an interlocutory appeal, if successful, would increase the number of claims litigated, potentially making discovery more difficult and costly.

Moreover, Mr. Hammons' primary argument for certification amounts to nothing more than a "speed up" argument. He argues that an interlocutory appeal would settle the sovereign immunity issue one way or another, obviating the danger of a post-trial appeal reversing the trial court and necessitating a re-trial of all three issues. (ECF No. 56-1, at 23). This argument, however, ignores that even if an interlocutory appeal occurred and the Fourth Circuit affirmed the trial court, the possibility remains

that Mr. Hammons or UMMS would take an appeal from the subsequent trial result. There is no guarantee an interlocutory appeal would materially advance litigation. The requirements necessary to permit the court to exercise its discretion to certify an interlocutory appeal are not met and the court denies Mr. Hammons' motion to certify an interlocutory appeal.

### III. Conclusion

For the foregoing reasons, the motion for partial reconsideration or, in the alternative, for certification of interlocutory appeal filed by Plaintiff will be denied. A separate order will follow.

                                         _____/s/_____
                                         DEBORAH K. CHASANOW
                                         United States District Judge