**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JESSE HAMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   Case No. 1:20-cv-02088-DKC |
| | ) |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) |
| CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |


**EXHIBIT A TO DEFENDANTS' MOTION FOR LEAVE TO AMEND**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JESSE HAMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   Case No. 1:20-cv-02088-DKC |
| | ) |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) |
| CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FIRST AMENDED ANSWER TO COMPLAINT**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendants University of

Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ"), and

University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (collectively,

"Defendants"), submit the following answer and affirmative defenses to Plaintiff Jesse

Hammons's Complaint (ECF No. 1).

**INTRODUCTION**

1.       UMMS, through its wholly owned subsidiaries UMSJ LLC and St. Joseph LLC

(collectively, "Defendants"), owns and operates a hospital in Towson, Maryland under the name

of University of Maryland St. Joseph Medical Center. Defendants are instrumentalities of the

State of Maryland and subject to the First Amendment's Establishment Clause and the

Fourteenth Amendment's Equal Protection Clause.  But, in violation of those constitutional

obligations, Defendants operate University of Maryland St. Joseph Medical Center as a Catholic

institution, guided by "Catholic health care values" and bound by the "Ethical and Religious

Directives for Catholic Health Care Services" established by the U.S. Conference of Catholic

Bishops (the "Catholic Directives").

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center is located in Towson, Maryland.  Defendants further admit Defendants UMSJ and St. Joseph LLC are subsidiaries of Defendant UMMS.  The remaining allegations in Paragraph 1 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the remaining allegations in Paragraph 1 of the Complaint. Except as specifically admitted, Defendants deny the allegations in Paragraph 1 of the Complaint.

2.      Plaintiff Jesse Hammons is a man who is transgender.  As part of Mr. Hammons's medically necessary treatment relating to his diagnosis of gender dysphoria, Mr. Hammons's surgeon scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  But approximately 7–10 days before Mr. Hammons's scheduled operation, Defendants canceled the surgery based on a discriminatory and unconstitutional application of Catholic religious doctrine.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery was scheduled to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  Defendants also admit Mr. Hammons's alleged surgery did not take place at the University of Maryland St. Joseph Medical Center.  Answering further, the allegations in the third sentence of Paragraph 2 of the Complaint assert legal conclusions, to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 of the Complaint, and therefore deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 2 of the Complaint.

3.       According to the administrators of University of Maryland St. Joseph Medical Center, Mr. Hammons could not receive his medical treatment at the hospital because, in the view of the administrators, Mr. Hammons's treatment would violate Catholic religious doctrine, as announced in the Catholic Directives.  The Catholic Directives state that Catholic hospitals may not perform procedures that induce sterility unless "their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." Catholic Directives p.19, ¶ 53.  The stated basis for this rule is the Catholic teaching that Catholic health care organizations are not permitted to engage in "immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization."  *Id.* p.25, ¶ 70.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery did not take place at the University of Maryland St. Joseph Medical Center.  Defendants further admit the Ethical and Religious Directives for Catholic Health Care Services ("ERDs") are referenced at the University of Maryland St. Joseph Medical Center.  The remaining allegations in Paragraph 3 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Defendants further deny all allegations in Paragraph 3 of the Complaint that are based on the alleged beliefs or thoughts of third-parties.  Except as specifically admitted, Defendants deny the allegations in Paragraph 3 of the Complaint.

4.       Hysterectomies are procedures that induce sterility.  On information and belief, however, University of Maryland St. Joseph Medical Center routinely performs hysterectomies when they are medically necessary to treat a diagnosed condition other than gender dysphoria. When they canceled Mr. Hammons's medically necessary surgery, Defendants thus treated Mr.

Hammons—as a man who is transgender—differently from non-transgender patients who require medically necessary hysterectomies for other medical conditions.

**ANSWER**:  Defendants admit hysterectomies have been performed at the University of Maryland St. Joseph Medical Center, but Defendants deny hysterectomies are "routinely" performed at the University of Maryland St. Joseph Medical Center.  The remaining allegations in Paragraph 4 of the Complaint assert legal conclusions, to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 4 of the Complaint.

5.       An instrumentality of the state may not operate a Catholic hospital or deny medical care to transgender patients based on Catholic religious beliefs.  By invoking Catholic religious doctrine as a basis for canceling Mr. Hammons's medically necessary surgery, Defendants violated the Establishment Clause of the First Amendment.  And by subjecting Mr. Hammons to different and unequal treatment, Defendants also violated the Equal Protection Clause of the Fourteenth Amendment and Section 1557 of the Affordable Care Act.

**ANSWER**:  The allegations in Paragraph 5 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

## JURISDICTION AND VENUE

6.       This Court has subject matter jurisdiction over this action pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343.

**ANSWER**:  The allegations in Paragraph 6 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), and the Court has personal jurisdiction over the Defendants because Defendants each hold themselves out as corporations under the laws of the State of Maryland; because they each reside in this District; and because a substantial part of the events or omissions giving rise to this action occurred and are occurring in this District.

**ANSWER**:  The allegations in Paragraph 7 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants state that venue is proper in this judicial district and that this Court has personal jurisdiction over Defendants.

**PARTIES**

8.      Plaintiff Jesse Hammons resides in Baltimore, Maryland.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint, and therefore deny those allegations.

9.      UMMS is a "nonprofit, nonstock corporation" in the State of Maryland.  Md. Code Educ. § 13-302(7).  UMMS was created by statute.  *See id.* § 13-301, *et seq.*  All of the voting members of its Board of Directors are appointed by the Governor of Maryland.  Id. § 13-304(b).  According to its authorizing statute, UMMS is intended to serve "the highest public interest" and its purposes "are essential to the public health and welfare" of the State.  *Id.* § 13-302(4).  UMMS's offices are located at 250 W. Pratt St., Baltimore, Maryland 21201.

**ANSWER**:  Defendants admit Defendant UMMS is located at 250 W. Pratt St., 24th Floor, Baltimore, Maryland 21201.  Defendants further admit Defendant UMMS's voting members of its Board of Directors are appointed by the Governor of Maryland.  The remaining allegations in Paragraph 9 of the Complaint assert legal conclusions to which no response is

-5-

required.  To the extent a response is deemed required, Defendants deny those allegations.

Answering further, the allegations in Paragraph 9 purport to quote, summarize, or derive from

the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its

contents that is inconsistent with its text.  Except as specifically admitted, Defendants deny the

allegations in Paragraph 9 of the Complaint.

      10.     UMSJ LLC is a wholly owned subsidiary of UMMS.  UMSJ LLC was organized

on or about February 12, 2013, by the then-General Counsel of UMMS, Megan M. Arthur, as

Authorized Person.  According to its articles of incorporation, the company was "organized and

shall be operated exclusively (i) in furtherance of the charitable, scientific and educational

purposes of, (ii) for the benefit of, (iii) to perform the functions of and (iv) to carry out the

purposes of: University of Maryland Medical System Corporation."  On information and belief,

UMMS created UMSJ LLC for the sole purpose of owning and operating University of

Maryland St. Joseph Medical Center.  At its inception, UMSJ LLC's principal office was

located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's

offices).  Now its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the

hospital's address).

      **ANSWER**:  Defendants admit that Defendant UMSJ is located at 7601 Osler Drive,

Towson, Maryland 21204.  Defendants further admit Defendant UMSJ is a subsidiary of

Defendant UMMS.  Answering further, the allegations in Paragraph 10 of the Complaint

purport to summarize, quote, or derive from documentary evidence.  Such documents speak for

themselves, and Defendants deny any characterization of their contents that is inconsistent with

their text.  Additionally, to the extent the allegations in Paragraph 10 of the Complaint assert

legal conclusions, no response is required.  To the extent a response is deemed required,

Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 10 of the Complaint.

11.      Defendant St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC.  St. Joseph LLC was organized under the name "Northeastern Maryland Regional Health System, LLC" on or about April 25, 2012, by then-General Counsel of UMMS, Megan M. Arthur, as Authorized Person.  According to its articles of incorporation, among the stated "charitable purposes" of this new entity was "[t]o maintain a hospital in northeastern Maryland."  On or about August 1, 2012, the new entity's name was changed to its present name: University of Maryland St. Joseph Medical Center, LLC.  On information and belief, UMMS created this entity for the sole purpose of purchasing the existing St. Joseph hospital.  At its inception, St. Joseph LLC's principal office was located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's offices).  Now, its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the address of the hospital).

**ANSWER**:  Defendants admit Defendant St. Joseph LLC is located at 7601 Osler Drive, Towson, Maryland 21204.  Defendants also admit Defendant St. Joseph LLC is a subsidiary of Defendant UMSJ.  Answering further, the allegations in Paragraph 11 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Additionally, to the extent the allegations in Paragraph 11 of the Complaint assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 11 of the Complaint.

12.     St. Joseph LLC owns and operates a hospital known as University of Maryland St. Joseph Medical Center located at 7601 Osler Drive, Towson, Maryland 21204.  University of Maryland St. Joseph Medical Center holds itself out as "an integral member of UMMS."

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center is located at 7601 Osler Drive, Towson, Maryland 21204.  The remaining allegations in Paragraph 12 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, to the extent the allegations in Paragraph 12 assert legal conclusions, no response is deemed required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 12 of the Complaint.

13.     On information and belief, University of Maryland St. Joseph Medical Center adheres to the Catholic Directives in administering care pursuant to a written agreement with UMMS.  University of Maryland St. Joseph Medical Center advertises that it provides treatment in accordance with its "core values" of "[r]everence" and "[r]espect for all people as God's loved children."

**ANSWER**:  Defendants admit the ERDs are referenced at the University of Maryland St. Joseph Medical Center.  Defendants further admit that core values related to providing service and compassionate care to patients are also referenced at the University of Maryland St. Joseph Medical Center.  Answering further, the remaining allegations in Paragraph 13 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents

that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     On information and belief, UMMS, UMSJ LLC, and St. Joseph LLC receive federal funds.

**ANSWER**:  Defendants admit they have received payments for patient procedures covered by Medicare and Medicaid.  Except as specifically admitted, Defendants deny the allegations in Paragraph 14 of the Complaint.

## FACTUAL ALLEGATIONS

**Maryland Creates UMMS as a Quasi-Private Corporation While Retaining State Control**

15.     Under Maryland law, the public University System of Maryland (the "University") is designated as "an instrumentality of the State and a public corporation" and "an independent unit of State government."  Md. Code Educ. § 12-102(a).  For almost a century, from 1897 to 1984, the University operated the University of Maryland Medical Center and referred to it as "University Hospital."

**ANSWER**:  The allegations in Paragraph 15 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 15 purport to quote, summarize, or derive from the Code of Maryland and other documentary evidence, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

16.     In 1984, the Maryland General Assembly passed a statute transferring the assets and liabilities of the University of Maryland Medical Center to a new corporation called the "University of Maryland Medical System Corporation"—UMMS.  *See id.* § 13-301, *et seq.*

**ANSWER**:  The allegations in Paragraph 16 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 16 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

17.     The statute declared UMMS to be an independent corporation and not a State agency, and the statute provided that UMMS "is not subject to any provisions of law affecting only governmental or public entities."  *Id.* § 13-303(a)(2).  Nevertheless, the statute reaffirmed that the new UMMS would continue to serve the same governmental purposes that it had served for nearly one hundred years when University Hospital was operated by a unit of State government.   To that end, the statute's legislative findings declared:

(1)     The purposes of the medical system are to provide medical care of the type unique to University medical facilities for the citizens of the State and region  and, in accomplishing this objective, to provide a clinical context for education and research conducted by the faculty of the University;

(2)     The purposes extend to all citizens of the State, particularly regarding health care needs which only an academic medical institution can adequately meet such as extensive tertiary care, major shock trauma treatment, and sophisticated surgical techniques;

(3)     The purposes also include rendering comprehensive health care to the community naturally served by University Hospital to assure its availability to citizens of that  community;

(4)     These purposes separately and collectively serve the highest public interest and are essential to the public health and welfare, but must be realized in the most efficient manner and at the lowest cost practicable and consistent with these purposes[.]

*Id.* § 13-302.

**ANSWER**:  The allegations in Paragraph 17 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants

deny those allegations.  Answering further, the allegations in Paragraph 17 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

18.     The statute specifically required that UMMS "[s]hall provide for and maintain . . . comprehensive services for patient populations naturally served by University Hospital, including uncompensated care and outpatient care," and "[s]hall maintain, create, and develop specialty care services . . . to meet the needs of the State and region."  *Id.* § 13-303(c).

**ANSWER**:  The allegations in Paragraph 18 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 18 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

19.     The statute also included a nondiscrimination provision, which stipulated that "[t]he Board of Directors shall operate the medical system without discrimination based upon race, creed, sex, or national origin."  *Id.* § 13-303(d).

**ANSWER**:  The allegations in Paragraph 19 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 19 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

20.     Under the statute, the State of Maryland continues to exercise ultimate authority and control over the governance of UMMS.  By statute, the Governor appoints all voting members on UMMS's Board of Directors, two of whom must be nominated by the President of

the Senate and Speaker of the House of Delegates, respectively. *Id.* § 13-304(b) & (c)(5). The

Governor also fills any vacancies on the Board. *See id.* § 13-304(d)(4). In addition, the

corporation could not exist until its articles of incorporation were approved by the Board of

Public Works, a State agency. *Id.* § 13-303(a)(1).

**ANSWER**: The allegations in Paragraph 20 of the Complaint assert legal conclusions

to which no response is required. To the extent a response is deemed required, Defendants

deny those allegations. Answering further, the allegations in Paragraph 20 purport to quote,

summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny

any characterization of its contents that is inconsistent with its text.

21.      Further, if the University Board of Regents and the Board of Public Works

determine that UMMS has failed to realize the purposes set forth in its enacting statute, they

have the power to terminate UMMS. *See id.* § 13-311(c).

**ANSWER**: The allegations in Paragraph 21 of the Complaint assert legal conclusions

to which no response is required. To the extent a response is deemed required, Defendants

deny those allegations. Answering further, the allegations in Paragraph 21 purport to quote,

summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny

any characterization of its contents that is inconsistent with its text.

22.      In light of these facts, Maryland's highest court has authoritatively determined

that "UMMS is an instrumentality of the State." *Napata v. Univ. of Md. Med. Sys. Corp.*, 12

A.3d 144, 151 (Md. 2011).

**ANSWER**: The allegations in Paragraph 22 of the Complaint assert legal conclusions to

which no response is required. To the extent a response is deemed required, Defendants deny

those allegations. Answering further, the allegations in Paragraph 22 purport to quote,

summarize, or derive from *Napata v. Univ. of Md. Med. Sys. Corp.*, 12 A.3d 144 (Md. 2011), which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

23.     The State of Maryland's own website recognizes that UMMS is an instrumentality of the State:

> Although it established the University of Maryland Medical Center (UMMS) as an ostensibly private corporation, the General Assembly ensured that the State would continue to play a prominent role in the System's governance when it required that the UMMS's articles of incorporation and the initial transfer of assets from the State be approved by the Board of Public Works, that the voting members of the Board be Governor's appointees, and that there be continuing operational coordination between UMMS and the University.  In addition, it required that the Center continue as a teaching hospital for the University of Maryland [a unit of the State] and that it enter annual contracts with the University with limited authority to establish nonprofit or for-profit subsidiaries (98 Opinions of the Attorney General 114, November 21, 2013).

**<u>ANSWER</u>**:  The allegations in Paragraph 23 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 23 purport to summarize, quote, or derive from documentary evidence or electronic sources, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

24.     For these and other reasons, UMMS is an instrumentality of the State of Maryland for purposes of the state action doctrine, making the guarantees of the First and Fourteenth Amendments to the United States Constitution binding on UMMS.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of

-13-

that corporation, the corporation is part of the Government for purposes of the First Amendment.").

**ANSWER**:  The allegations in Paragraph 24 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 24 purport to quote, summarize, or derive from *LeBron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), which speaks for itself, and Defendants deny any characterization its contents that is inconsistent with its text.

### UMMS Acquires St. Joseph Hospital and Agrees to Maintain the Hospital's "Catholic Identity"

25.     On information and belief, St. Joseph Hospital was originally founded by the Sisters of St. Francis of Philadelphia and operated as a private Catholic hospital until 2012. From 1996 to 2012 it was operated by Catholic Health Initiatives, a consortium of three Catholic health care systems and 10 congregations.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center was originally founded by the Sisters of St. Francis of Philadelphia.  Defendants further admit the University of Maryland St. Joseph Medical Center became part of Catholic Health Initiatives, a consortium of three Catholic health care systems and 10 congregations, from approximately 1996 to 2012.  Answering further, to the extent the allegations in Paragraph 25 of the Complaint assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, to the extent the allegations in Paragraph 25 of the Complaint purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of

their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     In or about early 2012, Catholic Health Initiatives began searching for financial assistance as a result of a series of lawsuits and other difficulties that left the hospital in financial distress, losing $3 million a month, and its very survival in jeopardy.  Catholic Health Initiatives put the hospital up for sale.  UMMS expressed interest in acquiring the hospital and bringing it into the University of Maryland system.  Merger negotiations began.

**ANSWER**:  Defendants admit Defendant UMMS and Catholic Health Initiatives entered negotiations for the sale and acquisition of the University of Maryland St. Joseph Medical Center in approximately 2012.  Defendants further admit the University of Maryland St. Joseph Medical Center was in poor financial condition in approximately 2012.  Except as specifically admitted, Defendants deny the allegations in Paragraph 26 of the Complaint.

27.     A sticking point in the negotiations was whether the hospital would continue to be run as a Catholic institution.  Historically, the hospital had adhered to the Catholic Directives in administering care.  The Catholic Church, even as it sought to divest itself of the hospital, was adamant that the hospital should continue to follow the Catholic Directives under its new ownership.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center has a Catholic heritage and the ERDs are referenced at the University of Maryland St. Joseph Medical Center.  Defendants further admit that the University of Maryland St. Joseph Medical Center's maintenance of its Catholic heritage and reference of the ERDs were raised during the acquisition process.  Answering further, Defendants deny all allegations in Paragraph 27 of the Complaint that are based on the alleged beliefs or thoughts of third-parties.  Except as specifically admitted, Defendants deny the allegations in Paragraph 27 of the Complaint.

-15-

28.     The Catholic Directives, developed and published by the U.S. Conference of Catholic Bishops, reflect Catholic religious ideals pertaining to health care. The Catholic Directives state that health care must "respect the sacredness of every human life from the moment of conception until death," Catholic Directives at p.8, and "must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church," *id.* at p.8, ¶ 1. They also state that "Catholic health care services must adopt these Directives as policy" and "require adherence to them within the institution as a condition for medical privileges and employment." *Id.* at p.9, ¶ 5.

**ANSWER**:  The allegations in Paragraph 28 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

29.     The Catholic Directives prohibit certain types of care that would ordinarily be available to patients in secular facilities, including other hospitals in the UMMS system.  For example, the Catholic Directives specifically prohibit a rape victim from receiving treatments "that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum."  *Id.* at p.15, ¶ 36.  The directives also ban abortion in all cases, without exception.  *Id.* at p.18, ¶ 45.  In addition, though they permit married couples to "limit the number of their children by natural means," the Catholic Directives entirely bar "contraceptive interventions that either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."  *Id.* at p.16 (internal quotation marks omitted).

**ANSWER**:  The allegations in Paragraph 29 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, to the extent the allegations in Paragraph 29 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Defendants deny the remaining allegations in Paragraph 29 of the Complaint.

30.     As relevant to Mr. Hammons, the Catholic Directives state that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted," with a lone exception: "Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id.* at p.19, ¶ 53.

**ANSWER**:  The allegations in Paragraph 30 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, to the extent the allegations in Paragraph 30 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

31.     A central focus during negotiations with UMMS was whether the hospital would continue to impose the Catholic Directives on its patients and staff under new ownership.  Church law forbade the sale of the hospital to a non-Catholic entity unless officials from the Archdiocese of Baltimore and the Vatican itself provided their approval.  Cardinal O'Brien, the head of the Archdiocese of Baltimore at the time, expressed disappointment about UMMS's selection as the purchaser of the hospital and promised the Church would "do everything

possible in the months and years ahead" to keep the hospital a fundamentally Catholic institution.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center's maintenance of its Catholic heritage and reference of the ERDs were raised during the acquisition process.  Answering further, the allegations in the second sentence of Paragraph 31 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, the allegations in Paragraph 31 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the remaining allegations in Paragraph 31 of the Complaint.

32.     On information and belief, as a condition to closing the deal, UMMS signed a written agreement with the Catholic Church promising to continue running the hospital as a Catholic institution and to continue operating under the Catholic Directives.  Archbishop Lori, who had recently succeeded Cardinal O'Brien as head of the Baltimore Diocese, told the press that the agreement "will ensure that St. Joseph's will continue this long tradition of providing faith-filled care throughout this new chapter in the hospital's storied history."

**ANSWER**:  Defendants admit that a written agreement was entered into for the acquisition of the University of Maryland St. Joseph Medical Center, but Defendants deny that the "Catholic Church" was a party to the agreement.  Defendants further admit the ERDs are referenced at the University of Maryland St. Joseph Medical Center and its Catholic heritage is maintained as a result of the acquisition.  Answering further, the allegations in Paragraph 32 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for

themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 32 of the Complaint.

33.     In or about December of 2012, UMMS formally acquired the hospital for over $200 million.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center was purchased for over $200 million.  Except as specifically admitted, Defendants deny the remaining allegations of Paragraph 33 of the Complaint.

**The State of Maryland Operates the Hospital as a Catholic Institution**

34.     Since the acquisition, UMMS and its subsidiaries have continued to operate University of Maryland St. Joseph Medical Center as a Catholic institution, just as when the hospital was owned and operated by a private religious entity.  For example, the hospital's website advertises that it is a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services."

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center has a Catholic heritage that has been maintained following its acquisition in 2012.  Answering further, the allegations in Paragraph 34 of the Complaint purport to summarize, quote, or derive from documentary evidence or electronic sources, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     While it continues to be operated as a religious institution, University of Maryland St. Joseph Medical Center derives substantial benefits from being purchased by, and publicly associated with, an arm of the Maryland State government.  University of Maryland St.

Joseph Medical Center advertises itself an "integral member of University of Maryland Medical System."

**ANSWER**:  The allegations in Paragraph 35 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations contained in the second sentence of Paragraph 35 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

36.     As alleged above, St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC. On information and belief, USMJ LLC and St. Joseph LLC are corporate alter egos.  On information and belief, they share a common Board of Directors and a common management structure.  Both entities—in separate public filings with the State and Federal governments— have held themselves out as owning and operating the University of Maryland St. Joseph Medical Center.

**ANSWER**:  Defendants admit Defendant St. Joseph LLC is a subsidiary of Defendant UMSJ.  Answering further, the allegations in Paragraph 36 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, the allegations in Paragraph 36 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     UMMS and its officials are pervasively entwined with the management and governance of UMSJ LLC and St. Joseph LLC, such that the activity of these entities is State action.  By way of example, UMMS is entitled to elect one or more board members of the governing body of both entities.  Their financial books are maintained in the care of S. Michelle Lee, UMMS's Chief Financial Officer.  And, every decision "must be approved by UMMS." On information and belief, that includes the decision to impose the Catholic Directives on the hospital's patients and staff, a direct consequence of which was the cancellation of Mr. Hammons's scheduled surgery.

**ANSWER**:  The allegations in Paragraph 37 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 37 of the Complaint.  Answering further, the allegations in Paragraph 37 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Defendants deny all remaining allegations in Paragraph 37.

38.     Moreover, the personnel involved in the creation of the ostensibly private subsidiaries of UMMS and the purchase of the hospital were UMMS personnel.  Corporate charter documents of both USMJ LLC and St. Joseph LLC were executed by the then-General Counsel of UMMS, Megan M. Arthur.  Ms. Arthur also served as resident agent of St. Joseph LLC until her retirement from UMMS in the wake of the recent Healthy Holly scandal, involving self-dealing by the UMMS board of directors.  Now, UMMS's Office of General Counsel serves as the resident agent of St. Joseph LLC (and the Senior Associate Counsel for

UMMS, Adil Daudi, is listed as the General Partner of UMSJ LLC on the corporate filing with the Maryland Secretary of State effecting that change).

**ANSWER**:  Defendants admit Megan M. Arthur was previously the General Counsel of Defendant UMMS.  The remaining allegations in Paragraph 38 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 38 of the Complaint.

39.     The Article of Transfer memorializing the purchase of the hospital from the Catholic Church was signed by Robert Chrencik as Authorized Agent for the Transferee St. Joseph LLC.  At the time, Mr. Chrencik was the President and CEO of UMMS. (He later resigned in the fallout of the Healthy Holly scandal.).

**ANSWER**:  Defendants admit Mr. Robert Chrencik previously served as President and CEO of Defendant UMMS.  The remaining allegations in Paragraph 39 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny all remaining allegations in Paragraph 39 of the Complaint.

40.     This pervasive entwinement between UMMS, UMSJ LLC, St. Joseph LLC, and University of Maryland St. Joseph Medical Center means that the actions of UMSJ LLC and St. Joseph LLC are the actions of UMMS, which is an instrumentality the State of Maryland.

**ANSWER**:  The allegations in Paragraph 40 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

### Transgender Individuals and Gender Dysphoria

41.     Gender identity is a well-established medical concept, referring to one's deeply felt sense of oneself as belonging to a particular gender.  Although the precise origins of each person's gender identity are not fully understood, experts agree that it likely results from a combination of biological factors as well as social, cultural, and behavioral factors.  The medical consensus is that gender identity, regardless of its precise etiology, is deeply rooted and cannot be voluntarily changed.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 41 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 41 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, Defendants deny all allegations in Paragraph 41 of the Complaint that are based on the alleged viewpoints or opinions of third-parties.

42.     Typically, people who are designated female at birth based on their external anatomy go on to identify as girls or women, and people who are designated male at birth go on to identify as boys or men.  For transgender individuals, however, their gender identity differs from the sex assigned to them at birth.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 42 of

-23-

the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 42 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

43.     Transgender men are men who were assigned "female" at birth, but have a male gender identity. Transgender women are women who were assigned "male" at birth, but have a female gender identity.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 43 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 43 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

44.     Being transgender is not a mental disorder.  People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.  But transgender people may require treatment for "gender dysphoria," the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex.  Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") and International Classification of Diseases ("ICD-10").  The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 44 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 44 of the Complaint purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

45.     The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH").  The WPATH standards of care have been recognized as the authoritative standards of care by the leading medical organizations and the U.S. Department of Health and Human Services.

**ANSWER**:  Defendants admit the World Professional Association for Transgender Health ("WPATH") has published a document titled "Standards of Care."  The remaining allegations in Paragraph 45 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, Defendants deny any allegations that are based on the alleged beliefs or opinions of third-parties.  Except as specifically admitted, Defendants deny the allegations in Paragraph 45 of the Complaint.

46.     Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another.  This treatment, often referred to as transition-related care, may include hormone therapy, surgeries (sometimes called "sex reassignment surgery" or "gender

affirming surgery"), and other medical services that align an individual's body with their gender identity.

**ANSWER**:  The allegations in Paragraph 46 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

47.     Under the WPATH standards, the exact medical treatment varies based on the individualized needs of the person. Under each patient's treatment plan, the goal is to enable the individual to live all aspects of their life consistent with their gender identity, thereby eliminating the distress associated with the incongruence.

**ANSWER**:  The allegations in Paragraph 47 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

48.     Hysterectomy is surgery to remove a patient's uterus.  In addition to treating gender dysphoria, hysterectomies are performed to treat a number of health conditions, including uterine fibroids, endometriosis, pelvic support problems, abnormal uterine bleeding, chronic pelvic pain, and gynecological cancer.  A patient can no longer become pregnant after undergoing a hysterectomy.  Thus, hysterectomy is an inherently sterilizing procedure, regardless of the reason for which it is performed.  According to the U.S. Department of Health and Human Services, hysterectomy is the second-most common surgery, after a Caesarean section, among women in the United States.

**ANSWER**:  Defendants admit the allegations in the first sentence of Paragraph 48 of the Complaint.  Answering further, Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the remaining

allegations in Paragraph 48 of the Complaint, and therefore deny those allegations. Additionally, the allegations in Paragraph 48 of the Complaint purport to summarize, quote, or derive from documentary evidence. Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text. Except as specifically admitted, Defendants deny the allegations in Paragraph 48 of the Complaint.

49.     Transgender men often require a hysterectomy as a gender-affirming surgical treatment for gender dysphoria. The United States Transgender Discrimination Survey in 2015, which surveyed almost 28,000 transgender people, found that 14% of transgender men surveyed had undergone a hysterectomy, and 57% wanted to undergo a hysterectomy. According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures such as hysterectomy, are effective, safe, and medically necessary.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 49 of the Complaint, and therefore deny those allegations. Answering further, the allegations in Paragraph 49 of the Complaint purport to summarize, quote, or derive from documentary evidence. Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text. Additionally, Defendants deny any allegations that are based on the alleged beliefs or opinions of third-parties.

50.     In the past, public and private insurance companies excluded coverage for transition-related care based on the assumption that such treatments were cosmetic or experimental. Today, however, transition-related surgical care is routinely covered by public and private insurance programs, including Medicare and Maryland Medicaid. The American

Medical Association, the American Psychological Association, the American Psychiatric Association, the American College of Obstetricians and Gynecologists, and other major medical organizations have issued policy statements and guidelines supporting healthcare coverage for transition-related care as medically necessary under contemporary standards of care.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint, and therefore deny those allegations.

**Mr. Hammons's Medically Necessary Treatment for Gender Dysphoria**

51.     Plaintiff Jesse Hammons is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint, and therefore deny those allegations.

52.     In accordance with the WPATH Standards of Care, Mr. Hammons's treating physicians recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria.  Mr. Hammons satisfied all of the criteria for a medically necessary hysterectomy under the WPATH Standards of Care.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 52 of the Complaint, and therefore deny those allegations.

53.     Mr. Hammons scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery was scheduled to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  Except as specifically admitted, Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     In planning for his surgery, Mr. Hammons underwent pre-operative blood tests, an echocardiogram, and other health screenings with his treating physician.  Mr. Hammons scheduled the surgery to be performed during a break from school and arranged to take off time from work for his surgery and recovery.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 54 of the Complaint, and therefore deny those allegations.

55.     Like many transgender people, Mr. Hammons experiences anxiety and increased dysphoria when discussing any of his anatomical characteristics that are typically associated with his sex assigned at birth.  In planning for his surgery, he worked hard over several months to mentally prepare himself for the experience.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 55 of the Complaint, and therefore deny those allegations.

56.     Approximately 7–10 days before Mr. Hammons's surgery was scheduled to take place, University of Maryland St. Joseph Medical Center's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, ordered the surgery canceled.  Dr. Cunningham told Mr. Hammons's surgeon that he could not perform Mr. Hammons's hysterectomy because the surgery conflicted with the hospital's Catholic religious beliefs and the Catholic Directives.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery did not take place at the University of Maryland St. Joseph Medical Center.  Defendants further admit Dr. Cunningham serves as the University of Maryland St. Joseph Medical Center's Senior Vice President for Medical Affairs and Chief Medical Officer.  Defendants also admit Dr. Cunningham spoke with Mr. Hammons's surgeon and informed his surgeon that the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center.  Except as specifically admitted, Defendants deny the allegations in Paragraph 56 of the Complaint.

57.     The Catholic Directives generally prohibit medical treatments that are primarily intended to induce sterilization, but authorize such procedures "when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." Catholic Directives p.19, ¶ 53.  Dr. Cunningham told Mr. Hammons's surgeon that, according to University of Maryland St. Joseph Medical Center's religious beliefs, Mr. Hammons's gender dysphoria did not qualify as a sufficient medical reason to authorize the procedure.

**ANSWER**:  Defendants admit that Dr. Cunningham spoke with Mr. Hammons's surgeon regarding Mr. Hammons's alleged surgery and informed his surgeon the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center. Answering further, the allegations in the first sentence of Paragraph 57 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 57 of the Complaint.

58.     Dr. Cunningham also told Mr. Hammons's surgeon that performing the hysterectomy and removing an otherwise healthy organ would violate the Catholic Directives'

command to preserve the "functional integrity" of the human body. *Id.* at p.14, ¶ 29.  But the Catholic Directives state that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available." *Id.*  For example, surgeons at University of Maryland St. Joseph Medical Center remove otherwise healthy tissue to prevent cancer or other diseases.  University of Maryland St. Joseph Medical Center also authorizes surgeons to perform purely cosmetic surgeries.  Dr. Cunningham, nevertheless, told Mr. Hammons's surgeon that University of Maryland St. Joseph Medical Center did not consider Mr. Hammons's gender dysphoria to be a valid basis under the Catholic Directives to justify disrupting the body's "functional integrity."

**ANSWER**:  Defendants admit patients may seek medical care or treatment at the University of Maryland St. Joseph Medical Center regardless of their gender.  Defendants further admit that Dr. Cunningham spoke with Mr. Hammons's surgeon regarding Mr. Hammons's alleged surgery and informed his surgeon the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center.  Defendants also admit procedures to treat cancer or that could be considered cosmetic have been performed at the University of Maryland St. Joseph Medical Center.  Answering further, the allegations in Paragraph 58 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 58 of the Complaint.

59.     When he learned that University of Maryland St. Joseph Medical Center had canceled his medically necessary surgery, Mr. Hammons felt shocked, angry, afraid, and devastated.  Mr. Hammons felt that he was being told his health and well-being were not

worthy of being protected, and he felt angry that the hospital—which is part of his own State government—was using other people's religious beliefs to deny him the medical treatment he needed.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 59 of the Complaint, and therefore deny those allegations.  Answering further, to the extent the allegations in the second sentence of Paragraph 59 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

60.     Mr. Hammons was not able to have his hysterectomy performed until June 24, 2020.  As a result of the rescheduling, Mr. Hammons had to spend more money on an additional round of pre-operative tests; he had to spend another six months experiencing gender dysphoria without the therapeutic benefits of the surgery; and he had to spend another six months carrying the stress and anxiety of having to mentally prepare himself for the surgery all over again.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 60 of the Complaint, and therefore deny those allegations.

## COUNT I

### VIOLATION OF THE ESTABLISHMENT CLAUSE

61.     Plaintiff re-alleges paragraph 1-60 as if fully set forth herein.

**ANSWER**:  Defendants deny the allegations in Paragraph 61 of the Complaint.  Count I of the Complaint was dismissed.

62.     As alleged above, Defendants are instrumentalities of the State of Maryland for purposes of the First Amendment (incorporated against the states via the Fourteenth Amendment).

**ANSWER**:  Defendants deny the allegations in Paragraph 62 of the Complaint.  Count I of the Complaint was dismissed.

63.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and declaratory relief for violations of the Establishment Clause of the First Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 63 of the Complaint.  Count I of the Complaint was dismissed.

64.     Although UMMS is an instrumentality of the state bound by the First Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because, among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency, political subdivision, public body, public corporation, or municipal corporation" and declared that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or public entities."  Md. Code Educ. § 13-303(a)(2).  That "statutory disavowal of [a quasi-private corporation's] agency status deprives [it] of sovereign immunity from suit."  Lebron, 513 U.S. at 392.

**ANSWER**:  Defendants deny the allegations in Paragraph 64 of the Complaint.  Count I of the Complaint was dismissed.

65.     Any judgment against UMMS would not be paid by the State: "Obligations of [UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of the University or the State."  Md. Code Educ. § 13-310.

**ANSWER**: Defendants deny the allegations in Paragraph 65 of the Complaint. Count I of the Complaint was dismissed.

66.     By purchasing the St. Joseph hospital and signing an agreement to operate the hospital as a Catholic institution and in accordance with the Catholic Directives, UMMS has violated the Establishment Clause by, among other things, (a) creating an impermissible fusion of governmental and religious functions; (b) impermissibly delegating government authority to be exercised in accordance with religious criteria; (c) impermissibly endorsing religion; taking government action that has the primary purpose and effect of advancing religion; creating unconstitutional governmental entanglement with religion; (e) favoring one set of religious beliefs over others; and (f) impermissibly coercing individuals to act in accordance with particular religious beliefs.

**ANSWER**: Defendants deny the allegations in Paragraph 66 of the Complaint. Count I of the Complaint was dismissed.

67.     As a result of Defendants' violations of the Establishment Clause, Plaintiff Jesse Hammons suffered an injury in fact when University of Maryland St. Joseph Medical Center canceled his medically necessary surgery to treat gender dysphoria based on the Catholic Directives.

**ANSWER**: Defendants deny the allegations in Paragraph 67 of the Complaint. Count I of the Complaint was dismissed.

68.     Defendants are liable for their violation of Mr. Hammons's rights under the Establishment Clause pursuant to 42 U.S.C. § 1983.

**ANSWER**: Defendants deny the allegations in Paragraph 68 of the Complaint. Count I of the Complaint was dismissed.

## COUNT II

### VIOLATION OF THE EQUAL PROTECTION CLAUSE

69.     Plaintiff re-alleges paragraph 1-68 as if fully set forth herein.

**ANSWER**:  Defendants deny the allegations in Paragraph 69 of the Complaint.  Count II of the Complaint was dismissed.

70.      As alleged above, Defendants are instrumentalities of the State of Maryland for purposes of the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 70 of the Complaint.  Count II of the Complaint was dismissed.

71.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and declaratory relief for violations of the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 71 of the Complaint.  Count II of the Complaint was dismissed.

72.     Although UMMS is an instrumentality of the state bound by the Fourteenth Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because, among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency, political subdivision, public body, public corporation, or municipal corporation" and declared that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or public entities." Md. Code Educ. § 13-303(a)(2). That "statutory disavowal of [a quasi-private corporation's] agency status deprives [it] of sovereign immunity from suit." *Lebron*, 513 U.S. at 392.

**ANSWER**:  Defendants deny the allegations in Paragraph 72 of the Complaint.  Count II of the Complaint was dismissed.

73.     Any judgment against UMMS would not be paid by the State: "Obligations of [UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of the University or the State."  Md. Code Educ. § 13-310.

**ANSWER**:  Defendants deny the allegations in Paragraph 73 of the Complaint.  Count II of the Complaint was dismissed.

74.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender.

**ANSWER**:  Defendants deny the allegations in Paragraph 74 of the Complaint.  Count II of the Complaint was dismissed.

75.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

**ANSWER**:  Defendants deny the allegations in Paragraph 75 of the Complaint.  Count II of the Complaint was dismissed.

76.     Because the need to undergo gender transition is a defining aspect of being transgender, discrimination based on whether surgery is part of gender transition is discrimination against transgender individuals as a class.

**ANSWER**:  Defendants deny the allegations in Paragraph 76 of the Complaint.  Count II of the Complaint was dismissed.

77.     Because gender transition inherently transgresses gender stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on gender nonconformity.

**ANSWER**:  Defendants deny the allegations in Paragraph 77 of the Complaint.  Count II of the Complaint was dismissed.

78.     Discrimination based on the fact that a person is transgender or needs to undergo gender transition is discrimination that would not occur but for the person's sex.  *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020).

**ANSWER**:  Defendants deny the allegations in Paragraph 78 of the Complaint.  Count II of the Complaint was dismissed.

79.     Defendants discriminated against Mr. Hammons on the basis of sex, which is subject to heightened scrutiny under the Equal Protection Clause.

**ANSWER**:  Defendants deny the allegations in Paragraph 79 of the Complaint.  Count II of the Complaint was dismissed.

80.     Defendants discriminated against Mr. Hammons on the basis of transgender status, which is independently subject to heightened scrutiny under the Equal Protection Clause.

    a.   People who are transgender, as a class, have historically been subject to discrimination.

    b.   People who are transgender, as a class, have a defining characteristic that bears no relation to an ability to perform or contribute to society.

    c.   People who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

    d.   People who are transgender, as a class, are a minority with relatively little

political power.

**ANSWER**:  Defendants deny the allegations in Paragraph 80 of the Complaint.  Count II of the Complaint was dismissed.

81.     Defendants' discrimination against Mr. Hammons was not narrowly tailored to serve a compelling governmental interest.

**ANSWER**:  Defendants deny the allegations in Paragraph 81 of the Complaint.  Count II of the Complaint was dismissed.

82.     Defendants' discrimination against Mr. Hammons was not substantially related to an important governmental interest.

**ANSWER**:  Defendants deny the allegations in Paragraph 82 of the Complaint.  Count II of the Complaint was dismissed.

83.     Defendants' discrimination against Mr. Hammons did not rationally further any legitimate governmental interest and was grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender.

**ANSWER**:  Defendants deny the allegations in Paragraph 83 of the Complaint.  Count II of the Complaint was dismissed.

84.     Defendants are liable for their violation of Mr. Hammons's rights under the Equal Protection Clause pursuant to 42 U.S.C. § 1983.

**ANSWER**:  Defendants deny the allegations in Paragraph 84 of the Complaint.  Count II of the Complaint was dismissed.

## COUNT III

### VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT

85.     Plaintiff re-alleges paragraph 1-84 as if fully set forth herein.

**ANSWER**:  Defendants re-affirm and incorporate by reference their answers to Paragraphs 1 through 84 of this Answer in response to Paragraph 85 of the Complaint.

86.     Section 1557 provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).

**ANSWER**:  The allegations in Paragraph 86 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

87.     Section 1557's prohibition on sex discrimination is enforceable by a private right of action.

**ANSWER**:  The allegations in Paragraph 87 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

88.     On information and belief, Defendants receive Federal financial assistance and are, therefore, subject to Section 1557's prohibition on sex discrimination.

**ANSWER**:  Defendants admit they provide services to Federal health care program beneficiaries and receive payments for those services.  The remaining allegations in Paragraph 88 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 88 of the Complaint.

89.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender, and thus discriminated against Mr. Hammons on the basis of sex.

**ANSWER**:  Defendants deny the allegations in Paragraph 89 of the Complaint.

90.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

**ANSWER**:  Defendants deny the allegations in Paragraph 90 of the Complaint.

91.     Because gender transition inherently transgresses sex stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on sex under Section 1557.

**ANSWER**:  The allegations in Paragraph 91 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

92.     Discrimination based on a person's transgender status or need to undergo gender transition is discrimination that would not occur but for the person's sex in violation of Section 1557.  *See Bostock*, 140 S. Ct. 1731.

**ANSWER**:  The allegations in Paragraph 92 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 92 of the Complaint.

93.     Pursuant to Section 1557's private right of action, Defendants are liable for their violation of Mr. Hammons's rights under Section 1557.

**ANSWER**:  Defendants deny the allegations in Paragraph 93 of the Complaint.

## REQUESTED RELIEF

A.      Defendants deny the allegations of Paragraph A of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

B.      Defendants deny the allegations of Paragraph B of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

C.      Defendants deny the allegations of Paragraph C of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

D.      Defendants deny the allegations of Paragraph D of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

E.      Defendants deny the allegations of Paragraph E of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

## GENERAL DENIAL

Defendants deny all allegations in the Complaint that are not specifically admitted or denied above.

## DENIAL OF HEADINGS

Defendants have restated in this Answer the headings as they appear in the Complaint. To the extent the headings purport to assert any factual allegations or legal conclusions, they are denied in their entirety.

## DEFENDANTS' AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by sovereign immunity.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Plaintiff lacks standing to assert his claim.

### THIRD AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Defendants are not the proximate or legal cause of Plaintiff's alleged injury.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred in whole or in part to the extent Plaintiff is seeking to recover damages that are speculative in nature.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by the doctrines of waiver, estoppel, and/or laches.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Defendants actions were justified.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred to the extent it seeks to hold Defendants jointly liable for conduct attributable only to one party.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Plaintiff has suffered no actual harm or damages.

## TENTH AFFIRMATIVE DEFENSE

All actions of Defendants in this matter were taken in good faith and for legitimate, non-discriminatory reasons.

## ELEVENTH AFFIRMATIVE DEFENSE

Although Defendants deny that they discriminated against Plaintiff in any way, to the extent that it is determined that an impermissible motive may have been a factor in any decision regarding Plaintiff, which is denied, the same decision would have been reached based upon legitimate and non-discriminatory reasons.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants did not engage in any discriminatory conduct.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants did not act with any discriminatory intent.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendants did not intentionally, deliberately, or knowingly engage in any conduct in violation of any federal or local statute, nor did Defendants exhibit reckless disregard for the requirements of any law or act with malice toward Plaintiff.

## FIFTEENTH AFFIRMATIVE DEFENSE

Defendants acted in good faith and had reasonable grounds for believing that their conduct and actions were lawful and in compliance with federal and local law.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by the ecclesiastical abstention doctrine.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred as to Defendant St. Joseph LLC by the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*

\*       \*       \*

Defendants reserve the right to amend this Answer and raise additional affirmative defenses should Defendants discover facts that would enable them to raise such additional affirmative defenses.

## ATTORNEY'S FEES & COSTS

Defendants are entitled to an award of their costs, including expert costs, and attorney's fees incurred in defending this action in such amount as this Court may deem appropriate.  The basis for such award includes, without limitation, 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Defendants pray for judgment against Plaintiff as follows:

1.       For an order dismissing Count III of the Complaint with prejudice;

2.      For judgment in favor of Defendants on Count III of the Complaint against

Plaintiff;

3.      For an award of attorney's fees and costs; and

4.      Such other and further relief as this Court may deem just and proper.


Dated: February 10, 2022                    _/s/ Denise Giraudo_____
                                            Denise Giraudo (Bar No. 29015)
                                            Paul Werner (admitted *pro hac vice*)
                                            Danielle Vrabie (admitted *pro hac vice*)
                                            Imad Matini (admitted *pro hac vice*)
                                            SHEPPARD, MULLIN, RICHTER &
                                            HAMPTON LLP
                                            2099 Pennsylvania Ave., N.W., Suite 100
                                            Washington, D.C. 20036
                                            Tel: 202-747-1906
                                            Fax: 202-747-3933
                                            dgiraudo@sheppardmullin.com
                                            pwerner@sheppardmullin.com
                                            dvrabie@sheppardmullin.com
                                            imatini@sheppardmullin.com

-45-

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2022, Plaintiff's counsel was served with the

foregoing document through the Court's Electronic Case Filing System.

___/s/ Denise Giraudo_____
Denise Giraudo

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JESSE HAMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   Case No. 1:20-cv-02088-DKC |
| | ) |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) |
| CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FIRST AMENDED ANSWER TO COMPLAINT**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendants University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (collectively, "Defendants"), submit the following answer and affirmative defenses to Plaintiff Jesse Hammons's Complaint (ECF No. 1).

**INTRODUCTION**

1.      UMMS, through its wholly owned subsidiaries UMSJ LLC and St. Joseph LLC (collectively, "Defendants"), owns and operates a hospital in Towson, Maryland under the name of University of Maryland St. Joseph Medical Center. Defendants are instrumentalities of the State of Maryland and subject to the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause.  But, in violation of those constitutional obligations, Defendants operate University of Maryland St. Joseph Medical Center as a Catholic institution, guided by "Catholic health care values" and bound by the "Ethical and Religious Directives for Catholic Health Care Services" established by the U.S. Conference of Catholic Bishops (the "Catholic Directives").

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center is located in Towson, Maryland.  Defendants further admit Defendants UMSJ and St. Joseph LLC are subsidiaries of Defendant UMMS.  The remaining allegations in Paragraph 1 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the remaining allegations in Paragraph 1 of the Complaint. Except as specifically admitted, Defendants deny the allegations in Paragraph 1 of the Complaint.

2.      Plaintiff Jesse Hammons is a man who is transgender.  As part of Mr. Hammons's medically necessary treatment relating to his diagnosis of gender dysphoria, Mr. Hammons's surgeon scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  But approximately 7–10 days before Mr. Hammons's scheduled operation, Defendants canceled the surgery based on a discriminatory and unconstitutional application of Catholic religious doctrine.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery was scheduled to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  Defendants also admit Mr. Hammons's alleged surgery did not take place at the University of Maryland St. Joseph Medical Center.  Answering further, the allegations in the third sentence of Paragraph 2 of the Complaint assert legal conclusions, to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 of the Complaint, and therefore deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 2 of the Complaint.

3.      According to the administrators of University of Maryland St. Joseph Medical
Center, Mr. Hammons could not receive his medical treatment at the hospital because, in the
view of the administrators, Mr. Hammons's treatment would violate Catholic religious doctrine,
as announced in the Catholic Directives.  The Catholic Directives state that Catholic hospitals
may not perform procedures that induce sterility unless "their direct effect is the cure or
alleviation of a present and serious pathology and a simpler treatment is not available."
Catholic Directives p.19, ¶ 53.  The stated basis for this rule is the Catholic teaching that
Catholic health care organizations are not permitted to engage in "immediate material
cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted
suicide, and direct sterilization."  *Id.* p.25, ¶ 70.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery did not take place at the
University of Maryland St. Joseph Medical Center.  Defendants further admit the Ethical and
Religious Directives for Catholic Health Care Services ("ERDs") are referenced at the
University of Maryland St. Joseph Medical Center.  The remaining allegations in Paragraph 3
of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such
documents speak for themselves, and Defendants deny any characterization of their contents
that is inconsistent with their text.  Defendants further deny all allegations in Paragraph 3 of the
Complaint that are based on the alleged beliefs or thoughts of third-parties.  Except as
specifically admitted, Defendants deny the allegations in Paragraph 3 of the Complaint.

4.      Hysterectomies are procedures that induce sterility.  On information and belief,
however, University of Maryland St. Joseph Medical Center routinely performs hysterectomies
when they are medically necessary to treat a diagnosed condition other than gender dysphoria.
When they canceled Mr. Hammons's medically necessary surgery, Defendants thus treated Mr.

Hammons—as a man who is transgender—differently from non-transgender patients who require medically necessary hysterectomies for other medical conditions.

**ANSWER**:  Defendants admit hysterectomies have been performed at the University of Maryland St. Joseph Medical Center, but Defendants deny hysterectomies are "routinely" performed at the University of Maryland St. Joseph Medical Center.  The remaining allegations in Paragraph 4 of the Complaint assert legal conclusions, to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 4 of the Complaint.

5.      An instrumentality of the state may not operate a Catholic hospital or deny medical care to transgender patients based on Catholic religious beliefs.  By invoking Catholic religious doctrine as a basis for canceling Mr. Hammons's medically necessary surgery, Defendants violated the Establishment Clause of the First Amendment.  And by subjecting Mr. Hammons to different and unequal treatment, Defendants also violated the Equal Protection Clause of the Fourteenth Amendment and Section 1557 of the Affordable Care Act.

**ANSWER**:  The allegations in Paragraph 5 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343.

**ANSWER**:  The allegations in Paragraph 6 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

-4-

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), and the Court has personal jurisdiction over the Defendants because Defendants each hold themselves out as corporations under the laws of the State of Maryland; because they each reside in this District; and because a substantial part of the events or omissions giving rise to this action occurred and are occurring in this District.

**ANSWER**:  The allegations in Paragraph 7 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants state that venue is proper in this judicial district and that this Court has personal jurisdiction over Defendants.

## PARTIES

8.      Plaintiff Jesse Hammons resides in Baltimore, Maryland.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint, and therefore deny those allegations.

9.      UMMS is a "nonprofit, nonstock corporation" in the State of Maryland.  Md. Code Educ. § 13-302(7).  UMMS was created by statute.  *See id.* § 13-301, *et seq.*  All of the voting members of its Board of Directors are appointed by the Governor of Maryland.  Id. § 13-304(b).  According to its authorizing statute, UMMS is intended to serve "the highest public interest" and its purposes "are essential to the public health and welfare" of the State.  *Id.* § 13-302(4).  UMMS's offices are located at 250 W. Pratt St., Baltimore, Maryland 21201.

**ANSWER**:  Defendants admit Defendant UMMS is located at 250 W. Pratt St., 24th Floor, Baltimore, Maryland 21201.  Defendants further admit Defendant UMMS's voting members of its Board of Directors are appointed by the Governor of Maryland.  The remaining allegations in Paragraph 9 of the Complaint assert legal conclusions to which no response is

required.  To the extent a response is deemed required, Defendants deny those allegations.

Answering further, the allegations in Paragraph 9 purport to quote, summarize, or derive from

the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its

contents that is inconsistent with its text.  Except as specifically admitted, Defendants deny the

allegations in Paragraph 9 of the Complaint.

10.     UMSJ LLC is a wholly owned subsidiary of UMMS.  UMSJ LLC was organized

on or about February 12, 2013, by the then-General Counsel of UMMS, Megan M. Arthur, as

Authorized Person.  According to its articles of incorporation, the company was "organized and

shall be operated exclusively (i) in furtherance of the charitable, scientific and educational

purposes of, (ii) for the benefit of, (iii) to perform the functions of and (iv) to carry out the

purposes of: University of Maryland Medical System Corporation."  On information and belief,

UMMS created UMSJ LLC for the sole purpose of owning and operating University of

Maryland St. Joseph Medical Center.  At its inception, UMSJ LLC's principal office was

located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's

offices).  Now its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the

hospital's address).

**ANSWER**:  Defendants admit that Defendant UMSJ is located at 7601 Osler Drive,

Towson, Maryland 21204.  Defendants further admit Defendant UMSJ is a subsidiary of

Defendant UMMS.  Answering further, the allegations in Paragraph 10 of the Complaint

purport to summarize, quote, or derive from documentary evidence.  Such documents speak for

themselves, and Defendants deny any characterization of their contents that is inconsistent with

their text.  Additionally, to the extent the allegations in Paragraph 10 of the Complaint assert

legal conclusions, no response is required.  To the extent a response is deemed required,

Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 10 of the Complaint.

11.      Defendant St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC.  St. Joseph LLC was organized under the name "Northeastern Maryland Regional Health System, LLC" on or about April 25, 2012, by then-General Counsel of UMMS, Megan M. Arthur, as Authorized Person.  According to its articles of incorporation, among the stated "charitable purposes" of this new entity was "[t]o maintain a hospital in northeastern Maryland."  On or about August 1, 2012, the new entity's name was changed to its present name: University of Maryland St. Joseph Medical Center, LLC.  On information and belief, UMMS created this entity for the sole purpose of purchasing the existing St. Joseph hospital.  At its inception, St. Joseph LLC's principal office was located at 250 W. Pratt St., Baltimore, Maryland 21201 (which is also the address of UMMS's offices).  Now, its principal office is located at 7601 Osler Drive, Towson, Maryland 21204 (the address of the hospital).

**ANSWER**:  Defendants admit Defendant St. Joseph LLC is located at 7601 Osler Drive, Towson, Maryland 21204.  Defendants also admit Defendant St. Joseph LLC is a subsidiary of Defendant UMSJ.  Answering further, the allegations in Paragraph 11 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Additionally, to the extent the allegations in Paragraph 11 of the Complaint assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 11 of the Complaint.

12.     St. Joseph LLC owns and operates a hospital known as University of Maryland St. Joseph Medical Center located at 7601 Osler Drive, Towson, Maryland 21204.  University of Maryland St. Joseph Medical Center holds itself out as "an integral member of UMMS."

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center is located at 7601 Osler Drive, Towson, Maryland 21204.  The remaining allegations in Paragraph 12 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, to the extent the allegations in Paragraph 12 assert legal conclusions, no response is deemed required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 12 of the Complaint.

13.     On information and belief, University of Maryland St. Joseph Medical Center adheres to the Catholic Directives in administering care pursuant to a written agreement with UMMS.  University of Maryland St. Joseph Medical Center advertises that it provides treatment in accordance with its "core values" of "[r]everence" and "[r]espect for all people as God's loved children."

**ANSWER**:  Defendants admit the ERDs are referenced at the University of Maryland St. Joseph Medical Center.  Defendants further admit that core values related to providing service and compassionate care to patients are also referenced at the University of Maryland St. Joseph Medical Center.  Answering further, the remaining allegations in Paragraph 13 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents

that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     On information and belief, UMMS, UMSJ LLC, and St. Joseph LLC receive federal funds.

**ANSWER**:  Defendants admit they have received payments for patient procedures covered by Medicare and Medicaid.  Except as specifically admitted, Defendants deny the allegations in Paragraph 14 of the Complaint.

## FACTUAL ALLEGATIONS

### Maryland Creates UMMS as a Quasi-Private Corporation While Retaining State Control

15.     Under Maryland law, the public University System of Maryland (the "University") is designated as "an instrumentality of the State and a public corporation" and "an independent unit of State government."  Md. Code Educ. § 12-102(a).  For almost a century, from 1897 to 1984, the University operated the University of Maryland Medical Center and referred to it as "University Hospital."

**ANSWER**:  The allegations in Paragraph 15 assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 15 purport to quote, summarize, or derive from the Code of Maryland and other documentary evidence, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

16.     In 1984, the Maryland General Assembly passed a statute transferring the assets and liabilities of the University of Maryland Medical Center to a new corporation called the "University of Maryland Medical System Corporation"—UMMS.  *See id.* § 13-301, *et seq.*

**ANSWER**:  The allegations in Paragraph 16 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 16 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

17.   The statute declared UMMS to be an independent corporation and not a State agency, and the statute provided that UMMS "is not subject to any provisions of law affecting only governmental or public entities." *Id.* § 13-303(a)(2).  Nevertheless, the statute reaffirmed that the new UMMS would continue to serve the same governmental purposes that it had served for nearly one hundred years when University Hospital was operated by a unit of State government.   To that end, the statute's legislative findings declared:

(1)   The purposes of the medical system are to provide medical care of the type unique to University medical facilities for the citizens of the State and region  and, in accomplishing this objective, to provide a clinical context for education and research conducted by the faculty of the University;

(2)   The purposes extend to all citizens of the State, particularly regarding health care needs which only an academic medical institution can adequately meet such as extensive tertiary care, major shock trauma treatment, and sophisticated surgical techniques;

(3)   The purposes also include rendering comprehensive health care to the community naturally served by University Hospital to assure its availability to citizens of that  community;

(4)   These purposes separately and collectively serve the highest public interest and are essential to the public health and welfare, but must be realized in the most efficient manner and at the lowest cost practicable and consistent with these purposes[.]

*Id.* § 13-302.

**ANSWER**:  The allegations in Paragraph 17 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants

deny those allegations.  Answering further, the allegations in Paragraph 17 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

18.     The statute specifically required that UMMS "[s]hall provide for and maintain . . . comprehensive services for patient populations naturally served by University Hospital, including uncompensated care and outpatient care," and "[s]hall maintain, create, and develop specialty care services . . . to meet the needs of the State and region."  *Id.* § 13-303(c).

**ANSWER**:  The allegations in Paragraph 18 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 18 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

19.     The statute also included a nondiscrimination provision, which stipulated that "[t]he Board of Directors shall operate the medical system without discrimination based upon race, creed, sex, or national origin."  *Id.* § 13-303(d).

**ANSWER**:  The allegations in Paragraph 19 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 19 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

20.     Under the statute, the State of Maryland continues to exercise ultimate authority and control over the governance of UMMS.  By statute, the Governor appoints all voting members on UMMS's Board of Directors, two of whom must be nominated by the President of

-11-

the Senate and Speaker of the House of Delegates, respectively.  *Id.* § 13-304(b) & (c)(5).  The Governor also fills any vacancies on the Board.  *See id.* § 13-304(d)(4).  In addition, the corporation could not exist until its articles of incorporation were approved by the Board of Public Works, a State agency.  *Id.* § 13-303(a)(1).

**ANSWER**:  The allegations in Paragraph 20 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 20 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

21.    Further, if the University Board of Regents and the Board of Public Works determine that UMMS has failed to realize the purposes set forth in its enacting statute, they have the power to terminate UMMS. *See id.* § 13-311(c).

**ANSWER**:  The allegations in Paragraph 21 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 21 purport to quote, summarize, or derive from the Code of Maryland, which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

22.    In light of these facts, Maryland's highest court has authoritatively determined that "UMMS is an instrumentality of the State."  *Napata v. Univ. of Md. Med. Sys. Corp.*, 12 A.3d 144, 151 (Md. 2011).

**ANSWER**:  The allegations in Paragraph 22 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 22 purport to quote,

-12-

summarize, or derive from *Napata v. Univ. of Md. Med. Sys. Corp.*, 12 A.3d 144 (Md. 2011), which speaks for itself, and Defendants deny any characterization of its contents that is inconsistent with its text.

23.     The State of Maryland's own website recognizes that UMMS is an instrumentality of the State:

> Although it established the University of Maryland Medical Center (UMMS) as an ostensibly private corporation, the General Assembly ensured that the State would continue to play a prominent role in the System's governance when it required that the UMMS's articles of incorporation and the initial transfer of assets from the State be approved by the Board of Public Works, that the voting members of the Board be Governor's appointees, and that there be continuing operational coordination between UMMS and the University.  In addition, it required that the Center continue as a teaching hospital for the University of Maryland [a unit of the State] and that it enter annual contracts with the University with limited authority to establish nonprofit or for-profit subsidiaries (98 Opinions of the Attorney General 114, November 21, 2013).

**ANSWER**:  The allegations in Paragraph 23 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations in Paragraph 23 purport to summarize, quote, or derive from documentary evidence or electronic sources, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

24.     For these and other reasons, UMMS is an instrumentality of the State of Maryland for purposes of the state action doctrine, making the guarantees of the First and Fourteenth Amendments to the United States Constitution binding on UMMS.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of

that corporation, the corporation is part of the Government for purposes of the First

Amendment.").

**ANSWER**:  The allegations in Paragraph 24 of the Complaint assert legal conclusions

to which no response is required.  To the extent a response is deemed required, Defendants

deny those allegations.  Answering further, the allegations in Paragraph 24 purport to quote,

summarize, or derive from *LeBron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), which

speaks for itself, and Defendants deny any characterization its contents that is inconsistent with

its text.

### UMMS Acquires St. Joseph Hospital and Agrees to Maintain the Hospital's "Catholic Identity"

25.     On information and belief, St. Joseph Hospital was originally founded by the

Sisters of St. Francis of Philadelphia and operated as a private Catholic hospital until 2012.

From 1996 to 2012 it was operated by Catholic Health Initiatives, a consortium of three

Catholic health care systems and 10 congregations.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center

was originally founded by the Sisters of St. Francis of Philadelphia.  Defendants further admit

the University of Maryland St. Joseph Medical Center became part of Catholic Health

Initiatives, a consortium of three Catholic health care systems and 10 congregations, from

approximately 1996 to 2012.  Answering further, to the extent the allegations in Paragraph 25

of the Complaint assert legal conclusions, no response is required.  To the extent a response is

deemed required, Defendants deny those allegations.  Additionally, to the extent the allegations

in Paragraph 25 of the Complaint purport to summarize, quote, or derive from documentary

evidence, such documents speak for themselves, and Defendants deny any characterization of

their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     In or about early 2012, Catholic Health Initiatives began searching for financial assistance as a result of a series of lawsuits and other difficulties that left the hospital in financial distress, losing $3 million a month, and its very survival in jeopardy.  Catholic Health Initiatives put the hospital up for sale.  UMMS expressed interest in acquiring the hospital and bringing it into the University of Maryland system.  Merger negotiations began.

**ANSWER**:  Defendants admit Defendant UMMS and Catholic Health Initiatives entered negotiations for the sale and acquisition of the University of Maryland St. Joseph Medical Center in approximately 2012.  Defendants further admit the University of Maryland St. Joseph Medical Center was in poor financial condition in approximately 2012.  Except as specifically admitted, Defendants deny the allegations in Paragraph 26 of the Complaint.

27.     A sticking point in the negotiations was whether the hospital would continue to be run as a Catholic institution.  Historically, the hospital had adhered to the Catholic Directives in administering care.  The Catholic Church, even as it sought to divest itself of the hospital, was adamant that the hospital should continue to follow the Catholic Directives under its new ownership.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center has a Catholic heritage and the ERDs are referenced at the University of Maryland St. Joseph Medical Center.  Defendants further admit that the University of Maryland St. Joseph Medical Center's maintenance of its Catholic heritage and reference of the ERDs were raised during the acquisition process.  Answering further, Defendants deny all allegations in Paragraph 27 of the Complaint that are based on the alleged beliefs or thoughts of third-parties.  Except as specifically admitted, Defendants deny the allegations in Paragraph 27 of the Complaint.

-15-

28.     The Catholic Directives, developed and published by the U.S. Conference of Catholic Bishops, reflect Catholic religious ideals pertaining to health care. The Catholic Directives state that health care must "respect the sacredness of every human life from the moment of conception until death," Catholic Directives at p.8, and "must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church," *id.* at p.8, ¶ 1. They also state that "Catholic health care services must adopt these Directives as policy" and "require adherence to them within the institution as a condition for medical privileges and employment." *Id.* at p.9, ¶ 5.

**ANSWER**:  The allegations in Paragraph 28 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

29.     The Catholic Directives prohibit certain types of care that would ordinarily be available to patients in secular facilities, including other hospitals in the UMMS system.  For example, the Catholic Directives specifically prohibit a rape victim from receiving treatments "that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum."  *Id.* at p.15, ¶ 36.  The directives also ban abortion in all cases, without exception.  *Id.* at p.18, ¶ 45.  In addition, though they permit married couples to "limit the number of their children by natural means," the Catholic Directives entirely bar "contraceptive interventions that either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."  *Id.* at p.16 (internal quotation marks omitted).

**ANSWER**:  The allegations in Paragraph 29 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text. Answering further, to the extent the allegations in Paragraph 29 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Defendants deny the remaining allegations in Paragraph 29 of the Complaint.

30.     As relevant to Mr. Hammons, the Catholic Directives state that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted," with a lone exception: "Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." *Id.* at p.19, ¶ 53.

**ANSWER**:  The allegations in Paragraph 30 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text. Answering further, to the extent the allegations in Paragraph 30 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

31.     A central focus during negotiations with UMMS was whether the hospital would continue to impose the Catholic Directives on its patients and staff under new ownership. Church law forbade the sale of the hospital to a non-Catholic entity unless officials from the Archdiocese of Baltimore and the Vatican itself provided their approval.  Cardinal O'Brien, the head of the Archdiocese of Baltimore at the time, expressed disappointment about UMMS's selection as the purchaser of the hospital and promised the Church would "do everything

-17-

possible in the months and years ahead" to keep the hospital a fundamentally Catholic institution.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center's maintenance of its Catholic heritage and reference of the ERDs were raised during the acquisition process.  Answering further, the allegations in the second sentence of Paragraph 31 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, the allegations in Paragraph 31 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the remaining allegations in Paragraph 31 of the Complaint.

32.     On information and belief, as a condition to closing the deal, UMMS signed a written agreement with the Catholic Church promising to continue running the hospital as a Catholic institution and to continue operating under the Catholic Directives.  Archbishop Lori, who had recently succeeded Cardinal O'Brien as head of the Baltimore Diocese, told the press that the agreement "will ensure that St. Joseph's will continue this long tradition of providing faith-filled care throughout this new chapter in the hospital's storied history."

**ANSWER**:  Defendants admit that a written agreement was entered into for the acquisition of the University of Maryland St. Joseph Medical Center, but Defendants deny that the "Catholic Church" was a party to the agreement.  Defendants further admit the ERDs are referenced at the University of Maryland St. Joseph Medical Center and its Catholic heritage is maintained as a result of the acquisition.  Answering further, the allegations in Paragraph 32 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for

-18-

themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 32 of the Complaint.

33.     In or about December of 2012, UMMS formally acquired the hospital for over $200 million.

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center was purchased for over $200 million.  Except as specifically admitted, Defendants deny the remaining allegations of Paragraph 33 of the Complaint.

### The State of Maryland Operates the Hospital as a Catholic Institution

34.     Since the acquisition, UMMS and its subsidiaries have continued to operate University of Maryland St. Joseph Medical Center as a Catholic institution, just as when the hospital was owned and operated by a private religious entity.  For example, the hospital's website advertises that it is a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services."

**ANSWER**:  Defendants admit the University of Maryland St. Joseph Medical Center has a Catholic heritage that has been maintained following its acquisition in 2012.  Answering further, the allegations in Paragraph 34 of the Complaint purport to summarize, quote, or derive from documentary evidence or electronic sources, which speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     While it continues to be operated as a religious institution, University of Maryland St. Joseph Medical Center derives substantial benefits from being purchased by, and publicly associated with, an arm of the Maryland State government.  University of Maryland St.

Joseph Medical Center advertises itself an "integral member of University of Maryland Medical System."

**ANSWER**:  The allegations in Paragraph 35 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Answering further, the allegations contained in the second sentence of Paragraph 35 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

36.     As alleged above, St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC. On information and belief, USMJ LLC and St. Joseph LLC are corporate alter egos.  On information and belief, they share a common Board of Directors and a common management structure.  Both entities—in separate public filings with the State and Federal governments— have held themselves out as owning and operating the University of Maryland St. Joseph Medical Center.

**ANSWER**:  Defendants admit Defendant St. Joseph LLC is a subsidiary of Defendant UMSJ.  Answering further, the allegations in Paragraph 36 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Additionally, the allegations in Paragraph 36 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     UMMS and its officials are pervasively entwined with the management and governance of UMSJ LLC and St. Joseph LLC, such that the activity of these entities is State action.  By way of example, UMMS is entitled to elect one or more board members of the governing body of both entities.  Their financial books are maintained in the care of S. Michelle Lee, UMMS's Chief Financial Officer.  And, every decision "must be approved by UMMS." On information and belief, that includes the decision to impose the Catholic Directives on the hospital's patients and staff, a direct consequence of which was the cancellation of Mr. Hammons's scheduled surgery.

**ANSWER**:  The allegations in Paragraph 37 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 37 of the Complaint.  Answering further, the allegations in Paragraph 37 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Defendants deny all remaining allegations in Paragraph 37.

38.     Moreover, the personnel involved in the creation of the ostensibly private subsidiaries of UMMS and the purchase of the hospital were UMMS personnel.  Corporate charter documents of both USMJ LLC and St. Joseph LLC were executed by the then-General Counsel of UMMS, Megan M. Arthur.  Ms. Arthur also served as resident agent of St. Joseph LLC until her retirement from UMMS in the wake of the recent Healthy Holly scandal, involving self-dealing by the UMMS board of directors.  Now, UMMS's Office of General Counsel serves as the resident agent of St. Joseph LLC (and the Senior Associate Counsel for

UMMS, Adil Daudi, is listed as the General Partner of UMSJ LLC on the corporate filing with the Maryland Secretary of State effecting that change).

**ANSWER**:  Defendants admit Megan M. Arthur was previously the General Counsel of Defendant UMMS.  The remaining allegations in Paragraph 38 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 38 of the Complaint.

39.    The Article of Transfer memorializing the purchase of the hospital from the Catholic Church was signed by Robert Chrencik as Authorized Agent for the Transferee St. Joseph LLC.  At the time, Mr. Chrencik was the President and CEO of UMMS. (He later resigned in the fallout of the Healthy Holly scandal.).

**ANSWER**:  Defendants admit Mr. Robert Chrencik previously served as President and CEO of Defendant UMMS.  The remaining allegations in Paragraph 39 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny all remaining allegations in Paragraph 39 of the Complaint.

40.    This pervasive entwinement between UMMS, UMSJ LLC, St. Joseph LLC, and University of Maryland St. Joseph Medical Center means that the actions of UMSJ LLC and St. Joseph LLC are the actions of UMMS, which is an instrumentality the State of Maryland.

**ANSWER**:  The allegations in Paragraph 40 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

<strong>Transgender Individuals and Gender Dysphoria</strong>

41.     Gender identity is a well-established medical concept, referring to one's deeply felt sense of oneself as belonging to a particular gender.  Although the precise origins of each person's gender identity are not fully understood, experts agree that it likely results from a combination of biological factors as well as social, cultural, and behavioral factors.  The medical consensus is that gender identity, regardless of its precise etiology, is deeply rooted and cannot be voluntarily changed.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 41 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 41 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, Defendants deny all allegations in Paragraph 41 of the Complaint that are based on the alleged viewpoints or opinions of third-parties.

42.     Typically, people who are designated female at birth based on their external anatomy go on to identify as girls or women, and people who are designated male at birth go on to identify as boys or men.  For transgender individuals, however, their gender identity differs from the sex assigned to them at birth.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 42 of

the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 42 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

43.     Transgender men are men who were assigned "female" at birth, but have a male gender identity. Transgender women are women who were assigned "male" at birth, but have a female gender identity.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 43 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 43 purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

44.     Being transgender is not a mental disorder.  People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.  But transgender people may require treatment for "gender dysphoria," the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex.  Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") and International Classification of Diseases ("ICD-10").  The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 44 of the Complaint, and therefore deny those allegations.  To the extent the allegations in Paragraph 44 of the Complaint purport to summarize, quote, or derive from documentary evidence, such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

45.     The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH").  The WPATH standards of care have been recognized as the authoritative standards of care by the leading medical organizations and the U.S. Department of Health and Human Services.

**ANSWER**:  Defendants admit the World Professional Association for Transgender Health ("WPATH") has published a document titled "Standards of Care."  The remaining allegations in Paragraph 45 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Answering further, Defendants deny any allegations that are based on the alleged beliefs or opinions of third-parties.  Except as specifically admitted, Defendants deny the allegations in Paragraph 45 of the Complaint.

46.     Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another.  This treatment, often referred to as transition-related care, may include hormone therapy, surgeries (sometimes called "sex reassignment surgery" or "gender

affirming surgery"), and other medical services that align an individual's body with their gender identity.

**ANSWER**:  The allegations in Paragraph 46 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

47.     Under the WPATH standards, the exact medical treatment varies based on the individualized needs of the person. Under each patient's treatment plan, the goal is to enable the individual to live all aspects of their life consistent with their gender identity, thereby eliminating the distress associated with the incongruence.

**ANSWER**:  The allegations in Paragraph 47 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.

48.     Hysterectomy is surgery to remove a patient's uterus.  In addition to treating gender dysphoria, hysterectomies are performed to treat a number of health conditions, including uterine fibroids, endometriosis, pelvic support problems, abnormal uterine bleeding, chronic pelvic pain, and gynecological cancer.  A patient can no longer become pregnant after undergoing a hysterectomy.  Thus, hysterectomy is an inherently sterilizing procedure, regardless of the reason for which it is performed.  According to the U.S. Department of Health and Human Services, hysterectomy is the second-most common surgery, after a Caesarean section, among women in the United States.

**ANSWER**:  Defendants admit the allegations in the first sentence of Paragraph 48 of the Complaint.  Answering further, Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the remaining

allegations in Paragraph 48 of the Complaint, and therefore deny those allegations. Additionally, the allegations in Paragraph 48 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 48 of the Complaint.

49.     Transgender men often require a hysterectomy as a gender-affirming surgical treatment for gender dysphoria.  The United States Transgender Discrimination Survey in 2015, which surveyed almost 28,000 transgender people, found that 14% of transgender men surveyed had undergone a hysterectomy, and 57% wanted to undergo a hysterectomy.  According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures such as hysterectomy, are effective, safe, and medically necessary.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the medical conclusions as framed and alleged in the allegations in Paragraph 49 of the Complaint, and therefore deny those allegations.  Answering further, the allegations in Paragraph 49 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Additionally, Defendants deny any allegations that are based on the alleged beliefs or opinions of third-parties.

50.     In the past, public and private insurance companies excluded coverage for transition-related care based on the assumption that such treatments were cosmetic or experimental.  Today, however, transition-related surgical care is routinely covered by public and private insurance programs, including Medicare and Maryland Medicaid.  The American

Medical Association, the American Psychological Association, the American Psychiatric Association, the American College of Obstetricians and Gynecologists, and other major medical organizations have issued policy statements and guidelines supporting healthcare coverage for transition-related care as medically necessary under contemporary standards of care.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint, and therefore deny those allegations.

**Mr. Hammons's Medically Necessary Treatment for Gender Dysphoria**

51.     Plaintiff Jesse Hammons is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint, and therefore deny those allegations.

52.     In accordance with the WPATH Standards of Care, Mr. Hammons's treating physicians recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria.  Mr. Hammons satisfied all of the criteria for a medically necessary hysterectomy under the WPATH Standards of Care.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 52 of the Complaint, and therefore deny those allegations.

53.     Mr. Hammons scheduled a hysterectomy to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery was scheduled to be performed at University of Maryland St. Joseph Medical Center on January 6, 2020.  Except as specifically admitted, Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     In planning for his surgery, Mr. Hammons underwent pre-operative blood tests, an echocardiogram, and other health screenings with his treating physician.  Mr. Hammons scheduled the surgery to be performed during a break from school and arranged to take off time from work for his surgery and recovery.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 54 of the Complaint, and therefore deny those allegations.

55.     Like many transgender people, Mr. Hammons experiences anxiety and increased dysphoria when discussing any of his anatomical characteristics that are typically associated with his sex assigned at birth.  In planning for his surgery, he worked hard over several months to mentally prepare himself for the experience.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 55 of the Complaint, and therefore deny those allegations.

56.     Approximately 7–10 days before Mr. Hammons's surgery was scheduled to take place, University of Maryland St. Joseph Medical Center's Senior Vice President for Medical Affairs and Chief Medical Officer, Gail Cunningham, ordered the surgery canceled.  Dr. Cunningham told Mr. Hammons's surgeon that he could not perform Mr. Hammons's hysterectomy because the surgery conflicted with the hospital's Catholic religious beliefs and the Catholic Directives.

-29-

**ANSWER**:  Defendants admit Mr. Hammons's alleged surgery did not take place at the University of Maryland St. Joseph Medical Center.  Defendants further admit Dr. Cunningham serves as the University of Maryland St. Joseph Medical Center's Senior Vice President for Medical Affairs and Chief Medical Officer.  Defendants also admit Dr. Cunningham spoke with Mr. Hammons's surgeon and informed his surgeon that the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center.  Except as specifically admitted, Defendants deny the allegations in Paragraph 56 of the Complaint.

57.     The Catholic Directives generally prohibit medical treatments that are primarily intended to induce sterilization, but authorize such procedures "when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." Catholic Directives p.19, ¶ 53.  Dr. Cunningham told Mr. Hammons's surgeon that, according to University of Maryland St. Joseph Medical Center's religious beliefs, Mr. Hammons's gender dysphoria did not qualify as a sufficient medical reason to authorize the procedure.

**ANSWER**:  Defendants admit that Dr. Cunningham spoke with Mr. Hammons's surgeon regarding Mr. Hammons's alleged surgery and informed his surgeon the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center. Answering further, the allegations in the first sentence of Paragraph 57 of the Complaint purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 57 of the Complaint.

58.     Dr. Cunningham also told Mr. Hammons's surgeon that performing the hysterectomy and removing an otherwise healthy organ would violate the Catholic Directives'

command to preserve the "functional integrity" of the human body.  *Id.* at p.14, ¶ 29.  But the Catholic Directives state that "[t]he functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available." *Id.*  For example, surgeons at University of Maryland St. Joseph Medical Center remove otherwise healthy tissue to prevent cancer or other diseases.  University of Maryland St. Joseph Medical Center also authorizes surgeons to perform purely cosmetic surgeries.  Dr. Cunningham, nevertheless, told Mr. Hammons's surgeon that University of Maryland St. Joseph Medical Center did not consider Mr. Hammons's gender dysphoria to be a valid basis under the Catholic Directives to justify disrupting the body's "functional integrity."

**ANSWER**:  Defendants admit patients may seek medical care or treatment at the University of Maryland St. Joseph Medical Center regardless of their gender.  Defendants further admit that Dr. Cunningham spoke with Mr. Hammons's surgeon regarding Mr. Hammons's alleged surgery and informed his surgeon the alleged surgery could not be performed at the University of Maryland St. Joseph Medical Center.  Defendants also admit procedures to treat cancer or that could be considered cosmetic have been performed at the University of Maryland St. Joseph Medical Center.  Answering further, the allegations in Paragraph 58 purport to summarize, quote, or derive from documentary evidence.  Such documents speak for themselves, and Defendants deny any characterization of their contents that is inconsistent with their text.  Except as specifically admitted, Defendants deny the allegations in Paragraph 58 of the Complaint.

59.     When he learned that University of Maryland St. Joseph Medical Center had canceled his medically necessary surgery, Mr. Hammons felt shocked, angry, afraid, and devastated.  Mr. Hammons felt that he was being told his health and well-being were not

worthy of being protected, and he felt angry that the hospital—which is part of his own State government—was using other people's religious beliefs to deny him the medical treatment he needed.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 59 of the Complaint, and therefore deny those allegations.  Answering further, to the extent the allegations in the second sentence of Paragraph 59 assert legal conclusions, no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

60.     Mr. Hammons was not able to have his hysterectomy performed until June 24, 2020.  As a result of the rescheduling, Mr. Hammons had to spend more money on an additional round of pre-operative tests; he had to spend another six months experiencing gender dysphoria without the therapeutic benefits of the surgery; and he had to spend another six months carrying the stress and anxiety of having to mentally prepare himself for the surgery all over again.

**ANSWER**:  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 60 of the Complaint, and therefore deny those allegations.

## COUNT I

### VIOLATION OF THE ESTABLISHMENT CLAUSE

61.     Plaintiff re-alleges paragraph 1-60 as if fully set forth herein.

**ANSWER**:  Defendants deny the allegations in Paragraph 61 of the Complaint.  Count I of the Complaint was dismissed.

-32-

62.     As alleged above, Defendants are instrumentalities of the State of Maryland for purposes of the First Amendment (incorporated against the states via the Fourteenth Amendment).

**ANSWER**:  Defendants deny the allegations in Paragraph 62 of the Complaint.  Count I of the Complaint was dismissed.

63.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and declaratory relief for violations of the Establishment Clause of the First Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 63 of the Complaint.  Count I of the Complaint was dismissed.

64.     Although UMMS is an instrumentality of the state bound by the First Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because, among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency, political subdivision, public body, public corporation, or municipal corporation" and declared that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or public entities."  Md. Code Educ. § 13-303(a)(2).  That "statutory disavowal of [a quasi-private corporation's] agency status deprives [it] of sovereign immunity from suit."  Lebron, 513 U.S. at 392.

**ANSWER**:  Defendants deny the allegations in Paragraph 64 of the Complaint.  Count I of the Complaint was dismissed.

65.     Any judgment against UMMS would not be paid by the State: "Obligations of [UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of the University or the State."  Md. Code Educ. § 13-310.

**ANSWER**:  Defendants deny the allegations in Paragraph 65 of the Complaint.  Count I of the Complaint was dismissed.

66.     By purchasing the St. Joseph hospital and signing an agreement to operate the hospital as a Catholic institution and in accordance with the Catholic Directives, UMMS has violated the Establishment Clause by, among other things, (a) creating an impermissible fusion of governmental and religious functions; (b) impermissibly delegating government authority to be exercised in accordance with religious criteria; (c) impermissibly endorsing religion; taking government action that has the primary purpose and effect of advancing religion; creating unconstitutional governmental entanglement with religion; (e) favoring one set of religious beliefs over others; and (f) impermissibly coercing individuals to act in accordance with particular religious beliefs.

**ANSWER**:  Defendants deny the allegations in Paragraph 66 of the Complaint.  Count I of the Complaint was dismissed.

67.     As a result of Defendants' violations of the Establishment Clause, Plaintiff Jesse Hammons suffered an injury in fact when University of Maryland St. Joseph Medical Center canceled his medically necessary surgery to treat gender dysphoria based on the Catholic Directives.

**ANSWER**:  Defendants deny the allegations in Paragraph 67 of the Complaint.  Count I of the Complaint was dismissed.

68.     Defendants are liable for their violation of Mr. Hammons's rights under the Establishment Clause pursuant to 42 U.S.C. § 1983.

**ANSWER**:  Defendants deny the allegations in Paragraph 68 of the Complaint.  Count I of the Complaint was dismissed.

## COUNT II

### VIOLATION OF THE EQUAL PROTECTION CLAUSE

69.     Plaintiff re-alleges paragraph 1-68 as if fully set forth herein.

**ANSWER**:  Defendants deny the allegations in Paragraph 69 of the Complaint.  Count II of the Complaint was dismissed.

70.      As alleged above, Defendants are instrumentalities of the State of Maryland for purposes of the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 70 of the Complaint.  Count II of the Complaint was dismissed.

71.     Pursuant to 42 U.S.C. § 1983, Defendants are state actors liable for monetary and declaratory relief for violations of the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER**:  Defendants deny the allegations in Paragraph 71 of the Complaint.  Count II of the Complaint was dismissed.

72.     Although UMMS is an instrumentality of the state bound by the Fourteenth Amendment, Defendants may not invoke Maryland's sovereign immunity from suit because, among other things, Maryland has, by statute, disavowed UMMS's status as "a State agency, political subdivision, public body, public corporation, or municipal corporation" and declared that UMMS "is not subject to any provisions of [Maryland] law affecting only governmental or public entities." Md. Code Educ. § 13-303(a)(2). That "statutory disavowal of [a quasi-private corporation's] agency status deprives [it] of sovereign immunity from suit." *Lebron*, 513 U.S. at 392.

**ANSWER**:  Defendants deny the allegations in Paragraph 72 of the Complaint.  Count II of the Complaint was dismissed.

73.     Any judgment against UMMS would not be paid by the State: "Obligations of [UMMS]: (1) Are payable only from assets of [UMMS]; and (2) Are not debts or obligations of the University or the State."  Md. Code Educ. § 13-310.

**ANSWER**:  Defendants deny the allegations in Paragraph 73 of the Complaint.  Count II of the Complaint was dismissed.

74.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender.

**ANSWER**:  Defendants deny the allegations in Paragraph 74 of the Complaint.  Count II of the Complaint was dismissed.

75.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

**ANSWER**:  Defendants deny the allegations in Paragraph 75 of the Complaint.  Count II of the Complaint was dismissed.

76.     Because the need to undergo gender transition is a defining aspect of being transgender, discrimination based on whether surgery is part of gender transition is discrimination against transgender individuals as a class.

**ANSWER**:  Defendants deny the allegations in Paragraph 76 of the Complaint.  Count II of the Complaint was dismissed.

77. Because gender transition inherently transgresses gender stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on gender nonconformity.

**ANSWER**: Defendants deny the allegations in Paragraph 77 of the Complaint. Count II of the Complaint was dismissed.

78. Discrimination based on the fact that a person is transgender or needs to undergo gender transition is discrimination that would not occur but for the person's sex. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020).

**ANSWER**: Defendants deny the allegations in Paragraph 78 of the Complaint. Count II of the Complaint was dismissed.

79. Defendants discriminated against Mr. Hammons on the basis of sex, which is subject to heightened scrutiny under the Equal Protection Clause.

**ANSWER**: Defendants deny the allegations in Paragraph 79 of the Complaint. Count II of the Complaint was dismissed.

80. Defendants discriminated against Mr. Hammons on the basis of transgender status, which is independently subject to heightened scrutiny under the Equal Protection Clause.

    a. People who are transgender, as a class, have historically been subject to discrimination.

    b. People who are transgender, as a class, have a defining characteristic that bears no relation to an ability to perform or contribute to society.

    c. People who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

    d. People who are transgender, as a class, are a minority with relatively little

political power.

**ANSWER**:  Defendants deny the allegations in Paragraph 80 of the Complaint.  Count II of the Complaint was dismissed.

81.     Defendants' discrimination against Mr. Hammons was not narrowly tailored to serve a compelling governmental interest.

**ANSWER**:  Defendants deny the allegations in Paragraph 81 of the Complaint.  Count II of the Complaint was dismissed.

82.     Defendants' discrimination against Mr. Hammons was not substantially related to an important governmental interest.

**ANSWER**:  Defendants deny the allegations in Paragraph 82 of the Complaint.  Count II of the Complaint was dismissed.

83.     Defendants' discrimination against Mr. Hammons did not rationally further any legitimate governmental interest and was grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender.

**ANSWER**:  Defendants deny the allegations in Paragraph 83 of the Complaint.  Count II of the Complaint was dismissed.

84.     Defendants are liable for their violation of Mr. Hammons's rights under the Equal Protection Clause pursuant to 42 U.S.C. § 1983.

**ANSWER**:  Defendants deny the allegations in Paragraph 84 of the Complaint.  Count II of the Complaint was dismissed.

## COUNT III

### VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT

85.     Plaintiff re-alleges paragraph 1-84 as if fully set forth herein.

**ANSWER**:  Defendants re-affirm and incorporate by reference their answers to Paragraphs 1 through 84 of this Answer in response to Paragraph 85 of the Complaint.

86.    Section 1557 provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).

**ANSWER**:  The allegations in Paragraph 86 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

87.    Section 1557's prohibition on sex discrimination is enforceable by a private right of action.

**ANSWER**:  The allegations in Paragraph 87 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

88.    On information and belief, Defendants receive Federal financial assistance and are, therefore, subject to Section 1557's prohibition on sex discrimination.

**ANSWER**:  Defendants admit they provide services to Federal health care program beneficiaries and receive payments for those services.  The remaining allegations in Paragraph 88 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.  Except as specifically admitted, Defendants deny the allegations in Paragraph 88 of the Complaint.

89.     By canceling Mr. Hammons's medically necessary surgery to treat gender dysphoria, Defendants discriminated against Mr. Hammons because he is a man who is transgender, and thus discriminated against Mr. Hammons on the basis of sex.

**ANSWER**:  Defendants deny the allegations in Paragraph 89 of the Complaint.

90.     Defendants did not cancel Mr. Hammons's surgery based on a generally applicable policy of not performing hysterectomies.  Defendants would not have canceled Mr. Hammons's hysterectomy if the surgery had been prescribed as medically necessary treatment for a condition other than gender dysphoria.

**ANSWER**:  Defendants deny the allegations in Paragraph 90 of the Complaint.

91.     Because gender transition inherently transgresses sex stereotypes, denying medically necessary coverage based on whether surgery is part of gender transition constitutes impermissible discrimination based on sex under Section 1557.

**ANSWER**:  The allegations in Paragraph 91 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny those allegations.

92.     Discrimination based on a person's transgender status or need to undergo gender transition is discrimination that would not occur but for the person's sex in violation of Section 1557.  *See Bostock*, 140 S. Ct. 1731.

**ANSWER**:  The allegations in Paragraph 92 of the Complaint assert legal conclusions to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 92 of the Complaint.

93.     Pursuant to Section 1557's private right of action, Defendants are liable for their violation of Mr. Hammons's rights under Section 1557.

-40-

**ANSWER**:  Defendants deny the allegations in Paragraph 93 of the Complaint.

## REQUESTED RELIEF

A.      Defendants deny the allegations of Paragraph A of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

B.      Defendants deny the allegations of Paragraph B of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

C.      Defendants deny the allegations of Paragraph C of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

D.      Defendants deny the allegations of Paragraph D of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

E.      Defendants deny the allegations of Paragraph E of Plaintiff's Requested Relief. Defendants deny Plaintiff is entitled to any relief.  Defendants further state they are entitled to attorney's fees and costs of this case and all other relief as the Court may deem just and proper.

## GENERAL DENIAL

Defendants deny all allegations in the Complaint that are not specifically admitted or denied above.

## DENIAL OF HEADINGS

Defendants have restated in this Answer the headings as they appear in the Complaint. To the extent the headings purport to assert any factual allegations or legal conclusions, they are denied in their entirety.

## DEFENDANTS' AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by sovereign immunity.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Plaintiff lacks standing to assert his claim.

### THIRD AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Defendants are not the proximate or legal cause of Plaintiff's alleged injury.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred in whole or in part to the extent Plaintiff is seeking to recover damages that are speculative in nature.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by the doctrines of waiver, estoppel, and/ or laches.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Defendants actions were justified.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred to the extent it seeks to hold Defendants jointly liable for conduct attributable only to one party.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred because Plaintiff has suffered no actual harm or damages.

## TENTH AFFIRMATIVE DEFENSE

All actions of Defendants in this matter were taken in good faith and for legitimate, non-discriminatory reasons.

## ELEVENTH AFFIRMATIVE DEFENSE

Although Defendants deny that they discriminated against Plaintiff in any way, to the extent that it is determined that an impermissible motive may have been a factor in any decision regarding Plaintiff, which is denied, the same decision would have been reached based upon legitimate and non-discriminatory reasons.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants did not engage in any discriminatory conduct.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants did not act with any discriminatory intent.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendants did not intentionally, deliberately, or knowingly engage in any conduct in violation of any federal or local statute, nor did Defendants exhibit reckless disregard for the requirements of any law or act with malice toward Plaintiff.

## FIFTEENTH AFFIRMATIVE DEFENSE

Defendants acted in good faith and had reasonable grounds for believing that their conduct and actions were lawful and in compliance with federal and local law.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred by the ecclesiastical abstention doctrine.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Count III of the Complaint is barred as to Defendant St. Joseph LLC by the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*

\*     \*     \*

Defendants reserve the right to amend this Answer and raise additional affirmative defenses should Defendants discover facts that would enable them to raise such additional affirmative defenses.

## ATTORNEY'S FEES & COSTS

Defendants are entitled to an award of their costs, including expert costs, and attorney's fees incurred in defending this action in such amount as this Court may deem appropriate.  The basis for such award includes, without limitation, 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Defendants pray for judgment against Plaintiff as follows:

1.      For an order dismissing Count III of the Complaint with prejudice;

2.      For judgment in favor of Defendants on Count III of the Complaint against

Plaintiff;

3.      For an award of attorney's fees and costs; and

4.      Such other and further relief as this Court may deem just and proper.


Dated: February 10, 2022                    _/s/ Denise Giraudo_____
                                            Denise Giraudo (Bar No. 29015)
                                            Paul Werner (admitted *pro hac vice*)
                                            Danielle Vrabie (admitted *pro hac vice*)
                                            Imad Matini (admitted *pro hac vice*)
                                            SHEPPARD, MULLIN, RICHTER &
                                            HAMPTON LLP
                                            2099 Pennsylvania Ave., N.W., Suite 100
                                            Washington, D.C. 20036
                                            Tel: 202-747-1906
                                            Fax: 202-747-3933
                                            dgiraudo@sheppardmullin.com
                                            pwerner@sheppardmullin.com
                                            dvrabie@sheppardmullin.com
                                            imatini@sheppardmullin.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2022, Plaintiff's counsel was served with the

foregoing document through the Court's Electronic Case Filing System.

___/s/ Denise Giraudo_____

Denise Giraudo
