**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JESSE HAMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:20-cv-02088-DKC |
| | ) | |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) | **ORAL ARGUMENT** |
| CORPORATION, et al. | ) | **REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................3

STANDARD ...........................................................................................................10

ARGUMENT ..........................................................................................................10

      I.     ONLY ST. JOSEPH – NOT UMMS – CAN POSSIBLY BE LIABLE FOR ALLEGED DISCRIMINATION IN ST. JOSEPH'S FEDERALLY FUNDED HEALTH PROGRAM. ........................................................................10

      II.    HAMMONS' SECTION 1557 CLAIM AGAINST ST. JOSEPH IS BARRED BY AN INJUNCTION ISSUED BY ANOTHER FEDERAL COURT. ..................15

      III.   IN ALL EVENTS, ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF INTENTIONAL DISCRIMINATION. ...........................................................................21

CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................... 10

*AT&T Corp. v. Hulteen*,
    556 U.S. 701 (2009) ............................................................................................... 25

*Barnes v. Gorman*,
    536 U.S. 181 (2002) .......................................................................................... 11, 19

*Baynard v. Malone*,
    268 F.3d 228 (4th Cir. 2001) ........................................................................... 11, 22

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020) ........................................................................................... 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................... 10

*Coalition for a Level Playing Field, LLC v. AutoZone, Inc.*,
    737 F. Supp. 2d 194 (S.D.N.Y. 2010) .................................................................. 20

*Cummings v. Premier Rehab Keller, PLLC*,
    142 S. Ct. 1562 (2022) .................................................................................. 11, 18, 19

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ........................................................... 10, 11, 13, 15, 18, 19

*Doe v. University of Denver*,
    952 F.3d 1182 (10th Cir. 2020) ............................................................................ 22

*Fadlalla v. DynCorp Int'l LLC*,
    402 F. Supp. 3d 162 (D. Md. 2019) ........................................................... 13, 14, 15

*Fobian v. Storage Tech. Corp.*,
    164 F.3d 887 (4th Cir. 1999) ................................................................................ 20

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ............................................................................................... 22

*General Electric Co. v. Gilbert*,
    429 U.S. 125 (1976) ............................................................................................... 24

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ................................................................................ 25

*Haley v. Va. Com. Univ.*,
   948 F. Supp. 573 (E.D. Va. 1996) ........................................................22

*Hennessy-Waller v. Snyder*,
   2021 WL 1192842 (D. Ariz. Mar. 30, 2021) .........................................22

*Hildreth v. Tidewater Equipment Co., Inc.*,
   838 A.2d 1204 (Md. 2003) .................................................................13

*James v. Paul*,
   49 S.W.3d 678, 683-84 (Mo. 2001) .....................................................20

*Jennings v. Univ. of N.C. at Chapel Hill*,
   240 F. Supp. 2d 492 (M.D.N.C. 2002) ................................................12

*Kinman v. Omaha Pub. Sch. Dist.*,
   171 F.3d 607 (8th Cir. 1999) ..............................................................12

*Lipsett v. Univ. of P.R.*,
   864 F.2d 881 (1st Cir. 1988) ..............................................................12

*Nat'l Coll. Athletic Ass'n v. Smith*,
   525 U.S. 459 (1999)...........................................................................18

*Nat'l Spiritual Assembly of Bahais of U.S. Under Hereditary Guardianship, Inc. v. Nat'l
   Spiritual Assembly of Bahais of U.S., Inc.*,
   628 F.3d 837 (7th Cir. 2010) ..............................................................19

*Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*,
   138 F.3d 160 (5th Cir. 1998) ..............................................................19

*Olson v. Moser*,
   2021 WL 6065314 (Md. Ct. Spec. App. Dec. 22, 2021) .................13, 15

*Polonczyk v. Anthem BlueCross and BlueShield*,
   2022 WL 551215, -- F. Supp. 3d -- (E.D. Ky. Feb. 23, 2022).........23, 24

*Regal Knitwear Co. v. NLRB*,
   324 U.S. 9 (1945)...............................................................................19

*Religious Sisters of Mercy v. Azar*,
   513 F. Supp. 3d 1113 (D.N.D. 2021)...............................15, 16, 17, 18

*Sanchez Carrera v. EMD Sales, Inc.*,
   402 F. Supp. 3d 128 (D. Md. 2019).....................................................10

*Shewmake v. Badger Oil Corp.*,
   654 F. Supp. 1184 (D. Colo. 1987)......................................................19

*Smith v. Metro. Sch. Dist. Perry Twp.*,
    128 F.3d 1014 (7th Cir. 1997) ...................................................................12

*United States v. Bestfoods*,
    524 U.S. 51 (1998) .......................................................................................13

*Weinreb v. Xerox Bus. Servs. LLC Health & Welfare Plan*,
    323 F. Supp. 3d 501 (S.D.N.Y. 2018) ..................................................10, 22

*Weiler v. Household Fin. Corp.*,
    101 F.3d 519 (7th Cir. 1996) ...................................................................17

*Weser v. Glen*,
    190 F. Supp. 2d 384 (E.D.N.Y. 2002) .....................................................22

*York v. Ferris State Univ.*,
    36 F. Supp. 2d 976 (W.D. Mich. 1998) ...................................................17

Statutes

42 U.S.C. § 18116(a) ...........................................................................10, 11,16, 18

Md. Code Educ. § 13-303(d) ...........................................................................3

Other Authorities

45 C.F.R. § 92.3(b) ...........................................................................................12

Fed. R. Civ. P. 56...............................................................................................10

Fed. R. Civ. P. 65...............................................................................................19

*Restatement (Second) of Contracts*, § 309(2) ...............................................19

*Restatement (Second) of Judgments*, § 56 cmt. a...........................................20

**APPENDIX OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1. | Declaration of Denise Giraudo. |
| 2. | Asset Purchase Agreement.  Bates No. UMMS000000832-1004. |
| 3. | Declaration of William C. Greskovich. |
| 4. | Everest Scott Conover Deposition Transcript. |
| 5. | Father Louis Asobi Deposition Transcript. |
| 6. | Declaration of Paul Nicholson. |
| 7. | St. Joseph Catholic Identity Agreement.  Bates No. UMMS000001035-114. |
| 8. | Dr. Gail Cunningham Deposition Transcript. |
| 9. | William C. Greskovich Rule 30(b)(6) Deposition Transcript. |
| 10. | Keith Riddle Deposition Transcript. |
| 11. | Defendants' Supplemental Response to Plaintiff's Interrogatory No. 14. |
| 12. | Defendants' Response to Plaintiff's Second Set of Interrogatories. |
| 13. | St. Joseph Operating Agreement.  Bates No.  UMMS000001211-42. |
| 14. | Dr. Michael J. Marion Deposition Transcript. |
| 15. | Dr. Steven Adashek Deposition Transcript. |
| 16. | Dr. Monica Buescher Deposition Transcript. |
| 17. | Ethical and Religious Directives for Catholic Health Services, Sixth Edition.  Bates No. UMMS000000139-68. |
| 18. | Defendants' Second Supplemental Response to Interrogatory No. 5. |
| 19. | Jesse Hammons Deposition Transcript. |
| 20. | Jesse Hammons' Text Messages.  Bates No.  HUM_0000185. |
| 21. | Defendants' Responses to Plaintiff's First Set of Interrogatories. |

| 22. | Declaration of Douglas G. Wilson Jr. |
|-----|--------------------------------------|
| 23. | Defendants' Response to Plaintiff's Interrogatory No. 18. |

## <u>INTRODUCTION</u>

Plaintiff Hammons' surgeon scheduled his gender-transition hysterectomy to occur at St. Joseph hospital, even though the surgeon knew that St. Joseph – a Catholic hospital from its founding – does not perform sterilization or remove healthy organs except under limited conditions in accordance with the Catholic Church's *Ethical & Religious Directives for Catholic Health Care Services* ("ERDs").  After the procedure was cancelled, Hammons sued, alleging (as relevant here) intentional discrimination based on sex in violation of Section 1557 of the Affordable Care Act ("ACA").  He sued two entities that directly own and operate St. Joseph: UMSJ Health System, LLC and University of Maryland St. Joseph Medical Center, LLC (together, "St. Joseph").  He also sued St. Joseph's ultimate owner, the University of Maryland Medical System Corporation ("UMMS").  With discovery now closed, the Court should grant summary judgment to all Defendants.

*First*, the Court should grant summary judgment to UMMS, because UMMS is simply not a proper defendant on this Section 1557 claim.  Section 1557 is Spending Clause legislation that operates as a contract between the Government and the federal funding recipient, with the latter agreeing not to discriminate within any of its "health program[s] or activit[ies]."  Under that contract-like framework, the Supreme Court has made clear that *only the funding recipient* for the allegedly discriminatory program can be held liable for a breach.  Here, Hammons alleges discrimination in a *St. Joseph* "health program" – that is, the hospital's surgery department – and the record shows that only *St. Joseph* received federal funding for that program.  Even if UMMS had played any role in the alleged discrimination – and discovery confirmed that it did not – UMMS still cannot be liable under Section 1557 for alleged discrimination that occurred in St. Joseph's federally funded "health program."  Only St. Joseph is potentially on the hook.

*Second*, although St. Joseph is a proper defendant in theory, Hammons cannot proceed against St. Joseph either, under the terms of a permanent injunction issued by a federal court in North Dakota.  In a challenge filed by a collection of religious employers including the Catholic Benefits Association ("CBA"), that court ruled that interpreting or applying Section 1557 so as to require gender-transition procedures would violate the Religious Freedom Restoration Act ("RFRA").  The court declared that interpretation of Section 1557 unlawful, and enjoined any such application of Section 1557 against those employers.  St. Joseph is a member of CBA.  It joined after the injunction was issued, but the injunction expressly protects "future members" of CBA so long as they meet certain criteria that are satisfied here.  The North Dakota injunction therefore precludes Hammons from pursuing his Section 1557 claim against St. Joseph.  This Court is bound to respect the final judgment of a sister court, and dismiss the claim.

*Finally*, in all events, the Court should grant summary judgment to all three Defendants because Hammons must – but cannot – prove that Defendants intentionally discriminated against him based on his sex (or transgender status).  The ERDs are facially neutral and apply to all patients, regardless of their sex or gender identity.  Consistent with that, the record shows that transgender and cisgender patients alike have had hysterectomies and other procedures performed (and denied) at St. Joseph.  And the record further shows that St. Joseph would not have performed Hammons' hysterectomy *regardless of his sex or gender identity*, because the purpose of the procedure did not satisfy the neutral requirements of the ERDs.  Put another way, Hammons' procedure was not cancelled because he is transgender; it was cancelled because it was not the type of medical procedure that St. Joseph performs *for anyone* for these reasons.  In the absence of any evidence that Defendants engaged in intentional discrimination, Defendants are entitled to summary judgment on Hammons' Section 1557 claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**_UMMS._** UMMS is a not-for-profit corporation providing comprehensive healthcare services through an integrated network of hospitals and clinical enterprises. Exhibit ("Ex.") 2, at UMMS000000838; Ex. 3 ("Greskovich Decl.") ¶ 5. It operates a regional medical system comprised of 10 member organizations with over 150 affiliate physician offices.[1] *Id.* at ¶ 6. Each hospital in the UMMS medical network is an independent corporate entity that directly receives its own federal funding for its own health programs and manages those funds in separate accounts. *Id.* at ¶ 7.

UMMS and its hospitals provide wide-ranging healthcare services "without discrimination based upon race, creed, sex, or national origin." Md. Code Educ. § 13-303(d); Greskovich Decl. ¶ 8. Among its many healthcare services, UMMS has a Transgender Health Program "dedicated" to helping transgender individuals "explore medical treatment options surrounding gender identity." Greskovich Decl. ¶ 9.[2] That program provides transgender individuals with counseling, primary healthcare, and customized case management. *Id.*

**_St. Joseph._** St. Joseph is a Catholic acute care hospital founded in 1864 that has served the North Baltimore region since 1965. Ex. 4 ("Conover Tr.") 26:4-5.[3] Its mission is to care for the broad "community" of patients and provide first-class care. Ex. 5 ("Asobi Tr.") 22:2-23:4; Ex. 6 ("Nicholson Decl.") ¶ 5.[4] Each year, St. Joseph handles more than 14,000 patient

---

[1]  *See* Univ. of Md. Med. Sys., *About Us*, https://www.umms.org/about (last visited June 24, 2022).

[2]  *See* Univ. of Md. Children's Hosp., *Transgender Family Health Services*, https://www.umms.org/childrens/health-services/adolescent-young-adult-medicine/transgender-family-health-services (last visited June 24, 2022).

[3]  *See* Univ. of Md. St. Joseph Med. Ctr., *About UM SJMC*, https://www.umms.org/sjmc/about (last visited June 24, 2022).

[4]  *See id.*

admissions, 22,000 emergency visits, and almost 90,000 outpatient visits.  Nicholson Decl. ¶ 5.[5]

St. Joseph also operates diverse outreach programs to provide community benefits, including free

primary care to uninsured and low-income patients, valued at nearly $45 million annually.  Ex. 7,

at UMMS000001041 § 2.9; Nicholson Decl. ¶ 5.[6]

From 1996 to 2012, Catholic Health Initiatives owned and operated St. Joseph.  Ex. 8

("Cunningham Tr.") 34:3-5.  In 2012, St. Joseph faced financial challenges that would have

forced it to close its doors.  ECF No. 1, Complaint ("Cmplt.") ¶ 26.  To prevent that outcome –

which would have resulted in tens of thousands of patients losing local hospital care – UMMS

acquired St. Joseph.  Cunningham Tr. 34:12-14.  Following the transaction, St. Joseph was

restructured as an LLC with one member, Defendant UMSJ, which is ultimately owned by

UMMS.  *Id.* at 35:6-19.  As noted above, this motion refers to both UMSJ and the St. Joseph LLC

together as "St. Joseph" and does not further distinguish between those two entities.  *See also*

Cmplt. ¶ 36 (alleging that these two LLCs are alter egos of one another).

Because of St. Joseph's Catholic heritage, the acquisition required approval from the

Catholic Church, which, in turn, required St. Joseph to maintain its Catholic identity.

Cunningham Tr. 55:16-19; Ex. 2, at UMMS000000902 § 11.6 & UMMS000000916 § 12.17.

But while St. Joseph operates in accordance with its Catholic heritage, UMMS and the other

hospitals in its network do not.  The connection between UMMS and St. Joseph is a "partnership

in the practice of medicine, not in Catholic identity."  Asobi Tr. 26:18-27:1.  Thus, UMMS "has

nothing to do with Saint Joseph's remaining a Catholic hospital."  *Id.* at 13:14-14:3, 29:6-9

& 31:21-32:1.  Instead, St. Joseph's Catholic heritage "is managed locally by the local leadership

---

[5] *See* https://www.umms.org/sjmc/-/media/files/um-sjmc/about/fact-
sheet/umsjmcfactsheet2021nov.pdf?upd=20220428185725 (last visited June 24, 2022).
[6] *See* https://www.umms.org/sjmc/community/community-benefit (last visited June 24, 2022).

team and the CEO and senior executives on the Board [of St. Joseph] at the hospital level." Ex. 9 ("Greskovich Tr.") 39:19-40:1; Ex. 10, ("Riddle Tr.") 44:8-44:12; Ex. 2, UMMS000000916 § 12.17(a) (stating the St. Joseph Board has "the authority and responsibility for maintaining Catholic identity"). St. Joseph "is unique and independent" within the UMMS network because it has a Catholic heritage that it alone bears the responsibility for maintaining. Asobi Tr. 26:18-27:1.

 ***Corporate Structure & Operations.*** UMMS and St. Joseph are distinct corporate entities, each with its own management and governance. Each entity has its own executive team and administrators. *See* Ex. 11, Defendants' Supplemental Response to Plaintiff's Interrogatory No. 14; Ex. 12, Defendants' Response to Plaintiff's Second Set of Interrogatories. UMMS officers do not serve in executive positions at St. Joseph. *Id.* UMMS has limited authority to appoint two members to St. Joseph's Board, which is currently composed of 18 board members. *See id.* St. Joseph's directors also do not sit on UMMS's Board of Directors. *Id.* St. Joseph conducts its own board meetings and maintains its own budget and financial statements. *See* Ex. 13, at UMMS000001224. Of particular relevance here, St. Joseph directly receives its own federal funding for its own health programs. Nicholson Decl. ¶¶ 7-10.

 Neither UMMS nor any other UMMS-related entity is involved in the day-to-day affairs or operations of St. Joseph. St. Joseph determines and implements its own policies and business practices, including its own strategic plan. Greskovich Tr. 57:9-20. And there is no "direct connection" between St. Joseph's medical executive committee and UMMS. Ex. 14 ("Marion Tr.") 15:7-9. Thus, while UMMS provides some back office support for its hospitals, St. Joseph "runs independently" and manages patient care and scheduling and all other internal operations without involvement or oversight by UMMS. Greskovich Tr. 83:21-90:7.

***The ERDs.***  To maintain its Catholic identity, St. Joseph follows the ERDs.  Ex. 7, at UMMS000001035 § 1.2.1.  Only St. Joseph follows the ERDs, which are interpreted and applied by its personnel.  *Id.* at UMMS000001035 § 1.3.2; Greskovich Tr. 39:19-40:1.  All medical personnel at St. Joseph agree to abide the ERDs as a condition of admitting privileges.  Riddle Tr. 53:14-19; Ex. 15 ("Adashek Tr.") 87:12-90:20; Asobi Tr. 36:13-16; Ex. 16 ("Buescher Tr.") 63:20-64:6.

The ERDs apply to "[a]ll persons" receiving treatment at St. Joseph regardless of their sex or gender identity; they do not discriminate.  Ex. 17 ("ERDs") at ¶¶ 29 & 53.  Under the ERDs, a procedure that results in a patient's "[d]irect sterilization" cannot proceed unless the "direct effect" of the procedure is "the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  *Id.* ¶ 53; Riddle Tr. 46:5-13.  The ERDs also prohibit procedures that result in the interference or removal of a "functional" and healthy organ unless necessary to "maintain the health or life of the person."  ERDs ¶ 29.  Thus, the ERDs do not allow elective sterilization procedures, or any procedure involving the removal of a healthy organ and direct sterilization unless necessary to treat a "life-threatening" condition as understood in the context of the ERDs.  Cunningham Tr. 295:14-21; Buescher Tr. 28:8-15; Riddle Tr. 89:16-21; Ex. 18, Defendants' Second Supplemental Response to Interrogatory No. 5.

St. Joseph applies the ERDs to all patients in the same way and manner – again, without regard to their sex or gender identity.  It bases surgery decisions on whether the procedure and its purpose comply with the sterilization and bodily integrity requirements of the ERDs – not on a patient's sex or gender.  As one witness explained: "[I]f it's something that we do hysterectomies for then we would be able to do it regardless of the patient being transgender or not."  Marion Tr.

63:4-14.  As a result, St. Joseph does not allow *elective* "hysterectomies for women, [or] vasectomies for men," because they are sterilization procedures.  Cunningham Tr. 186:7-10.

 While St. Joseph will not perform a hysterectomy on a woman who simply does not wish to have periods or wants to prevent pregnancy, such a procedure may be allowed based on a medical indication that could lead to a life-threatening condition, such as excessive bleeding. Buescher Tr. 30:4-11 & 91:10-92:3; Riddle Tr. 52:7-13 & 55:18-24.  St. Joseph applies this same approach to transgender patients.  For example, where transgender patients have sought hysterectomies for uterine bleeding, the surgery has proceeded at St. Joseph.  Ex. 19, ("Hammons Tr.") 47:12-22; Adashek Tr. 99:4-8 & 110:15-111:4; Marion Tr. 39:1-11 & 54:18-76:20.  In those cases, the surgeon diagnosed the patient with abnormal uterine bleeding and the surgery proceeded because the condition could be "life-threatening."  Marion Tr. 36:1-8 & 57:1-19.

 While hysterectomies can be and are performed at St. Joseph to treat potentially life threatening conditions under the ERDs, they are not performed on a strictly elective basis. Buescher Tr. 91:16-19.  Under these circumstances, and regardless of sex or gender, the procedure would amount to sterilization and involve the removal of a physically healthy organ. *Id.*  As a result, in deciding whether a procedure may proceed and caring for its patients, St. Joseph does not "discriminat[e] against anyone" and treats all of its patients the same, whether they are "male, female, [or] transgender."  Riddle Tr. 14:14-15:1 & 92:23-93:10.

 ***Hammons' Surgery.***  Dr. Steven Adashek is an OB-GYN surgeon who has had admitting privileges at St. Joseph for decades.  Adashek Tr. 21:14-22:1; Cunningham Tr. 279:16-280:1. Like all medical personnel at St. Joseph, he agreed to adhere to the ERDs.  Adashek Tr. 87:12-90:20.  Dr. Adashek has performed 40 hysterectomies on transgender patients, only two of which

were at St. Joseph.  *Id.* at 85:3-17.  The hysterectomies Dr. Adashek performed at St. Joseph on

transgender patients proceeded because they were performed for medical reasons that complied

with the ERDs.  Marion Tr. 57:1-19.  He scheduled and performed the other hysterectomies at

Greater Baltimore Medical Center.  Adashek Tr.. at 85:3-17 & 27:20-28:4.

 Hammons is transgender; his biological sex at birth was female but he identifies as male.

Cmplt. ¶ 51.  While Hammons was not referred to Dr. Adashek by a psychologist or another

medical professional for the purpose of obtaining a hysterectomy as a medically necessary

treatment for a diagnosis of gender dysphoria, he met with Dr. Adashek September 4, 2019, to

discuss such a procedure.  Hammons Tr. 17:1-15.  After meeting with Hammons, Dr. Adashek

agreed to perform a hysterectomy to treat gender dysphoria, not another indication such as

excessive bleeding or another life threatening condition.  Adashek Tr. 33:7-35:5.

 Dr. Adashek never discussed with Hammons where his surgery would be performed, or

his obligation to adhere to the ERDs at St. Joseph, and Hammons did not request that his surgery

be performed at St. Joseph.  Hammons Tr. 24:11-15 & 25:1-4.  Nevertheless, Dr. Adashek

scheduled Hammons' surgery at St. Joseph for January 6, 2020, knowing it could not proceed

there without an indication like excessive bleeding.  Hammons Tr. 41:3-15; Cunningham Tr.

279:16-280:1.

 On Christmas Eve, Dr. Adashek called Dr. Cunningham, the Chief Medical Officer for

St. Joseph, to inform her that he had scheduled a hysterectomy on a patient "for the purpose of

. . . transgender surgery," not a life threatening condition.  Cunningham Tr. 31:11-13 & 237:4-

12; ERDs ¶¶ 29 & 53.  Dr. Adashek did not indicate that Hammons had any other medical

diagnoses or issues that were life-threatening; he in fact did not.  Cunningham Tr. 237:4-12.  As

Dr. Cunningham explained, "[t]here was no degree of illness discussed or degree of anything

discussed.  It was just about could he do this procedure."  *Id.* at 240:8-241:21.  Without any medical indication, Dr. Cunningham explained that, while Hammons could have the procedure performed at any other UMMS facility, it could not proceed at St. Joseph.  *Id.* at 244:11-15, 255:14-16 & 262:15-18.  In fact, Dr. Cunningham was surprised Dr. Adashek was even calling her to question the procedure when "[h]e knows that we operate under the ERDs," has been with St. Joseph for decades, and expressly agreed to comply with the ERDs.  *Id.* at 279:16-280:1.

After he was notified the procedure could not move forward, Dr. Adashek did not inform Hammons, even though it was his responsibility to inform the scheduling department that the procedure had to be canceled.  *Id.* at 257:18-258:4.  Dr. Adashek's office informed Hammons on January 2, 2020, that his surgery was, going forward, and did not notify him of the cancellation until January 5, 2020 – the night before the surgery was ostensibly to take place at St. Joseph.  Hammons Tr. 42:9-12, 44:16-20 & Ex. 5; Adashek Tr. 47:2-8.  As Dr. Adashek admitted, "my office dropped the ball . . . I asked Mary [my assistant] to reschedule the surgery to GBMC, it didn't happen.  And I took full responsibility."  Adashek Tr. 47:9-17 & 108:10-14.  Hammons ultimately obtained a hysterectomy at Greater Baltimore Medical Center.  Hammons Tr. 81:3-8.

***Hammons' Complaint.***  After Dr. Adashek belatedly informed Hammons his procedure was canceled, Hammons refused to discuss the cancelation with St. Joseph despite outreach efforts by the hospital's leadership.  Hammons Tr. 65:14-66:6 & 67:18-68:7.  Instead, he decided he would "see [them] . . in court."  Ex. 20, at HUM_0000185.  Then he sued Defendants, seeking damages and a declaration that it discriminated against him based on his transgender status in violation of Section 1557 of the ACA.  *See* Cmplt. ¶¶ 68, 84 & 93.  This Court dismissed Hammons' other claims on the pleadings.  *See* ECF 52.  Only Count III – the Section 1557 claim – remains.

-9-

## STANDARD

Summary judgment is properly granted if there is "no genuine issue as to any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A "scintilla of evidence in support" of the non-moving party's claims is not enough to save them.  *Anderson*, 477 U.S. at 252; *see Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 144 (D. Md. 2019).

## ARGUMENT

**I.    ONLY ST. JOSEPH – NOT UMMS – CAN POSSIBLY BE LIABLE FOR ALLEGED DISCRIMINATION IN ST. JOSEPH'S FEDERALLY FUNDED HEALTH PROGRAM.**

At the threshold, and without reaching the merits of Hammons' discrimination claims, UMMS is entitled to summary judgment for a basic reason: It is not a proper defendant in a Section 1557 claim asserting discrimination in *St. Joseph's* "health program or activity."  42 U.S.C. § 18116(a); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Section 1557 is spending legislation that functions like a contract with recipients of federal funds, whereby those recipients promise not to permit their health programs to discriminate. Consistent with that structure, only the *funding recipient* for the discriminatory program can be held liable under this statute.  The Supreme Court has made this clear in the analogous Title IX context, and many lower courts have accordingly dismissed claims against defendants who were not themselves the funding recipient for the relevant program – even if they allegedly engaged in or facilitated the discrimination.  UMMS is entitled to judgment for the same reason.

-10-

A.      **Only Funding Recipients Can Be Held Liable Under Spending Clause Legislation Like Section 1557.**

Section 1557 prohibits sex-based discrimination by a "health program or activity" that receives federal funding.  42 U.S.C. § 18116(a).  Like Title VI, Title IX, and the Rehabilitation Act, Section 1557 is Spending Clause legislation that "amounts essentially to a contract between the Government and the recipient of funds" where the funding recipient "agree[s] to comply with federally imposed conditions."  *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1569-70 (2022).  As to sex discrimination, Section 1557 "expressly incorporates the rights and remedies" under Title IX.  *Id.* at 1569; *see also Weinreb v. Xerox Bus. Servs. LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018).

As the Supreme Court has repeatedly noted, the contractual underpinning of spending legislation "has implications" for "the scope of available remedies" under its implied private right of action.  *Barnes v. Gorman*, 536 U.S. 181, 187 (2002); *see also Cummings*, 142 S. Ct. at 1570 (explaining that this contract analogy "limits the scope of available remedies").  As relevant here, the contractual framework of these statutes means that liability only attaches to the *actual recipient of federal funds* for its "own misconduct" occurring in its own "program or activities."  *Davis*, 526 U.S. at 640.  "The Government's enforcement power may *only be exercised against the funding recipient*, and we have not extended damages liability … to parties outside the scope of this power."  *Id.* at 641 (emphasis added); *see also Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (explaining "the contractual nature of Title IX" means "school district may be held liable . . . only for its own misconduct").  That makes sense: Only the funding recipient has agreed to the statutory conditions; those conditions extend only to the funding recipient's own "program or activity"; and only the funding recipient could be liable for breach of contract if it fails to adhere to its obligations.

-11-

Importantly, it does not matter if another person or entity was involved in, or in some sense could be deemed culpable for, the alleged misconduct.  "Courts have generally held that *only the funding recipient* can be liable under Title IX."  *Jennings v. Univ. of N.C. at Chapel Hill*, 240 F. Supp. 2d 492, 509 (M.D.N.C. 2002) (emphasis added).  For example, courts have refused to hold liable school officials who participated or overlooked sex discrimination; only the school district itself, as a recipient of federal funds for an allegedly discriminatory education program, is on the hook.  *See, e.g.*, *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018 (7th Cir. 1997); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988).

Here, St. Joseph is the relevant contracting party and thus the only potential defendant for this Section 1557 claim.  Hammons alleges that he suffered discrimination in *St. Joseph's* "health program or activity" – more precisely, its surgery department – when St. Joseph's chief medical officer canceled his surgery based on the ERDs.  Cmplt. ¶¶ 54-60.  A "health program or activity" includes "all of the operations" of an entity "engaged in the business of providing healthcare that receive[s] Federal financial assistance."  45 C.F.R. § 92.3(b).  In this case, that entity is *St. Joseph*, which receives its own federal funding for its health programs.  Nicholson Decl. ¶¶ 6-10.  St. Joseph is therefore the proper defendant for this claim.

By contrast, the alleged discrimination did not occur in any "health program or activity" undertaken by *UMMS*, let alone one for which *UMMS* received federal funding.  Cmplt. ¶¶ 51-60; Ex 21, Defendants' Response to Interrogatory No. 10.  Hammons has no evidence suggesting otherwise.  As such, UMMS cannot be held liable under Section 1557 for this conduct.  *See Davis*, 526 U.S. at 640-41.

### B.      Hammons Cannot Extend Section 1557 Liability to UMMS.

In discovery, Hammons has sought to adduce evidence suggesting that UMMS is – in some abstract and remote sense – responsible for St. Joseph's continued adherence to the ERDs. That is not true as a factual matter, but it is also irrelevant here as a legal matter.  Again, Section 1557 does not penalize anyone who engages in, or can otherwise be held responsible for, discrimination.  Instead, it exposes to damages the *recipients of federal funds* who promise not to discriminate when they accept those funds.  *Davis*, 526 U.S. at 641.  That is why, in the analogous Title IX context, courts have consistently dismissed claims against individual school officials, even if they were alleged to have been culpable in the discrimination.  *Supra* at I.A. That principle applies here too, and requires the dismissal of UMMS from the case regardless of whatever attenuated link to the allegedly discriminatory conduct Hammons might try to draw.

Nor can Hammons escape this clear conclusion by conflating UMMS with its subsidiary. The Supreme Court has made clear that federal statutes, if otherwise silent on the issue, are to be construed as respecting the "general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  To be sure, that principle is subject to narrow exceptions, like the alter ego doctrine to which Hammons has previously alluded.  *See United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 193 (D. Md. 2019).  But the alter ego doctrine applies only in "exceptional circumstances," where necessary to prevent egregious cases of fraud and misconduct.  *Hildreth v. Tidewater Equipment Co., Inc.* 838 A.2d 1204, 1210 (Md. 2003).  To apply it here, Hammons would need to prove that UMMS exercises "complete dominion" over St. Joseph.  *Olson v. Moser*, 2021 WL 6065314, at *3 (Md. Ct. Spec. App. Dec. 22, 2021).  He would have to show that UMMS and St. Joseph have a "unity of interest" – *i.e.*, the same

-13-

"ownership" through a commonality of "officers and directors" and maintaining the same "books, records, and offices" as well as "property." *Fadlalla*, 402 F. Supp. 3d at 193.

That is a heavy burden, and one the evidence shows that Hammons cannot meet. To the contrary, the uncontroverted evidence establishes that St. Joseph operates "independently" without any "direct connection" to UMMS. Marion Tr. 15:7-9; Greskovich Tr. 83:21-84:5. UMMS and St. Joseph each has its own CEO and president, and St. Joseph's directors do not sit on UMMS's board of directors. *See* Ex. 12, Defendants' Response to Plaintiff's Interrogatory No. 15; Ex. 13, at UMMS00001224. St. Joseph also conducts its own board meetings, develops its own corporate strategies and directives, and maintains its own budget and financial records. Greskovich Tr. 57:9-20 (testifying that UMMS does not sign or approve each hospital's strategic plan); *see* Ex. 12, Defendants' Response to Plaintiff's Interrogatory No. 15.

UMMS also has no involvement in St. Joseph's day-to-day affairs. It does not control St. Joseph's patient scheduling and treatment decisions, make employment decisions, or oversee any aspect of its Catholic heritage. Marion Tr. 15:7-9; Greskovich Tr. 83:21-84:5 (St. Joseph operates as its "own entity" as part of the UMMS hospital system); Ex. 11, Defendants' Supplemental Response to Plaintiff's Interrogatories No. 14; Ex. 12, Defendants' Response to Plaintiff's Second Set of Interrogatories. St. Joseph alone applies the ERDs. Greskovich Tr. 39:19-40:1. In short, St. Joseph "runs independently" within UMMS's hospital system, Greskovich Tr. 83:21-84:5, and UMMS has "nothing to do" with St. Joseph's application of the ERDs or its daily operations, Asobi Tr. 29:6-9.

Indeed, neither UMMS nor any of its officers was involved in the scheduling or ultimate cancellation of Hammons' procedure. St. Joseph's personnel – without notice to or consultation with anyone at UMMS – determined his surgery could not proceed. Cunningham Tr. 240:8-

-14-

241:21; Ex. 12, Defendants' Response to Plaintiff's Interrogatory No. 15.  UMMS thus did not play "any role" in the events that gave rise to this claim.  *Davis*, 526 U.S. at 636; Cunningham Tr. 240:8-241:19-21.  Regardless, since UMMS does not exercise "complete dominion" over St. Joseph, UMMS cannot be held liable for St. Joseph's alleged discrimination on an alter ego theory.  *Olson v*, 2021 WL 6065314, at *3; *Fadlalla*, 402 F. Supp. 3d at 193.

*          *          *

As the Supreme Court has explained (and reiterated just this year in *Cummings*), Section 1557 is spending legislation that operates like a contract with a funding recipient.  Accordingly, only the funding recipient for the allegedly discriminatory health program is exposed to private damages liability.  Here, that is (at most) St. Joseph.  There is no statutory basis for any liability against UMMS, a distinct corporate entity that operates distinct health programs and receives a distinct flow of federal funds.  UMMS is therefore entitled to summary judgment.

## II.     HAMMONS' SECTION 1557 CLAIM AGAINST ST. JOSEPH IS BARRED BY AN INJUNCTION ISSUED BY ANOTHER FEDERAL COURT.

As explained above, St. Joseph is the only proper defendant as to Hammons' claim under Section 1557 of the ACA.  But St. Joseph, in turn, is shielded from the claim by another federal court's injunction.  The District of North Dakota has invalidated Section 1557 to the extent that it requires the CBA or its members to perform gender-transition procedures, and declared unlawful any statutory interpretation that would so require.  St. Joseph is a member of CBA.  The North Dakota injunction therefore protects St. Joseph from Hammons' Section 1557 claim.

### A.     A Federal Court Has Enjoined the Enforcement of Section 1557 To Require CBA and Its Members To Perform Gender-Transition Procedures.

The controlling injunction was issued in January 2021 in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021).  The District of North Dakota consolidated two cases in which religious plaintiffs challenged Section 1557 and its regulations under RFRA.  As

-15-

relevant here, one of those plaintiffs was CBA, a broad association of Catholic employers "that commit to providing benefits or services consistent with Catholic values." *Id.* at 1133. The court granted summary judgment to the plaintiffs. Applying Section 1557 to require Catholic entities to perform gender-transition procedures would impose a substantial burden on their religious exercise, the court held, because violating Section 1557 would trigger "significant monetary penalties" whereas compliance "would violate the Catholic Plaintiffs' religious beliefs as they sincerely understand them." *Id.* at 1147. And applying Section 1557 in that way does not advance a compelling government interest through the narrowest means, as there exist "many less restrictive alternatives beyond forcing the Catholic Plaintiffs to perform and cover gender-transition procedures in violation of their religious beliefs." *Id.* at 1148. The court accordingly concluded that interpreting or applying Section 1557 to require the plaintiffs to perform gender-transition procedures violates RFRA. *Id.* at 1149.

By way of relief, the District of North Dakota issued an order "permanently enjoin[ing] the Defendants from enforcing the successfully challenged interpretations of federal law against the Catholic Plaintiffs." *Id.* at 1153. The court "DECLARE[D] that HHS's interpretation of Section 1557 that requires the Catholic Plaintiffs to perform . . . gender-transition procedures violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA." *Id.* (footnote omitted). And the court "PERMANENTLY ENJOIN[ED] AND RESTRAIN[ED] HHS, Secretary Azar, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the ACA, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the Catholic Plaintiffs in a manner that would require them to perform . . . gender-transition procedures, including by denying federal financial assistance because of

their failure to perform . . . such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions." *Id.* at 1153-54.

Of particular relevance here, the court expressly provided that its relief would extend to the Catholic Plaintiffs (including CBA) as well as "their present *and future* members," so long as those future members meet the CBA's "strict membership criteria" as those criteria existed when the CBA first filed suit in December 2016, and were not already protected or bound by another judicial order either way on the topic. *See id.* at 1154 (emphasis added).

**B.    The North Dakota Injunction Forecloses Hammons' Claim Here.**

The North Dakota injunction forecloses Hammons from pursuing his Section 1557 claim against St. Joseph. Hammons' claim rests on the very interpretation of Section 1557 that the court in North Dakota declared unlawful and enjoined. And although St. Joseph joined CBA after the issuance of the order, it qualifies as a "future" member within the meaning of the injunction and therefore is protected from such claims and enforcement actions.

*First*, starting with the latter point, St. Joseph is covered by the North Dakota injunction as a member of CBA. St. Joseph joined CBA subject to the same "strict membership criteria," *Religious Sisters*, 513 F. Supp. 3d at 1154, that were in place in December 2016 and have not since changed. Ex. 22, ("Wilson Decl.") ¶¶ 2-3. St. Joseph is not otherwise "protected from interpretations of Section 1557 … that require the provision … of gender transitions by any other judicial order." *Religious Sisters*, 513 F. Supp. 3d at 1154. Nor is St. Joseph already subject to "an adverse ruling on the merits … that require[s] the provision … of gender transitions." *Id.*[7]

---

[7] Of course, this Court previously denied a motion to dismiss. ECF 52. But "[a] decision that the plaintiff alleged facts sufficient to survive a motion to dismiss is not a ruling on the merits." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996); *see also York v. Ferris State Univ.*, 36 F. Supp. 2d 976, 981 (W.D. Mich. 1998) ("a ruling on a motion to dismiss is not a ruling on the merits"). Moreover, the ruling denying the motion to dismiss clearly did not "*require* the provision . . . of gender transitions," *Religious Sisters*, 513 F. Supp. 3d at 1154

*Second*, Hammons' claim is plainly barred by the injunction.  Count III rests on an "interpretation of Section 1557 that requires" St. Joseph "to perform . . . gender-transition procedures" – that is, the very interpretation that *Religious Sisters* declared to be unlawful.  *Id.* at 1153.  And Hammons' claim seeks to enforce Section 1557 "in a manner that would require" St. Joseph "to perform . . . gender-transition procedures" – that is, the very enforcement actions that *Religious Sisters* enjoined.  *Id.*  While Hammons does not seek injunctive relief here, the North Dakota injunction equally bars any requests for retrospective relief, such as "penalties," as part of "enforcement actions" premised on the interpretation of Section 1557 that the court rejected under RFRA.  *Id.* at 1154.  This is clearly such an enforcement action.

To be sure, the North Dakota injunction by its terms restrains only HHS, its agents, and anyone acting in concert or participation with them.  *Id.* at 1153.  But the Supreme Court has expressly "reject[ed]" the notion "that the private right of action available under [Title IX] is potentially broader than the Government's enforcement authority."  *Nat'l Coll. Athletic Ass'n v. Smith*, 525 U.S. 459, 467 n.5 (1999).  It would be "anomalous," the Court ruled, for an "implied private right of action to proscribe conduct that Government enforcement may not check."  *Id.*; *see also Davis*, 526 U.S. at 641 (reiterating "we have not extended damages liability under Title IX to parties outside the scope of" the "Government's enforcement power").  As explained above, Section 1557 imports Title IX's implied right of action for sex discrimination.  *See* 42 U.S.C. § 18116; *Cummings*, 142 S. Ct. at 1569.  Accordingly, private plaintiffs invoking Title IX's implied right of action for Section 1557 violations likewise cannot sue over "conduct that Government enforcement may not check."  *Nat'l Coll.*, 525 U.S. at 476 n.5.  In short, because

_____

(emphasis added), and thus is not a conflicting judgment that disqualifies St. Joseph from the protection of the injunction.

-18-

HHS could not directly enforce Section 1557 against St. Joseph on these facts, Hammons cannot do so indirectly through an implied private right of action.

This conclusion is unsurprising given that Section 1557 is (again, as explained above) Spending Clause legislation that operates as a contract between the Government and the funding recipient. *See Cummings*, 142 S. Ct. at 1569-70; *Davis*, 526 U.S. at 639-40. Viewed through that "contract analogy," *Cummings*, 142 S. Ct. at 1571, private plaintiffs suing for discrimination are – in the Supreme Court's words – "third-party beneficiaries" of the contract between the Government and the funding recipient. *Barnes*, 536 U.S. at 187. And that "has implications" for "the scope of available remedies." *Id.* Of relevance here, when a contract "ceases to be binding in whole or in part," for reasons of "public policy" or the like, "the right of any beneficiary is to that extent discharged." *Restatement (Second) of Contracts*, § 309(2). Here, the "contract" is between St. Joseph and the Government. The North Dakota injunction, however, has partially invalidated that contract as it relates to gender-transition procedures. Hammons' rights as third-party beneficiary are thus "discharged" to the same extent. *Id.*

Principles of *res judicata* point in the same direction. "[A]n injunction may be enforced against a nonparty in 'privity' with an enjoined party." *Nat'l Spiritual Assembly of Bahais of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Bahais of U.S., Inc.*, 628 F.3d 837, 848-49 (7th Cir. 2010); *see also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); Fed. R. Civ. P. 65(d)(2). The North Dakota order therefore binds not only HHS but also anyone in privity with HHS. And a third-party beneficiary "must be considered in privity" with a contracting promisee. *Shewmake v. Badger Oil Corp.*, 654 F. Supp. 1184, 1187 (D. Colo. 1987); *see also Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 166 (5th Cir. 1998) (holding "third-party beneficiaries" are "precluded" and "bound by" findings in

litigation between contracting parties); *James v. Paul*, 49 S.W.3d 678, 683-84 (Mo. 2001) (invoking "privity" to bind "third party beneficiary" of insurance contract to findings made in litigation between contracting parties); *Restatement (Second) of Judgments*, § 56 cmt. a ("When a judgment is entered in an action between the promisee and the promisor that terminates the obligation," that usually "discharges the obligation in favor of the beneficiary."). Hammons is thus derivatively bound, as a matter of *res judicata*, by the injunction against HHS.

In short, the North Dakota injunction *protects* St. Joseph, and also *binds* Hammons given the nature of Section 1557 and its implied private right of action for third-party beneficiaries. As a result, Hammons cannot proceed with Count III, and the Court should therefore dismiss it.

### C.    Hammons Cannot Collaterally Attack RFRA's Applicability.

In earlier briefing, Hammons argued that Defendants are state actors and so cannot invoke RFRA. (ECF 74 at 8.) But this Court never held that *St. Joseph* is a state actor; instead, following the parties' lead, the Court "treated" all Defendants "as a single entity for purposes of" the motion to dismiss. (ECF 52 at 21-22.) On a full record, Defendants believe applying this Court's analysis to St. Joseph as a distinct entity would yield a different conclusion.

Regardless, the debate is academic for present purposes, because St. Joseph is not seeking summary judgment based on RFRA. Instead, St. Joseph is seeking summary judgment based on the binding permanent injunction issued by the federal court in North Dakota. Any argument by Hammons that the North Dakota injunction is overbroad or otherwise erroneous must be directed in the first instance to the court that issued that injunction. *See Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 889 (4th Cir. 1999) (explaining "the proper forum in which to bring Rule 60(b) motions for relief from [a] court's own judgments" is that court itself); *Coalition for a Level Playing Field, LLC v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 208 (S.D.N.Y. 2010) (applying *res judicata* because objections to judicial order "must be addressed to the court that issued the

challenged judgment").  The law does not permit Hammons to pursue, in this Court, a collateral

attack on the North Dakota judgment.

*          *          *

St. Joseph, unlike UMMS, is at least theoretically the right defendant for a Section 1557

claim alleging discrimination in St. Joseph's health programs.  But by virtue of its membership

in the CBA, St. Joseph is shielded by the North Dakota injunction from any Section 1557

liability premised on its refusal to perform gender-transition surgeries.  HHS cannot claw back

St. Joseph's federal funding or demand that St. Joseph perform gender-transition surgeries going

forward, nor can Hammons evade that restriction by invoking an implied private right of action

as a third-party beneficiary to demand compensatory damages or other relief.

Whether this Court agrees with the District of North Dakota's reasoning or not, that sister

court's injunction is a binding final judgment that controls the scope of the non-discrimination

"contract" between St. Joseph and the Government—and, in turn, resolves this case.  Hammons'

claim under Section 1557 must be dismissed as a matter of law.

III.    **IN ALL EVENTS, ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF INTENTIONAL DISCRIMINATION.**

Even putting aside all of the above, all Defendants are entitled to summary judgment in

their favor because Hammons cannot prove intentional discrimination against him on the basis of

sex.  The record shows that the ERDs apply neutrally to all patients, regardless of sex or gender

identity.  St. Joseph would perform a hysterectomy on *any* patient who needs one to treat a life

threatening condition.  And St. Joseph would *not* perform a hysterectomy on *any* patient who

seeks one without a sufficient medical basis under the ERDs.  While the result may be that St.

Joseph will not perform surgery for purposes of gender transition, that is not equivalent to

intentional discrimination against transgender individuals based on their status, because transgender patients are not treated differently than similarly situated cisgender patients.

### A.     The ERDs Apply Neutrally Without Regard to Sex or Gender Identity.

Because Section 1557 incorporates the rights and remedies of Title IX, it is limited to claims of *intentional* discrimination based on sex.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998); *Baynard*, 268 F.3d at 237; *Weinreb*, 323 F. Supp. 3d at 521-22.  Thus, to survive summary judgment on such a claim, Hammons must "adduce substantial evidence" of intentional discrimination.  *Haley v. Va. Com. Univ.*, 948 F. Supp. 573, 578 (E.D. Va. 1996).  That is a "high burden," *Hennessy-Waller v. Snyder*, 2021 WL 1192842, at *8 (D. Ariz. Mar. 30, 2021), and the record now confirms that Hammons cannot overcome it.

The defendants did not intentionally discriminate against Hammons based on his sex or gender.  While Hammons alleges St. Joseph canceled his procedure because he is transgender, the evidence instead shows that St. Joseph canceled his procedure because the ERDs do not allow for St. Joseph to perform sterilization procedures (for either sex) or procedures that result in the removal of a physically healthy organ.  ERDs ¶¶ 29 & 53; Cunningham Tr. 186:7-10 (St. Joseph does not allow "hysterectomies for women" or "vasectomies for men."); Riddle Tr. 46:5-13 ("The ERDs don't allow direct sterilization of men or women."); Buescher Tr. 28:8-15 (testifying hysterectomies are never performed as an elective sterilization procedure at St. Joseph regardless of gender).  Those rules apply equally and across the board to all patients served by St. Joseph.  Accordingly, because "there is no implication" in the ERDs that people "are subject[ed] to different standards or otherwise treated differently, the policy itself" is facially neutral and "not discriminatory." *Weser v. Glen*, 190 F. Supp. 2d 384, 399 (E.D.N.Y. 2002); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1192-93 (10th Cir. 2020) (noting where a policy is gender-neutral on its face, "something more" is required to prove discrimination).

St. Joseph also *applies* the ERDs to every patient equally.  In making surgery decisions, St. Joseph determines whether the primary purpose of the procedure is to prevent procreation or affect the integrity of a healthy organ.  *See* Marion Tr. 63:4-14 ("[I]f it's something that we do hysterectomies for then we would be able to do it regardless of the patient being transgender or not."); Buescher Tr. 28:8-15; Riddle Tr. 89:16-21; Ex. 18, Defendants' Second Supplemental Response to Interrogatory No. 5.  Under this approach, St. Joseph has performed hysterectomies for transgender patients for the same medical reasons as suffice for cisgender patients.  *See* Marion Tr. 39:1-11 & 54:18-76:20 (transgender patient received hysterectomy in 2018 to treat uterine bleeding); Adashek Tr. 99:4-8 & 110:15-111:4; Ex. 23, Defendants' Response to Plaintiff's Interrogatory No. 18.  It has also disallowed vasectomies because, under this approach, they are solely for the purpose of sterilization.  Adashek Tr. 60:8; Marion Tr. 43:1-3.

St. Joseph applied that same analysis in Hammons' case.  Cunningham Tr. 240:8-241:21.  His surgery could not proceed because its primary purpose was sterilization and the removal of a healthy organ, not to treat a life-threatening condition.  *See* Hammons Tr. 27:2–7 (testifying he had no life threatening condition under the ERDs); Cunningham Tr. 244:11-15.  Indeed, when specifically asked whether the procedure was to treat a life-threatening condition, Hammons' physician said it was not.  Adashek Tr. 46:8–13, 67:10-22 & 103:22-104:3.  As such, under the same ERD approach St. Joseph uses for all of its patients, the procedure could not go forward.  Cunningham Tr. 255:14-16 & 262:15-18.  Because St. Joseph applied the neutral ERDs in a neutral manner to Hammons "regardless of [his] status as a transgender individual," he "cannot" establish intentional discrimination.  *Polonczyk v. Anthem BlueCross & BlueShield*, 2022 WL 551215, at *7, -- F. Supp. 3d -- (E.D. Ky. Feb. 23, 2022).

-23-

The recent *Polonczyk* decision is instructive.  In that case, a health plan excluded all "cosmetic" procedures from coverage, except under limited circumstances for emergencies.  *Id.* at *6.  On the basis of that exclusion, the health plan denied coverage for a transgender member's gender transition-related procedure because it was deemed "cosmetic."  *Id.*  The court held the health plan did not intentionally discriminate against the member based on sex because the exclusion was facially neutral and "applie[d] to every Plan participant, regardless of their sex," including plaintiff.  *Id.*  The same goes here.  Just as in *Polonczyk*, St. Joseph has a facially neutral policy of disallowing sterilization procedures except in "limited" circumstances that it applies to all patients regardless of gender.  *Id.* at *6.  It applied that policy here, determining that Hammons' procedure could not go forward because the purpose of it was not to treat a life-threatening condition.  Because defendants did not intentionally discriminate against Hammons, they are entitled to summary judgment.  *Id.*

### B.     Hammons' Counterargument Is Too Facile.

Hammons' contrary argument trades on the reality that, in practice, only transgender individuals seek gender-transition surgeries.  Hammons uses that correlation to insinuate that if a policy (like the ERDs) does not allow surgeries for purposes of gender transition, it is necessarily discriminatory against transgender individuals.  But that is logically and legally mistaken.  The Supreme Court rejected the same argument in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), which held that treating pregnancy differently from other disabilities does not amount to sex discrimination.  "Pregnancy is, of course, confined to women," the Court observed, but it is also different in other ways than other medical disabilities, and so treating it differently does not prove intentional sex discrimination.  *See id.* at 136.  In just the same way, it may well be true that gender-transition surgeries are "confined" to transgender persons, but these procedures are

also unique (medically, ethically, etc.) such that treating them differently cannot be conflated with intentional discrimination against those with a transgender identity.[8]

Another way to appreciate the defect in Hammons' theory is to ask whether St. Joseph would have acted differently had Hammons been male or cisgender.  The answer is no: Had Hammons been cisgender, St. Joseph still would not have performed the hysterectomy, because there was no approved medical basis for it under the ERDs.  Had Hammons been a biological male, St. Joseph *could not* have performed a hysterectomy, so the counterfactual exercise is an impossibility.  This proves that there was no forbidden discrimination.

For these reasons, this case is not analogous to those where transgender employees were fired based on their gender identity.  *E.g.*, *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1737 (2020) ( "An employer fired a long-time employee shortly after the employee revealed that he or she is . . . transgender—and allegedly for no reason other than the employee's . . . transgender status.").  In those cases, the employee is subjected to adverse action precisely because of animus toward his transgender identity, and would not have suffered those consequences (all else equal) had he been cisgender.  Nor is this case analogous to those where transgender men or women are barred from entering bathrooms for cisgender men or women.  *E.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).  Those cases involve classifications that discriminate on their face based on sex, such that the result would be different if the person's sex were different.  *See id.* at 608.  Here, however, there is no allegation of animus, the ERDs do not distinguish based on sex

---

[8]  In response to *Gilbert*, Congress enacted the Pregnancy Discrimination Act ("PDA"), which requires pregnancy to be treated on equal terms with other medical conditions.  But that only proves the point – without the PDA, pregnancy discrimination would not be sex discrimination. *See AT&T Corp. v. Hulteen*, 556 U.S. 701, 710-11 (2009) (holding that it was permissible to rely on pre-PDA seniority credit accruals because the system "was not gender-based discrimination" at the time, before the PDA was enacted).  Likewise, discrimination against gender-transition surgery is not discrimination based on sex or gender identity.

or gender, and Hammons would not have been eligible for a hysterectomy at St. Joseph in any event.  That is not intentional sex discrimination.

*          *          *

Hammons' argument may have superficial appeal – St. Joseph will not perform gender-transition surgery, ergo St. Joseph is discriminating against transgender people – but it does not withstand serious scrutiny.  That syllogism is contradicted by the record evidence.  St. Joseph treats its transgender patients just like it does all of its others, including by applying the same limitations on procedures it will perform on them.  As such, it will not perform sterilizations for men or women of any gender identity, whereas it will perform surgeries for any person who has a potentially life threatening condition.  The consequence may be that St. Joseph will perform a hysterectomy for excessive bleeding but not for gender dysphoria.  But that is not intentional sex discrimination; it just reflects the unique medical and ethical questions implicated by gender-transition procedures.  Section 1557 does not purport to answer those questions, or to condemn Defendants for their answers.  This Court should grant summary judgment.

## <u>CONCLUSION</u>

The Court should grant summary judgment to Defendants.

-26-

Dated: June 24, 2022

*/s/ Denise Giraudo*
Denise Giraudo (Bar No. 29015)
Paul Werner (admitted *pro hac vice*)
Imad Matini (admitted *pro hac vice*)
Danielle Vrabie (admitted *pro hac vice*)
Hannah Wigger (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20036
Tel: 202-747-1906
Fax: 202-747-3933
dgiraudo@sheppardmullin.com
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
dvrabie@sheppardmullin.com
hwigger@sheppardmullin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2022, Plaintiff's counsel was served with the foregoing document through the Court's Electronic Case Filing System.  I further certify that Exhibits 2, 7, 10, 13, 15, and 19 filed under seal with this motion were served on the following counsel via electronic mail on June 24, 2022:

Louis J. Ebert
ROSENBERG MARTIN GREENBERG,
LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer
Andrew D. Cohen
Christopher Wilds
Edward J. Delman
Jonathan Hermann
Jonah Knobler
Abigail E. Marion
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
cwilds@pbwt.com
edelman@pbwt.com
jhermann@pbwt.com
jknobler@pbwt.com
amarion@pbwt.com

Joshua A. Block
Leslie Cooper
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627

Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

___ */s/ Denise Giraudo*_____
Denise Giraudo