# Exhibit 8

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MARYLAND

3

4    JESSE HAMMONS,                      )

5         Plaintiff,                     )

6         -v-                            ) Case No.

7    UNIVERSITY OF MARYLAND MEDICAL ) 1:20-cv-02088-DKC

8    SYSTEM CORPORATION, et al.         )

9         Defendants.                    )

10

11

12          Videotaped Deposition of Gail P. Cunningham

13                         Towson, MD

14                   Thursday, April 14, 2022

15                          9:00 a.m.

16

17

18   Job No:  J8078725

19   Pages:   1-308

20   Reported by:  Kenneth Norris

21



1           Deposition of Gail P. Cunningham

2           Taken at:

3

4           UNIVERSITY OF MARYLAND

5           ST. JOSEPH MEDICAL CENTER

6           7601 Osler Drive

7           Towson, MD 21204

8           Telephone: (410)328-8667

9

10

11

12

13

14           Pursuant to Notice, before Kenneth Norris, a

15   Professional Reporter and Notary Public in and for the

16   State of Maryland.

17

18

19

20

21



```
 1    APPEARANCES:

 2         ON BEHALF OF THE PLAINTIFF:

 3         EDWARD J. DELMAN, ESQUIRE

 4              Patterson, Belknap, Webb & Tyler LLP

 5              1133 Avenue of the Americas

 6              New York, NY 10036

 7              Telephone(212)336-2000

 8              E-mail: edelman@pbwt.com

 9

10

11         ON BEHALF OF THE DEFENDANT, UNIVERSITY OF

12         MARYLAND MEDICAL SYSTEM CORPORATION:

13         PAUL A. WERNER, ESQUIRE

14              Sheppard, Mullin, Richter & Hampton LLP

15              2099 Pennsylvania Avenue, Suite 100

16              Washington, DC 20006

17              (Telephone)202-767-1900

18              E-mail:  pwerner@sheppardmullin.com

19

20              VIDEOGRAPHER: KIM JOHNSON

21
```



```
1              CONTENTS

2    EXAMINATION OF Gail P. Cunningham            Page

3    By Mr. Delman                                  8

4

5

6

7

8

9

10   Exhibits                                     Page

11   Exhibit   1    Articles of organization of    37

12                  Northeastern Maryland Regional

13                  Health System

14   Exhibit   2    Articles of amendment from      37

15                  Northeastern Maryland Regional

16                  Health System

17   Exhibit   3    Form 990 for USMJ from 2017     39

18   Exhibit   4    Asset purchase agreement        41

19   Exhibit   5    Second amendment and restated   43

20                  Offering agreement for

21                  St. Joseph's Medical center
```



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 6 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                        5

| | | | | |
|---|---|---|---|---|
| 1 | Exhibit | 6 | Catholic identity agreement | 60 |
| 2 | Exhibit | 7 | Minutes from Institutional | 64 |
| 3 | | | Ethics Committee dated 3/19/2019 | |
| 4 | Exhibit | 8 | Hysterectomy spreadsheet | 87 |
| 5 | Exhibit | 9 | E-mail chain from November, 2019 | 105 |
| 6 | Exhibit | 10 | Printout of Catholic identity and | 120 |
| 7 | | | Ethics review data analysis | |
| 8 | | | Spreadsheet | |
| 9 | Exhibit | 11 | E-mail between Keith Riddle and | 126 |
| 10 | | | Dr. Monica Buescher | |
| 11 | Exhibit | 12 | Document of Dr. Sewell's | 128 |
| 12 | | | Comments | |
| 13 | Exhibit | 13 | Document entitled Transgender | 196 |
| 14 | | | Issues in Catholic Health Care | |
| 15 | Exhibit | 14 | E-mail dated November, 2014 | 203 |
| 16 | Exhibit | 15 | E-mail chain starting | 216 |
| 17 | | | October 2018 | |
| 18 | Exhibit | 16 | E-mail chain starting | 231 |
| 19 | | | January 14, 2020 | |
| 20 | Exhibit | 17 | Defendant's responses and | 236 |
| 21 | | | Objections to Plaintiff's | |



1               First set of Interrogatories

2    Exhibit   18   Plaintiff's complaint          247

3    Exhibit   19   Audio recording                266

4    Exhibit   20   Audio recording                267

5    Exhibit   21   E-mail dated January 13, 2020  287

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



1              P R O C E E D I N G S

2

3              VIDEOGRAPHER: Here begins the video-recorded

4    deposition of Dr. Gail Cunningham taken in the matter

5    of Hammons versus University of Maryland Medical

6    System Corporation in the U.S. District Court of

7    Maryland, Case No. 1:20-cv-02088.

8              Today's date is April 14, 2022.  The time is

9    9:00 a.m.

10             This deposition is being held at 7601 Osler

11   Drive, Towson, Maryland.

12             The court reporter is Kenneth Norris.  The

13   video camera operator is Kim Johnson, both on behalf

14   of Esquire.

15             Will counsel please introduce yourselves and

16   state who you represent.

17             MR. DELMAN:  This is Edward Delman from

18   Patterson, Belknap, Webb & Tyler representing the

19   Plaintiff Jesse R. Hammons.

20             MR. WERNER:  Paul Werner of Sheppard Mullin

21   for the Defendants.



1              VIDEOGRAPHER:  Attorneys on Zoom?

2              No one?  Okay.

3              Will the court reporter please swear the

4    witness?

5    Whereupon,

6                       Gail P. Cunningham

7    A witness of lawful age, after being duly sworn to

8    tell the truth, the whole truth and nothing but the

9    truth, testified as follows:

10                      EXAMINATION:

11   BY MR. DELMAN:

12       Q.   Dr. Cunningham, can you please state your

13   name for the record?

14       A.   Sure.  Gale Patricia Cunningham.

15       Q.   And, Dr. Cunningham, have you ever been

16   deposed before?

17       A.   Yes.

18       Q.   In what instances have you been deposed

19   before?

20       A.   As a defendant witness in malpractice cases,

21   maybe three to five times.



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 10 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    30

1   the medical staff?

2        A.   There I represented the entire medical

3   staff, so all physicians from all departments, ran the

4   medical executive committee, had oversight over

5   multiple medical staff committees, and had a seat on

6   the board.  There is an -- it's not called an

7   ex officio, but I had a seat on the board as the

8   president.

9        Q.   And that's the board of St. Joseph Medical

10  Center?

11       A.   Yes.

12       Q.   Was that also the board of USMJ?

13       A.   I can't speak to how that was constructed at

14  that time.

15       Q.   Okay.

16            And while you were president of the medical

17  staff, did you have any occasion or need to interpret

18  the ERDs?

19       A.   Nothing that comes immediately to mind.

20       Q.   So then in 2012 you became interim chief

21  medical officer?



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    31

```
 1        A.   Yes.

 2        Q.   And is there any significance between being

 3   interim chief medical officer and non-interim chief

 4   medical officer?

 5             MR. WERNER:  Object to the form.

 6             THE WITNESS:  Not really.  It was just I

 7   kind of volunteered and was accepted in the role while

 8   we were going through a transition.  And then, once we

 9   were acquired it became a permanent position.

10   BY MR. DELMAN:

11        Q.   And you remain chief medical officer today;

12   right?

13        A.   Yes.

14        Q.   Do you hold any other titles?

15        A.   My titles are combined chief medical officer

16   and senior vice president of medical affairs, somewhat

17   used interchangeably.

18        Q.   Is there any difference in responsibility

19   between those two roles?

20        A.   No.

21        Q.   And to whom do you report in those roles?
```



1        A.    Chief executive officer.

2        Q.    And that's Dr. Thomas Smyth?

3        A.    Yes.

4        Q.    And who, if anyone, reports directly to you?

5        A.    I have 10 clinical chiefs representing 10

6    departments, the director of infection prevention, the

7    director of quality, the director of -- what is called

8    our Norton Transformation Office, which is a

9    performance improvement office.

10            I have my own strategic manager, and the

11   medical staff office, the director of the medical

12   staff office.

13       Q.    And in general what are your

14   responsibilities as chief medical officer?

15       A.    My principal responsibility is the oversight

16   of the quality of care that we deliver here at

17   St. Joe's, patient safety, credentialing and

18   privileging, infection prevention which is tied

19   directly to quality and safety.

20            I ensure that our policies and procedures

21   are followed, particularly on the clinical side of



 1  things.

 2          I partner with the chief nursing officer in

 3  strategic initiatives to improve health care here at

 4  St. Joe's.

 5          I am a resource for any member of the

 6  medical staff who has concerns or issues, who maybe

 7  don't choose to go talk to their own clinical chief.

 8          I assure that there is good interdepartment

 9  collaboration on complex issues.

10          Oversee the joint commission survey of all

11  of our accreditation.

12          And all other duties as assigned, incident

13  commander for COVID-19.

14      Q.   That sounds pretty exhaustive, but anything

15  else?

16      A.   I think that probably covers most of it.

17      Q.   So do you remember approximately when in

18  2012 you became interim chief medical officer?

19      A.   I believe it was March.

20      Q.   So was that prior to the acquisition?

21      A.   Yes.  The acquisition was -- I don't know



1    that it -- I know it was announced in December.  I

2    don't know the actual signature date.

3        Q.   So from 1996 to 2012, St. Joseph was owned

4    and operated by Catholic Health Initiatives; right?

5        A.   Yes.

6        Q.   And what is Catholic Health Initiatives?

7             MR. WERNER:  Object to the form.

8             THE WITNESS:  It's another Catholic

9    corporation that owns and operates multiple hospitals

10   across the United States.  I don't know elsewhere.

11   BY MR. DELMAN:

12       Q.   And then in 2012 St. Joseph was purchased by

13   the University of Maryland Medical System; right?

14       A.   Yes.

15       Q.   Now, were you involved in any way with the

16   negotiations concerning the purchase of St. Joseph?

17       A.   Only being at some -- actually at this table

18   sometimes when there would be discussions back and

19   forth about timing, but not in -- nothing monetary or

20   in any -- no part of the actual negotiations.

21       Q.   You didn't have any role in the negotiation



1   of the terms of the asset purchase agreement?

2      A.   No.

3      Q.   And did you have any role in the negotiation

4   of the Catholic identity agreements?

5      A.   No.

6      Q.   So St. Joseph is currently an LLC with the

7   name University of Maryland St. Joseph's Medical

8   Center, LLC; right?

9      A.   Right.

10      Q.   And that LLC has one member; right?

11      A.   Yes.

12      Q.   And that member is UMSJ Health System, LLC?

13      A.   I believe so.

14      Q.   And UMSJ Health System in turn also has only

15   one member; right?

16      A.   I believe so.

17      Q.   And that member is the University of

18   Maryland Medical System Corporation?

19      A.   I believe so.

20      Q.   And so, UMSJ Health System is a wholly owned

21   subsidiary of University of Maryland Medical System?



1              MR. WERNER:  Object to the form.

2              THE WITNESS:  I don't know what that term

3    means, wholly owned subsidiary.

4    BY MR. DELMAN:

5        Q.   The University of Maryland Medical System is

6    the only owner of UMSJ Health System?

7        A.   Yes.

8        Q.   And similarly, UMSJ Health System is the

9    only owner of St. Joseph's Medical Center?

10       A.   Yes.

11       Q.   So University of Maryland through UMSJ is

12   the sole owner of St. Joseph; right?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:  Yes.

15   BY MR. DELMAN:

16       Q.   And no other entity has any ownership stake

17   in St. Joseph?

18       A.   No.

19       Q.   Now, the University of Maryland St. Joseph

20   Medical Center was previously known as Northeastern

21   Maryland Regional Health System, LLC; right?



1        Q.   And UMMS has also reserved the power to make

2    UMSJ Health System take certain actions without prior

3    approval of the board; right?

4              MR. WERNER:   Object to the form.

5              THE WITNESS:   Yes.

6    BY MR. DELMAN:

7        Q.   For example, UMMS can appoint and remove

8    UMSJ Health System's CEO; right?

9              MR. WERNER:   Object to the form.

10             THE WITNESS:   Yes.

11   BY MR. DELMAN:

12       Q.   And UMMS can add, expand, revise, or delete

13   certain health care services provided by UMSJ Health

14   System?

15             MR. WERNER:   Object to the form.

16             THE WITNESS:   Yes.

17   BY MR. DELMAN:

18       Q.   UMMS can make UMSJ Health Systems submit

19   corrective action plans if performance and financial

20   targets aren't met?

21             MR. WERNER:   Object to the form.



```
 1                 THE WITNESS:  Yes.

 2    BY MR. DELMAN:

 3         Q.   And it can enforce those corrective action

 4    plans?

 5                 MR. WERNER:  Object to the form.

 6                 THE WITNESS:  Yes.

 7    BY MR. DELMAN:

 8         Q.   Do you have any reason to believe that UMMS

 9    no longer holds any of those reserved powers?

10         A.   No.

11         Q.   Are you aware of any other powers that UMMS

12    exercises over the UMSJ Health System or SJMC?

13                 MR. WERNER:  Object to the form.

14                 THE WITNESS:  No.

15    BY MR. DELMAN:

16         Q.   Now, UMMS' 2012 acquisition of St. Joseph

17    was contingent on the approval from the Roman Catholic

18    Church; right?

19         A.   Yes.

20         Q.   And as part of the acquisition, UMMS

21    committed to continuing to operate SJMC in a manner
```



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 19 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                      56

1 | consistent with Catholic values and principles?

2 |           MR. WERNER:  Object to the form.

3 | BY MR. DELMAN:

4 |     Q.   Now, are you aware that UMMS contractually

5 | promised to ensure that St. Joseph establish and

6 | maintain certain fundamentals in order to hold SJMC

7 | accountable for its Catholic identity?

8 |           MR. WERNER: Object to the form.

9 |           THE WITNESS:  No.

10 | BY MR. DELMAN:

11 |     Q.   Are you aware that one of those fundamentals

12 | is that the ERDs is the operations lines of

13 | St. Joseph?

14 |     A.   Yes.

15 |           MR. WERNER:  Object to the form.

16 | BY MR. DELMAN:

17 |     Q.   And that one of those fundamentals is that

18 | UMSJ Health Systems' Board establishes a committee

19 | charged with overseeing the integration of the

20 | Catholic mission into St. Joseph's structures,

21 | policies, programs and practices?



1        Q.    You have no knowledge in your personal

2    capacity?

3        A.    Right.

4        Q.    And do you have any knowledge in your

5    capacity as corporate representative?

6        A.    No.

7        Q.    And, again, putting aside procedures

8    involving transgender patients, isn't it true that

9    there is no particular procedure in place at St. Joe's

10   for reviewing whether a hysterectomy is complying with

11   the ERDs?

12            MR. WERNER:  Object to the form.

13            THE WITNESS:  There's not a procedure in

14   place, but there is implicit, I think -- I mean, there

15   is knowledge that's conveyed to the people who would

16   be doing those procedures of what's acceptable and

17   what's not acceptable.  And very clearly stated that

18   we do not do sterilization -- man, woman, whomever --

19   here at St. Joe's.

20   BY MR. DELMAN:

21       Q.    And so physicians at St. Joe's -- and



1   specifically OBs -- are expected to have a general

2   understanding of what categories of procedures are not

3   allowed here?

4        A.   Absolutely.

5        Q.   And those categories include sterilizations?

6        A.   Yes.  Abortion, yes.

7             So hysterectomies for women, vasectomies for

8   men, and I don't even think there is a privilege to

9   the physicians are allowed to apply for in that

10  regard.

11            Prescription of contraception unless there

12  is a medical indication for it.

13            Those would probably be the major

14  procedures.

15       Q.   Just to be clear, I think you said

16  hysterectomies.  Hysterectomies are only prohibited

17  insofar as they are being done expressly for the

18  purpose of sterilization?

19       A.   Correct.  We can't do tubal ligations.  We

20  can remove ovaries for the purpose of sterilization.

21       Q.   You can perform oophorectomies, but only for



1    a medical indication?

2         A.   Correct.

3         Q.   And so it's the same process as for

4    hysterectomies?

5              MR. WERNER:  Object to the form.

6              THE WITNESS:  What do you mean by process?

7    BY MR. DELMAN:

8         Q.   The same considerations are in play with

9    oophorectomies as to hysterectomies?

10        A.   Yes.

11        Q.   Dr. Cunningham, are you familiar with the

12   medical condition gender dysphoria?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:  Yes.  I've not studied it in

15   depth.

16   BY MR. DELMAN:

17        Q.   What's your understanding of it?

18        A.   That it is -- what is the situation?  It is

19   a condition in which a person's DNA makeup is

20   incongruent with how they perceive themselves, from a

21   sexual -- as a sexual being.  Not a sexual being.  As



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 23 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                      236

 1              (Plaintiff's Exhibit No. 17 was thereupon

 2      marked for identification.)

 3      BY MR. DELMAN:

 4         Q.   These are Defendant's Responses and

 5      Objections to Plaintiff's First Set of

 6      Interrogatories.

 7              So obviously feel free to read through the

 8      whole thing, but we're specifically going to discuss

 9      the response to Interrogatory No. 10, which starts at

10      page 17.

11              MR. WERNER:  I assume you really want to

12      direct her attention to the information on page 18, so

13      she has full context?

14              MR. DELMAN:  Yes.

15              THE WITNESS:  Okay.

16      BY MR. DELMAN:

17         Q.   So, Dr. Cunningham, this paragraph at the

18      top of page 18 here, do you recall ever reviewing this

19      statement before?

20         A.   Yes.

21         Q.   And do you recall signing a document



1  swearing under penalty of perjury that the statement

2  was true and correct to the best of your knowledge?

3       A.   Yes.

4       Q.   So can you tell me generally what happened

5  on December -- on Christmas Eve 2019 regarding

6  plaintiff's hysterectomy.

7       A.   I received a phone call from Dr. Adashek,

8  who wanted to know if it was okay if he performed a

9  hysterectomy on a patient of his for the purpose of

10 transgender -- transgender surgery.  And I said no, we

11 cannot do transgender surgery at St. Joe's.

12            And that was the extent of the conversation.

13      Q.   And so, Dr. Adashek just sort of like called

14 you out of the blue on Christmas Eve?

15      A.   Yes.  It was very unusual.

16      Q.   And by the time this phone call had

17 happened, had the procedure already been scheduled;

18 right?

19      A.   Yes.

20      Q.   And no one in scheduling had sort of alerted

21 you that this procedure had been scheduled?



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                     238

```
 1          A.   No.

 2          Q.   And generally no one in the hospital had

 3   told you that this procedure had been scheduled?

 4          A.   No.

 5          Q.   And he hadn't asked you about -- he being

 6   Dr. Adashek -- had not asked you about it before

 7   scheduling it?

 8          A.   No.

 9          Q.   Do you remember approximately how long the

10   phone call was?

11          A.   It was brief.  A minute.

12          Q.   A minute?

13          A.   Maybe.

14          Q.   That short?

15          A.   It was pretty quick, yes.

16          Q.   And just again, you two had no prior

17   conversations about this procedure before that date?

18          A.   No.  No.  Not that I can recall.

19          Q.   And before this occasion, when was the last

20   time Dr. Adashek had called you directly to request

21   permission to perform any procedure at St. Joe's?
```



1        A.    I don't believe he ever had.

2        Q.    Like, for example, he didn't call you to

3    request permission about the transhysterectomy in 2018

4    that we had discussed?

5        A.    Not that I recall.

6        Q.    And he obviously generally did not call you

7    to request permission for every hysterectomy he

8    performed at St. Joe's?

9        A.    No.

10       Q.    So do you recall exactly what Dr. Adashek

11   told you when he called on Christmas Eve 2019?

12             MR. WERNER: Object to the form.

13             THE WITNESS:  No, I don't recall the exact

14   details.  I know it was a brief conversation.  That I

15   was surprised that he was even asking if he could do

16   this because it was well known that we couldn't do

17   those procedures here at St. Joe's.  Or I thought

18   everybody knew it well.

19             And we didn't get into any discussion about

20   the specifics of the patient.  I accepted that the

21   purpose of the surgery was for transgender purposes.



DR. GAIL P. CUNNINGHAM                                  April 14, 2022
Hammons vs University of Maryland Medical System                   240

```
 1   BY MR. DELMAN:

 2       Q.   So what did he tell you about the patient's

 3   condition on the phone call?

 4       A.   He didn't tell me about the patient's

 5   condition.  Just that the patient was seeking

 6   transgender surgery and the hysterectomy was part of

 7   that.  But that was it.

 8            There was no degree of illness discussed or

 9   degree of anything discussed.  It was just about could

10   he do this procedure.

11       Q.   Okay.  And did he tell you anything about

12   the proposed treatment beyond it being a hysterectomy?

13       A.   No.

14       Q.   And beyond the fact that the patient was

15   transgender, it was a hysterectomy and it was being

16   done for the purpose of gender transition.  Did he

17   tell you anything else about it?

18            MR. WERNER:  Object to the form.

19            THE WITNESS:  No.

20            MR. WERNER:  Asked and answered.

21            THE WITNESS:  No.
```



1  BY MR. DELMAN:

2      Q.   And you told Dr. Adashek that -- on that

3  call that the surgery could not take place at

4  St. Joe's; correct?

5      A.   Correct.

6           MR. WERNER:  Object to the form.

7  BY MR. DELMAN:

8      Q.   And so within the span of that one phone

9  call, you made the choice that -- you made the

10 decision that the hysterectomy could not take place at

11 St. Joe's; right?

12          MR. WERNER:  Object to the form.

13          THE WITNESS:  Correct.

14 BY MR. DELMAN:

15     Q.   And in the span of that one phone call you

16 fully considered the nature of the plaintiff's

17 condition?

18          MR. WERNER:  Object to the form.

19          THE WITNESS:  I considered the reason that

20 the surgeon wanted to do the surgery and that -- and

21 it was black and white to me, and I said no.



 1   BY MR. DELMAN:

 2       Q.   Did you do any research into gender

 3   dysphoria during that phone call?

 4            MR. WERNER:  Object to the form.

 5            THE WITNESS:  No.

 6            MR. WERNER:  She didn't even testify that

 7   gender dysphoria was mentioned.  You are just

 8   misstating her testimony.

 9            If you want to ask a question, ask a

10   question.  But don't presuppose facts that aren't

11   actually in the record.

12            MR. DELMAN:  Okay.  Thank you again for the

13   tips, Paul.

14            MR. WERNER:  Yeah, you need them.

15            MR. DELMAN:  Okay.  Thank you.  Appreciate

16   it.

17   BY MR. DELMAN:

18       Q.   Dr. Cunningham, did Dr. Adashek use the term

19   gender dysphoria at any point during that phone call?

20       A.   I don't recall.

21       Q.   Use the term gender transition during that



Case 1:20-cv-02088-DKC  Document 98-9  Filed 06/24/22  Page 30 of 53
DR. GAIL P. CUNNINGHAM                               April 14, 2022
Hammons vs University of Maryland Medical System            243

 1  phone call?

 2      A.   I don't recall the exact terms he used, but

 3  all I know is that it was for the purpose of gender

 4  reassignment.

 5      Q.   During the phone call did you look into the

 6  potential consequences of not allowing a gender

 7  reassignment surgery?

 8           MR. WERNER:  Object to the form.

 9           THE WITNESS:  No.

10  BY MR. DELMAN:

11      Q.   And did you review the plaintiff's chart at

12  all during that phone call?

13      A.   No.

14      Q.   So --

15      A.   I may have told Dr. Adashek that I knew that

16  he had privileges at GBMC, which is a mile away, and

17  that he could proceed with the procedure there.

18      Q.   And so, generally, in what way did you

19  consider the plaintiff's condition during that phone

20  call?

21           MR. WERNER:  Object to the form.  Asked and



DR. GAIL P. CUNNINGHAM                                                April 14, 2022
Hammons vs University of Maryland Medical System                              244

1   answered.

2              THE WITNESS:  I did not do an assessment of

3   the patient's condition.  I only did an assessment of

4   the request for a surgery that I knew could not happen

5   here.

6   BY MR. DELMAN:

7       Q.   And so also in what way did you consider the

8   proposed treatment during the phone call?

9              MR. WERNER:  Object to the form.

10             Asked and answered.

11             THE WITNESS:  I only -- I objected like I

12  would to somebody that calls and says, hey, I want to

13  remove a left eyeball.  We don't remove eyeballs at

14  St. Joseph, so it wasn't the condition of the patient,

15  it is what is allowed here.

16  BY MR. DELMAN:

17      Q.   And in the span of that phone call you fully

18  considered the ERDs and what they allowed?

19             MR. WERNER:  Object to the form.

20             THE WITNESS:  I knew that transgender

21  surgery was not allowed by the ERDs.



1   BY MR. DELMAN:

2       Q.   Did you review a copy of the ERDs while you

3   were on the phone?

4           MR. WERNER:  Object to the form.

5           THE WITNESS:  No.  No.

6   BY MR. DELMAN:

7       Q.   And did you consult with anyone about the

8   ERDs while you were on the phone?

9           MR. WERNER:  Object to the form.

10          THE WITNESS:  No.

11  BY MR. DELMAN:

12      Q.   Generally you just relied on your personal

13  understanding of what the ERDs allowed?

14          MR. WERNER:  Object to the form.

15          THE WITNESS:  My knowledge of what they

16  allowed.

17  BY MR. DELMAN:

18      Q.   And just generally in terms of deciding that

19  the procedure could not take place at St. Joe's, did

20  you consult with anyone else in making that decision?

21      A.   No.



1        A.    In terms of I would have said violate the

2   Catholic directives command to preserve the functional

3   integrity of the human body.

4        Q.    You don't believe that you used the term

5   functional integrity during the call?

6              MR. WERNER:  Object to the form.  Asked and

7   answered.

8              THE WITNESS:  No, I do not.

9   BY MR. DELMAN:

10       Q.    And you don't believe you referenced any

11  rule regarding removal of healthy organs during that

12  call?

13             MR. WERNER:  Object to the form.  Asked and

14  answered.

15             THE WITNESS:  I would doubt it.

16  BY MR. DELMAN:

17       Q.    So how did Dr. Adashek respond to you on

18  that call?

19       A.    I think he might have been a little

20  frustrated.  But, you know, not -- I don't think he

21  was particularly angry.  I think he remained calm and



1    cool, and I said -- I told him that he would need to

2    cancel and relocate the surgery and -- but from what I

3    can remember, he said okay and that was sort of the

4    end of it.

5         Q.   Do you recall if he tried to convince you to

6    allow the procedure to take place?

7              MR. WERNER:  Object to the form.

8              THE WITNESS:  He referenced the 2018 case,

9    very briefly.  Because I think I said to him I'm

10   really surprised you're even asking about this, and he

11   said, well, this came up in 2018 and I was wondering

12   if the rules had changed, or something along those

13   lines.  And I said no.

14             Nothing's changed.  You can't do the surgery

15   here.  You can -- you could do it at GBMC or

16   elsewhere, and that was it.

17        Q.   Is there any chance you recall what his

18   exact words were to you?

19        A.   No.

20        Q.   And did you and Dr. Adashek agree at all to

21   speak again about the matter at a later date?



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                      256

```
1        A.   I don't recall that.

2        Q.   And did you at any point discuss with

3   Dr. Adashek whether the patient's gender dysphoria was

4   severe enough to be life-threatening?

5             THE WITNESS:  No.

6             MR. WERNER:  Object to the form.  Asked and

7   answered.

8   BY MR. DELMAN:

9        Q.   It was just the fact that it was a gender

10  transition treatment that was enough to deny it;

11  right?

12            MR. WERNER:  Object to the form.  Asked and

13  answered.

14            THE WITNESS:  Yes.

15  BY MR. DELMAN:

16       Q.   And so prior to January 6, 2020, how many

17  other times did you speak with Dr. Adashek about

18  plaintiff's procedure?

19       A.   Prior to January the 6th?

20       Q.   Um-um.

21       A.   Which is when the procedure was scheduled?
```



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 36 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                     257

1        Q.   Correct.

2        A.   I don't believe I did.  I know we had

3   subsequent conversations, but I don't think it was

4   before January 6th.

5        Q.   It's your recollection that the Christmas

6   Eve call was the only call you two had?

7        A.   That's my recollection, yes.

8        Q.   And you two didn't e-mail about it at all?

9        A.   No, not that I know of.

10        Q.   To the best of your knowledge, did

11   Dr. Adashek speak with anyone else at UMSJ or at SJMC

12   after speaking with you?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:  No.  And he forgot to cancel

15   the case, so I don't think that he did speak to

16   anybody else.

17   BY MR. DELMAN:

18        Q.   Did you inform the scheduling department

19   that the procedure had been cancelled?

20             MR. WERNER:  Object to the form.

21             THE WITNESS:  No.  That would be up to the



 1 | surgeon.

 2 | BY MR. DELMAN:

 3 |     Q.    That's the surgeon's responsibility?

 4 |     A.    Yes.

 5 |     Q.    Did you -- following that Christmas Eve call

 6 | and prior to the scheduled date of the surgery, did

 7 | you speak to anyone at St. Joe's about the procedure?

 8 |     A.    I would suspect that I probably would have

 9 | talked to Dr. Marion, the chief of surgery.  I don't

10 | know that I -- at some point I talked to Dr. Smyth,

11 | but I don't know that it was in that time interval.  I

12 | can't recall.

13 |     Q.    Why do you presume that you would have

14 | talked to Dr. Marion?

15 |     A.    Just to let him know, to put this on the

16 | radar that Dr. Adashek was trying to post a case that

17 | he should have known that we couldn't do here.

18 |         And whether I would have -- I'm trying to

19 | think if Dr. Buescher was in her role at that point.

20 | Maybe Dr. Buescher as well.  In fact, she was in her

21 | role there.  So those two I may have talked to about



 1      Q.   And you were trying to reach out to him

 2   because of -- you wanted to discuss why the procedure

 3   had not been cancelled?

 4      A.   Yes.

 5      Q.   Between the Christmas Eve phone call and

 6   January 6th, did you take any actions regarding

 7   plaintiff's procedure?

 8           MR. WERNER:  Object to the form.

 9           THE WITNESS:  Not that I recall.

10   BY MR. DELMAN:

11      Q.   Did you at any point consult with the ethics

12   committee about plaintiff's procedure?

13           MR. WERNER:  Object to the form.  Asked and

14   answered.

15           THE WITNESS:  No.

16   BY MR. DELMAN:

17      Q.   Even after the surgery was cancelled, was

18   the procedure ever discussed before the ethics

19   committee?

20           MR. WERNER:  Object to the form.

21           THE WITNESS:  I don't know.  I can't



1    remember.

2    BY MR. DELMAN:

3        Q.   If it had been discussed, there would be

4    minutes reflecting that?

5        A.   Yes.

6        Q.   Likewise, any point before or after the

7    surgery was cancelled, was this matter brought before

8    the Catholic Identity Committee?

9            MR. WERNER:   Object to the form.

10           THE WITNESS:   I don't know.

11   BY MR. DELMAN:

12       Q.   If it had been, would minutes have been

13   taken of that meeting?

14       A.   I believe so.

15       Q.   And you just testified that during the call

16   you suggested to Dr. Adashek that he could do the

17   procedure at GBMC; right?

18       A.   Correct.

19       Q.   Did you believe that a non-Catholic hospital

20   would view gender dysphoria as a sufficient medical

21   reason to perform a hysterectomy?



1            MR. WERNER:  Object to the form.

2            THE WITNESS:  I know that GBMC is not a

3    Catholic hospital and does not have to abide by ERDs.

4    BY MR. DELMAN:

5        Q.   So because they don't have to abide by the

6    ERDs, they would likely view gender transition as a

7    sufficient medical reason for a procedure?

8            MR. WERNER:  Object to the form.  You

9    understand she is not here testifying for GBMC.

10           MR. DELMAN:  I'm asking her based on her

11   personal knowledge.

12           MR. WERNER:  You're asking what they think.

13           MR. DELMAN:  I'm asking based off her

14   knowledge what she believes.

15           MR. WERNER:  You're asking her personal

16   belief on what they think.  Okay.  That's not a proper

17   question.

18           MR. DELMAN:  Okay.  Again, she answered the

19   question based on her personal knowledge.

20           THE WITNESS:  I don't know how GBMC makes

21   decisions about what's allowed, what's sufficient,



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    278

1   procedure to take place here; right?

2              MR. WERNER:  Object to the form.

3              THE WITNESS:  He should have known and not

4   posted the case here.

5   BY MR. DELMAN:

6       Q.   And --

7       A.   And he should have cancelled the case when

8   he was told that it needed to be cancelled.

9       Q.   Do you know if anyone at St. Joe's followed

10  up with Dr. Adashek at any point between that

11  Christmas Eve call and January 6th to ask why the

12  surgery was still on the calendar?

13      A.   I don't know.

14      Q.   And, again, you don't recall communicating

15  to anyone the substance of your conversation with

16  Dr. Adashek?

17      A.   No.

18      Q.   Now, Dr. Adashek has performed, say, dozens

19  of hysterectomies at St. Joe's; right?

20      A.   Presumably, yes.

21      Q.   And as we've thoroughly discussed here,



 1 │ St. Joe's has as far as you know never disallowed a

 2 │ hysterectomy for any medical condition other than

 3 │ gender dysphoria; correct?

 4 │          MR. WERNER:  Object to the form.

 5 │          THE WITNESS:  I don't know.  Again, because

 6 │ that might happen at the chief level and not at my

 7 │ level.

 8 │ BY MR. DELMAN:

 9 │     Q.   Is it fair to say -- again assuming it was a

10 │ mistake and not on purpose -- that Dr. Adashek's

11 │ mistake was not recognizing that St. Joe's has a

12 │ policy of not allowing hysterectomies to treat gender

13 │ dysphoria --

14 │          MR. WERNER:  Object to the form.  Asked and

15 │ answered.

16 │          THE WITNESS:  He knows that we operate under

17 │ the ERDs.  He has been here since 19-whatever --

18 │ 80-something or whatever.  He knows we don't do

19 │ abortions here.  He knows we don't do tubal ligations

20 │ here.  He knows there are a whole host of things that

21 │ we don't do here, so I don't think this was a lack of



Case 1:20-cv-02088-DKC   Document 98-9   Filed 06/24/22   Page 43 of 53
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                     280

1   knowledge.

2   BY MR. DELMAN:

3       Q.   Again, one of those things that we don't do

4   here is gender transition as well?

5       A.   Correct.

6       Q.   So, pursuant to that policy of not allowing

7   gender transitions, Dr. Adashek's scheduled procedure

8   was cancelled?

9            MR. WERNER:  Object to the form.

10           THE WITNESS:  He didn't cancel it.

11  BY MR. DELMAN:

12      Q.   It was ordered to be cancelled?

13      A.   Right.  Right.

14      Q.   Apart from that January 30th, 2020, meeting

15  that we've just discussed, what other meetings have

16  you had about treating transgender patients at

17  St. Joe's since January 2020?

18           MR. WERNER:  Object to the form.

19           THE WITNESS:  I don't know that there have

20  been any specific meetings.  You know, that was --

21  about three weeks later COVID hit and anything we may



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                  295

1  or false question that is not actually susceptible to

2  a true or false answer?  Don't you think that's a

3  misleading question?

4          Maybe you should try harder to ask a

5  question that's intelligible.

6  BY MR. DELMAN:

7      Q.   Again, without that interruption --

8          MR. WERNER:  Objection.

9  BY MR. DELMAN:

10     Q.   -- I'm going to read you a statement and I'm

11  telling you it's not -- I'm not asking you for your

12  answer whether it's true or false.  I'm asking whether

13  it is consistent with your understanding.

14          "For purposes of applying the ERDs, the

15  terms life-threatening and life-altering, do not

16  reflect a medical diagnosis.  Instead, these terms are

17  used as a means to understand the implications of the

18  ERDs on a particular procedure and/or a

19  patient-desired procedure."

20          MR. WERNER:  Object to the form.

21          THE WITNESS:  That's true.



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    296

```
 1   BY MR. DELMAN:

 2        Q.   Is that statement consistent with your

 3   understanding?

 4        A.   Can you read the last part of it, again?

 5        Q.   Sure.  Of course.

 6        A.   Go ahead and read the whole thing.

 7        Q.   Okay.

 8             "For purposes of applying the ERDs the terms

 9   life-threatening and life-altering do not reflect a

10   medical diagnosis.  Instead, these terms are used as a

11   means to understand the implications of the ERDs on a

12   particular procedure and/or a patient's desired

13   procedure."

14             MR. WERNER:  Object to the form.  If you're

15   reading from a document, you should give her the

16   document.

17             THE WITNESS:  True.

18   BY MR. DELMAN:

19        Q.   Again, that statement's consistent with your

20   understanding?

21        A.   Yes.
```



```
 1              REPORTER'S CERTIFICATE

 2              State of Maryland

 3              County of Baltimore, to wit:

 4                   I, KENNETH NORRIS, a Notary Public of

 5      the State of Maryland, County of Baltimore, do hereby

 6      certify that the within named witness personally

 7      appeared before me at the time and place herein set

 8      out, and after having been duly sworn by me, according

 9      to law, was examined.

10                   I further certify the examination was

11      recorded stenographically by me and this transcript is

12      a true record of the proceedings.

13                   I further certify that I am not of

14      counsel to any of the parties, nor in any way

15      interested in the outcome of this action.

16                   As witness my hand and notarial seal

17      this 14th day of April, 2022.

18                           _____

19                           KENNETH NORRIS

20                           Notary Public

21      My Commission Expires: 7-22-22
```



1    Reference No.: 8078725

2

3    Case:  Hammons vs University of Maryland Medical System

4

5         DECLARATION UNDER PENALTY OF PERJURY

6         I declare under penalty of perjury that
     I have read the entire transcript of my Depo-
7    sition taken in the captioned matter or the
     same has been read to me, and the same is
8    true and accurate, save and except for
     changes and/or corrections, if any, as indi-
9    cated by me on the DEPOSITION ERRATA SHEET
     hereof, with the understanding that I offer
10   these changes as if still under oath.

11         _____  _____

12         Dr. Gail P. Cunningham

13

14         NOTARIZATION OF CHANGES

15              (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____



Reference No.: 8078725

Case:· Hammons vs University of Maryland Medical System

Page No. ___1__ Line No. __14___ Change to: From Gale to Gail
_____

Reason for change: Incorrect spelling _____

Page No.__30___ Line No._12___ Change to: Not sure if that is USMJ

or meant to be UMMS?

Reason for change: _____

Page No. 40_____ Line No._21_____ Change to: UMS to UMMS
_____

Reason for change: Incorrect Spelling

Page No. 41_____ Line No._9_____ Change to: Ums to Umms
_____

Reason for change: Incorrect Spelling

Page No.57_____ Line No.16_____ Change to:  Father Sobey to Father

Asobi_____

Reason for change: Incorrect Spelling

Page No.68_____ Line No.15_____ Change to: Mission to Admission_____
_____

Reason for change: Incorrect Spelling _____

*Page No.71_____ Line No._____ Change to: Management to Anesthesia_____
_____

Reason for change: Wrong Wording _____

SIGNATURE _____ DATE: 5/25/2022

Dr. Gail P. Cunningham

Reference No.: 8078725

Case:· Hammons vs University of Maryland Medical System

Page No. 73_____Line No. 19_____Change to:_ DPA to BPA _____

_____

Reason for change: Incorrect Spelling _____

Page No. 74_____Line No.6_____Change to:_ DPA to BPA _____

_____

Reason for change: Incorrect Spelling _____

Page No. 74_____Line No. 10_____Change to: Repair to Rare _____

_____

Reason for change:_ Incorrect wording _____

*Page No. 101_____Line No. 16_____Change to:_ Sobey to Asobi _____

_____

Reason for change: Incorrect Spelling _____

Page No. 118_____Line No. 18_____Change to:_ Sobey to Asobi _____

_____

Reason for change:__ Incorrect Spelling _____

Page No. 119_____Line No. 6_____Change to:_ Sobey to Asobi _____

_____

Reason for change:_ Incorrect Spelling _____

Page No. 119_____Line No. 15_____Change to:_ Employee to Employed _____

_____

Reason for change: Incorrect Wording _____

SIGNATURE: _____ DATE:_ 5/25/2022 _____

Dr. Gail P. Cunningham

Page No. 120____ Line No._1____ Change to: Touhey to Tewey_____

_____

Reason for change: Incorrect Spelling_____

Page No.___148____ Line No._12____ Change to: Fetal to Futile_____

_____

Reason for change:_____

*Page No._148____ Line No.13_____ Change to: phone_____

_____

Reason for change:_____

Page No. 149_____ Line No._16____ Change to:_Nelapas to_Manlapaz_____

_____

Reason for change:_Incorrect Spelling_____

Page No. 160____ Line No._9____ Change to: Eminence to Imminence_____

_____

Reason for change:_Incorrect Spelling_____

Page No._161____ Line No._18____ Change to:_Sobey to Asobi_____

_____

Reason for change:_Incorrect Spelling_____

Page No. 172_____ Line No._14_____ Change to:_OBNR to OBGYN's_____

_____

Reason for change: Incorrect Spelling_____

Page No. 173_____ Line No.19_____ Change to: Feel to be_____

_____

Reason for change: Incorrect wording_____

SIGNATURE: _Gail P. C_____ DATE: 5/25/2022

Dr. Gail P. Cunningham

Page No. __186__ Line No. _20__ Change to: _Can to Can't_____

_____

Reason for change: _Incorrect Wording_____

*Page No. 188_____ Line No. _4_____ Change to: _It comes from_____

_____

Reason for change: _Incorrect Wording_____

*Page No. _188____ Line No. _21____ Change to: _Order to Corner_____

_____

Reason for change: _Incorrect Wording_____

*Page No. _189____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No. _202_____ Line No. _2____ Change to: _I to In_____

_____

Reason for change: _Incorrect Wording_____

Page No. _211____ Line No. _21____ Change to: _Sobey to Asobi_____

_____

Reason for change: _Incorrect Spelling_____

Page No. _220_____ Line No. _4____ Change to: _Normal to Abnormal_____

_____

Reason for change: _Incorrect Wording_____

Page No. _225_____ Line No. _2____ Change to: _Remove F_____

_____

Reason for change: _Incorrect Spelling_____

Page No. _226_____ Line No. _2____ Change to: _Marks to Marx_____

_____

Reason for change: _Incorrect Spelling_____

Page No. _232_____ Line No. _21____ Change to: _BPH to BPA_____

_____

Reason for change: Incorrect Spelling _____

Page No. 233____ Line No. 10____ Change to: EPIQ to EPIC_____

_____

Reason for change: Incorrect Spelling _____

Page No. 246_____ Line No. 7____ Change to: Incorrect Spelling_____

_____

Reason for change: __ Incorrect Spelling _____

*Page No. 268_____ Line No. _21___ Change to:__and he_____

_____

Reason for change:_ _____

Page No. 274_____ Line No. 4____ Change to: Kuhn to Kunz_____

_____

Reason for change: Incorrect Spelling _____

Page No. 282_____ Line No. 10____ Change to: Hough to Hodes_____

_____

Reason for change: Incorrect Spelling _____

Page No. 282_____ Line No. 12____ Change to:__ Hough to Hodes_____

_____

Reason for change:_ Incorrect Spelling _____

Page No. 298_____ Line No. 8____ Change to: Sobey to Asobi_____

_____

Reason for change: Incorrect Spelling _____

Page No. 298_____ Line No.14_____ Change to: Sobey to Asobi_____

_____

Reason for change: Incorrect Spelling _____

SIGNATURE: _Gail P. C_____ DATE: 5/25/2022___

Dr. Gail P. Cunningham

Page No. 298   Line No. 21   Change to: Sobey to Asobi

_____

Reason for change: Incorrect Spelling _____

Page No. 299   Line No. 15   Change to: Sobey to Asobi

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

SIGNATURE:_____DATE: 5/25/2022

Dr. Gail P. Cunningham