**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JESSE HAMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-2088-DKC |
| | ) | |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

APPENDIX OF EXHIBITS ......................................................................................... viii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ..................................................................... 3

I.      Gender Dysphoria and Its Treatment. ................................................................... 3

II.     UMMS Controls the Hospital Through Two Wholly Owned Subsidiaries. ........ 5

III.    St. Joseph's Catholic Identity. ............................................................................. 7

        A.      St. Joseph Prohibits Transition-Related Care. ......................................... 9

        B.      St. Joseph Regularly Performs Hysterectomies for Any Medical Reason—Except to Treat Gender Dysphoria. ............................................. 11

IV.    St. Joseph Canceled Mr. Hammons's Hysterectomy Because He Is Transgender. ........... 14

LEGAL STANDARD .................................................................................................... 17

ARGUMENT ................................................................................................................. 17

I.      DEFENDANTS' DENIAL OF CARE TO MR. HAMMONS VIOLATED THE ACA. ........................................................................................................... 17

        A.      DEFENDANTS DENIED MEDICAL CARE TO MR. HAMMONS ON THE BASIS OF SEX. ................................................................ 17

        B.      MR. HAMMONS SUFFERED HARM. ................................................ 22

        C.      DEFENDANTS RECEIVE FEDERAL FUNDS. ................................. 23

II.     UMMS IS LIABLE FOR THE VIOLATION OF MR. HAMMONS'S RIGHTS. ........... 24

        A.      UMMS Is Subject to Section 1557 In All Its Operations. .................... 24

        B.      UMMS Is Directly Liable for Its Own Conduct. ................................. 26

        C.      UMMS Is Indirectly Liable for St. Joseph's Actions. .......................... 28

III.    THE NORTH DAKOTA INJUNCTION DOES NOT INSULATE ST. JOSEPH FROM LIABILITY. ................................................................................... 31

CONCLUSION ................................................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................17

*Balogh v. Lombardi*,
  816 F.3d 536 (8th Cir. 2016) ...............................................................................33

*Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*,
  210 F.3d 18 (1st Cir. 2000).................................................................................29

*Billard v. Charlotte Catholic High Sch.*,
  No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021), *appeal filed*
  No. 22-1440 (4th Cir. Apr. 25, 2022) ..................................................................35

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731 (2020).............................................................................18, 21, 22

*Bouchat v. Balt. Ravens Football Club, Inc.*,
  346 F.3d 514 (4th Cir. 2003) ...............................................................................17

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ...........................................................21, 22

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
  80 F. Supp. 2d 729 (W.D. Mich. 2000) ...............................................................26

*Cole v. Fam. Dollar Stores of Md., Inc.*,
  No. CV PX-17-0393, 2018 WL 3818811 (D. Md. Aug. 10, 2018), *aff'd*, 811
  F. App'x 168 (4th Cir. 2020) ...............................................................................19

*Conley v. Nw. Fla. State Coll.*,
  145 F. Supp. 3d 1073 (N.D. Fla. 2015)................................................................20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  142 S. Ct. 1562 (2022).........................................................................................23

*Daniel v. Paul*,
  395 U.S. 298 (1969).............................................................................................23

*Drewitt v. Pratt*,
  999 F.2d 774 (4th Cir. 1993) ...............................................................................17

*Dulaney v. Packaging Corp. of Am.*,
  673 F.3d 323 (4th Cir. 2012) ...............................................................................17

### TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

*Equal Rights Ctr. v. Equity Residential*,
  No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016) ......................................26, 29

*Fain v. Crouch*,
  545 F. Supp. 3d 338 (S.D. W. Va. 2021) ...............................................................................23

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983)................................................................................................19, 31, 33

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)................................................................................................................19

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976)..........................................................................................................19, 20

*Goddard v. Apogee Retail LLC*,
  No. 19-3269, 2021 WL 2589727 (D. Md. June 24, 2021).....................................................35

*Good v. Am. Water Works Co., Inc.*,
  No. CV 2:14-01374, 2016 WL 5402230 (S.D. W. Va. Sept. 26, 2016) ................................26

*Goya Foods, Inc v. Wallack Mgmt. Co.*,
  290 F.3d 63 (1st Cir. 2002)....................................................................................................32

*Grimm v. Gloucester Cty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021)............................... *passim*

*Grove City College v. Bell*,
  465 U.S. 555 (1984)....................................................................................................24, 25, 26

*Gunter v. Long Island Power Auth./Keyspan*,
  No. 08-cv-498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011).........................35

*Heckler v. Mathews*,
  465 U.S. 728 (1984)................................................................................................................23

*In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*,
  958 F. Supp. 1045 (D. Md. 1997)...........................................................................................26

*Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*,
  No. CIV.A. ELH-12-572, 2013 WL 1010357 (D. Md. Mar. 13, 2013) ................................25

*Kadel v. Folwell*,
  446 F. Supp. 3d 1 (M.D.N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861, 211 L. Ed. 2d 568
  (2022) ..........................................................................................................................18, 21, 22

iv

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Kadel v. Folwell*,
　No. 1:19CV272, 2022 WL 2106270 (M.D.N.C. June 10, 2022)............................21

*Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*,
　12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022)........................30

*Keffer v. H.K. Porter Co.*,
　872 F.2d 60 (4th Cir. 1989) ...............................................................................29

*Lebron v. Natl R.R. Passenger Corp.*,
　513 U.S. 374 (1995)......................................................................................31, 35

*Libertarian Party of Va. v. Judd*,
　718 F.3d 308 (4th Cir. 2013) ...........................................................................17

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
　No. CV 19-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) ............................20

*NCAA v. Smith*,
　525 U.S. 459 (1999)..........................................................................................33

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
　462 U.S. 669 (1983)..........................................................................................20

*Next Investments, LLC v. Bank of China*,
　12 F. 4th 119 (2d Cir. 2021) ............................................................................32

*NFIB v. Sebelius*,
　567 U.S. 519 (2012)..........................................................................................30

*Paulone v. City of Frederick*,
　No. CV ELH-09-2007, 2012 WL 13184457 (D. Md. May 1, 2012) ......................25

*Pearson v. Component Tech. Corp.*,
　247 F.3d 471 (3d Cir. 2001)........................................................................27, 28

*Religious Sisters of Mercy v. Azar*,
　513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr.
　21, 2021) ................................................................................................. *passim*

*Roberts v. U.S. Jaycees*,
　468 U.S. 609 (1984)..........................................................................................23

*Rumble v. Fairview Health Servs.*,
　No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015)..........24

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Scott v. Harris,*
   550 U.S. 372 (2007)............................................................................................17, 19

*Shimkus v. Gersten Cos.*,
   816 F. 2d 1318 (9th Cir. 1987) ..........................................................................33

*Stanford v. Fox Coll.*,
   No. 18 C 3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020)...............................20

*T.S. by & through T.M.S. v. Heart of CarDon, LLC*,
   No. 1:20-CV-01699-TWP-MG, 2021 WL 2946447 (S.D. Ind. July 14, 2021).....................25

*Taylor v. Fluor Corp.*,
   No. CV 6:17-1875-BHH, 2019 WL 4727464 (D.S.C. Sept. 27, 2019)..................28

*Thaxton v. Vaughan*,
   321 F.3d 474 (4th Cir. 1963) ..............................................................................32

*Tolan v. Cotton*,
   572 U.S. 650 (2014) (per curiam) .......................................................................17

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014)................................................................................28

*United States v. Bestfoods*,
   524 U.S. 51 (1998)...............................................................................................26

*United States v. Sec'y Fla. Agency for Health Care Admin.*,
   21 F. 4th 730 (11th Cir. 2021) ............................................................................33

*Whole Woman's Health v. Jackson*,
   142 S. Ct. 522 (2021)...........................................................................................32

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
   477 F.3d 1282 (11th Cir. 2007) ..........................................................................26

*Workman v. Univ. of Akron*,
   No. 5:16-CV-156, 2017 WL 6326898 (N.D. Ohio Dec. 11, 2017) ......................20

**Statutes**

42 U.S.C. § 18116.....................................................................................................23, 24

42 U.S.C. § 2000e(k) ................................................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 § 2, 102 Stat. 28
(1988) ...................................................................................................................2

Md. Code Educ. § 13-301 ......................................................................................5

Md. Code Educ. § 13-302 ......................................................................................5

Md. Code Educ. § 13-303 ......................................................................................5

**Other Authorities**

34 C.F.R. § 106.40(b) ..........................................................................................20

45 C.F.R. § 92.3(b) ..............................................................................................25

Fed. R. Civ. P. 56 .................................................................................................17

Fed. R. Civ. P. 65 .................................................................................................32

*Nondiscrimination in Health and Health Education Programs or Activities,
Delegation of Authority*, 85 Fed. Reg. 37160-01 (June 19, 2020)....................21, 25

*Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375-01
(May 18, 2016)..................................................................................................21, 25

APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Declaration of Jesse R. Hammons. |
| 2 | Dr. Kate Thomas Letter to Dr. Steven Adashek. Bates No. HUM_0000050-51. |
| 3 | Expert Witness Report and Declaration of Loren S. Schechter, M.D. |
| 4 | Dr. Gail Cunningham Rule 30(b)(6) and Personal Capacity Deposition Transcript. |
| 5 | UMSJ Health System, LLC Articles of Organization. Bates No. HUM_0001100-03. |
| 6 | Northeastern Maryland Regional Health System, LLC Articles of Organization. Bates No. HUM_0000513-15. |
| 7 | Northeastern Maryland Regional Health System, LLC Articles of Amendment. Bates No. HUM_0000516-17. |
| 8 | William C. Greskovich Rule 30(b)(6) Deposition Transcript. |
| 9 | Everest Scott Conover Deposition Transcript. |
| 10 | UMSJ Health System, LLC 2017 Form 990. Bates No. HUM_0000518-619. |
| 11 | Keith Riddle Deposition Transcript. |
| 12 | Fr. Louis Asobi Deposition Transcript. |
| 13 | National Catholic Bioethics Center Policy Document. Bates No. UMMS000000004-05. |
| 14 | Catholic Identity and Ethics Review. Bates No. UMMS000000768. |
| 15 | Dr. Michael J. Marion Deposition Transcript. |
| 16 | Dr. Gail Cunningham Email Exchange. Bates No. UMMS000000107-10. |
| 17 | Dr. Monica Buescher Email to Dr. Steven Adashek et al. |
| 18 | Dr. Monica Buescher Deposition Transcript. |
| 19 | Dr. Steven Adashek Deposition Transcript. |
| 20 | Jesse R. Hammons Deposition Transcript. |
| 21 | Dr. Steven Adashek Handwritten Notes from January 30, 2020 Meeting. |

| 22 | Dr. Gail Cunningham Email to Dr. Michael J. Marion et al. Bates No. UMMS000000715-16. |
|----|----|

Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons") respectfully submits this memorandum of law in support of his motion for summary judgment and in opposition to the motion for summary judgment, ECF No. 98, filed by Defendants University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ LLC"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (all three collectively, "Defendants"; UMSJ LLC and St. Joseph LLC collectively, "St. Joseph").

## PRELIMINARY STATEMENT

Mr. Hammons is a man who is transgender and who has also been diagnosed with gender dysphoria. As part of his medically necessary care, Mr. Hammons's surgeon scheduled a hysterectomy to take place at the University of Maryland St. Joseph Medical Center, a wholly owned subsidiary of UMMS. But before Mr. Hammons's surgery could take place, St. Joseph ordered Mr. Hammons's surgeon to cancel the procedure because St. Joseph refuses to provide any gender-affirming care for transgender individuals.

As Defendants have now admitted in discovery, Defendants have a facially discriminatory policy against providing gender-affirming care of any kind to transgender patients at St. Joseph. That is because, despite being a government hospital system, UMMS requires St. Joseph to adhere to the Ethical & Religious Directives of the United States Conference of Catholic Bishops ("ERDs"), which St. Joseph interprets to ban all gender-affirming care, including gender-affirming hormone therapy and all gender-affirming surgery. Pursuant to that policy, Defendants "denied [Mr. Hammons] the benefits of [their] services because he has gender dysphoria, a condition inextricably linked to being transgender." ECF No. 52 (decision on motion to dismiss) at 46.

Defendants have asserted that St. Joseph has a facially neutral policy of not performing hysterectomies because of a generally applicable prohibition on sterilization procedures, but the undisputed evidence shows that this assertion has no basis in fact. Discovery revealed that St.

Joseph does not regard hysterectomies as "sterilization procedures" and routinely performs hysterectomies for any medically indicated reason *except* to treat gender dysphoria.  Discovery also revealed that St. Joseph refuses to provide any gender-affirming care regardless of whether the surgery impacts fertility at all.  Defendants thus "regarded [Mr. Hammons's] medical need [for a hysterectomy] differently because he is transgender" and "discriminated against him on the basis of sex by treating him worse than others who are similarly situated.'"  ECF No. 52 at 47 (cleaned up).  By denying Mr. Hammons's surgery on that basis, Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557." *Id.*

UMMS and both of its defendant subsidiaries are jointly liable for violating Mr. Hammons's rights under Section 1557 of the Affordable Care Act ("ACA").  UMMS is directly liable for signing and enforcing an agreement with the Archdiocese of Baltimore in which UMMS promised to maintain St. Joseph's Catholic heritage and require St. Joseph to adhere to the ERDs.  And UMSJ LLC and St. Joseph LLC are liable because they implemented the discriminatory policy and applied it against Mr. Hammons.

Defendants' attempts to evade accountability are meritless.  UMMS argues that it cannot be held liable under Section 1557 because it did not receive the specific federal funds that were used in the program that discriminated against Mr. Hammons.  But federal law explicitly requires an entity receiving federal financial assistance to comply with antidiscrimination requirements in all its operations.  *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 § 2, 102 Stat. 28, 28 (1988) (codified at 29 U.S.C. § 794(b)) ("CRRA").  The flow of specific federal funds is irrelevant.

Defendants also erroneously contend that Mr. Hammons's claims against UMSJ LLC and

St. Joseph LLC are barred by an injunction in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d

1113, 1153-54 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr. 21, 2021), which prohibits

the federal government from enforcing Section 1557 against members of the Catholic Benefits

Association.  Defendants assert that because UMSJ LLC and St. Joseph LLC ostensibly joined the

Catholic Benefits Association a few days before filing their motion for summary judgment, the

injunction in *Religious Sisters of Mercy* prevents Mr. Hammons from bringing claims against them

in private litigation.  To the contrary, Mr. Hammons was not a party in the *Religious Sisters of*

*Mercy* case and is not in privity with the federal government for purposes of the North Dakota

injunction.  Indeed, the injunction in *Religious Sisters of Mercy* was based on the Religious

Freedom Restoration Act ("RFRA"), which does not even apply to litigation between private

parties.  And, as governmental entities, UMSJ LLC and St. Joseph LLC cannot claim protection

under RFRA in any event.

Because the undisputed facts establish that Defendants denied Mr. Hammons care pursuant

to a discriminatory policy, and because all Defendants are liable for that discrimination, Mr.

Hammons's motion for summary judgment should be granted, and Defendants' motion denied.

## STATEMENT OF UNDISPUTED FACTS

**I.    Gender Dysphoria and Its Treatment.**

Plaintiff Jesse Hammons is a man who is transgender, which means that he has a male

gender identity but the sex assigned to him at birth was female.  Ex. 1 ("Hammons Decl.") ¶ 3.

Mr. Hammons has been diagnosed by his medical providers with gender dysphoria, a diagnostic

term for clinically significant distress experienced by some transgender people based on the

incongruence between their gender identity and the sex assigned to them at birth.  *Id.* at ¶ 4; Ex. 2

(Letter, Kate Thomas, PhD to Dr. Steven J. Adashek (Dec. 27, 2019)); Ex. 3 (Expert Witness

Report and Declaration of Loren S. Schechter, M.D. (Dec. 14, 2021)) ¶ 20.  Gender dysphoria is a

serious medical condition recognized by the Diagnostic and Statistical Manual of Mental Disorders and by the International Classification of Diseases published by the World Health Organization. Ex. 3 ¶ 21.  Transgender individuals diagnosed with gender dysphoria can experience intense discomfort with the primary and/or secondary sex characteristics of the sex they were assigned at birth, and those who do not receive necessary treatment can suffer severe and debilitating harms such as depression, anxiety, self-harm and suicidal ideation or attempts.  *Id.* at ¶¶ 22-23.

The World Professional Association for Transgender Health ("WPATH") publishes Standards of Care for treating gender dysphoria.  *Id.* at ¶ 24.  Under the WPATH Standards, which are widely recognized guidelines on how to effectively treat transgender individuals with gender dysphoria,[1] medically necessary treatment for gender dysphoria may require medical treatment to affirm one's gender identity and transition from living as one gender to another.  *Id.* at ¶¶ 27-30. This treatment, commonly referred to as gender-affirming or gender-confirming care, may include hormone therapy and surgery.  *Id*.  Gender-affirming care is recognized by medical and mental health professionals as medically necessary for treating people with gender dysphoria.  *Id.*

According to the WPATH Standards of Care, some transgender individuals may require surgery to alleviate their gender dysphoria.  *Id.*  In these instances, surgical treatment is medically necessary because the treatments are clinically indicated to treat an underlying medical condition, gender dysphoria.  *Id.*  For transgender men, surgical treatment options may include chest reconstruction or breast removal, genital reconstruction, or removal of internal sex organs, including a hysterectomy.  *Id.* at ¶ 29.

---

[1] The Fourth Circuit has noted that the WPATH Standards of Care "represent the consensus approach of the medical and mental health community [for treating gender dysphoria] and have been recognized by various courts, including this one, as the authoritative standards of care." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

## II.     UMMS Controls the Hospital Through Two Wholly Owned Subsidiaries.

UMMS was created by Maryland statute in 1984, to provide "comprehensive health care" to the state and region.  Md. Code Educ. § 13-301, *et seq.*; *id.* at § 13-302(1), (3).  The statute authorizes UMMS to establish "nonprofit or for-profit subsidiaries" subject to approval by the University of Maryland.  *Id.* at § 13-303(k)(2).  In 2012, UMMS purchased St. Joseph Medical Center, a Catholic hospital (the "Hospital").  Defs.' Ex. 2 (Asset Purchase Agreement); Ex. 4 ("Cunningham Tr.") 34:12-14.[2]  UMMS is the sole owner of the Hospital.  Cunningham Tr. 36:5-18.

UMMS controls the Hospital through two wholly-owned subsidiaries, UMSJ LLC and St. Joseph LLC.  Ex. 5 (Articles of Organization of UMSJ LLC); Ex. 6 (Articles of Organization of St. Joseph LLC, under prior name, Northeastern Maryland Regional Health System, LLC); Ex. 7 (changing name); Ex. 8 ("Greskovich Tr.") 80:6-13.[3]  The two subsidiaries are indistinguishable in practice.  Indeed, Defendants themselves refer to the two entities collectively as St. Joseph and

---

[2] Dr. Gail Cunningham, St. Joseph's Chief Medical Officer, was designated to testify as St. Joseph's 30(b)(6) witness on, among other things, St. Joseph's acquisition by UMMS; any commitments to continue operate St. Joseph as a Catholic hospital that abides by the ERDs; St. Joseph's adherence to the ERDs; all review processes in place to determine whether a procedure is consistent with the ERDs; St. Joseph's definition of a "life-threatening condition"; all policies and processes for treating transgender patients with gender dysphoria; all policies and processes relating to gender-affirming surgery and related treatments; all policies and processes relating to hysterectomies; and all procedures that have not been permitted to take place at St. Joseph because of the ERDs.

[3] William Greskovich, Vice President for Operations for UMMS, was designated to testify as the UMMS 30(b)(6) witness on UMMS's acquisition of St. Joseph, UMMS's relationship with UMSJ LLC and St. Joseph LLC, UMMS's involvement in or approval of the operation of St. Joseph LLC in a manner consistent with Catholic values and principles, and UMMS's awareness of or participation in a Catholic Identity and Ethics Review.

explicitly state that they will "not further distinguish between th[em]."  Defs.' Mem. at 4.  Mr.

Hammons here likewise refers to both entities jointly as "St. Joseph."[4]

UMMS retains controlling authority over St. Joseph's management and operations.

UMMS has the power to appoint and remove St. Joseph's CEO and President.  Cunningham Tr.

54:7-10; Ex. 9 ("Conover Tr.") 44:2-10; Defs.' Ex. 13 (St. Joseph Operating Agreement) at 1217,

1232.  UMMS directly appoints two board members for St. Joseph; delegates to the Archdiocese

of Baltimore the power to appoint one board member; selects St. Joseph's CEO, who holds an *ex*

*officio* board seat; and selects all remaining board members through a nomination process.  Defs.'

Ex. 2 at 915 (setting out nomination process); Cunningham Tr. 49:19-50:19 (confirming

nomination process).  The UMMS CEO also sits on the joint board as an *ex officio* director and

has the right to serve on every committee of the board.  Defs.' Ex. 13 at 1219; Cunningham Tr.

45:3-10.  UMMS must also approve all decisions of St. Joseph's board.  Ex. 10 (UMSJ LLC Form

990 (2017)) at 596; *see also* Cunningham Tr. 40:14-41:7; 50:20-51:6.  In addition, UMMS must

approve St. Joseph's strategic plans; St. Joseph's annual budget, which includes the salaries and

---

[4] Formally, UMMS exercises control over UMSJ LLC's board pursuant to an Asset Purchase
Agreement; UMSJ LLC in turn exercises control over St. Joseph LLC's board pursuant to a Second
Amended and Restated Operating Agreement.  Defs.' Ex. 2 at 915; Defs.' Ex. 13 at 1219-20;
Conover Tr. 34:10-12; Cunningham Tr. 35:6-36:18.  But UMMS's control over UMSJ LLC gives
it direct control over St. Joseph LLC.  When it purchased the hospital, UMMS agreed that the
boards of St. Joseph LLC and UMSJ LLC must consist of the same members.  Defs.' Ex. 2 at 916
¶ 12.16(c); *see also* Cunningham Tr. 49:1-4 (testifying that Asset Purchase Agreement provides
that boards must be the same); Conover Tr. 34:19-35:12 (testifying that boards are the same).  Dr.
Thomas Smyth is the Chief Executive Officer and President for both UMSJ LLC and St. Joseph
LLC.  *See* Conover Tr. 44:2-5.  And UMMS's corporate representative testified that there is no
intermediary between the leadership teams of UMMS and the Hospital, and that they interface
directly.  Greskovich Tr. 76:16-77:1.  Moreover, UMMS's express and reserved powers over
UMSJ LLC are identical to UMSJ LLC's express and reserved powers over St. Joseph LLC, and
thus any action subject to approval by UMSJ LLC is also subject to approval by UMMS.  *Compare*
Defs.' Ex. 2 at 963-65, *with* Defs.' Ex. 13 at 1215-17 (enumerating actions requiring approval by
UMSJ LLC "followed by the approval of UMMS").

compensation for all employees of the hospital; any of St. Joseph's real estate transactions; any material additions, expansions, revisions or deletions of a health care service at St. Joseph; and an array of St. Joseph's other business and financial matters. Cunningham Tr. 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1215-16. UMMS also may require St. Joseph to make financial contributions to UMMS's general expenses. Defs.' Ex. 13 at 1217.

Defendants cite the testimony of UMMS's 30(b)(6) witness to argue that, notwithstanding the contractual powers vested in UMMS over St. Joseph, UMMS does not exercise those powers in practice. Defs.' Mem. at 14. The witness supplied no such testimony. To the contrary, he admitted that he had no knowledge of the topic, and that he did not prepare to testify about UMMS's control of and supervisory authority over St. Joseph, or about other topics for which he was designated to testify. *See, e.g.*, Greskovich Tr. 41:16-43:16, 47:14-48:14, 51:5-53:12, 63:6-64:9, 70:3-72:15. For example, the witness did not, as Defendants assert, testify that UMMS does not approve St. Joseph's strategic plans, as it is contractually required to do. Defs.' Ex. 2 at 963. Instead, the witness testified only that he had no knowledge of whether UMMS approves such strategic plans, Greskovich Tr. 57:18-20, and further that he could not speak to any specific strategic plans adopted by St. Joseph or approved by UMMS, *id.* 58:3-7; *but see id.* 81:9-13 ("Under oath I can't factually give you an example of when I've seen [UMMS] exercise [its reserved powers over St. Joseph]. My understanding of these agreements are they're there for a reason, and so I would assume that that happens."). The 30(b)(6) witness's absence of knowledge and preparation is insufficient to create a disputed question of fact.

## III.    St. Joseph's Catholic Identity.

Before it was purchased by UMMS, the Hospital was owned by Catholic Health Initiatives and operated as a Catholic facility. *See* Defs.' Ex. 2 at 838; Defs.' Ex. 7 (Catholic Identity

Agreement).  As a Catholic facility, the Hospital adhered to the ERDs.  The ERDs are guidelines published by the United States Conference of Catholic Bishops that dictate what a Catholic hospital can and cannot do.  Ex. 11 ("Riddle Tr.") 32:22-33:6; Ex. 12 ("Asobi Tr.") 32:10-16.  For example, the ERDs explicitly bar certain procedures, such as abortion.  Defs.' Ex. 17 (ERDs) at 156 ¶ 45; Riddle Tr. 46:5-8.   The ERDs also prohibit "sterilization" procedures unless the procedure is done to treat a "present and serious pathology and a simpler treatment is not available."  Defs.' Ex. 17 at 157 ¶ 53.  The ERDs do not mention hysterectomies, nor do they explicitly address gender dysphoria or gender-affirming care.  Riddle Tr. 55:12-57:1, 103:14-16.  Nonetheless, the National Catholic Bioethics Center interprets the ERDs to prohibit all gender-affirming care, including gender-affirming hormone therapy and all gender-affirming surgery, regardless of whether the surgery impacts fertility.  *See* Ex. 13 (National Catholic Bioethics Center, *Transgender Issues in Catholic Health Care* (Feb. 2017)).

When UMMS acquired the Hospital, UMMS promised as a condition of the sale that it would maintain the Hospital's Catholic identity and require St. Joseph to continue to adhere to the ERDs.  Defs.' Ex. 2 at 916-17; Defs.' Ex. 7.  Specifically, in the Asset Purchase Agreement, UMMS agreed that "UMMS . . . shall continue to operate" the Hospital "in a manner consistent with Catholic values and principles."  Defs.' Ex. 2 at 916.[5]  UMMS further agreed that "UMMS . . . shall ensure" that the Hospital will be held "accountable for [its] Catholic identity"; and that "[f]rom and after the Closing, UMMS and [UMSJ LLC] shall continue to ensure that the [Hospital] compl[ies] with the . . . '*Elements and Accountability for Catholic Identity*,'" a framework for

---

[5] The document specifically refers to the "Health System Businesses," a term which is defined to include the hospital run by St. Joseph.  Defs.' Ex. 2 at 845 (defining Health System Businesses to include "the Hospital"), *id.* at 838 (defining the "Hospital" as "St. Joseph Medical Center, a general acute care hospital located at 7601 Osler Drive, Towson, Maryland").

maintaining Catholic ideals.  *Id*. at 917.  UMMS also specifically promised that St. Joseph "will be operated in accordance with the [ERDs]."  Defs.' Ex 7 at 1036; *see also* Defs.' Ex. 2 at 916.

In addition, UMMS agreed in the Asset Purchase Agreement to establish formal corporate governance measures to maintain St. Joseph's Catholic identity.  UMMS agreed that St. Joseph's "executive team will include a Vice President, Mission Integration, who will have a direct reporting relationship to the [St. Joseph] board," and who would make regular reports to the board and the Archdiocese on such compliance.  Defs.' Ex. 2 at 916; Riddle Tr. 24:2-9, 28:1-15.  UMMS also agreed that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore.  Defs.' Ex. 2 at 915; Defs.' Ex. 7 at 1038; Defs.' Ex. 13 at 1220.

UMMS also signed a separate Catholic Identity Agreement with the Archdiocese, in which UMMS agreed, *inter alia*, that St. Joseph would undergo an audit every two years by the National Catholic Bioethics Center to assess its adherence to the ERDs.  Defs.' Ex 7, at 1041; Cunningham Tr. 60:5-64:8.  Pursuant to that agreement, if that audit finds "any areas in which [St. Joseph's] activities are inconsistent with its Catholic identity," the Archbishop must be consulted on a corrective action plan, and a follow up audit must be performed within six months.  Defs.' Ex 7, at 1041.

The Asset Purchase Agreement and the Catholic Identity Agreement were both signed by Robert A. Chrencik, UMMS's then-President and CEO, who also signed on behalf of St. Joseph. Defs.' Ex. 2 at 938; Defs.' Ex 7. at 1048.  Pursuant to these contracts, St. Joseph lacks the power to decide that it will no longer follow or operationalize the ERDs.  Cunningham Tr. 66:17-67:4.

**A. St. Joseph Prohibits Transition-Related Care.**

Because the National Catholic Bioethics Center regularly audits St. Joseph, as discussed above, St. Joseph closely follows its interpretation and policy guidance on the ERDs.  Riddle Tr.

79:5-14.   Thus, when it comes to gender-affirming care, St. Joseph also follows the National

Catholic Bioethics Center's guidance, and refuses to provide any treatment for gender dysphoria.

Asobi Tr. 88:16-21, 90:20-91:4, 92:3-94:12; Riddle Tr. 100:23-103:6, 104:1-6, 106:9-18.   In

particular, St. Joseph follows and implements a National Catholic Bioethics Center guidance

document that states, "Gender transitioning of any kind is intrinsically disordered because it cannot

conform to the true good of the human person, who is a body-soul union unalterably created male

or female. Gender transitioning should never be performed, encouraged, or positively affirmed as

a good in Catholic health care.  This includes surgeries, the administration of cross-sex hormones

or pubertal blockers, and social or behavioral modifications."  Ex. 13 at 004.

   In a section titled "Cooperation With Evil," the National Catholic Bioethics Center also

dictates that, should a transgender patient come into a Catholic hospital for "unrelated reasons,"

hospitals must not provide them with the hormones they are already taking because it "amounts to

formal cooperation with gender transitioning and is immoral."  *Id.*  And when the National Catholic

Bioethics Center audited St. Joseph, it requested data on every single encounter with a patient for

the purpose of treating a gender dysphoria diagnosis.   Ex. 14 (Catholic Identity and Ethics

Review); Riddle Tr. 134:7-17.

   St. Joseph's medical staff implements the National Catholic Bioethics Center guidance as

Hospital policy.  Cunningham Tr. 198:16-20.  Dr. Gail Cunningham, the Hospital's Chief Medical

Officer, and Dr. Michael Marion, the Hospital's Chief of Surgery, testified that St. Joseph prohibits

medical personnel from participating in any gender affirming treatments for transgender patients.

*Id*. at 229:13-19; Ex. 15 ("Marion Tr.") 51:5-52:13.  This prohibition is enforced irrespective of

whether the treatment results in sterilization or involves the removal of a healthy organ.

Cunningham Tr. 199:1-202:8, 209:8-210:9.  For example, St. Joseph will permit a cisgender man

to undergo a phalloplasty if his penis was injured or if born with a "micropenis," but will not permit the same surgery as part of a transgender man's gender affirming care.  Cunningham Tr. 213:16-214:10; Ex. 16 (Email, Dr. Rachel Bluebond-Langer to Dr. Gail Cunningham (Nov. 13, 2014)) at 109. Similarly, St. Joseph will permit a cisgender woman to undergo breast-reconstruction surgery following a mastectomy, but will not permit the same for a transgender woman "for the purpose of transgender reaffirming."  Cunningham Tr. 202:16-203:5.  Even after this litigation was filed, the chair of the OB-GYN department, Dr. Monica Buescher, wrote to her physicians to remind them, "[i]n no uncertain terms" that "gender affirmation/hormonal therapy . . . are disallowed. Period."  Ex. 17 (Email, Dr. Monica Buescher to Dr. Steven Adashek, *et al.* (Nov. 15, 2021)) at 300-02.

### B.  St. Joseph Regularly Performs Hysterectomies for Any Medical Reason—Except to Treat Gender Dysphoria.

Defendants have asserted in this litigation that, "[i]n accordance with the ERDs, hysterectomies . . . are generally not performed at St. Joseph," and are "generally disallowed" at the Hospital.  ECF No. 39-1 (Defs.' Mot. to Dismiss) at 7; Defs.' Ex. 18 (Defs.' Resp. & Suppl. Resps. to Interrogatory No. 5) at 10.  Defendants have further claimed that hysterectomies are "sterilization procedures" barred by the ERDs, which may be performed only "where the procedure is necessary to treat a life-threatening condition"; and that "[i]n deciding whether a procedure can be performed at St. Joseph, personnel engage in a patient- and procedure-specific review for each individual case."  Defs.' Ex. 18 at 8; Defs.' Mem. at 6.

But discovery has conclusively shown these assertions to be false.  To start, the evidence shows that St. Joseph does not actually regard hysterectomies as sterilization procedures.  While a hysterectomy results in a person's inability to become pregnant, the procedure is not performed for the primary purpose of sterilization because simpler and less invasive sterilization procedures

11

are available, such as tubal ligations.  Ex. 18 ("Buescher Tr.") 27:18-28:21; Cunningham Tr. 85:4-86:8; Ex. 19 ("Adashek Tr.") 123:6-17.  In other words, sterilization is not a medically indicated reason to perform a hysterectomy.  *Id.*  Consistent with this medical understanding, the National Catholic Bioethics Center does not request information regarding hysterectomies when auditing whether St. Joseph complies with the ERDs' prohibition on performing sterilization procedures. Ex. 14; Buescher Tr. 115:6-116:16.

More fundamentally, the evidence shows that hysterectomies are generally allowed at St. Joseph, not "disallowed."  St. Joseph regularly and frequently performs hysterectomies, for any medically indicated reason, except to treat gender dysphoria.  Cunningham Tr. 229:6-11 ("Q. And so, putting aside gender dysphoria, isn't it true that so long as the hysterectomy is consistent with the standard of care for a given diagnosis, the hysterectomy may be performed here? A. Yes."), 289:6-15 (testifying "[t]hat's false" in response to whether it is true that "[h]ysterectomies are generally disallowed and cannot proceed at [St. Joseph]"); Buescher Tr. 54:10-55:6 ("Q. So as long as there is a medically diagnosed condition being treated, hysterectomies are allowed at [St. Joseph]? A. Yes. I would say yes. In general, that's correct."), 84:21-85:2 ("Q. Now, to your understanding,  do  the  ERDs  prohibit  hysterectomies?  A.  No.  They  don't  prohibit hysterectomies."); Marion Tr. 65:1-14 (testifying that hysterectomies are "one of the more common procedures that GYNs do in the hospital").  Medically indicated reasons for performing a hysterectomy include pelvic pain, abnormal uterine bleeding, and fibroids.  Buescher Tr. 35:9-40:19; Adashek Tr. 106:16-107:5.  In fact, multiple hysterectomies are performed weekly at St. Joseph.  Buescher Tr. 53:20-54:6; Marion Tr. 31:15-16.  Over approximately the last five years, 634 hysterectomies were performed at St. Joseph.  Cunningham Tr. 87:16-92:19.

Because hysterectomies are performed for any medically indicated reason except gender

dysphoria, it is also not true that the procedure is only performed when "necessary" to treat a "life-threatening" condition, under any medical understanding of that term. Buescher Tr. 87:11-13 ("I personally have never used the term life-threatening" when assessing the need for a hysterectomy); *id.* 89:7–11 (physicians "aren't required to certify or verify that a patient suffers from a life-threatening condition before scheduling a hysterectomy"). The evidence unequivocally establishes that St. Joseph allows surgeons to perform hysterectomies for a host of medical reasons that it does not generally consider to be life-threatening in a medical sense, including fibroids, *see* Buescher Tr. 40:17-19; Marion Tr. 34:12-22, abnormal menstruation, *see* Buescher Tr. 32:14-33:5, and pelvic pain, *see* Buescher Tr. 36:21-37:9.

Defendants state that the term "life-threatening" is not a "a medical diagnosis" but rather a term of art for assessing whether a procedure is consistent with the ERDs. Defs.' Ex. 18 at 10. They assert that "[i]n deciding whether a procedure can be performed at St. Joseph, personnel engage in a patient- and procedure-specific review for each individual case." Defs.' Ex. 18 at 8. These assertions are also untrue. The evidence shows that there is no approval process at St. Joseph for surgeons before scheduling or performing hysterectomies at all. Cunningham Tr. 185:7-19, 290:16-291:8; Marion Tr. 46:1-47:14; Buescher Tr. 66:6-67:4, 67:19-69:16. Indeed, St. Joseph has never invoked the ERDs to cancel or block a hysterectomy from taking place, except for Mr. Hammons's.[6] Marion Tr. 46:1-8. Thus, there is no support in the record for the assertion that hysterectomies may only be performed when necessary to treat a life-threatening condition, under any definition of the term "life-threatening."

---

[6] Dr. Marion testified about a transgender patient who received a hysterectomy at the hospital in 2018. According to Dr. Marion, there was discussion about whether the hysterectomy would violate the ERDs, but the surgeon confirmed that its medical indication was for excessive uterine bleeding, not gender dysphoria. Marion Tr. 39:1-11, 53:4-64:3.

**IV.     St. Joseph Canceled Mr. Hammons's Hysterectomy Because He Is Transgender.**

Mr. Hammons began receiving gender-affirming testosterone therapy for gender dysphoria in 2008.  Hammons Decl. ¶ 4.  Over the course of his treatment for gender dysphoria, medical professionals told Mr. Hammons that it would eventually be medically necessary for him to get a hysterectomy, both to treat his gender dysphoria and because undergoing hormone replacement therapy without the benefit of a hysterectomy could increase the risk of cancer.  *Id.* ¶ 5.

Mr. Hammons met with Dr. Steven Adashek on September 4, 2019, for a consultation regarding a hysterectomy.  Adashek Tr. 33:9-34:4; Hammons Decl. ¶ 7.  Dr. Adashek confirmed that a hysterectomy was medically necessary.  Adashek Tr. 35:3-21, 106:7-19.  Dr. Adashek's office worked with Mr. Hammons to find a date and time for the procedure, based on Mr. Hammons's schedule and on Dr. Adashek's availability to perform the procedure at one of the hospitals where he has admitting privileges.   Adashek Tr. 37:5-22, 40:1-17.   Because Mr. Hammons worked for the Community College of Baltimore County, he asked for the surgery to be scheduled during the school's winter break so he would not have to take additional time off from work for surgery and recovery.  Hammons Decl. ¶ 11.  Dr. Adashek's office scheduled Mr. Hammons's procedure to take place at St. Joseph on January 6, 2020.  Adashek Tr. 38:6-14; Hammons Decl. ¶ 8.  Mr. Hammons prepared for the surgery, both mentally and by going through pre-operative blood tests, an echocardiogram, and other health screenings with Dr. Adashek and his other medical providers.  Hammons Decl. ¶¶ 9-10.

In late December 2019, Dr. Cunningham told Dr. Adashek by telephone that Mr. Hammons's hysterectomy could not take place at St. Joseph because it was being done to treat gender dysphoria.  Cunningham Tr. 237:4-241:21, 256:2-14 (Q. "It was just the fact that it was a gender transition treatment that was enough to deny it; right?" A. "Yes."); Adashek Tr. 43:12-18 ("My understanding was that they, the diagnosis code, gender identity disorder, was not one that

they would allow a hysterectomy for at St. Joe's.").[7]  Dr. Cunningham did not consider whether Mr. Hammons's gender dysphoria was life-threatening, nor was there any ethics consultation or input from the Vice President for Mission Integration.  Cunningham Tr. 239:13-241:21.[8]

Due to an oversight, Dr. Adashek did not inform Mr. Hammons that the surgery had been cancelled until January 5, the night before the surgery had been scheduled to occur.  Dr. Adashek called Mr. Hammons that night and informed him that St. Joseph would not allow the hysterectomy to take place because the purpose was to treat gender dysphoria.  Adashek Tr. 51:1-6; Ex. 20 ("Hammons Tr.") 44:16-22, 48:9-21.  When he received the call, Mr. Hammons "felt shocked, angry, afraid, and devastated."  Hammons Decl. ¶ 13.  Mr. Hammons "felt like [he] was being told that [his] health and well-being were not worthy of being protected, and [he] felt angry that St. Joseph was using other people's religious beliefs to deny [him] the medical treatment [he] needed."  *Id.*

Subsequently, on January 30, 2020, Dr. Adashek was called to a meeting with Dr. Cunningham, Dr. Smyth, Dr. Buescher, and Keith Riddle, St. Joseph's Vice President for Mission Integration, to discuss Mr. Hammons's procedure.  Adashek Tr. 55:7-14; Cunningham Tr. 269:12-270:3.  Mr. Riddle reiterated that, pursuant to the ERDs, the hospital would not provide transition-related care.  Adashek Tr. 58:15-60:15; Buescher Tr. 127:15-128:1; Cunningham Tr. 273:2-13.

_____

[7] Dr. Adashek used the term "gender identity disorder," which is the term used in earlier editions of the Diagnostic and Statistical Manual of Mental Disorders.  *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (noting that "gender identity disorder" was the diagnosis listed in the DSM "until the DSM-5 was published in 2013").

[8] Defendants erroneously contend that Dr. Adashek knew the procedure could not be performed at St. Joseph, and then called Dr. Cunningham to ask whether the procedure could go forward despite the ERDs.  In fact, Dr. Adashek testified that he was unaware that St. Joseph's refused to treat gender dysphoria until the hospital reached out and informed him that Mr. Hammons's procedure could not go forward.  Adashek Tr. 42:2-45:15, 77:18-78:6.  In any event, this dispute is immaterial to Mr. Hammons's legal claims.

15

Specifically, Mr. Riddle stated that ERD paragraph 53 prohibited the removal of a normal organ, and paragraph 29 prohibited mutilating the body in any way.  Ex. 21 (Notes of Dr. Adashek) at 295; Adashek Tr. 59:3-5.  In response, Dr. Buescher stated at the meeting that she thought the Hospital was pointing to those portions of the ERDs because it did not want to "get into the miasma" of explaining "[t]hat we believe you should stay the way you were born no matter what. We don't believe in gender reassignment."  Ex. 21 at 297; Adashek Tr. 71:4-73:19.  Dr. Buescher said the Hospital was using the ERD's prohibitions on removing healthy organs as "a smoke screen" to avoid giving that explanation.  Ex. 21 at 297; Adashek Tr. 71:4-73:19.

Following the cancellation of Mr. Hammons's surgery, St. Joseph has further entrenched its policy of prohibiting all treatment for gender dysphoria.  Now, if a pre-operative diagnosis contains the word "gender," the Hospital's electronic records system sends an alert to the scheduling department to ensure that no procedures are scheduled or performed for the purpose of treating gender dysphoria.  Marion Tr. 46:16-47:9, 86:2-18, 92:3-94:19, Ex. 22 (Email, Dr. Gail Cunningham to Dr. Michael Marion, et al. (Jan. 15, 2020)) at 1-2.  St. Joseph has no other alerts for any other pre-operative diagnosis.  Marion Tr. 96:1-9; Cunningham Tr. 231:20-235:12.  The chair of the OB-GYN department, Dr. Monica Buescher, also recently wrote to her physicians to remind them, "[i]n no uncertain terms" that "gender affirmation/hormonal therapy . . . are disallowed. Period."  Ex. 17.

Mr. Hammons eventually underwent a hysterectomy at Greater Baltimore Medical Center on June 24, 2020.  Hammons Decl. ¶ 14.  Mr. Hammons's procedure was delayed because of the COVID-19 pandemic and because he needed to schedule time to take off of work for his recovery. Adashek Tr. 108:10-109:5; Hammons Decl. ¶ 14.  As a result, Mr. Hammons had to spend another six months experiencing gender dysphoria and dealing with the stress and anxiety of having to

mentally prepare for a major surgery again.  *Id.* ¶ 15.  Mr. Hammons also lost $748.46 in wages

as a result of having to take the additional time off work for the surgery.  *Id.* ¶ 16

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (*quoting Dulaney v. Packaging

Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  The court must view the evidence in the light most favorable to the

nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam), and draw all

reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007).  At the same

time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt

v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## ARGUMENT

## I.   DEFENDANTS' DENIAL OF CARE TO MR. HAMMONS VIOLATED THE ACA.

Mr. Hammons readily satisfies the elements of his ACA claim: (i) "discrimination on the

basis of sex and the denial of benefits on the basis of sex in any health program or activity"; (ii) that

the health program or activity was receiving federal financial assistance; and (iii) "harm[] by a

defendant's improper conduct."  ECF No. 52 at 42 (citing *Grimm*, 972 F.3d at 616).

### A.   DEFENDANTS DENIED MEDICAL CARE TO MR. HAMMONS ON THE BASIS OF SEX.

The undisputed evidence shows that Defendants cancelled Mr. Hammons's hysterectomy

because the surgery was meant to treat his gender dysphoria.  Cunningham Tr. 239:13-241:21,

256:2-14; Adashek Tr. 43:12-18.  Indeed, Defendants admitted as much.  *See* Cunningham Tr. 256:2-14 (Q. "It was just the fact that it was a gender transition treatment that was enough to deny it; right?" A. "Yes.").  As the Court previously recognized, by "den[ying] Plaintiff the benefits of its services because he has gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557."  ECF No. 52 at 46-47 (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1742 (2020)); *accord Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020), *aff'd*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861, 211 L. Ed. 2d 568 (2022) ("The characteristics of sex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them.").

The undisputed evidence also shows that cancelling Mr. Hammons's surgery subjected him to discrimination by "treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (cleaned up).  St. Joseph routinely performs hysterectomies for any medically indicated reason, *except* to treat gender dysphoria.  Cunningham Tr. 229:6-11 ("Q. And so, putting aside gender dysphoria, isn't it true that so long as the hysterectomy is consistent with the standard of care for a given diagnosis, the hysterectomy may be performed here? A. Yes."), 289:6-19; Buescher Tr. 54:10-55:6, 84:21-85:2; Marion Tr. 65:1-14.  This differential treatment is underscored by the fact that Defendants do not review whether hysterectomies generally comply with the ERDs, but they have created a special alert for the word "gender" so that they may track and cancel any procedure related to gender dysphoria.  Marion Tr. 46:16-47:9, 86:2-18, 92:3-96:9; Cunningham Tr. 185:7-17, 231:20-235:12; Buescher Tr. 66:6-14, 67:19-69:16; Ex. 22 at 1-2.

While Defendants assert that hysterectomies are generally disallowed unless necessary to

treat a life-threatening condition, this assertion is "blatantly contradicted by the record, so that no reasonable jury could believe it."  *Scott*, 550 U.S. at 380; *see also Cole v. Fam. Dollar Stores of Md., Inc.*, No. CV PX-17-0393, 2018 WL 3818811, at *1 n.1 (D. Md. Aug. 10, 2018), *aff'd*, 811 F. App'x 168 (4th Cir. 2020) (disregarding assertions contradicted by documentary record).  In reality, Defendants will perform a hysterectomy to treat any medical condition other than gender dysphoria; again, Defendants admitted as much.  *See* Cunningham Tr. 229:6-11.  As the Court has explained, Defendants "regarded [Mr. Hammons's] medical need differently because he is transgender" and thus "discriminated against him on the basis of sex by treating him worse than others who are similarly situated."  ECF No. 52 at 47 (cleaned up).

Defendants now argue that the Court's prior legal reasoning is "too facile."  Defs.' Mem. at 24.  Drawing a strained analogy to Supreme Court cases holding that policies discriminating based on pregnancy do not facially discriminate based on sex, Defendants contend that their policy of refusing to provide gender-affirming care is not facially discriminatory either.  *See Geduldig v. Aiello*, 417 U.S. 484 (1974) (interpreting Equal Protection Clause); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) (interpreting Title VII).  Defendants contend that under the reasoning of *Geduldig* and *Gilbert*, "it may well be true that gender-transition surgeries are 'confined' to transgender persons, but these procedures are also unique (medically, ethically, etc.) such that treating them differently cannot be conflated with intentional discrimination against those with a transgender identity."  Defs.' Mem. at 24-25.

Defendants' new argument is wrong for at least three reasons.  ***First***, despite Defendants' assumption to the contrary, *Gilbert* does not apply to Title IX or Section 1557.  As Defendants acknowledge (Defs.' Mem. at 25 n.8), Congress overruled *Gilbert* by passing the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which amended the definition of "sex" in Title VII to

include "pregnancy."  In doing so, Congress "unambiguously expressed its disapproval of both the holding *and the reasoning* of the Court in the Gilbert decision." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983) (emphasis added).  "The House Report stated, 'It is the Committee's view that the dissenting Justices correctly interpreted the Act.'  Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they 'correctly express both the principle and the meaning of [T]itle VII.'"  *Id.* at 679 (cleaned up).  "Thus, the Pregnancy Discrimination Act merely 'clarified' what Congress had intended all along, *i.e.,* that Title VII's sex-discrimination prohibition includes pregnancy discrimination." *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1084 (N.D. Fla. 2015).

Instead of applying *Gilbert*, "[c]ourts have held that discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX." *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *accord Stanford v. Fox Coll*., No. 18 C 3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020) ("Discrimination 'on the basis of sex' [under Title IX] includes pregnancy discrimination."); *Workman v. Univ. of Akron*, No. 5:16-CV-156, 2017 WL 6326898, at *3 (N.D. Ohio Dec. 11, 2017) ("The discrimination prohibited by Title IX includes discrimination related to pregnancy.").  "Although it is true that Congress has never amended Title IX's definition of sex to explicitly include pregnancy," that is simply a reflection of the fact that "[i]n the case of Title IX there has been no faulty precedent to overturn." *Conley*, 145 F. Supp. 3d at 1084-85.  Indeed, Title IX's regulations have long prohibited discrimination based on pregnancy as part of discrimination based on sex.  *See* 34 C.F.R. § 106.40(b).[9]

---

[9] Both past and current versions of the Section 1557 regulations provide that discrimination based on pregnancy also violates Section 1557.  The 2016 implementing regulations for Section 1557

**Second**, even if *Gilbert*'s holding with respect to pregnancy did apply to Title IX and Section 1557, Defendants' policy of refusing to provide any form of gender-affirming treatment would still facially discriminate on the basis of sex.   By definition, excluding coverage for medically necessary treatment because the surgery is performed for the purposes of gender-affirming care "unavoidably discriminates against persons with one sex identified at birth and another today."  *Bostock*, 140 S. Ct. at 1746.  "[T]he diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned sex and gender identity."  *Kadel*, 446 F. Supp. 3d at 18.  "The characteristics of sex and gender are directly implicated; it is impossible to refer to" Defendants' policy "without referring to them."  *Id.*

For these reasons, court have repeatedly rejected attempts to draw an analogy between pregnancy and gender dysphoria.  *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 2106270, at *21 (M.D.N.C. June 10, 2022) ("Pregnancy can be explained without reference to sex, gender, or transgender status. The same cannot be said of the exclusion at issue here.") (footnote omitted); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999–1000 (W.D. Wis. 2018) ("Defendants' reliance on *Geduling* . . . rests on a finding that the Exclusion does not treat individuals differently based on sex. For the reasons explained above, the court has rejected this argument.").

**Third**, even if Defendants' policy were regarded as facially neutral, the undisputed

---

explicitly stated that "[o]n the basis of sex includes, but is not limited to, discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31375-01, at 31467 (May 18, 2016).  The 2020 regulations declined to define "on the basis of sex" but reaffirmed that the term included pregnancy.  "Many comments on the 2019 NPRM assume that Section 1557's protection against discrimination 'on the basis of sex' covers women's health issues including pregnancy, uterine cancer, and prenatal and postpartum services.  That assumption is correct: These issues are protected under Section 1557 because of the ordinary and biological meaning of 'sex.'" *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160-01, at 37179-80 (June 19, 2020).

evidence establishes that the policy is based on the discriminatory purpose of enforcing gender conformity. *See Bostock*, 140 S. Ct. at 1742-43 (explaining that adverse employment action based on "fail[ure] to fulfill traditional sex stereotypes" is discrimination because of sex); *id.* at 1749 (same). Defendants cancelled Mr. Hammons's surgery pursuant to the National Catholic Bioethics Center's instructions that transgender people and gender transition are "intrinsically disordered because [they] cannot conform to the true good of the human person." Ex. 13 at 004. The policy is based on a religious belief that "a body-soul union [is] unalterably created male or female," *id.*, and that people "should stay the way you were born no matter what," Ex. 21 at 297; Adashek Tr. 71:13-17. Instead of relying on sex-neutral motivations, Defendants' policy is thus explicitly based on disapproval of the fact that gender-affirming surgery fails to conform to a person's sex assigned at birth. *See Boyden*, 341 F. Supp. 3d at 997 (explaining that excluding transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex"); *Kadel*, 446 F. Supp. 3d at 14 ("By denying coverage for gender-confirming treatment, the Exclusion tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject.").

For all these reasons, the Court should adhere to its previous conclusion that by "den[ying] Plaintiff the benefits of its services because he has gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking," and thus "denied him the benefits of [their] services on the basis of sex, in violation of § 1557." ECF No. 52 at 46-47 (citation omitted).

### B. MR. HAMMONS SUFFERED HARM.

Mr. Hammons was "harm[ed] by a defendant's improper conduct." ECF No. 52 at 42 (citing *Grimm*, 972 F.3d at 616). Mr. Hammons suffered $748.46 in lost wages as a result of having to take the additional time off work for the surgery. Hammons Decl. ¶ 16. Mr. Hammons

22

also suffered emotional harm from experiencing another six months experiencing gender dysphoria and dealing with the stress and anxiety of having to mentally prepare for a major surgery again. *Id.* at ¶ 15.[10]  And Mr. Hammons also suffered the dignitary and stigmatic harm that is inevitably inflicted on individuals "who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984). Hammons "felt like [he] was being told that [his] health and well-being were not worthy of being protected, and [he] felt angry that St. Joseph was using other people's religious beliefs to deny [him] the medical treatment [he] needed." Hammons Decl. ¶ 13. Our nation's civil rights laws have thus recognized the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (quoting H.R. Rep. No. 914, 88th Cong., 1st Sess., 18); *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984).  Accordingly, this element of Mr. Hammons's claim is satisfied.

### C.   DEFENDANTS RECEIVE FEDERAL FUNDS.

Defendants admit that they each receive federal financial assistance in the form of Medicare and Medicaid payments.  ECF No. 83 at 9 ¶ 14.  By accepting Medicare and Medicaid funding, an entity is covered under Section 1557.  42 U.S.C § 18116(a); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022); *Fain v. Crouch*, 545 F. Supp. 3d 338, 343 (S.D. W. Va. 2021).  Thus, this final element of Mr. Hammons's claim is also satisfied.

---

[10] Mr. Hammons does not seek to recover monetary damages for that emotional distress in this litigation.  His emotional harm is nevertheless relevant to the elements of his claim.

## II.  UMMS IS LIABLE FOR THE VIOLATION OF MR. HAMMONS'S RIGHTS.

Defendants do not dispute that St. Joseph[11] may be held directly liable in this action.  Nor could they, given that St. Joseph implemented the discriminatory policy, and applied it against Mr. Hammons.  Instead, Defendants claim that UMMS, as the corporate parent, cannot be held liable because (a) its federal funding is not traceable to St. Joseph, (b) it lacks sufficient involvement in the discrimination to be held directly liable, and (c) it may not be otherwise held indirectly liable by piercing the corporate veil.  Defendants are wrong on all counts.

### A.  UMMS Is Subject to Section 1557 In All Its Operations.

Defendants argue that UMMS is not subject to Section 1557 with respect to the operations at St. Joseph because St. Joseph receives its "own federal funding" and "the alleged discrimination did not occur in any 'health program or activity' . . .  for which *UMMS* received federal funding." Defs.' Mem. at 12.  This argument misconceives the scope of Section 1557, which does not restrict coverage to the particular parts of an entity receiving federal funding.  Rather, Section 1557 explicitly applies to "any health program or activity, *any part of which* is receiving Federal financial assistance."  See 42 U.S.C. § 18116(a) (emphasis added).  Thus, Section 1557 plaintiffs "need not seek medical care specifically from the part of the organization that receives federal funding" to be protected by the statute.  *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015).

By extending coverage to an entire health program or activity if "any part of" it received federal funding, Section 1557 applies the same coverage standards set forth for Title IX claims in the CRRA.  In *Grove City College v. Bell*, 465 U.S. 555 (1984), the Supreme Court held that

---

[11] As noted *supra* at pages 5-6, Plaintiff uses "St. Joseph" here to refer to both UMSJ LLC and St. Joseph LLC.

receipt of federal funds "does not trigger institution-wide coverage under Title IX," *id.* at 573; instead, only the "aided program or activity"—that is, only the specific program that received federal funds—was required to operate "in accordance with Title IX and the applicable regulations," *id.* 575. "But in 1988, Congress—over President Ronald Reagan's veto—passed the [CRRA] to vindicate the scope of protection." *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, No. 1:20-CV-01699-TWP-MG, 2021 WL 2946447, at *5 (S.D. Ind. July 14, 2021); *accord Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A. ELH-12-572, 2013 WL 1010357, at *4 n.9 (D. Md. Mar. 13, 2013) (explaining that the CRRA overruled *Grove City*). Under the CRRA, "[i]f 'any part' of 'a department, agency, . . . or other instrumentality of a State' receives federal financial assistance, the entire agency is subject to" the antidiscrimination requirements of Title VI, Title IX, and the Rehabilitation Act. *Paulone v. City of Frederick*, No. CV ELH-09-2007, 2012 WL 13184457, at *2 (D. Md. May 1, 2012) (quoting 29 U.S.C. § 794(b)); *see also Heart of CarDon*, 2021 WL 2946447, at *2 & n.1, *7 (applying CRRA to Section 1557). Thus, the CRRA makes clear that Section 1557 covers all of UMMS's operations, including its operations with respect to St. Joseph.[12]

Defendants' argument that "only the funding recipient for the allegedly discriminatory health program is exposed to private damages liability" under Section 1557, Defs.' Mem. at 15, if

---

[12] Past and present versions of Section 1557's implementing regulations have also recognized that the statute covers "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R. § 92.3(b); *see also* 85 Fed. Reg. at 37171 (2020 rule explaining that this definition "align[s] . . . with the standard articulated in the CRRA"); 81 Fed. Reg. at 31386 (2016 rule: "[T]he term 'health program or activity' must be interpreted in a manner that uniformly covers all of the operations of any entity that receives Federal financial assistance and that is principally engaged in health services . . . even if only part of the health program or activity receives such assistance. . . . This approach is consistent with the approach Congress adopted in the CRRA.").

accepted, would effectively reimpose the narrow definition of "program or activity" that the Supreme Court articulated in *Grove City*, and that Congress specifically overturned.  To the contrary, under the plain text of Section 1557 and the CRRA, UMMS is subject to Section 1557 regardless of whether UMMS received federal funding for St. Joseph or for a different part of its operations.[13]

### B.    UMMS Is Directly Liable for Its Own Conduct.

UMMS is directly liable for the violation of Mr. Hammons's rights under Section 1557.  A "parent's involvement in activities related to the subsidiary may give rise to direct liability" when "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of." *Equal Rights Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *4 (D. Md. Mar. 31, 2016) (cleaned up).  In particular, "by 'forcing' a subsidiary to take a particular action . . . a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others." *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *9 (S.D. W. Va. Sept. 26, 2016)).  "In such instances, the parent is directly liable for its own actions." *United States v. Bestfoods*, 524 U.S. 51, 65 (1998); *see In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 958 F. Supp. 1045, 1051 (D. Md. 1997) (parent company liable "as a principal" where it "expressly authorized and directed the subsidiary's wrongful acts").

Under the undisputed facts of this case, UMMS is directly liable for its own actions in

---

[13] Even if UMMS did not independently receive federal funding, UMMS would still have to comply with Section 1557 with respect to St. Joseph because "any entity which has controlling authority over a 'program or activity receiving Federal financial assistance' is subject to Title IX's anti-discrimination rule." *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733 (W.D. Mich. 2000); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) (adopting same test).  For the same reasons discussed in Section II.B and C, *infra*, UMMS holds controlling authority over St. Joseph's Catholic identity and its mandate to adhere to the ERDs.

mandating that St. Joseph adhere to the Catholic religious directives.  When it purchased St. Joseph, UMMS signed multiple agreements with the Archdiocese of Baltimore in which UMMS promised to maintain St. Joseph's Catholic heritage.  Defs.' Ex. 2 at 916-17; Defs.' Ex. 7.  UMMS also specifically promised that St. Joseph "will be operated in accordance with the [ERDs]."  Defs.' Ex 7, at 1036; *see also* Defs.' Ex. 2 at 916.  UMMS further agreed that St. Joseph would undergo an audit every two years, performed by the National Catholic Bioethics Center to assess adherence to the ERDs.  Defs.' Ex 7, at 1041.[14]

Further, UMMS is plainly the "final decisionmaker for the challenged practice."  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001).  The UMMS President and CEO signed the relevant agreements regarding Catholic practices at the Hospital on behalf of UMMS and St. Joseph alike.  Defs.' Ex. 2 at 938; Defs.' Ex 7, at 1048.  And, as Defendants acknowledge, pursuant to these contracts, St. Joseph lacks the power to decide that it will no longer adhere to and operationalize the ERDs.  Cunningham Tr. 66:17-67:4.  UMMS also retains an active part in maintaining St. Joseph's Catholic identity.  UMMS promised to undertake a continuing obligation to "ensure" that St. Joseph would adhere to Catholic teachings in their operations.  Defs.' Ex. 2 at 916-17.  And UMMS must approve all decisions of the St. Joseph board, as well as strategic plans, and any material additions, expansions, revisions or deletions of a health care service—meaning that any efforts to change the Hospital's adherence to the ERDs or policies regarding the provision of health care would require UMMS's approval.  Cunningham Tr. 40:14-

---

[14] In addition, UMMS agreed to establish formal corporate governance positions to further the St. Joseph's Catholic identity.  UMMS agreed that St. Joseph's "executive team will include a Vice President, Mission Integration," who would make regular reports to the board and the Archdiocese on St. Joseph's compliance with its Catholic mandate.  Defs.' Ex. 2 at 916; Riddle Tr. 24:2-9, 28:1-15.  UMMS also agreed that at least one seat on St. Joseph's board would be a representative of the Archdiocese of Baltimore.  Defs.' Ex. 2 at 915; Defs.' Ex 7 at 1038; Defs.' Ex. 13 at 1220.

41:7, 50:20-51:6, 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1215-16; Ex. 10 at 596.

Thus, through its own actions and conduct, UMMS is directly responsible for St. Joseph's facially discriminatory policy of refusing to provide any form of gender-affirming care. By virtue of the agreements entered into by UMMS, St. Joseph is contractually bound to follow the ERDs, and must undergo audits performed by the National Catholic Bioethics Center to ensure their compliance with the ERDs. Defs.' Ex. 2 at 916-17; Defs.' Ex 7, at 1036, 41; Cunningham Tr. 60:5-64:8. Pursuant to these obligations, St. Joseph is required to follow the National Catholic Bioethics Center's instruction that the ERDs prohibit all gender-affirming care. Asobi Tr. 88:16-21, 90:20-91:4, 92:3-94:12; Riddle Tr. 100:23-103, 104:1-6, 106:9-18. St. Joseph then applied that policy to Mr. Hammons, in violation of Section 1557. The discriminatory policy of refusing to provide transition-related care is thus rooted in UMMS's actions and contractual obligations. *See Pearson*, 247 F.3d at 487 (explaining that direct parent liability attaches if parent "has forced the subsidiary to take the complained-of action" or is "specifically responsible for the . . . practice at issue in the litigation"); *cf. Taylor v. Fluor Corp.*, No. CV 6:17-1875-BHH, 2019 WL 4727464, at *4 (D.S.C. Sept. 27, 2019) (denying parent entity's motion for summary judgment where "the policies at issue are [the parent]'s corporate policies"); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (jury question found on parent liability as employer where parent "negotiated and entered into the collective bargaining agreement with the union, and it was this agreement that governed the plant's response to [the plaintiff]'s complaints" regarding discrimination).

### C.    UMMS Is Indirectly Liable for St. Joseph's Actions.

In addition to being directly liable, UMMS is also indirectly liable under Section 1557 for discrimination at its wholly owned subsidiary. "[I]n the federal cases a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Equal Rights Ctr.*, 2016

WL 1258418, at *3 (cleaned up).  This inquiry "usually gives less respect to the corporate form than does the strict common law alter ego doctrine." *Id.* (quoting *Thomas v. Peacock*, 39 F.3d 493, 503-04 (4th Cir. 1994)).  "Under this approach, the court considers 'the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies.'" *Id.* (quoting *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 27 (1st Cir. 2000)).

The Fourth Circuit also instructs courts to consider "traditional" veil-piercing factors, such as: (1) "that it would be 'fundamentally unfair' to allow [a parent] to escape liability by hiding behind [a subsidiary's] corporate existence"—a factor which receives particular emphasis; (2) that the parent exercised "excessive control" over the subsidiary's "operations, by requiring . . . approval of all proposals, and its purse strings"; (3) that the subsidiary was grossly undercapitalized; (4) that the parent "usurped the functions ordinarily served by the junior corporation's officers and directors"; (5) that the parent pays medical coverage and life insurance benefits of retirees; and (6) common officers and directors between the parent and subsidiary. *Keffer v. H.K. Porter Co*., 872 F.2d 60, 65 (4th Cir. 1989).  However, "not all of these factors need be present for the court to pierce the corporate veil, and considering the emphasis federal common law places on the legislative policies behind federal statutes, the interests of 'public convenience, fairness, and equity,' likely will require fewer of these traditional factors when those policies are affected by respect for the corporate form." *Equal Rights Ctr.*, 2016 WL 1258418, at *4 (quoting *Thomas*, 39 F.3d at 503-04).

Here, if UMMS were not directly liable, veil piercing would be necessary to prevent UMMS from frustrating Section 1557's antidiscrimination mandate.  The primary purposes of the ACA are "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).  Of the many barriers to health care

that the ACA addresses, chief among them is the "shameful history of invidious discrimination and the stark disparities in outcomes in our health care system."  *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 436 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) (quoting Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (statement of Sen. Patrick Leahy)).   The ACA's prohibition of discrimination is therefore central to its design.  *Id.* at 435–36.

By agreeing that St. Joseph would continue to operate "in a manner consistent with Catholic values and principles," Defs.' Ex. 2 at 916, and "in accordance with the [ERDs]," Defs.' Ex 7 at 1036, UMMS ensured that St. Joseph maintained a policy that flouted the antidiscrimination principles of the ACA.  All the while, UMMS continues to exercise the power of the purse over St. Joseph by approving its annual budget and by retaining the authority to require St. Joseph to make financial contributions to UMMS's general expenses.  Defs.' Ex. 13 at 1217. It also must approve all decisions of the board, as well as an array of St. Joseph's business and financial matters, such as its strategic plans, real estate transactions, and any material alterations of health care services.  Cunningham Tr. 40:14-41:7, 50:20-51:6, 51:16-55:10; Conover Tr. 44:6-10; Defs.' Ex. 13 at 1216; Ex. 10 at 596.  And UMMS generally controls St. Joseph's board, appoints St. Joseph's CEO, and reserves a board seat for the UMMS CEO, who may sit on all St. Joseph committees.  Cunningham Tr. 45:3-10, 49:19-50:19, 54:7-10; Conover Tr. 44:2-10; Defs.' Ex. 13 at 1217, 1219, 1232; Defs.' Ex. 2 at 915.

Despite its domination over St. Joseph and its agreement to operationalize the ERDs at St. Joseph, UMMS now seeks to hide behind the corporate form by arguing that St. Joseph adheres to the ERDs "independently" of UMMS.  Courts have "consistently refused to give effect to the corporate form where," as here, "it is interposed to defeat legislative policies."  *First Nat'l City*

*Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983); *cf. Lebron v. Natl R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."). Allowing UMMS to first pledge enforcement of a discriminatory policy, then disclaim any liability as a parent entity, would be "fundamentally unfair" and at odds with Section 1557's prohibition of discrimination.

## III.    THE NORTH DAKOTA INJUNCTION DOES NOT INSULATE ST. JOSEPH FROM LIABILITY.

As a final matter, the Court should reject St. Joseph's last-minute attempt to avoid accountability by joining the Catholic Benefits Association. *See* Defs.' Mem. at 15-21. In *Religious Sisters of Mercy*, the Catholic Benefits Association and other non-governmental Catholic entities preemptively challenged the Department of Health and Human Services' ("HHS") interpretation and implementation of Section 1557 based on RFRA. *See* 513 F. Supp. 3d at 1153. The court granted summary judgment on the RFRA claim and permanently enjoined "HHS, Secretary Azar, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them," from, *inter alia*, interpreting or enforcing Section 1557 in such a way as to require the non-governmental Catholic entities to perform gender-transition procedures. *Id*.

Three days before filing its summary judgment motion, St. Joseph became a member of the Catholic Benefits Association. *See* Defs.' Ex. 22. Based on St. Joseph's new membership status, Defendants argue that the injunction in *Religious Sisters of Mercy* immunizes St. Joseph, not only from future enforcement action by the government, but also from private lawsuits under Section 1557. *See, e.g.*, Defs.' Mem. at 21. Defendants' arguments are creative, but wrong.

To start, the *Religious Sisters of Mercy* injunction, by its own terms, applies only to the

federal government.  *See* 513 F. Supp. 3d at 1153-54.  Moreover, under Federal Rule of Civil Procedure 65, an injunction "binds only" "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with" them.  Fed. R. Civ. P. 65(d)(2).

Mr. Hammons does not fit within any of the above categories.  Mr. Hammons was not a party to the North Dakota litigation and has no affiliation to any party to that litigation.  Nor is Mr. Hammons—a private citizen with no connection to HHS or to any of the circumstances in *Religious Sisters of Mercy*—"in active concert or participation" with any of the parties to that litigation.  *See Thaxton v. Vaughan*, 321 F.3d 474, 478 (4th Cir. 1963) ("Action as an alter ego, or in collusion, is required to find concert or participation under rule 65(d)."); *see also Next Investments, LLC v. Bank of China*, 12 F. 4th 119, 134 (2d Cir. 2021) ("The relevant inquiry under Rule 65(d) is whether the nonparty Banks aided or abetted the Defendant[].");  *Goya Foods, Inc v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002) (explaining that "active concert or participation" requires that "the nonparty must be legally identified with" the party enjoined, "or, at least, deemed to have aided and abetted that defendant in the enjoined conduct").  As a result, under the plain terms of Rule 65, the North Dakota injunction does not apply to Mr. Hammons.

Indeed, it is black-letter law that injunctions against the government—or settlements with the government—do not bar separate lawsuits by private parties not before the court.  "Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large or purport to enjoin challenged laws themselves."  *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (cleaned up).  Similarly, "[w]hen the government brings a discrimination action against a party resulting in a consent order, private

parties, not in privity with the order, are not bound by its terms and may bring their own suit against the defendant." *Shimkus v. Gersten Cos.*, 816 F. 2d 1318, 1320 (9th Cir. 1987); *see also Balogh v. Lombardi*, 816 F.3d 536, 544 (8th Cir. 2016) (holding that lawsuit against government could not redress injuries from the threat of private lawsuits).

Defendants' authority does not say otherwise.  **First,** Defendants rely on a footnote, in *NCAA v. Smith*, 525 U.S. 459, 467 n.5 (1999), which observes that a private citizen cannot use Title IX to challenge conduct that the federal government itself cannot challenge under that statute. *See* Defs.' Mem. at 18.  But the Court's footnote in *Smith* concerns the scope of Title IX's private right of action, not whether a private citizen is barred from pursuing a lawsuit due to an injunction against the federal government.  *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F. 4th 730, 746 (11th Cir. 2021) ("*Smith* teaches that when Congress creates an implied private right of action to sue for civil rights violations, the private right of action and the federal government's enforcement authority are coextensive.").  *Religious Sisters of Mercy* did not alter the scope of the federal government's statutory authority under Section 1557.  It merely held, due to the countervailing force of RFRA, that the federal government is prohibited from enforcing Section 1557 in a particular manner against the particular plaintiffs in that case.  *See Religious Sisters of Mercy*, 513 F. Supp. 3d at 1149 (holding that, "*[a]s applied*, the challenged interpretations of Section 1557 and Title VII violate the RFRA" and granting summary judgment accordingly) (emphasis added).  Because *Religious Sisters of Mercy* did not alter the federal government's statutory enforcement authority, the decision did not affect the scope of the private right of action either.

**Second**, Defendants urge the Court to restrict Mr. Hammons's ability to seek relief based on the theory that *Religious Sisters of Mercy* has partly abrogated the "contract" between St. Joseph

and the federal government, and therefore Plaintiff—as a "third-party beneficiary" of that contract—cannot bring suit.  *See* Defs.' Mem. at 19.  Defendants cite no authority for the proposition that as-applied injunctions against particular government enforcement actions somehow partially void the "contract" created by Spending Clause legislation. In any event, Defendants' spurious theory fails on its own terms because, as discussed, the District of North Dakota's injunction has not altered the statutory scope of Section 1557.  The "contract" between the federal government and the plaintiffs in *Religious Sisters of Mercy* still requires the latter to comply with Section 1557's prohibition on sex discrimination.  All that the injunction has done is prevented *the government* from enforcing that contract in a particular way due to that court's application of RFRA.

*Third*, Defendants claim that Mr. Hammons is bound by the injunction because he is somehow in privity with HHS.  *See* Defs.' Mem. at 19-20.  But Defendants' case says the opposite. Defendants cite *National Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. National Spiritual Assembly of Baha'is of U.S., Inc.*, which explained that "when it comes to injunctions, the concept of nonparty privity has at least two subcategories[:] . . . an injunction will bind nonparty successors in interest to an enjoined party[, and] a nonparty may be bound by an injunction if the nonparty is otherwise 'legally identified' with the enjoined party."  628 F.3d 837, 849 (7th Cir. 2010).  Mr. Hammons does not fit either category.  *See id*. at 853 ("'Legal identity' usually means successors and assigns, but it can include a limited class of other nonparties as well—*provided* the evidence establishes a very close identity of interest and such significant control over the organization *and* the underlying litigation that it is fair to say that the nonparty had his day in court when the injunction was issued.").

Even if Defendants could somehow overcome all these obstacles, their attempt to rely upon

the *Religious Sisters of Mercy* would face the problem that RFRA simply does not apply to this case.   As this Court has already recognized, RFRA does not apply to litigation between private parties.  *See* ECF No. 81 at 5; *Goddard v. Apogee Retail LLC*, No. 19-3269, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) ("[RFRA] places restrictions on the government, not private parties.") (Chasanow, D.J.); *Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *15-17 (W.D.N.C. Sept. 3, 2021), *appeal filed* No. 22-1440 (4th Cir. Apr. 25, 2022) (holding that RFRA does not apply to private parties and noting that three circuits and "district courts have almost universally agreed that RFRA does not apply to suits between private parties").   Mr. Hammons is not the government; his private lawsuit cannot be barred by RFRA.

Moreover, this Court has already held that Defendants are state entities and, therefore, may not invoke a RFRA defense.  *See* ECF No. 81 at 6.  UMMS is a governmental entity under *Lebron*, and, as the wholly-owned subsidiaries of a state entity, there is little doubt that UMSJ LLC and St. Joseph LLC are, as the Court has already held, state entities too.  *See Gunter v. Long Island Power Auth./Keyspan*, No. 08-cv-498 (RRM) (LB), 2011 WL 1225791, at *7-8 (E.D.N.Y. Feb. 15, 2011) (holding that a wholly-owned subsidiary of a state-owned utility company was a state actor, and citing *Lebron*).  Defendants have failed to present any argument or evidence to the contrary.  Defs.' Mem. at 20.  RFRA is therefore irrelevant to Mr. Hammons's claims.  *See* ECF No. 81 at 6 ("The Medical System concedes that it cannot assert" RFRA "because of its status as a governmental entity.").

## CONCLUSION

For these reasons, Mr. Hammons respectfully requests that the Court grant his motion for summary judgment and deny Defendants' motion for summary judgment.


Dated: July 25, 2022

Respectfully submitted,

*/s/ Louis J. Ebert*
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Jonathan S. Z. Hermann (*pro hac vice*)
Edward J. Delman (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
jhermann@pbwt.com
edelman@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

36

*Counsel for Plaintiff Jesse Hammons*