# EXHIBIT 4

**In the Matter Of:**

Hammons vs University of Maryland Medical System

1:20-cv-02088-DKC

---

**DR. GAIL P. CUNNINGHAM**

*April 14, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MARYLAND

 3

 4   JESSE HAMMONS,                 )

 5        Plaintiff,               )

 6        -v-                       ) Case No.

 7   UNIVERSITY OF MARYLAND MEDICAL ) 1:20-cv-02088-DKC

 8   SYSTEM CORPORATION, et al.     )

 9        Defendants.              )

10

11

12        Videotaped Deposition of Gail P. Cunningham

13                    Towson, MD

14             Thursday, April 14, 2022

15                    9:00 a.m.

16

17

18   Job No:  J8078725

19   Pages:   1-308

20   Reported by:  Kenneth Norris

21
```



1           Deposition of Gail P. Cunningham

2           Taken at:

3

4           UNIVERSITY OF MARYLAND

5           ST. JOSEPH MEDICAL CENTER

6           7601 Osler Drive

7           Towson, MD 21204

8           Telephone: (410)328-8667

9

10

11

12

13

14           Pursuant to Notice, before Kenneth Norris, a

15    Professional Reporter and Notary Public in and for the

16    State of Maryland.

17

18

19

20

21



 1  that it -- I know it was announced in December.  I

 2  don't know the actual signature date.

 3      Q.   So from 1996 to 2012, St. Joseph was owned

 4  and operated by Catholic Health Initiatives; right?

 5      A.   Yes.

 6      Q.   And what is Catholic Health Initiatives?

 7           MR. WERNER:  Object to the form.

 8           THE WITNESS:  It's another Catholic

 9  corporation that owns and operates multiple hospitals

10  across the United States.  I don't know elsewhere.

11  BY MR. DELMAN:

12      Q.   And then in 2012 St. Joseph was purchased by

13  the University of Maryland Medical System; right?

14      A.   Yes.

15      Q.   Now, were you involved in any way with the

16  negotiations concerning the purchase of St. Joseph?

17      A.   Only being at some -- actually at this table

18  sometimes when there would be discussions back and

19  forth about timing, but not in -- nothing monetary or

20  in any -- no part of the actual negotiations.

21      Q.   You didn't have any role in the negotiation



1    of the terms of the asset purchase agreement?

2         A.    No.

3         Q.    And did you have any role in the negotiation

4    of the Catholic identity agreements?

5         A.    No.

6         Q.    So St. Joseph is currently an LLC with the

7    name University of Maryland St. Joseph's Medical

8    Center, LLC; right?

9         A.    Right.

10        Q.    And that LLC has one member; right?

11        A.    Yes.

12        Q.    And that member is UMSJ Health System, LLC?

13        A.    I believe so.

14        Q.    And UMSJ Health System in turn also has only

15   one member; right?

16        A.    I believe so.

17        Q.    And that member is the University of

18   Maryland Medical System Corporation?

19        A.    I believe so.

20        Q.    And so, UMSJ Health System is a wholly owned

21   subsidiary of University of Maryland Medical System?



1              MR. WERNER:  Object to the form.

2              THE WITNESS:  I don't know what that term

3      means, wholly owned subsidiary.

4      BY MR. DELMAN:

5         Q.   The University of Maryland Medical System is

6      the only owner of UMSJ Health System?

7         A.   Yes.

8         Q.   And similarly, UMSJ Health System is the

9      only owner of St. Joseph's Medical Center?

10        A.   Yes.

11        Q.   So University of Maryland through UMSJ is

12     the sole owner of St. Joseph; right?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:  Yes.

15     BY MR. DELMAN:

16        Q.   And no other entity has any ownership stake

17     in St. Joseph?

18        A.   No.

19        Q.   Now, the University of Maryland St. Joseph

20     Medical Center was previously known as Northeastern

21     Maryland Regional Health System, LLC; right?



```
 1   feel free to look through it as much or as little as

 2   you like.  You can just let me know when you're done

 3   looking at it.

 4       A.   Okay.

 5       Q.   I just ask you to turn to HUM 596.

 6       A.   Okay.

 7       Q.   I'd ask you to just read this section here

 8   right on the page.

 9            MR. WERNER:  You want her to read it aloud?

10            MR. DELMAN:  No, to herself.

11            MR. WERNER:  Okay.

12            THE WITNESS:  Okay.

13   BY MR. DELMAN:

14       Q.   According to this document, this Form 990

15   for UMSJ, UMMS has the ability to appoint members to

16   the board of the UMSJ Health System; right?

17            MR. WERNER:  Object to the form.

18            THE WITNESS:  Yes.

19   BY MR. DELMAN:

20       Q.   And also all decisions of USMJ's governing

21   board must be approved by UMS?
```



1              MR. WERNER:  Object to the form.

2              THE WITNESS:  That's what this says.

3    BY MR. DELMAN:

4       Q.   Do you have any reason to believe that

5    that's not the case?

6              MR. WERNER:  Object to the form.

7              THE WITNESS:  No.

8    BY MR. DELMAN:

9       Q.   Do you have any reason to believe that UMS

10   does not have the ability to appoint members of the

11   board of UMSJ?

12      A.   No.

13      Q.   This is UMMS 832 being marked as Plaintiff's

14   Exhibit 4.

15             (Plaintiff's Exhibit No. 4 was marked for

16   identification.)

17             THE WITNESS:  Is there anything in

18   particular you want me to look at?

19   BY MR. DELMAN:

20      Q.   I'm happy to move ahead and we can sort of

21   work through it together.



1      Q.   Dr. Cunningham, this is the second amended

2   and restated offering agreement for St. Joseph's

3   Medical Center; right?

4      A.   Yes.

5      Q.   Have you seen this document before?

6      A.   I don't believe so.

7      Q.   I just want to confirm here on the -- in

8   this first paragraph, it confirms that this was

9   effective as of September 11, 2019?

10          MR. WERNER:  Object to the form.

11          THE WITNESS:  That's what this states.

12   BY MR. DELMAN:

13      Q.   Did you have any awareness before this of

14   St. Joseph having a second amended and restated

15   offering agreement?

16      A.   No.

17      Q.   Turn with me to 1011 of Section 305.

18          If you'll look at Section C, this again

19   confirms that UMMS has the right to directly appoint

20   two voting members.

21          MR. WERNER: Object to the form.



```
 1            THE WITNESS: Yes.

 2   BY MR. DELMAN:

 3        Q.   And according to Section B, the UMMS CEO or

 4   his or her designee also sits on the board as an

 5   ex officio director?

 6            MR. WERNER:  Object to the form.

 7            THE WITNESS:  Yes.

 8   BY MR. DELMAN:

 9        Q.   Is that CEO currently Dr. Mohan Suntha?

10        A.   Yes.

11        Q.   Am I pronouncing that correctly?

12        A.   Suntha.

13        Q.   Suntha?

14        A.   Right.

15        Q.   Great.  And Dr. Suntha is also on the

16   board's executive committee; right?

17            MR. WERNER:  Object to the form.

18            THE WITNESS:  Yes.

19   BY MR. DELMAN:

20        Q.   Now, one other member of the board is also

21   representative of the Archdiocese of Baltimore?
```



1        A.    Go ahead.

2        Q.    According to subsection E UMMS has the power

3    and authority to elect all of the elected directors

4    pursuant to a nomination process?

5              MR. WERNER:  Object to the form.

6              THE WITNESS:  If the member means UMMS, yes.

7    BY MR. DELMAN:

8        Q.    Now, if you'll just turn back to Exhibit 4,

9    please?

10             MR. WERNER:  Are we done with 5?

11             MR. DELMAN:  We might come back to it.

12   BY MR. DELMAN:

13       Q.    And turn to page 916.  Is that right?  Yes.

14   Look at Subsection C.

15             MR. WERNER:  Of 12.16, is that what we're

16   talking about?

17             MR. DELMAN:  Correct.

18             THE WITNESS:  Okay.

19   BY MR. DELMAN:

20       Q.    Okay.  So just according to Section C,

21   Subsection C, the UMSJ board is the -- strike that.



1              According to Subsection C, the board of UMSJ

2     Health System is also the board of SJMC?

3              MR. WERNER:  Object to the form.

4              THE WITNESS:  Yes.

5     BY MR. DELMAN:

6        Q.   As far as you're aware, UMMS still retains

7     the power to directly appoint two members to the UMSJ

8     and SJMC boards?

9        A.   As far as I know.

10       Q.   Do you know who those members are currently?

11       A.   Dr. Lisa Rowan, which is -- they've had some

12    board turnover recently.  I'm just trying to remember.

13             It had been the dean of the medical school.

14    Now it's Dr. Lisa Rowan and -- I'm not sure of the

15    other member right now.  It may come to me.

16       Q.   I'm sorry.  Just going to 915, the page

17    prior, it's Roman numeral 5.

18       A.   Yes.

19       Q.   It says here that apart from the

20    representative of the Archdiocese, the CEO, and the

21    two directly appointed voting members, all other



1   members shall be appointed by UMMS pursuant to a

2   nomination process?

3          MR. WERNER:  Object to the form.

4          THE WITNESS:  Yes.

5   BY MR. DELMAN:

6      Q.   Do you have any reason to believe that

7   that's no longer the case?

8      A.   No.

9      Q.   You don't know who those members are off the

10  top of your head?

11     A.   The two UMMS members?

12     Q.   No.  The members who are not either

13  ex officio representatives of the Archdiocese or the

14  two UMMS members.

15     A.   I could name some of them.

16     Q.   Do you have any -- do you have any sense of

17  approximately what percentage of the board those

18  members constitute?

19     A.   Probably between half and three quarters.

20     Q.   As we discussed previously, all decisions by

21  the board of UMSJ must be approved by UMMS; right?



 1            MR. WERNER:  Object to the form.

 2            THE WITNESS:  That's what it states, yes.

 3   BY MR. DELMAN:

 4       Q.   And as you discussed, you have no reason to

 5   believe that's not the case?

 6       A.   Correct.

 7       Q.   If you will turn with me to on the same

 8   exhibit, Exhibit 4 -- Exhibit 4 to 963.  So we're

 9   looking at Exhibit F, which is titled UMMS's reserved

10   powers; right?

11       A.   Yes.

12       Q.   I think just for efficiency sake, please

13   feel free to just read through the three pages of that

14   exhibit, and then we can talk.

15       A.   Okay.

16       Q.   So, according to the asset purchase

17   agreement, UMMS has reserved certain powers for

18   itself; right?

19            MR. WERNER:  Object to the form.

20            THE WITNESS: Yes.

21   BY MR. DELMAN:



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    52

```
 1        Q.   For example, UMMS has to approve any

 2   amendments to USMJ Health Systems' articles or

 3   organizational operating agreement?

 4             MR. WERNER:  Object to the form.

 5   BY MR. DELMAN:

 6        Q.   And UMMS has to approve of USMJ's annual

 7   budget?

 8             MR. WERNER:  Object to the form.

 9             THE WITNESS:  Yes.

10   BY MR. DELMAN:

11        Q.   Does the annual budget include the salaries

12   and compensation for all employees of USMJ Health

13   System?

14        A.   I believe so.

15        Q.   And UMMS has to approve of UMSJ Heath

16   System's strategic plans; right?

17             MR. WERNER:  Object to form.

18             THE WITNESS:  Yes.

19   BY MR. DELMAN:

20        Q.   Do you know what this document means by

21   strategic plans?
```



1      A.   Yes.   Each hospital has a five-year

2   strategic plan or three years, depends on -- a

3   five-year strategic plan as approved by the board and

4   then approved by UMMS.

5      Q.   What sorts of information is in the

6   strategic plan?

7      A.   Anything from quality goals to expansion

8   goals, you know.  Partnership goals.  Could be a

9   digital health strategy, an array of activities across

10  the hospital that would be strategic usually set with

11  some metrics or targets.

12     Q.   Would it ever involve any planned or

13  proposed changes in policies and procedures?

14     A.   It's not that specific, no.

15     Q.   UMMS also has to approve any material

16  additions, expansions, revisions or deletions of the

17  health care services not an approved budget or

18  strategic plan; right?

19          MR. WERNER:  Object to the form.

20          THE WITNESS:  Yes.

21  BY MR. DELMAN:



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                    54

1        Q.   And UMMS has also reserved the power to make

2    UMSJ Health System take certain actions without prior

3    approval of the board; right?

4              MR. WERNER:  Object to the form.

5              THE WITNESS:  Yes.

6    BY MR. DELMAN:

7        Q.   For example, UMMS can appoint and remove

8    UMSJ Health System's CEO; right?

9              MR. WERNER:  Object to the form.

10             THE WITNESS:  Yes.

11   BY MR. DELMAN:

12       Q.   And UMMS can add, expand, revise, or delete

13   certain health care services provided by UMSJ Health

14   System?

15             MR. WERNER:  Object to the form.

16             THE WITNESS:  Yes.

17   BY MR. DELMAN:

18       Q.   UMMS can make UMSJ Health Systems submit

19   corrective action plans if performance and financial

20   targets aren't met?

21             MR. WERNER:  Object to the form.



```
 1              THE WITNESS:  Yes.

 2    BY MR. DELMAN:

 3       Q.   And it can enforce those corrective action

 4    plans?

 5              MR. WERNER:  Object to the form.

 6              THE WITNESS:  Yes.

 7    BY MR. DELMAN:

 8       Q.   Do you have any reason to believe that UMMS

 9    no longer holds any of those reserved powers?

10       A.   No.

11       Q.   Are you aware of any other powers that UMMS

12    exercises over the UMSJ Health System or SJMC?

13              MR. WERNER:  Object to the form.

14              THE WITNESS:  No.

15    BY MR. DELMAN:

16       Q.   Now, UMMS' 2012 acquisition of St. Joseph

17    was contingent on the approval from the Roman Catholic

18    Church; right?

19       A.   Yes.

20       Q.   And as part of the acquisition, UMMS

21    committed to continuing to operate SJMC in a manner
```



1    Plaintiff's Exhibit 6.

2              (Plaintiff's Exhibit No. 6 was thereupon

3    marked for identification.)

4    BY MR. DELMAN:

5         Q.   Dr. Cunningham, this is the Catholic

6    identity agreement; right?

7         A.   Yes.

8         Q.   Have you seen this before?

9         A.   Yes.

10        Q.   When did you see this?

11        A.   I probably saw it in its entirety a long

12   time ago, and then I have seen a few pages of it in

13   preparation for the deposition.

14        Q.   Okay.

15             The Catholic identity agreement requires

16   that St. Joseph be operated in accordance with the

17   ERDs; right?

18        A.   Correct.

19        Q.   And also UMMS is the signatory for the

20   Catholic identity agreement; right?

21        A.   Yes.



1        Q.    And the Catholic identity agreement mandates

2    the creation of a clinical ethics committee?

3        A.    Yes.

4        Q.    As far as you're aware, members of that

5    committee must be trained on the ERDs?

6        A.    Yes.

7        Q.    And they must agree to act as committee

8    members in compliance with the ERDs?

9        A.    Yes.

10       Q.    The Catholic identity agreement also

11   requires that St. Joseph undergo an audit by the

12   National Catholic Bioethics Center every two years;

13   right?

14       A.    Yes.

15       Q.    And what is the National Catholic Bioethics

16   Center?

17            MR. WERNER:   Object to the form.

18            THE WITNESS:   It's a center located in

19   Philadelphia that is the resource for ethical and

20   moral direction for Catholic Health Care at least, and

21   one of their arms is to conduct audits of Catholic



 1   hospitals to make sure we're in alignment with the

 2   expectations related to being a Catholic hospital.

 3   BY MR. DELMAN:

 4        Q.   And in general, would you agree that the

 5   National Catholic Bioethics Center understands what

 6   the ERDs mean and require?

 7             MR. WERNER:  Object to the form.

 8             THE WITNESS:  Yes.

 9   BY MR. DELMAN:

10        Q.   Is it fair to say that the National Catholic

11   Bioethics Center's interpretations of the ERDs are

12   authoritative interpretations?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:  I don't know what you mean by

15   authoritative.

16   BY MR. DELMAN:

17        Q.   Is it fair to say that if the National

18   Catholic Bioethics Center released a document stating

19   what the ERDs require, you would trust that

20   interpretation?

21             MR. WERNER:  Object to the form.



```
 1              THE WITNESS:  Yes.

 2   BY MR. DELMAN:

 3       Q.   The Catholic identity agreement also

 4   requires the creation of the Catholic identity

 5   committee?

 6       A.   Yes.

 7       Q.   And one purpose of that committee is to

 8   ensure that St. Joseph remains faithful to the ERDs?

 9       A.   Yes.

10       Q.   And we'll just turn very quickly to 1048,

11   which is the signature page?

12              MR. WERNER:  It's a one-signature page.

13              MR. DELMAN:  Yes.

14   BY MR. DELMAN:

15       Q.   The signatory here for the University of

16   Maryland St. Joseph Medical Center is Megan Arthur;

17   right?

18       A.   Yes.

19       Q.   As we discussed, Megan Arthur was general

20   counsel for UMMS?

21       A.   Yes.
```



```
1              MR. WERNER:  Object to the form.

2    BY MR. DELMAN:

3        Q.   Now, do you have any reason to believe that

4    the requirements set forth in the Catholic identity

5    agreement do not reflect the present reality of

6    operations at St. Joseph?

7              MR. WERNER:  Object to the form.

8              THE WITNESS:  No reason to think so.

9    BY MR. DELMAN:

10       Q.   And is it fair to say that physician

11   compliance with ERDs was the largest part of the focus

12   when UMMS purchased St. Joseph?

13             MR. WERNER:  Object to the form.

14             THE WITNESS:   When you -- I don't know.  I

15   don't know the physician complying with the ERDs was

16   the primary focus.

17   BY MR. DELMAN:

18       Q.   This is UMMS 817 going to be marked as

19   Plaintiff's Exhibit 7.

20             (Plaintiff's Exhibit No. 7 was thereupon

21   marked for identification.)
```



1        Q.   And the document says here that Dr. Rossiter

2    mentioned that when a physician signs on, he signs to

3    all of the ERDs and that this was the largest part of

4    the focus when UMMS purchased St. Joseph.

5             MR. WERNER:  Object to the form.

6    BY MR. DELMAN:

7        Q.   Do you see that?

8        A.   Yes.  So Dr. Rossiter was the chief of OB at

9    the time, and that might have been her perception.

10       Q.   Do you have any reason to believe that that

11   perception was incorrect?

12            MR. WERNER:  Object to the form.

13            THE WITNESS:  Well, I know that there were

14   many other parts of the Catholic identity agreement

15   that were beyond the ERDs.

16   BY MR. DELMAN:

17       Q.   So, Dr. Cunningham, based on the agreements

18   we've reviewed, do you agree that St. Joseph does not

19   have the power to decide that it will no longer adhere

20   to and operationalize the ERDs?

21            MR. WERNER:  Object to the form.



1            THE WITNESS:  It's such an unfathomable

2    question.

3            I imagine in the -- per the legal documents

4    that would be the case.

5    BY MR. DELMAN:

6        Q.   And do you agree that the majority or at

7    least half of St. Joseph's board is selected either

8    directly or following a nomination process by UMMS?

9            MR. WERNER:  Object to the form.

10           THE WITNESS:  It's not quite half.  It's

11   depending on the number.

12   BY MR. DELMAN:

13       Q.   But a significant number?

14       A.   A significant number, yes.

15       Q.   Do you agree that St. Joseph lacks the power

16   to decide that it will no longer maintain a Catholic

17   identity committee?

18           MR. WERNER:  Object to the form.

19           You're just asking for a legal conclusion.

20   She's no here testifying as a lawyer.

21           THE WITNESS:  Yes.  I imagine if the legal



1   documents are written, that's the case.  But, again,

2   I'm not an attorney.

3   BY MR. DELMAN:

4        Q.   Going back to the documents.

5             Oh, I'll ask, do you believe that St. Joseph

6   would face -- do you believe that St. Joseph would be

7   free to no longer maintain a Catholic identity

8   committee, if it wanted to?

9             MR. WERNER:  Object to the form.

10            THE WITNESS:  No. It's one of our

11  obligations.

12  BY MR. DELMAN:

13       Q.   And do you believe that St. Joseph would be

14  free to no longer hire and have a vice president for

15  admission integration, if it wanted to?

16            MR. WERNER:  Objection to the form.

17            THE WITNESS:  No.  It's part of the

18  agreement.

19  BY MR. DELMAN:

20       Q.   And would St. Joseph be free to no longer

21  have an ethics committee if it wanted to?



1           MR. WERNER:  Object to the form.

2           THE WITNESS:  No.  It's part of the

3     agreement.

4     BY MR. DELMAN:

5       Q.   And do you believe that St. Joseph would be

6     free to no longer participate in the National Catholic

7     Bioethics Center's audit on a biannual basis?

8           MR. WERNER:  Object to the form.

9           THE WITNESS:  No.  It's part of the

10    agreement.

11          MR. DELMAN:  All right.  Why don't we take a

12    break.

13          MR. WERNER: How long?

14          MR. DELMAN: 10 minutes.

15          VIDEOGRAPHER:  Off the record at 10:08.

16          (Whereupon, a recess ensued.)

17          VIDEOGRAPHER:  Back on the record at 10:18.

18    BY MR. DELMAN:

19      Q.   Good afternoon.  Dr. Cunningham, we

20    discussed that regarding the 2012 negotiations you

21    were not personally involved in those negotiations;



Case 1:20-cv-02088-DKC   Document 105-6   Filed 07/25/22   Page 29 of 77
DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                      85

1        A.    Yes.

2              MR. WERNER:   Object to the form.

3    BY MR. DELMAN:

4        Q.    Now, you know hysterectomies do result in

5    sterilization.   You would agree that physicians do not

6    typically perform hysterectomies for the purpose of

7    sterilization; right?

8        A.    At this organization or across the country?

9        Q.    Across the country.

10       A.    Well, across the country I can't speak to. I

11   can only speak to at this organization.

12       Q.    As a medical professional, do you have any

13   sense of how common it is for medical professionals in

14   this country to perform hysterectomies solely for the

15   purpose of sterilization?

16             MR. WERNER:   Object to the form.

17             THE WITNESS:   I would think it would not

18   happen often.

19   BY MR. DELMAN:

20       Q.    And why do you think it would not happen

21   often?



1        A.   Because I do not believe it would be

2   considered a medically necessary procedure.  And there

3   are alternatives.

4        Q.   And what are some of those alternatives?

5        A.   Any array of contraceptive procedures.

6        Q.   Such as?

7        A.   An IUD, a tubal ligation, ablation, probably

8   those are the main ones.

9        Q.   Now, putting aside -- strike that.

10            Hysterectomies are in fact performed to

11   treat diagnosed medical conditions; right?

12        A.   Yes.

13        Q.   And in fact hysterectomies are frequently

14   performed here at St. Joseph to treat certain medical

15   conditions; right?

16        A.   Yes.

17        Q.   Now, we get to the final immediate parts.

18            MR. DELMAN:  Paul, I tried to do this in way

19   that would be most successful for your client, so what

20   we have here first is a printout not of the entirety

21   of UMMS 1034, but the first 20 rows of each sheet.



```
 1   It's a multi-sheet document.

 2              MR. WERNER:  Yes.

 3              MR. DELMAN:  So I suggest to have a paper

 4   copy to mark as an exhibit.

 5              MR. WERNER:  And do you have a native

 6   version as well that you're going to --

 7              MR. DELMAN:  I do.  I have it on iPad, which

 8   I'm going to provide to the witness.

 9              MR. WERNER:  I don't need two.

10              MR. DELMAN:  Sorry.

11              So this is UMMS 1034 and it will be

12   Exhibit 8.

13              (Plaintiff's Exhibit No. 8 was thereupon

14   marked for identification.)

15   BY MR. DELMAN:

16        Q.   So before I get this is to, Dr. Cunningham,

17   I'm showing you a spreadsheet that was produced to us

18   by your counsel, and they represented to us that it

19   shows all hysterectomies performed at St. Joseph from

20   fiscal year 2017 through fiscal year 2022, which is

21   still ongoing.
```



1           Have you seen this spreadsheet before?

2      A.   Yes.

3      Q.   And when did you see this spreadsheet

4  before?

5      A.   It was shared with me by counsel this past

6  week.

7           MR. WERNER:  Well, just to be clear, don't

8  go into things that we did together to prepare for the

9  deposition.

10          So if you saw a document that refreshed your

11 recollection, you can testify to that.  But please

12 don't go into things that I may have shown you.

13          THE WITNESS:  Okay.

14 BY MR. DELMAN:

15     Q.   Dr. Cunningham, did you have any involvement

16 in the creation of this spreadsheet?

17     A.   No.

18     Q.   Okay.  Actually, I don't need to give this

19 to you yet.

20          What I have here is good for our purposes.

21          So let's just start with this summary sheet,



```
 1   which is this first sheet here.

 2       A.   Um-um.

 3       Q.   So this sheet purports to summarize by

 4   diagnostic code all the hysterectomies performed at

 5   St. Joseph during fiscal year 2017 to 2022; right?

 6       A.   Yes.

 7       Q.   Now, do you know where this data was pulled

 8   from?

 9       A.   I presume from our electronic medical

10   records.

11       Q.   Is that EPIC?

12       A.   Yes.

13       Q.   Is there any other electronic medical record

14   system here at St. Joseph?

15       A.   Yes, there is a different record used in the

16   GI lab.  That's the only one that I'm aware of.

17       Q.   This would have come from EPIC?

18       A.   Yes.

19       Q.   And do you know what office handled pulling

20   this data?

21       A.   Surgical services has a business office, and
```



1   I believe it would be the business office tied to

2   surgical services.

3       Q.   So actually if we go to the very last page

4   of this, there is a page with -- it says HPN sample on

5   top.  Do you see here on -- by sample name it says

6   "Katy's request for account numbers."

7       A.   Okay.

8       Q.   Do you know who Katy is?

9       A.   That's probably Kate Christner, who is the

10  business manager.  I don't know if that's her official

11  title, but functions as a business manager for

12  surgical services.

13      Q.   And so Katy -- do you think Katy is the

14  person who supervised the collection of this data?

15      A.   Most likely.

16      Q.   Okay.  So let's go back to the summary.

17           So column A here is the medical indication

18  for hysterectomy; right?

19      A.   Yes.

20      Q.   So I think you just nodded.

21      A.   Yes.



1        Q.    An column B here is the ICD-10 diagnostic

2     code that corresponds to that indication?

3        A.    Correct.

4        Q.    And both column A and column B are the

5     preoperative diagnoses; right?

6        A.    I presume so.

7        Q.    You presume so?

8        A.    It's the principale diagnostic code, yes.

9        Q.    And so those would be the diagnoses that

10    form the basis for the hysterectomy being performed;

11    right?

12       A.    I believe so.  Although, if it's just

13    principle diagnosis, there may be two -- two, three

14    other reasons as well listed, but this is just one

15    principle diagnosis.

16       Q.    And if one wanted to find those two or three

17    other underlying preoperative diagnoses where would

18    one be able to find that information?

19       A.    I imagine through a similar query, but I

20    don't know for sure.

21       Q.    So now we will go to the iPad.



```
 1              I will pass this over to you.  And if it

 2     gets closed out, let me know because I can get back

 3     into it.  It is password protected.

 4         A.   Okay.

 5         Q.   I have you on the summary page there.  You

 6     can feel free to scroll up and down on that page.

 7         A.   Okay.

 8         Q.   And so according to this spreadsheet, 634

 9     hysterectomies were performed at St. Joseph during

10     fiscal year 2017 through 2022; right?

11         A.   Yes.

12         Q.   And do you have any reason to disagree with

13     that count?

14         A.   No.

15         Q.   So does it sound accurate to you to say that

16     number equates to approximately two to three

17     hysterectomies per week?

18         A.    634 divided by 5 years times 50 weeks?

19     Yes, one to two.  Yes.

20         Q.   So you would agree that hysterectomies are a

21     fairly common procedure here at St. Joseph; right?
```



1      Q.    You have no knowledge in your personal

2   capacity?

3      A.    Right.

4      Q.    And do you have any knowledge in your

5   capacity as corporate representative?

6      A.    No.

7      Q.    And, again, putting aside procedures

8   involving transgender patients, isn't it true that

9   there is no particular procedure in place at St. Joe's

10  for reviewing whether a hysterectomy is complying with

11  the ERDs?

12          MR. WERNER:  Object to the form.

13          THE WITNESS:  There's not a procedure in

14  place, but there is implicit, I think -- I mean, there

15  is knowledge that's conveyed to the people who would

16  be doing those procedures of what's acceptable and

17  what's not acceptable.  And very clearly stated that

18  we do not do sterilization -- man, woman, whomever --

19  here at St. Joe's.

20  BY MR. DELMAN:

21      Q.    And so physicians at St. Joe's -- and



 1              THE WITNESS:  Okay.

 2   BY MR. DELMAN:

 3      Q.   So what we're looking here is a document

 4   from NCBC entitled Transgender Issues in Catholic

 5   Health Care.

 6              First of all, do you recall ever seeing this

 7   document before?

 8      A.   I can't recall. I may have.

 9              There are a couple of terms here that look

10   familiar to me. I'm not sure.  In the data in the FAQ

11   at the bottom it says surgery is ringing a bell.

12   That's an unusual term, so I may have, but I can't say

13   for sure.

14      Q.   Does the document sort of refresh your

15   recollection of anything?

16      A.   No.

17      Q.   And so, Dr. Cunningham, we already discussed

18   that you trust NCBC to understand what the ERDs

19   require; right?

20      A.   Right.

21              MR. WERNER:  Object to the form.



```
 1              THE WITNESS:  Right.

 2    BY MR. DELMAN:

 3         Q.   And according to this document, gender

 4    transitioning should never be performed, encouraged,

 5    or positively affirmed as a good in Catholic Health

 6    Care; right?

 7              MR. WERNER:  Object to the form.

 8              THE WITNESS:  Yes.

 9    BY MR. DELMAN:

10         Q.   And that includes surgeries, the

11    administration of cross-sex hormones, or puberty

12    blockers, and social behavioral modifications?

13              MR. WERNER:  Object to the form.

14              THE WITNESS:  Correct.

15    BY MR. DELMAN:

16         Q.   And do you have any reason to believe that

17    the guidance that's in this document does not apply

18    here at St. Joe's?

19              MR. WERNER:  Object to the form.

20              THE WITNESS:  No.

21    BY MR. DELMAN:
```



1        Q.   So, for example, medical personnel at

2    St. Joe's cannot provide a transgender patient with

3    voice-alteration therapy for the purpose of gender

4    transition; right?

5             MR. WERNER:  Object to the form.

6             THE WITNESS:  Per this form, yes, that's

7    correct.

8    BY MR. DELMAN:

9        Q.   And that treatment does not involve

10   sterilization; right?

11       A.   That's correct.

12       Q.   And that treatment also did not involve the

13   removal of any healthy organs?

14            MR. WERNER:  Object to the form.

15            THE WITNESS:  That's correct.

16   BY MR. DELMAN:

17       Q.   Similarly, medical personnel here at

18   St. Joe's cannot prescribe or administer cross-sex

19   hormone therapy for the purpose of gender transition;

20   right?

21       A.   That's correct.



1        Q.   And, again, that treatment does not involve

2   sterilization?

3        A.   That's correct.

4        Q.   And that treatment does not involve the

5   removal of any healthy organs?

6        A.   That's correct.

7        Q.   Medical personnel here at St. Joe's cannot

8   perform breast reconstruction for a transgender woman

9   for the purpose of gender affirmation right?

10       A.   That's correct.

11       Q.   And, again, that treatment does not involve

12  sterilization?

13       A.   That's correct.

14       Q.   And that treatment also does not involve the

15  removal of any healthy organs?

16       A.   It would be removal of breast tissue that

17  would be considered healthy.

18       Q.   Is tissue synonymous with organ in this

19  context?

20       A.   I would say, yes.

21       Q.   So the removal of any skin can count as



 1  removal of healthy tissue?

 2          MR. WERNER:  Object to the form.

 3          THE WITNESS:  I would say healthy skin

 4  removal.  Trying to think of a circumstance where that

 5  would even be likely, but if -- you know, I would say

 6  since skin is an organ and -- yeah, the removal of

 7  healthy skin would not be considered okay.

 8  BY MR. DELMAN:

 9      Q.   Is breast reconstruction primarily an

10  additive procedure as opposed to a subtractive

11  procedure?

12          MR. WERNER:  Object to the form.

13          THE WITNESS:  It can be either.

14  BY MR. DELMAN:

15      Q.   In what ways is it subtractive?

16      A.   Well, you can have breast reduction surgery,

17  right?  Or you can have breast augmentation surgery.

18      Q.   What about a surgery where you are giving a

19  patient breasts whereas they otherwise did not have

20  breasts?

21      A.   What about that?



 1        Q.    Would that be additive or subtractive?

 2        A.    I a traditional way of thinking, it would be

 3   additive.

 4        Q.    And would that involve the removal of

 5   healthy organs?

 6             MR. WERNER:  Object to the form.

 7             THE WITNESS:  No.  But in the context of

 8   this conversation it would be alteration.

 9   BY MR. DELMAN:

10        Q.    What do you mean alteration?

11        A.    Of the body.

12        Q.    Alteration of the body?

13        A.    Yes.

14        Q.    And in what way does alteration of the body

15   play into this conversation?

16        A.    Well, when I think about the ERDs and the

17   items that you just read, we are prohibited from, for

18   instance, reconstructive surgery related to

19   transgender.  So we would be prohibited from doing

20   breast reconstructions as additive -- adding breast

21   tissue for the purpose of transgender reaffirming.



1        Q.   But you would able to do that procedure, for

2   example, on a patient who had, say, previously gotten

3   a mastectomy to treat breast cancer?

4            MR. WERNER:  Object to the form.

5            THE WITNESS:  Yes.

6   BY MR. DELMAN:

7        Q.   Now, Dr. Cunningham, you have been part of

8   conversations at St. Joe's about whether gender

9   transition procedures may take place here; right?

10       A.   Correct.

11       Q.   This is --

12           MR. WERNER:  14.

13   BY MR. DELMAN:

14       Q.   -- UMMS 111, and it is also Exhibit 14.

15           MR. DELMAN:  Thank you, Paul.

16           (Plaintiff's Exhibit No. 14 was thereupon

17   marked for identification.)

18   BY MR. DELMAN:

19       Q.   Dr. Cunningham, I'm showing you here an

20   e-mail chain from November 2014.

21       A.   Yes.



DR. GAIL P. CUNNINGHAM                                    April 14, 2022
Hammons vs University of Maryland Medical System                     204

1       Q.   I recall we discussed that you have reviewed

2    some e-mails prior to this deposition. Is this one of

3    those?

4       A.   Yes.

5       Q.   So I ask you to turn, when you're ready to

6    UMMS 114, which will be the second to last page.

7       A.   Yes.

8       Q.   And so this is an e-mail from Dr. Rachel

9    Bluebond-Langner dated November 13, 2014, to you;

10   right?

11      A.   Um-um.

12      Q.   And who is Dr. Bluebond-Langner?

13      A.   She was a plastic surgeone who had

14   privileges here at St. Joe's and operated

15   occasionally.

16      Q.   And here Dr. Bluebond-Langner is e-mailing

17   you about performing a penile reconstruction case?

18      A.   Correct.

19      Q.   Generally, do you recall having this

20   interaction with Dr. Bluebong-Langner?

21      A.   I recall having a couple of interactions



DR. GAIL P. CUNNINGHAM                                  April 14, 2022
Hammons vs University of Maryland Medical System                    205

```
 1   with her, yes.
 2        Q.   And, generally, do plastic surgeons need to
 3   get permission from you to perform procedures here at
 4   St. Joe's?
 5        A.   No.  For the most part, no.  This is pretty
 6   rare.
 7        Q.   And this case here in particular involved a
 8   transgender patient; right?
 9        A.   Presumably, yes.
10        Q.   And I believe this was in fact the third
11   time Dr. Bluebond-Langner had approached you
12   about performing surgery on a transgender patient;
13   right?
14        A.   I think that's what I reference in the
15   e-mail.  I don't remember now, but I said that then.
16   I think that would be accurate.
17        Q.   Okay.
18             If you can turn to the bottom of 113.  Tell
19   me if that bottom part refreshes your recollection as
20   to anything.
21        A.   Yes.  I mean, that confirms the third time,
```



1   yes.

2        Q.   And those other two surgeries were also

3   phalloplasties; right?

4        A.   I believe so.

5        Q.   Do you recall when those other two instances

6   were?

7        A.   I don't recall, but if I was to guess, I

8   would guess it was -- the three occasions was within a

9   year's time.

10       Q.   Okay.

11       A.   Maybe.

12       Q.   Do you generally recall any details about

13   those other cases?

14       A.   Only that, I think, she approached me by

15   phone or text with the other cases.  I don't know that

16   there was e-mails.  This is the only one that I've

17   seen an e-mail for, so I think it would have been by

18   phone.  I remember having a phone conversation or two

19   with her.

20       Q.   So in those cases do you recall if the

21   procedures had been scheduled before she reached out



1    to you?

2         A.   I don't recall.  I don't think so, but I

3    don't recall.

4         Q.   And also do you recall what the results were

5    of those prior two conversations?

6         A.   Yes.  She had privileges at the medical

7    center as well, and I told her that I didn't think

8    those cases should proceed here at St. Joe's and that

9    she should take care of the patients at the medical

10   center.

11        Q.   When you say the medical center, is that

12   GBMC?

13        A.   No.  That's the University of Maryland

14   Medical Center.  She had privileges -- primarily most

15   of her surgeries were done down there, and she rarely

16   operated up here.

17        Q.   Okay.

18             And so is it your understanding that the

19   reason Dr. Bluebond-Langner reached out to you about

20   this particular case is because it involved a

21   transgender patient?

1        A.    Yes.

2        Q.    And --

3        A.    Where the procedure was a

4    transgender-related surgery, yes.

5        Q.    And isn't it true that at the time of this

6    e-mail St. Joe's did not have any institutional policy

7    regarding transgender surgeries?

8              MR. WERNER:   Object to the form.

9              THE WITNESS:   The policies would have fallen

10   -- would have been related to our ERDs.   We didn't

11   have a written policy about transgender patients.

12   BY MR. DELMAN:

13       Q.    So I look at this e-mail here, this one on

14   the bottom of 113, and you wrote here "I do not feel

15   comfortable being a sole arbitrator of these sorts of

16   decisions and think we need an institutional policy in

17   this regard."

18             Do you see that?

19       A.    Yes.

20       Q.    So what did you mean by we need an

21   institutional policy?



 1        A.    That we had the ERDs, but we didn't have an

 2     explicit -- these are the -- you know, go back to the

 3     CPT codes.  These are the -- you know, very

 4     prescriptive.  This is what is not allowed at

 5     St. Joe's so it wouldn't have to be one-off

 6     conversations about each procedure as we were

 7     approached about them.

 8        Q.    So there was a general understanding that

 9     gender transition was not permitted at St. Joe's?

10        A.    Right.

11        Q.    But there was no sort of explicit formal

12     policy in place?

13        A.    Right.

14        Q.    And following this -- following this

15     interaction, did St. Joe's, in fact, formulate any

16     sort of institutional policy?

17        A.    No.

18        Q.    Now, if you turn back to 114, very quickly,

19     this proposed phalloplasty involved a patient who

20     already had no breast, vagina, or uterus; right?

21        A.    Correct.



1        Q.    So the only thing that's happening in this

2   surgery was the creation of a phallus?

3        A.    Correct.

4        Q.    And so the surgery would not have involved

5   any sterilization; right?

6        A.    Correct.

7        Q.    And would the surgery have involved the

8   removal of any healthy organs?

9        A.    I don't believe so.

10       Q.    So back to the top of 113, you have an

11  e-mail from -- an e-mail reply from Dr. Dietrick.

12  Dr. Dietrick at the time was chief of surgery?

13       A.    Correct.

14       Q.    I'll also have to ask the D-3 in his

15  signature is that because his name is Daniel D.

16  Dietrick?

17       A.    Yes.

18       Q.    I like that.

19             And here Dr. Dietrick wrote that St. Joe's

20  had the technical capability of performing the

21  surgery; correct?



1        A.   Yes.

2        Q.   And now on 112 we have our e-mail response

3    from Susanne DeCrane; right?

4        A.   Yes.

5        Q.   And Susanne DeCrane who at that time was

6    vice president of mission integration?

7        A.   Yes.

8        Q.   Was she Keith Riddle's immediate

9    predecessor?

10        A.   There was one person in between.

11        Q.   Who was in between?

12        A.   For a short period of time -- I'm blanking

13    on his name.  Michael was his first name, but I can't

14    remember his last name.  He was only here for a few

15    months.  I can get that to you, but I don't have it

16    off the top of my head.

17        Q.   All right.

18             Am I correct that the chronology starting

19    with Susanne DeCrane is Susanne DeCrane, Michael

20    question mark last name, interim period where you are

21    pinch hitting, then Keith Riddle, then Father Sobey?



```
 1        A.   Yes.

 2        Q.   And so, here in this e-mail from Ms. DeCrane

 3   -- actually Dr. DeCrane -- Dr. DeCrane said that the

 4   procedure cannot take place at St. Joe's because it

 5   was not consistent with the Catholic moral tradition;

 6   right?

 7        A.   Right.

 8        Q.   And here Dr. DeCrane notes that St. Joe's

 9   does not perform procedures whose direct purpose or

10   intention is sterilization; right?

11        A.   Right.

12        Q.   But we've established that this proposed

13   penile reconstruction did not involve sterilization;

14   right?

15        A.   Correct.

16        Q.   Now, let's turn to the front page briefly.

17             And your e-mails here refer to Mohan.

18   That's Mohan Suntha?

19        A.   Um-um.

20        Q.   And at the time Dr. Suntha was CEO of

21   St. Joe's; right?
```



1      A.    Correct.

2      Q.    As we've discussed, he's now CEO of UMMS?

3      A.    Yes.

4      Q.    When did Dr. Suntha become CEO of UMMS?

5      A.    Probably three years ago, I believe.  I

6  don't know the exact date.  He left here and he became

7  the CEO of the medical center downtown, so the

8  academic hub.  And he did that for a couple of years

9  and then he moved into the CEO of UMMS.  I don't know

10  the exact date, but about two and a half years ago,

11  I'd say.

12      Q.    Was he the immediate successor of Dr. Smyth?

13      A.    Yes.  And that happened five and a half

14  years ago.

15      Q.    Got it.

16            And so, based on this correspondence, is it

17  fair to say that medical personnel at St. Joe's cannot

18  perform phalloplasties for a transgender man for the

19  purpose of gender affirmation?

20      A.    Yes.

21      Q.    Even though it doesn't involve



1    sterilization?

2         A.   Yes.

3         Q.   And even if it did involve removal of

4    healthy organs?

5         A.   Yes.

6         Q.   Now, for example, they could perform a

7    phalloplasty on a cisgender man if his penis was

8    terribly injured in an accident; right?

9              MR. WERNER:  Object to the form.

10             THE WITNESS:  Yes.

11   BY MR. DELMAN:

12        Q.   Do you recall at any point when you were

13   discussing these issues either with

14   Dr. Langer-Bluebond [sic] or with your colleagues,

15   whether there was any effort to determine whether the

16   patient's gender dysphoria was severe enough to be

17   life-threatening?

18             MR. WERNER:  Object to the form.

19             THE WITNESS:  No.

20   BY MR. DELMAN:

21        Q.   And just to confirm, the idea of



1  know that there's a database that keeps that

2  information.

3       Q.   You don't know if there is a database

4  anywhere that shows procedures that have been

5  cancelled?

6       A.   Oh, I'm sure there are cancellations, but I

7  don't think it would have a comment that it's ERD

8  related.

9       Q.   Okay.  Did you take a look back at prior

10  cancelled procedures in general?

11       A.   No.

12       Q.   So just in general -- we've got one minute?

13  Yeah.  Why don't we take a break so you can get to

14  your call and come back.

15            VIDEOGRAPHER:  Off the record at 1:59.

16            (Whereupon, a recess ensued.)

17            VIDEOGRAPHER:  Stand by. Back on the record

18  at 2:13.

19  BY MR. DELMAN:

20       Q.   Dr. Cunningham, you testified earlier that

21  in order for a hysterectomy to be performed here at



 1   St. Joe's there must be a diagnosis for which a

 2   hysterectomy is within the standard of care; right?

 3           MR. WERNER:  Object to the form.

 4           THE WITNESS:  Yes.

 5   BY MR. DELMAN:

 6       Q.   And so, putting aside gender dysphoria,

 7   isn't it true that so long as the hysterectomy is

 8   consistent with the standard of care for a given

 9   diagnosis, the hysterectomy may be performed here?

10           MR. WERNER:  Object to the form.

11           THE WITNESS:  Yes.

12   BY MR. DELMAN:

13       Q.   Also, generally, isn't it true that

14   St. Joe's prohibits medical personnel from

15   participating in all gender transitions or gender

16   aforming treatments -- sorry -- gender affirming

17   treatments for transgender patients?

18           MR. WERNER:  Object to the form.

19           THE WITNESS:  Yes.

20   BY MR. DELMAN:

21       Q.   And that's true for both surgical and



1   nonsurgical treatments; right?

2        A.   Correct.

3        Q.   And that policy does not necessarily depend

4   on whether the treatment in question involves the

5   removal of healthy organs?

6        A.   Correct.

7        Q.   And that policy also does not depend on

8   whether the treatment in question either directly or

9   indirectly leads to an inability to procreate?

10       A.   Can you say the last statement again?

11       Q.   Sure.

12            And that policy does not depend on whether

13  the treatment in question, either directly or

14  indirectly, leads to an inability to procreate?

15       A.   When you're referring to the policy, are you

16  referring to the practice that's allowed here?  And I

17  think I'm just getting a little disoriented.

18            The procedure -- if the procedure is

19  medically indicated, it could affect the ability to

20  procreate and it would be allowed.  I think that's

21  what you're asking.



 1        Q.   So --

 2             MR. WERNER:  I'm sorry, can we just go off

 3   the record?  I didn't realize --

 4             VIDEOGRAPHER: Off the record at 2:15.

 5             (Whereupon, a recess ensued.)

 6             VIDEOGRAPHER:  Back on the record at 2:17.

 7   BY MR. DELMAN:

 8        Q.   I'll ask that question a slightly different

 9   way, Dr. Cunningham.

10             St. Joe's policy of not permitting gender

11   transition treatments, that policy does not depend on

12   whether the treatment in question is a sterilization

13   procedure; right?

14        A.   Correct.

15        Q.   This will be UMMS 715 and going to be marked

16   as Exhibit 16.

17             (Plaintiff's Exhibit No. 16 was thereupon

18   marked for identification.)

19   BY MR. DELMAN:

20        Q.   Dr. Cunningham, this is an e-mail chain from

21   January 2020 discussing a BPA; right?



```
 1        A.    Um-um.

 2        Q.    Why don't you just go ahead and take a quick

 3   look through all of it?

 4        A.    Okay.

 5        Q.    Do you recall this e-mail correspondence at

 6   all?

 7        A.    I've seen this, yes.

 8        Q.    So this e-mail chain starts on January 14th,

 9   2020; right?

10        A.    Yes.

11        Q.    And that was about a week after the

12   cancellation of the plaintiff's hysterectomy?

13        A.    Yes.

14        Q.    And the subject line for this chain

15   indicates that the participants in the chain are

16   following up regarding the cancellation of that

17   surgery; right?

18        A.    Correct.

19        Q.    Now, in this e-mail chain, Kate Barbara, the

20   former Kate Barbara, suggests that St. Joe's could

21   create a system that would send a BPH to the scheduler
```



DR. GAIL P. CUNNINGHAM                                April 14, 2022
Hammons vs University of Maryland Medical System                 233

1  when a preop diagnosis involves the word gender;

2  right?

3       A.   Correct.

4       Q.   That we've discussed the system?

5       A.   Yes.

6       Q.   And I forget -- we thought BPA stands for

7  best practice alert?

8       A.   Yes.

9       Q.   And so I understand, a best practice alert

10 it an automated alert in EPIQ that warns or advises

11 the reader about clinically significant information?

12      A.   Yes.

13      Q.   So what Barbara -- what Ms. Barbara is

14 proposing in this e-mail is that schedulers receive an

15 automatic alert any time a surgeon tries to schedule a

16 procedure with a preoperative diagnosis that includes

17 the word gender; right?

18      A.   Right.

19      Q.   So that means a scheduler would receive a

20 BPA if a surgeon tried to schedule a procedure where

21 there's a preop diagnosis of gender dysphoria?



```
 1           A.    Correct.

 2           Q.    Or similarly for a gender identity disorder?

 3           A.    Correct.

 4           Q.    And this system was specifically suggesting

 5     to try to catch and alert people to gender transition

 6     surgeries; right?

 7           A.    Correct.

 8           Q.    And you wrote that this system would be a

 9     great step in helping avoid future postings that

10     should never occur; right?

11           A.    Correct.

12           Q.    And that's because surgeons are prohibited

13     from performing gender transition procedures at

14     St. Joe's?

15           A.    Correct.

16           Q.    And this system specifically was suggested

17     because St. Joe's previously did not have any system

18     in place for reviewing scheduled surgeries; right?

19           A.    Correct.

20           Q.    And I think we discussed this alert -- this

21     system was actually implemented; right?
```



1      A.   Yes.

2      Q.   And has it successfully prevented the

3  posting of any procedures involving transgender

4  patients?

5      A.   I don't know.

6      Q.   And I think we already discussed this, but

7  has St. Joe's implemented a BPA system for any other

8  set of preoperative diagnosis terms?

9      A.   Not that I know of.

10     Q.   And same testimony from the perspective of

11  corporate representative?

12     A.   Agreed.

13     Q.   Okay.

14          Let's turn to discussing the reason we're

15  here, plaintiff's surgery.

16          So when did you first become aware of

17  plaintiff's scheduled hysterectomy?

18     A.   On Christmas Eve of 2019, when Dr. Adashek

19  called me at home.  Or called my cell and I was at

20  home.

21     Q.   So this will be Exhibit 17.



1   swearing under penalty of perjury that the statement

2   was true and correct to the best of your knowledge?

3       A.   Yes.

4       Q.   So can you tell me generally what happened

5   on December -- on Christmas Eve 2019 regarding

6   plaintiff's hysterectomy.

7       A.   I received a phone call from Dr. Adashek,

8   who wanted to know if it was okay if he performed a

9   hysterectomy on a patient of his for the purpose of

10  transgender -- transgender surgery.  And I said no, we

11  cannot do transgender surgery at St. Joe's.

12          And that was the extent of the conversation.

13      Q.   And so, Dr. Adashek just sort of like called

14  you out of the blue on Christmas Eve?

15      A.   Yes.  It was very unusual.

16      Q.   And by the time this phone call had

17  happened, had the procedure already been scheduled;

18  right?

19      A.   Yes.

20      Q.   And no one in scheduling had sort of alerted

21  you that this procedure had been scheduled?



1          A.    No.

2          Q.    And generally no one in the hospital had

3     told you that this procedure had been scheduled?

4          A.    No.

5          Q.    And he hadn't asked you about -- he being

6     Dr. Adashek -- had not asked you about it before

7     scheduling it?

8          A.    No.

9          Q.    Do you remember approximately how long the

10    phone call was?

11         A.    It was brief.  A minute.

12         Q.    A minute?

13         A.    Maybe.

14         Q.    That short?

15         A.    It was pretty quick, yes.

16         Q.    And just again, you two had no prior

17    conversations about this procedure before that date?

18         A.    No.  No.  Not that I can recall.

19         Q.    And before this occasion, when was the last

20    time Dr. Adashek had called you directly to request

21    permission to perform any procedure at St. Joe's?



1          A.    I don't believe he ever had.

2          Q.    Like, for example, he didn't call you to

3    request permission about the transhysterectomy in 2018

4    that we had discussed?

5          A.    Not that I recall.

6          Q.    And he obviously generally did not call you

7    to request permission for every hysterectomy he

8    performed at St. Joe's?

9          A.    No.

10         Q.    So do you recall exactly what Dr. Adashek

11   told you when he called on Christmas Eve 2019?

12              MR. WERNER: Object to the form.

13              THE WITNESS:  No, I don't recall the exact

14   details.  I know it was a brief conversation.  That I

15   was surprised that he was even asking if he could do

16   this because it was well known that we couldn't do

17   those procedures here at St. Joe's.  Or I thought

18   everybody knew it well.

19              And we didn't get into any discussion about

20   the specifics of the patient.  I accepted that the

21   purpose of the surgery was for transgender purposes.

```
 1   BY MR. DELMAN:

 2        Q.   So what did he tell you about the patient's

 3   condition on the phone call?

 4        A.   He didn't tell me about the patient's

 5   condition.  Just that the patient was seeking

 6   transgender surgery and the hysterectomy was part of

 7   that.  But that was it.

 8             There was no degree of illness discussed or

 9   degree of anything discussed.  It was just about could

10   he do this procedure.

11        Q.   Okay.  And did he tell you anything about

12   the proposed treatment beyond it being a hysterectomy?

13        A.   No.

14        Q.   And beyond the fact that the patient was

15   transgender, it was a hysterectomy and it was being

16   done for the purpose of gender transition.  Did he

17   tell you anything else about it?

18             MR. WERNER:  Object to the form.

19             THE WITNESS:  No.

20             MR. WERNER:  Asked and answered.

21             THE WITNESS:  No.
```



1    BY MR. DELMAN:

2         Q.   And you told Dr. Adashek that -- on that

3    call that the surgery could not take place at

4    St. Joe's; correct?

5         A.   Correct.

6              MR. WERNER:  Object to the form.

7    BY MR. DELMAN:

8         Q.   And so within the span of that one phone

9    call, you made the choice that -- you made the

10   decision that the hysterectomy could not take place at

11   St. Joe's; right?

12             MR. WERNER:  Object to the form.

13             THE WITNESS:  Correct.

14   BY MR. DELMAN:

15        Q.   And in the span of that one phone call you

16   fully considered the nature of the plaintiff's

17   condition?

18             MR. WERNER:  Object to the form.

19             THE WITNESS:  I considered the reason that

20   the surgeon wanted to do the surgery and that -- and

21   it was black and white to me, and I said no.



```
 1         A.   I don't recall that.

 2         Q.   And did you at any point discuss with

 3    Dr. Adashek whether the patient's gender dysphoria was

 4    severe enough to be life-threatening?

 5              THE WITNESS:  No.

 6              MR. WERNER:  Object to the form.  Asked and

 7    answered.

 8    BY MR. DELMAN:

 9         Q.   It was just the fact that it was a gender

10    transition treatment that was enough to deny it;

11    right?

12              MR. WERNER:  Object to the form.  Asked and

13    answered.

14              THE WITNESS:  Yes.

15    BY MR. DELMAN:

16         Q.   And so prior to January 6, 2020, how many

17    other times did you speak with Dr. Adashek about

18    plaintiff's procedure?

19         A.   Prior to January the 6th?

20         Q.   Um-um.

21         A.   Which is when the procedure was scheduled?
```



```
 1   whatever reason didn't seek that option.

 2            That we wished that we would have -- that he

 3   would have been informed and the lack of cancellation

 4   just added insult to injury to him, and we were sorry

 5   that that happened.

 6       Q.   And do you know -- do you have any sense of

 7   what Dr. Smyth intended to say or was it the same

 8   thing?

 9            MR. WERNER:  Object to the form.

10            THE WITNESS:  No.

11   BY MR. DELMAN:

12       Q.   So now do you recall attending a meeting

13   with Doctors Smyth, Cunningham, and Adashek on

14   January 30th, 2020, to discuss transgender issues in

15   general?

16       A.   Yes.

17       Q.   And do you recall if anyone else was in

18   attendance at that meeting?

19       A.    I believe Dr. Buescher was in attendance,

20   but I'm not going to swear to it.

21       Q.   Do you recall if Mr. Riddle was in
```



1   attendance at the meeting?

2        A.   I believe he may have been in that meeting

3   as well.

4        Q.   And what was the purpose of that meeting?

5        A.   Wanting to understand how Dr. Adashek

6   thought that that surgery would be okay here, and what

7   we might have to do differently to assure that it was

8   very clear to our other surgeons about what was okay

9   and not okay to do here.

10       Q.   And what conversation do you recall from

11  that meeting?

12            MR. WERNER:  Object to the form.

13            THE WITNESS:  That Dr. Adashek talked quite

14  a bit about how he is an advocate for the transgender

15  community here, that he's, I think, sort of become one

16  of the go-to physicians.  That he works closely, I

17  think, with Sheppard Pratt and with patients who have

18  suffered other aspects of -- I'm not saying gender

19  dysphoria -- sexual trouble, but he's also helped

20  other patients who have been victims of some sort of

21  trauma related to their sexuality and that -- I



1   suspect I don't recall exactly, but I suspect that he

2   was trying to make a case for, you know, maybe why

3   this is a -- why gender dysphoria is a medical

4   diagnosis.

5           I don't want to get into too much guessing

6   about the exact conversation.  I definitely know that

7   he talked about the advocacy for the community, that

8   he was a surgeon that people relied on, that he does

9   these surgeries.  That he thought there was an

10  opportunity for us to learn more about it and educate

11  ourselves more about it.

12          That's my recollection.

13      Q.   And do you recall him saying anything else

14  beyond that?

15      A.   Not without prompting.

16      Q.   Okay.

17          Do you recall saying anything during that

18  meeting?

19      A.   I'm sure I spoke.  I might have expressed

20  frustration with him, again, for not canceling the

21  surgery.  And probably asked him directly why did he



1    think that that was okay to do here.

2         Q.   And do you recall what he said in response

3    to that?

4         A.   I don't.

5         Q.   Did you tell Dr. Adashek during that meeting

6    that it was his fault that plaintiff's procedure was

7    cancelled?

8         A.   I don't recall using those words.  If I did,

9    it was because had he not put in the case in the first

10   place, he would not have had to cancel it.

11        Q.   You don't recall necessarily conveying that

12   message to him?

13        A.   What message?

14        Q.   That the blame for the cancellation of the

15   surgery was on him?

16        A.   I wouldn't be surprised if I had said that.

17        Q.   But you don't recall specifically if you did

18   or did not?

19        A.   I don't recall any specific words, no.

20        Q.   Do you recall if anyone at the meeting

21   conveyed that message to Dr. Adashek?



1      A.    I don't know.

2      Q.    And at that meeting did you discuss why

3   plaintiff's hysterectomy was cancelled?

4      A.    He knew why it was cancelled.

5      Q.    Sure.  But did you discuss it at the

6   meeting?

7      A.    Most likely.  I mean, I think we might have

8   gone over again the reason for the cancellation.

9      Q.    And, again, just do you recall what specific

10  reason was given during that meeting?

11          MR. WERNER:  Object to the form.

12          THE WITNESS:  It was inconsistent with the

13  ERDs.

14  BY MR. DELMAN:

15     Q.    Dr. Cunningham, did you exchange e-mails

16  with anyone at St. Joe's about that -- this meeting we

17  have been discussing either before or after it

18  occurred?

19     A.    Not that I recall.  But if you showed me an

20  e-mail, I would remember.

21     Q.    Do you recall texting with anyone at



1    cancelled by Dr. Adashek on Friday because of

2    insurance-related issues and that was not the reason

3    that it was cancelled.  So that's the part that I

4    thought was interesting.

5         Q.   Got it.

6              All right.  Dr. Cunningham, I would like to

7    just read to you a few statements and ask you whether

8    they are true or false.

9              So here is the first statement.

10             Hysterectomies are generally disallowed and

11   cannot proceed at SJMC.

12             MR. WERNER:  Object to the form.

13   BY MR. DELMAN:

14        Q.   You can answer the question, ma'am.

15        A.   That's false.

16        Q.   In fact, hysterectomies are generally

17   allowed at St. Joe's; right?

18             MR. WERNER:  Object to the form.

19             THE WITNESS:  They are allowed.

20   BY MR. DELMAN:

21        Q.   And, in fact, hysterectomies generally can



 1    proceed at St. Joe's?

 2              MR. WERNER:  Object to the form.

 3              THE WITNESS:  Yes.

 4    BY MR. DELMAN:

 5         Q.   Here is another statement.

 6              Hysterectomies may be performed at

 7    St. Joseph only where the procedure is necessary to

 8    treat a life-threatening condition.

 9              MR. WERNER:  Object to the form:

10    BY MR. DELMAN:

11         Q.   Is that statement true or false?

12         A.   From an ERD perspective if, that's true, not

13    everyone would interpret some of the etiologies with

14    some of the causes for a hysterectomy as

15    life-threatening outside of the ERDs.

16         Q.   And we've discussed that there's sort of no

17    formal process in place for reviewing whether a

18    patient scheduled for a hysterectomy has a

19    life-threatening condition; right?

20              MR. WERNER:  Object to the form.  Asked and

21    answer.



```
 1              THE WITNESS:  That's correct.

 2   BY MR. DELMAN:

 3       Q.   And we've also discussed that there is no

 4   sort of documentation showing that any condition for

 5   surgery that was performed was sort of assessed to be

 6   life-threatening?

 7              MR. WERNER:  Object to the form.

 8              THE WITNESS:  Correct.

 9   BY MR. DELMAN:

10       Q.   Here's another statement.

11              St. Joseph's policy of limiting certain

12   types of surgery to those necessary to treat

13   life-threatening conditions applies to all patients

14   equally regardless of sexual orientation and/or gender

15   identify.

16              MR. WERNER:  Object to the form.

17              THE WITNESS:  Can you read the statement

18   again, please?

19   BY MR. DELMAN:

20       Q.   Of course.

21              St. Joseph's policy of limiting certain
```

