## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JESSE HAMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:20-cv-02088-DKC |
| | ) | |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) | |
| CORPORATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................1

ARGUMENT........................................................................................................2

I.      UMMS Is Entitled to Summary Judgment Because the Discrimination
        Allegedly Occurred Outside Its Health Programs and Activities. ...........................2

        A.      Hammons' "Direct Participation" Theory Is Legally and Factually
                Baseless.....................................................................................................4

        B.      Hammons' "Indirect" Liability Theory Is Also Legally and Factually
                Baseless.....................................................................................................8

II.     St. Joseph Is Entitled to Summary Judgment Because the Final Injunction in
        the District of North Dakota Bars Hammons' Claim Against It. ...............................14

III.    All Defendants Are Entitled to Summary Judgment Because the Facts Do
        Not Amount to Prohibited Discrimination Based on Sex........................................18

IV.     At Minimum, Hammons is Not Entitled to Summary Judgment in His Favor .........21

        CONCLUSION ................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ademiluyi v. Pennymac Mortg. Invest. Trust Hldgs. I, LLC*,
   929 F. Supp. 2d 502 (D. Md. 2013) .........................................................................13

*Antigua Condo. Ass'n v. Melba Investors*,
   517 A.2d 75 (Md. 1986) .............................................................................................13

*Atherton v. F.D.I.C.*,
   519 U.S. 213 (1997)..............................................................................................8, 10

*BAII Banking Corp. v. UPG, Inc.*,
   985 F.2d 685 (2d Cir. 1993).......................................................................................16

*Barnes v. Gorman*,
   536 U.S. 181 (2002)............................................................................................15, 16

*Barnhart v. Thomas*,
   540 U.S. 20 (2003)......................................................................................................31

*Bart Arconti Sons, Inc. v. Ames-Ennis, Inc.*,
   340 A.2d 225 (Md. 1975) .....................................................................................11, 13

*Bd. of Trustees v. Courtad, Inc.*,
   2014 WL 3613383 (N.D. Ohio July 18, 2014) ..........................................................8

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)....................................................................................................32

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wisc. 2018)...................................................................19

*C & H Co. v. Richardson*,
   78 F. App'x 894 (4th Cir. 2003) ...............................................................................27

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)....................................................................................................31

*Conley v. Nw. Fla. State Coll.*,
   145 F. Supp. 3d 1073 (N.D. Fla. 2015)....................................................................20

*Cummings v. Premier Keller Rehab, PLLC*,
   142 S. Ct. 1562 (2022)...................................................................................2, 5, 9, 16

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ...................................................................................2, 3, 5, 15

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ...............................................................................................20

*EEOC v. Catholic Univ.*,
  83 F.3d 455 (D.C. Cir. 1996) .....................................................................................29

*Equal Rts. Ctr. v. Equity Residential*,
  2016 WL 1258418 (D. Md. Mar. 31, 2016)...............................................................9, 10

*Fontenot v. Upjohn Co.*,
  780 F.2d 1190 (5th Cir. 1986) ...................................................................................21

*Geduldig v. Aiello*,
  417 U.S. 484 (1974).....................................................................................................19

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2010) .....................................................................................29

*Gen. Elec. Co. v. Gilberg*,
  429 U.S. 125 (1976).....................................................................................................19

*Goddard v. Apogee Retail LLC*,
  2021 WL 2589727 (D. Md. June 24, 2021) ...............................................................29

*Good v. Am. Water Works Co.*,
  2016 WL 5402230 (S.D. W. Va. Sept. 26, 2016) ......................................................4

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...............................................................................18, 19

*Gunter v. Long Island Power Auth./Keyspan*,
  2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011).............................................................28

*Hankins v. Lyght*,
  441 F.3d 96 (2d Cir. 2006)..............................................................................29, 30, 31

*Harte-Hanks Direct Mktg. v. Varilease Tech. Fin.*,
  299 F. Supp. 2d 505 (D. Md. 2004) ...........................................................................11

*Hildreth v. Tidewater Equip. Co.*,
  838 A.2d 1204 (Md. 2003) .....................................................................................12, 13

*Jennings v. Univ. of N.C. at Chapel Hill*,
  240 F. Supp. 2d 492 (M.D.N.C. 2002) .....................................................................3, 5

*Kadel v. Folwell*,
2022 WL 2106270 (M.D.N.C. June 10, 2022) ...................................................19

*Keffer v. H.K. Porter Co., Inc.*,
872 F.2d 60 (4th Cir. 1989) ...........................................................................8

*Lipsett v. Univ. of P.R.*,
864 F.2d 881 (1st Cir. 1988)...........................................................................5

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ........................................................................29

*Lozada-Leoni v. MoneyGram Int'l, Inc.*,
2020 WL 7000874 (E.D. Tex. Oct. 19, 2020) .................................................9

*Marietta Memorial Hosp. Employee Health Benefit Plan v. DaVita Inc.*,
142 S. Ct. 1968 (2022)...................................................................................20

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018)...................................................................................21

*Miller v. Strudwick*,
2018 WL 4679730 (D. Md. Sept. 28, 2018) ...........................................13, 24

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
2019 WL 5810308 (E.D. La. Nov. 7, 2019) ...................................................20

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................................31

*Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*,
138 F.3d 160 (5th Cir. 1998) .........................................................................16

*NCAA v. Smith*,
525 U.S. 459 (1999)........................................................................................15

*NFIB v. Sebelius*,
567 U.S. 519 (2012)........................................................................................10

*Northbound Grp., Inc. v. Norvax, Inc.*,
795 F.3d 647 (7th Cir. 2015) ...........................................................................4

*Olson v. Moser*,
2021 WL 6065314 (Md. Ct. Spec. App. Dec. 22, 2021) .................................11

*Palmore v. Sidoti*,
466 U.S. 429 (1984)........................................................................................31

*Pearson v. Component Tech. Corp.*,
  247 F.3d 471 (3d Cir. 2001)...............................................................................4, 7, 22

*Proctor v. Prince George's Hosp. Ctr.*,
  32 F. Supp. 2d 820 (D. Md. 1998) .................................................................................21

*Ramlall v. Mobilpro Corp.*,
  30 A.3d 1003 (Md. Ct. Spec. App. 2011) .......................................................................11

*Religious Sisters of Mercy v. Azar*,
  513 F. Supp. 3d 1113 (D.N.D. 2021) ..............................................................................17

*Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*,
  728 A.2d 783 (Md. Ct. Spec. App. 1999) ..................................................................11, 13

*Revock v. Cowpet Bay West Condo. Ass'n*,
  853 F.3d 96 (3d Cir. 2017)................................................................................................9

*Roley v. Nat'l Prof. Exchange, Inc.*,
  474 F. Supp. 3d 708 (D. Md. 2020) ................................................................................24

*Schneider Moving & Storage Co. v. Robbins*,
  466 U.S. 364 (1984) ........................................................................................................16

*Shewmake v. Badger Oil Corp.*,
  654 F. Supp. 1184 (D. Colo. 1987).................................................................................16

*Shimkus v. Gersten Cos.*,
  816 F.2d 1318 (9th Cir. 1987) ........................................................................................14

*Sikorsky Aircraft Corp. v. United States*,
  102 Fed. Cl. 38 (Fed. Cl. 2011) ......................................................................................31

*Sutton v. Providence St. Joseph Medical Ctr.*,
  192 F.3d 826 (9th Cir. 1999) ..........................................................................................30

*Taylor v. Fluor Corp.*,
  2019 WL 4727464 (D.S.C. Sept. 27, 2019).....................................................................23

*Thomas v. Peacock*,
  39 F.3d 493 (4th Cir. 1994) ..............................................................................................8

*Todd v. Xoom Energy Md., LLC*,
  2016 WL 727108 (D. Md. Feb. 22, 2016) .....................................................................4, 9

*Tolan v. Cotton*,
  572 U.S. 650 (2014)........................................................................................................21

*Torres Vargas v. Santiago Cummings*,
    149 F.3d 29 (1st Cir. 1998) ........................................................................21

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ......................................................................23

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ....................................................................................10

*United States v. Dawn Props., Inc.*,
    2016 WL 7223398 (S.D. Miss. Dec. 13, 2016) .........................................9

*Untracht v. Fikri*,
    454 F. Supp. 2d 289 (W.D. Pa. 2006) .......................................................29

*In re Young*,
    82 F.3d 1407 (8th Cir. 1996) ...............................................................29, 30

<u>Statutes</u>

42 U.S.C. §§ 2000bb-1(a), (b), (b)(1), (c) and 2(1) ............................................30, 31

42 U.S.C. § 18116(a) ...........................................................................................2, 3

<u>Other Authorities</u>

34 C.F.R. § 106.40(b) .............................................................................................20

Federal Rule of Civil Procedure 65(d)(2) ...............................................................15

*Restatement (Second) of Judgments*, § 56 .............................................................16

*Restatement (Second) of Contracts*, § 309 .......................................................16, 17

## <u>INTRODUCTION</u>

This case is ripe for summary judgment in the Defendants' favor.  Hammons' opposition and cross-motion fail to demonstrate otherwise, much less that he is entitled to that relief.

*First*, UMMS is entitled to summary judgment as a matter of law, because Hammons' allegations concern discrimination in *St. Joseph's* health program, in an alleged breach of *St. Joseph's* commitment to HHS.  Under Section 1557, the only proper defendant is the funding recipient for that allegedly discriminatory health program – namely, *St. Joseph*.  While Hammons nevertheless argues that UMMS bears direct or indirect responsibility for St. Joseph's discrimination, he ignores the Spending Clause context of Section 1557, which limits liability to the funding recipient only.  Instead, he relies on inapposite doctrines that no court has ever applied to Section 1557 or to any other Spending Clause legislation, and that are factually inapplicable to boot.

*Second*, while St. Joseph is theoretically a proper defendant, it is shielded by an injunction issued by another federal court.  Because that injunction runs against HHS, Hammons insists it does not bar a case brought by him.  But, yet again, he ignores Section 1557's unique contract-law framework, under which third-party beneficiaries of St. Joseph's promise are in privity with HHS and bound by judgments that modify the contract between the parties (*i.e.*, HHS and the funding recipients).  Hammons' fallback collateral attack on the injunction's merits is also procedurally improper.  Objections to the injunction must be raised to the issuing court, not this one.  This Court is duty bound to respect the final judgment of its sister court.

*Third*, Hammons has not proved a Section 1557 violation in any event (nor can he do so).  He equates refusal to perform gender-transition surgery with sex discrimination, but that is wrong as a matter of both common sense and Supreme Court precedent.  The critical – and undisputed –

fact is that St. Joseph would not have performed a hysterectomy on Hammons regardless of his gender identity. Under current law, this is not prohibited discrimination.

*Finally*, at minimum Hammons is not entitled to summary judgment in his favor. Apart from their legal flaws, his arguments rest on disputed facts about Defendants' policies and corporate relationships. And, in any event, St. Joseph is entitled to advance a Religious Freedom Restoration Act ("RFRA") defense at trial, further precluding summary judgment for Hammons.

For these reasons, and those set forth in Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, the Court should grant Defendants' motion and, at minimum, deny Plaintiff's cross-motion.

## ARGUMENT

### I.   UMMS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE DISCRIMINATION ALLEGEDLY OCCURRED OUTSIDE ITS HEALTH PROGRAMS AND ACTIVITIES.

Hammons' Opposition (ECF No. 105, "Hammons Br.") argues the elements of his claim while conveniently skipping over the threshold question whether UMMS is even a proper defendant. It is not. Hammons cannot properly assert a claim against UMMS because any alleged discrimination occurred outside of its health programs and activities, and Section 1557 limits remedies to the funding recipients for the allegedly discriminatory program.

Section 1557 functions as a condition on federal funding. *See Cummings v. Premier Keller Rehab, PLLC*, 142 S. Ct. 1562, 1569-70 (2022). If an entity accepts HHS funds for "any part" of its "health program or activity," it is covered by Section 1557 and promises that no individual will "be subjected to discrimination under" that "health program or activity." 42 U.S.C. § 18116(a). If unlawful discrimination occurs within a health program or activity, "the funding recipient" for that program or activity is thus liable for breach of its contract. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999). Given the contractual nature of the commitment, "*only* the

funding recipient can be liable." *Jennings v. Univ. of N.C. at Chapel Hill*, 240 F. Supp. 2d 492, 509 (M.D.N.C. 2002) (emphasis added).

In this case, both UMMS and St. Joseph receive federal funds. *See* Hammons Br. 23. Accordingly, each "entity is covered under Section 1557." *Id.* Each entity has therefore promised that its "health program or activity" will not discriminate. But the alleged discrimination here unquestionably occurred only within *St. Joseph's* "health program or activity." As Hammons alleges, his surgery was scheduled "at *St. Joseph*," but *St. Joseph's* Chief Medical Officer directed that it "could not take place at *St. Joseph*." *Id.* at 14-16 (emphasis added). Thus, because it is St. Joseph's "health program or activity" that allegedly discriminated against Hammons, he can only sue *that program's* "funding recipient" – namely, St. Joseph itself – under Section 1557. *See Davis*, 526 U.S. at 640-41; *Jennings*, 240 F. Supp. 2d at 509. Hammons alleges no discrimination in UMMS's health program or operations, and therefore has no claim against UMMS.

Hammons responds that Section 1557 "does not restrict coverage to the particular parts of an entity receiving federal funding." Hammons Br. 24. But that misses the point. It is true that the statute applies if "any part of" a health program or activity receives federal funds. 42 U.S.C. § 18116(a). Here, that means that St. Joseph's receipt of federal funds subjects *all* of St. Joseph's operations to the non-discrimination promise. The trouble for Hammons is that it also means that UMMS's receipt of federal funds extends Section 1557 no further than "all of UMMS's operations." Hammons Br. 25. Just as Section 1557 does not "restrict coverage" to "particular parts of an entity," *id.* at 24, it also does not extend liability beyond that "entity," for discrimination in *another company's* program. UMMS is therefore not liable for discrimination at St. Joseph.

Hammons nonetheless argues that UMMS is liable for *causing* St. Joseph's discrimination. That theory is mistaken. So, too, is his back-up veil-piercing theory. Both misunderstand the

governing law and misrepresent the undisputed facts.  Neither can support a Section 1557 claim against UMMS.  The Court should therefore grant summary judgment in UMMS's favor.

A.    **Hammons' "Direct Participation" Theory Is Legally and Factually Baseless.**

Hammons argues that *UMMS is liable for discrimination in *St. Joseph's* health program, because that discrimination was supposedly "rooted in" UMMS's actions.  *Id.* at 28.  Specifically, when UMMS acquired St. Joseph, it agreed that the hospital would "maintain" its Catholic heritage, and any effort by St. Joseph to abandon the ERDs "would require UMMS's approval."  *Id.* at 27.  Hammons claims that these actions and contractual powers render UMMS a direct participant in – and "directly responsible for" – St. Joseph's alleged discrimination against him.  *Id.*  This argument is incorrect both on the law *and* the facts.

1.    Starting with the law, Hammons' argument rests on a faulty premise – that liability under Section 1557 turns on who is "responsible" for the discrimination.  That is how *tort law* works; liability extends to any entity (including a parent company) that independently participated in the tort.  "[A] parent corporation is responsible for its own torts in the same way that any other business is."  *Good v. Am. Water Works Co.*, 2016 WL 5402230, at *8 (S.D. W. Va. Sept. 26, 2016).  The same rule holds for many "statutory violations."  *Id.* at *9.  For example, a parent corporation can be liable for violating labor law if it "ordered" a subsidiary "to institute an unfair labor practice."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001).

But "this theory of direct participation" does not apply "to *breaches of contract*."  *Northbound Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015) (emphasis added).  Indeed, "logic" dictates "against extending that doctrine to a breach of contract claim because to do so would 'make a corporation that is not a signatory to a contract a de facto party to the contract.' "  *Todd v. Xoom Energy Md., LLC*, 2016 WL 727108, at *7 (D. Md. Feb. 22, 2016).  No court has ever gone so far, nor should this Court.  *Id.*  Rather, the only proper defendant in a breach of

contract action is the contract's signatory, even if a third party or parent corporation somehow caused or contributed to the breach. *See id.*

Since Section 1557 is Spending Clause legislation that "amounts essentially to a contract," contract law dictates (and "limits") the "available remedies." *Cummings*, 142 S. Ct. at 1569-70. The direct participation theory of liability therefore does not apply. Instead, as the Supreme Court has held, "liability" attaches only to the "funding recipient" – the contracting party. *Davis*, 526 U.S. at 640-41. And here, it is St. Joseph that allegedly breached its contract with HHS through purported discrimination in St. Joseph's health program. Hammons' attempt to "trace[ ]" St. Joseph's alleged discrimination back to UMMS's actions (Hammons Br. 26) is thus misguided, because Section 1557 liability does not extend backwards through this sort of tort-like causal chain.

Notably, Hammons does not cite a single case applying this "direct participation" theory to Spending Clause legislation like Section 1557 or Title IX. Instead, all of his cited cases involve either common-law torts or ordinary statutory liabilities. *See* Hammons Br. 26-28. Hammons also ignores the body of caselaw that UMMS cited, in which courts have unanimously refused to extend Title IX liability to individual school officials, even if they were "directly responsible" (Hammons Br. 27) for the forbidden discrimination. *See Jennings*, 240 F. Supp. 2d at 509 (citing cases); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988) (holding a school official who "*directly* engaged in sexual harassment" would not be liable under Title IX); Defendants' Brief 12 (ECF No. 98, "Defs. Br.")(citing additional cases). Hammons' "direct participation" theory is foreclosed by this well-established authority that he understandably does not take on in his brief.

     **2.**     Even if his direct participation theory held water as a matter of law – it does not – Hammons' theory also fails on the undisputed facts. Hammons has not and cannot point to the type of conduct by UMMS that would subject it to any direct participation liability. He identifies

two sources for UMMS's supposed direct responsibility, but neither suffices, even under the legally inapposite case law that he invokes.

*First*,  UMMS's agreement to *maintain* St. Joseph's Catholic identity is different from *causing* it.  Even Hammons himself points out (albeit under case law in an entirely different context), that a parent is liable only if it "forc[es]" a subsidiary to take a particular action or acts as the "final decisionmaker" for the challenged practice.  Hammons Br. 26-27.  There is no such evidence here.  To the contrary, Hammons' own account confirms that St. Joseph followed the ERDs *long before* UMMS acquired it.  *See* Hammons Br. 7-8 (acknowledging that, "[b]efore it was purchased by UMMS, the Hospital . . . operated as a Catholic facility" and "adhered to the ERDs").  That accords with the undisputed facts: UMMS did not impose the ERDs or a Catholic identity on St. Joseph, but rather took the hospital as it found it.  *See* Cunningham Tr. 55:16-19 (ECF No. 98-9); Asobi Tr. 22:18-23:4 & 29:6-9 (ECF No. 98-6); Conover Tr. 26:4-8 (ECF No. 98-5) (indicating that St. Joseph has been a Catholic hospital since its founding).  Indeed, it was precisely because of St. Joseph's long-standing Catholic heritage that UMMS's acquisition of St. Joseph required approval from the Catholic Church, and it was the Catholic Church (not UMMS) that required St. Joseph to maintain its Catholic identity as a condition of the sale.  Cunningham Tr. 55:16-19 (ECF No 98-9); ECF No. 98-3 ("Asset Purchase Agreement"), at UMMS000000902 § 11.6 & UMMS000000916 § 12.17.  St. Joseph's continued adherence to the ERDs therefore cannot be causally linked to UMMS or the acquisition documents.

In other words, Hammons has no evidence suggesting that, but for UMMS's acquisition, St. Joseph would have abandoned the ERDs and hence performed his hysterectomy, or that UMMS imposed the ERDs on St. Joseph.  To the contrary, the evidence makes clear that UMMS has

"nothing to do" with St. Joseph's remaining a Catholic hospital.  Asobi Tr. 26:12 (ECF No. 98-6).

"[That] is between Saint Joseph's and the Archdiocese of Baltimore."  *Id.* 29:6–9.

The cases that Hammons relies on are therefore distinguishable.  For example, in *Pearson*, the Third Circuit explained that "direct" liability attaches only where "the parent has overridden the subsidiary's ordinary decision-making process and ordered it to institute an unfair labor practice, or to create discriminatory hiring policies."  247 F.3d at 487.  There is no evidence in the record that UMMS "forced" St. Joseph's adherence to its Catholic principles and the ERDs, or did so by overriding or ordering anything.  Moreover, "UMMS executives and administrators neither control nor are involved in St. Joseph's day to day affairs, including but not limited to decisions regarding the provision and scheduling of patient-specific care."  ECF No. 98-13, Defendants' Responses to Plaintiff's Second Set of Interrogatories, at 8.  It is thus entirely up to St. Joseph, not UMMS, how to apply the ERDs in its daily operations and in connection with patient care.

*Second*, Hammons also argues that UMMS is directly responsible for the conduct at issue because it has the contractual authority to *reject* certain of St. Joseph's decisions.  But the mere *existence* of that contractual authority does not prove causation in the absence of any *exercise* of that authority.  There is no evidence that St. Joseph ever sought to abandon its Catholic heritage, much less that UMMS stood in the way.  Instead, the evidence shows that St. Joseph "runs independently" within UMMS's hospital system, and determines and implements its own policies and business practices. Greskovich Tr. 57:9-20 & 83:21-84:5 (ECF No 98-10).  Crystalizing the point, when Dr. Cunningham, St. Joseph's Chief Medical Officer, was asked whether she agreed that "St. Joseph does not have the power to decide that it will no longer adhere to and operationalize the ERDs?"  Dr. Cunningham responded: "It's such an unfathomable question."  Exhibit ("Ex.") 2, Cunningham Tr. 66:17-67:4.  St. Joseph could not even fathom abandoning the ERDs or its

Catholic identity, and it in fact has not.  As a result, even if Hammons' direct participation theory were legally valid, the facts do not fit it here.

> **B.**     **Hammons' "Indirect" Liability Theory Is Also Legally and Factually Baseless.**

Hammons' alternative, veil-piercing theory – that UMMS can be held liable for St. Joseph's alleged discrimination in its capacity as a parent corporation – is also mistaken, both legally and factually.  *See* Hammons Br. 28-31.

**1.**     As an initial matter, Hammons asks this Court to impose liability on UMMS using *federal common law* veil-piercing standards, without any support that it would be proper to do so in this context.  The Supreme Court has repeatedly emphasized that cases where the creation and application of federal common law is justified are "few and restricted."  *Atherton v. F.D.I.C.*, 519 U.S. 213, 218-19 (1997) (quoting *O'Melveny & Meyers v. F.D.I.C.*, 512 U.S. 79, 87 (1994)).  Yet Hammons does nothing to show that this is such a case.  Nor does he cite any authority for the notion that federal common law (rather than Maryland law) should control veil-piercing or alter ego liability in the context of Section 1557, Title IX, or any Spending Clause legislation.

Instead of any on-point case law, Hammons relies on cases like *Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60 (4th Cir. 1989), which involves the Employee Retirement Income Security Act of 1974 ("ERISA").  Those cases have marginal relevance, however, because it is well-established that ERISA presents one of the "few and restricted" cases in which application of federal common law is appropriate.  Courts applying federal common law in ERISA cases have specifically noted that "[f]ederal common law has found a strong foothold in labor and ERISA cases, which require national uniform rules."  *Bd. of Trustees v. Courtad, Inc.*, 2014 WL 3613383, at *3 (N.D. Ohio July 18, 2014); *see also Thomas v. Peacock*, 39 F.3d 493, 503 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996).  The same cannot be said of Spending Clause legislation, where

courts have not made a similar finding or applied federal common law on issues of corporate structure.

Hammons similarly relies on *Equal Rights Center v. Equity Residential*, 2016 WL 1258418, at *3 (D. Md. Mar. 31, 2016), for the proposition that, under federal common law, a "a corporate entity may be disregarded in the interests of public convenience, fairness and equity."  Hammons Br. 29.  But, *Equal Rights Center* is a Fair Housing Act case, another area where the application of federal common law is well-established.  *See, e.g.*, *United States v. Dawn Props., Inc.*, 2016 WL 7223398, at *2 (S.D. Miss. Dec. 13, 2016); *Revock v. Cowpet Bay West Condo. Ass'n*, 853 F.3d 96, 108 (3d Cir. 2017); *Lozada-Leoni v. MoneyGram Int'l, Inc.*, 2020 WL 7000874, *20 (E.D. Tex. Oct. 19, 2020).   It is *not* a Title IX or Spending Clause legislation case.

In fact, the reasoning of *Equal Rights Center* actually explains why federal common law on veil-piercing is *not* appropriate in the Spending Clause context.  It held that, in evaluating veil-piercing for the purposes of federal statutory liability, courts must consider the purpose of the relevant statute to "determine whether the statute places importance on the corporate form."  2016 WL 1258418, at *3.  Section 1557 is Spending Clause legislation that "amounts essentially to a contract between the Government and the recipient of funds."  *Cummings*, 142 S. Ct. at 1570.  And contract law, perhaps above any other area of the law, implicitly requires respect for the corporate form.  *See Todd*, 2016 WL 727108, at *7.  As such, courts should be particularly protective of the corporate form in Spending Clause cases, and not rush to adopt a looser federal test to disregard the contractual agreement between a specific entity and the government.  This likely explains why Hammons did not find any on point case law.

Not only does Hammons fail to cite any authority; he also fails to provide any good reason why this should be one of the "few and restricted" cases warranting the creation of federal common

-9-

law.  *Atherton*, 519 U.S. at 218-19 (quoting *O'Melveny & Meyers*, 512 U.S. at 87).  "[N]ormally, when courts decide to fashion rules of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must be specifically shown. . . . Indeed, such a conflict is normally a precondition."  *Id.* at 219 (internal quotations & citations omitted).  Here, however, application of Maryland law does not conflict with the policy or interest of the Affordable Care Act, which (as Hammons identifies it) is to "increase the number of Americans covered by health insurance and decrease the cost of health care."  *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).  Maryland law already has its own state common law veil-piercing principles, and Hammons does not suggest that they create any conflict with the Affordable Care Act's federal policies or interests.

In addition, while Hammons urges the application of federal common law, he does not meaningfully address any of the federal considerations for piercing the corporate veil.  He does not substantively discuss, for example, whether St. Joseph was undercapitalized (it is not), whether UMMS usurps the functions of St. Joseph officers and directors (it does not), whether UMMS exercises "excessive control" over St. Joseph (it does not), and so on.  Greskovich Tr. 83:21-84:5 (ECF No. 98-10); Marion Tr. 15:7-9 (ECF No. 98-15); ECF No. 98-13, Defendants' Responses to Plaintiff's Second Set of Interrogatories, at 8; Pl.'s Ex. 10 (UMSJ IRS 990).  Instead, Hammons simply asserts that veil-piercing would best achieve federal policy.  But even under his preferred federal test, "there must be *some* factual circumstances suggesting an improper use of the corporate form; absent a statutory directive to the contrary, frustration of federal legislative policy alone is insufficient justification for piercing the corporate veil."  *Equal Rts. Ctr.*, 2016 WL 1258418, at *4; *cf. United States v. Bestfoods*, 524 U.S. 51, 62 (1998) (discussing "fundamental principle of corporate law" that "corporate veil may be pierced … when, inter alia, *the corporate form would*

*otherwise be misused to accomplish certain wrongful purposes, most notably fraud*" (emphasis added)).  Hammons comes nowhere close to making any such showing.

      **2.**     Presumably, Hammons seeks to avoid state law on veil piercing because "Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil." *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 728 A.2d 783, 790-91 (Md. Ct. Spec. App. 1999); *Harte-Hanks Direct Mktg. v. Varilease Tech. Fin*., 299 F. Supp. 2d 505, 514 (D. Md. 2004) (same).  Under Maryland law, a court may pierce the corporate veil "only based on fraud or proof that it is necessary to enforce a paramount equity." *Ramlall v. Mobilpro Corp.*, 30 A.3d 1003, 1009 (Md. Ct. Spec. App. 2011); *see also Bart Arconti Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 234 (Md. 1975) ("We make it clear that the rule of law in this State is that no matter how flimsily woven is the corporate curtain, it may not be flung aside except to prevent fraud or endorse a paramount equity.").  And when asking a court to pierce the corporate veil on the basis of fraud, the "burden of proof is on the one charging fraud to establish by clear, specific acts, facts that in law constitute fraud." *Ramlall*, 30 A.3d at 1010 (quoting *Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*, 458 A.2d 805, 816 (Md. 1983)).  The elements of fraud in Maryland are:

> (1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation.

*Olson v. Moser*, 2021 WL 6065314, at *5 (Md. Ct. Spec. App. Dec. 22, 2021) (quoting *Colandrea v. Colandrea*, 401 A.2d 480, 484 (Md. Ct. Spec. App. 1979)).

      Here, however, neither Hammons' pleadings nor his brief alleges *any* acts of fraud on the part of UMMS (or any other Defendant), let alone any clear or specific acts.  Having failed to make any allegations of fraud (or point to anything that even resembled it), Hammons must instead

establish that veil-piercing is necessary to enforce a paramount equity.  He cannot do so.  Although the term has no precise definition, in assessing "paramount equity" courts consider:

> (1) whether the corporation is adequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Hildreth v. Tidewater Equip. Co.*, 838 A.2d 1204, 1210 (Md. 2003).

All of these considerations weigh heavily here *against* a finding that "paramount equity" requires veil-piercing.  *See* Defs. Br. 14-15.  As outlined in Defendants' opening brief, UMMS and St. Joseph are distinct corporate entities with their own separate executive teams and corporate administrators.   *See* ECF No. 98-12, Defendants' Supplemental Response to Plaintiff's Interrogatory No. 14; ECF No. 98-13, Defendants' Responses to Plaintiff's Second Set of Interrogatories, at 7-8.  UMMS officers do not serve in executive positions at St. Joseph.  *See id*. St. Joseph conducts its own board meetings and maintains its own budget and financial statements, and also directly receives and handles its own federal funding.  *See* ECF No. 98-14 ("Operating Agreement"), at UMMS000001224; Nicholson Dec. ¶¶ 7-10 (ECF No. 98-7).   There is no evidence whatsoever that the two organizations co-mingle funds nor is there any evidence that St. Joseph would have any trouble satisfying any judgment in this case (let alone that it is insolvent). All of this remains undisputed in the factual record before this Court.

While Hammons does point to, for example, UMMS's ability to appoint two of the eighteen St. Joseph board members[1] and its ability to approve St. Joseph's annual budget, none of that is

---

[1]  Plaintiff asserts that "UMMS directly appoints two board members for St. Joseph; delegates to the Archdiocese of Baltimore the power to appoint one board member; selects St. Joseph's CEO, who holds an *ex officio* board seat; and selects all remaining board members through a nominating process."  Hammons Br. 6.  However, that is not consistent with St. Joseph's operating agreement,

enough to justify piercing the corporate veil.  Courts have declined to pierce the veil where a parent was far more involved and integrated into a subsidiary's operations.  *See, e.g., Ademiluyi v. Pennymac Mortg. Invest. Trust Hldgs. I, LLC*, 929 F. Supp. 2d 502, 516 (D. Md. 2013) (dismissing claim where allegations of day to day control of subsidiary's operations "through the direction of [the parent's] Board of Trustees and management staff" were insufficient under Maryland law to pierce corporate veil); *Antigua Condo. Ass'n v. Melba Investors*, 517 A.2d 75, 93 (Md. 1986) (declining to pierce veil when "the subsidiary corporation was the service company of the parent [company and] operated out of the offices of the parent using persons on the payroll of the parent").

Moreover, while a corporate veil may theoretically be pierced based on considerations of "paramount equity," Maryland courts have in practice refused to disregard the corporate form without a showing of *fraud* – even where a corporate form was created for the purpose of evading legal obligations.  *See Residential Warranty Corp.*, 728, A.2d at 789 ("Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil 'for reasons other than fraud' have failed in Maryland courts."); *Bart Arconti Sons, Inc.*, 340 A.2d at 234-35 (declining to pierce corporate veil, even though the principals transferred assets of the corporation and rendered it insolvent for the purpose of evading its legal obligations); *Hildreth*, 838 A.2d at 1212-13 (same).  There is no reason for the Court to deviate from that general principle here where Hammons has not identified any evidence of any fraudulent conduct, and cannot do so.[2]

---

which indicates that UMMS has the power to appoint two board members, but that all "Elected Directors" are elected by St. Joseph itself.  Operating Agreement, at UMMS000001219.

[2]  Even if Hammons had identified a sufficient factual basis to support piercing the veil under either federal or Maryland law (which he has not), summary judgment remains inappropriate.  For the veil-piercing inquiry "is inherently fact-based" and is therefore best suited for the jury.  *Miller v. Strudwick*, 2018 WL 4679730, at *7 (D. Md. Sept. 28, 2018).  *See infra* Part IV.A.

\*         \*         \*

UMMS is entitled to summary judgment because the alleged discrimination occurred outside its health programs or activities in an entirely separate and independent legal entity with its own separate stream of federal funding.  Hammons' theories that UMMS is either "directly" or "indirectly" liable for what occurred at St. Joseph are both legally and factually baseless.  That entitles UMMS to summary judgment on Hammons' claim against it.

## II.   ST. JOSEPH IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FINAL INJUNCTION IN THE DISTRICT OF NORTH DAKOTA BARS HAMMONS' CLAIM AGAINST IT.

Although St. Joseph is the proper defendant for Hammons' Section 1557 claim, his action against St. Joseph is precluded by an injunction issued by the District of North Dakota.  Hammons does not dispute that, as a member of the Catholic Benefits Association ("CBA"), St. Joseph is now protected by the express terms of that injunction.  Nor does Hammons dispute that his claim – which seeks to enforce Section 1557 to require a Catholic hospital to perform gender-transition surgery – is the type of claim the injunction precludes.  *See* Defs. Br. 17-18.  Instead, Hammons' only argues that the injunction only binds HHS, and thus has no effect on his capacity to pursue a private claim against St. Joseph.  *See* Hammons Br. 31-34.  Hammons is incorrect.

It is true, of course, that an injunction against the government generally does not preclude private litigation.  Hammons cites some cases for that undisputed point.  *E.g.*, *Shimkus v. Gersten Cos.*, 816 F.2d 1318, 1320 (9th Cir. 1987).  But St. Joseph explained why the unique context of Section 1557 – its Spending Clause framework, and the implied right of action for third-party beneficiaries of the contract between the government and the funding recipient – requires a different result.  *See* Defs. Br. 18-20.  That context gives rise to at least three reasons why Hammons is bound by the injunction against HHS.

-14-

*First*, the Supreme Court has expressly linked the implied private right of action under Title IX and other Spending Clause legislation with "the Government's enforcement authority," reading them as necessarily co-extensive. *NCAA v. Smith*, 525 U.S. 459, 467 n.5 (1999).  In other words, private plaintiffs cannot sue "to proscribe conduct that Government enforcement may not check." *Id.*  Hammons derides this as a "footnote" (Hammons Br. 33), but the Supreme Court's footnotes are binding precedent.  Regardless, the Court later repeated the same point in above-the-line text. *See Davis*, 526 U.S. at 641 (citing & quoting the *Smith* footnote).

Hammons' only *substantive* response to *Smith* and *Davis* is to argue that they do not apply here because the injunction "did not alter the scope of the federal government's *statutory authority* under Section 1557," but instead only provided "that the federal government is prohibited from *enforcing* Section 1557 in a particular manner against the particular plaintiffs."  Hammons Br. 33 (emphasis added).  Even if that elusive distinction held up, it would not help.  The Supreme Court tied the implied right of action to the scope of "the Government's *enforcement* authority," on the basis that it would be "anomalous" to allow private litigation over conduct that "Government *enforcement* may not check." *Smith*, 525 U.S. at 467 n.5 (emphasis added).  Hammons' concession that the injunction precludes HHS "from *enforcing*" Section 1557 here therefore aligns perfectly with *Smith* and *Davis* and confirms St. Joseph's point that this private lawsuit is off-limits.

*Second*, Hammons is bound by the injunction because he is in privity with HHS for these purposes.  Hammons admits that the injunction binds not only HHS, but (consistent with Federal Rule of Civil Procedure 65(d)(2)) also its privies. *See* Hammons Br. 34.  Hammons also does not dispute that, under the Supreme Court's Spending Clause framework, he is suing as part of a class of "third-party beneficiaries" of the contract between HHS and the "funding recipient." *Barnes v. Gorman*, 536 U.S. 181, 186-87 (2002).  Yet Hammons simply ignores all of the authority that St.

-15-

Joseph cited (Defs. Br. 19-20) establishing that third-party beneficiaries "must be considered in privity" with the contracting promisee, *Shewmake v. Badger Oil Corp.*, 654 F. Supp. 1184, 1187 (D. Colo. 1987), and so are "bound" by judgments between contracting parties, *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 166 (5th Cir. 1998). Secondary sources reflect the same black-letter rule. *Restatement (Second) of Judgments*, § 56 cmt. a. Accordingly, the "contract-law analogy" that the Supreme Court has long applied in this area, *Barnes*, 536 U.S. at 186, compels the conclusion that the North Dakota injunction binds Hammons too.

*Third*, principles of contract law confirm the same. The Supreme Court has repeatedly said that the "contract-law analogy" carries "implications" for "the scope of available remedies" under Spending Clause legislation. *Id.* at 187; *see also Cummings*, 142 S. Ct. at 1570 (analogy to contract law "limits the scope of available remedies"). As a matter of contract law, if a contractual promise becomes unenforceable as to the promisee, it also cannot be enforced by a third-party beneficiary. *Restatement (Second) of Contracts*, § 309; *see also Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370 (1984) (citing "general rule that the promisor may assert against the beneficiary any defense that he could assert against the promisee"). Hammons, "[a]s a third-party beneficiary" of the promise from St. Joseph to HHS, "possesse[s] no greater right to enforce [the] contract than the actual parties to the contract," *i.e.*, HHS. *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697 (2d Cir. 1993). Since HHS admittedly cannot enforce the promise, neither can Hammons.

Once again, Hammons' response is not responsive. He repeats that the injunction "has not altered the statutory scope of Section 1557," only "prevented *the government* from enforcing that contract in a particular way." Hammons Br. 34. So what? By preventing "the government" from "enforcing" St. Joseph's contractual promise in this particular way, the injunction has rendered the promise "unenforceable" as between the parties, and that "infirmity" extends to "the right of any

-16-

beneficiary." *Restatement (Second) of Contracts*, § 309(1). It does not matter *why* the promisee cannot enforce – whether due to "impracticability, public policy, non-occurrence of a condition," or other failures – the result remains that "the right of any beneficiary is to that extent discharged or modified." *Id.* § 309(2). Under these well-established legal principles, the North Dakota court's judgment that RFRA precludes HHS from enforcing Section 1557 to require CBA members (such as St. Joseph) to perform gender-transition surgeries means any obligation of St. Joseph toward Hammons is equally "discharged" and cannot be enforced by him.

For all of these reasons, the judgment in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021), operates to preclude Hammons from suing St. Joseph. This Court must respect that final judgment of a sister court, and grant summary judgment accordingly.

In a final, last-ditch effort to avoid that fate, Hammons argues that RFRA "does not apply to this case" and that St. Joseph "may not invoke a RFRA defense." Hammons Br. 35. But those arguments are misdirected here. As St. Joseph has explained (Defs. Br. 20-21), it is *not* seeking summary judgment based on RFRA. Rather, St. Joseph is seeking summary judgment based on the preclusive force of the *Religious Sisters* injunction. Hammons' arguments about RFRA are effectively an effort to attack, on the merits, the breadth of the injunction issued by the federal court in North Dakota. But as St. Joseph pointed out in its opening brief and Hammons ignores, any such disputes must be taken to the court that issued the injunction – not pursued collaterally. This Court should reject Hammons' attempt to distract from the binding injunction by quibbling with the issuing court's basis for granting it. The injunction's basis is not before this Court. It is the injunction itself that compels judgment in St. Joseph's favor.[3]

---

[3] Although St. Joseph did not *seek* summary judgment under RFRA, St. Joseph does *oppose* Hammons' motion for summary judgment by invoking a RFRA defense. On that issue and in that posture, Hammons is free to debate the merits of RFRA's application to this case. *See infra* Part

        *            *            *

In this unique context, the Government's inability to enforce a statutory funding condition precludes private plaintiffs from invoking an implied cause of action to enforce the same condition derivatively. And, whether this Court would reach the same conclusion or not, the North Dakota district court has enjoined HHS from enforcing Section 1557 to force CBA members to do gender-transition surgeries. That entitles St. Joseph to summary judgment on Hammons' claim.

## III.   ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FACTS DO NOT AMOUNT TO PROHIBITED DISCRIMINATION BASED ON SEX.

For the reasons above, both UMMS and St. Joseph are entitled to summary judgment in this case without regard to whether the facts amount to sex discrimination under Section 1557. So this Court need not reach that issue. But if it does, this Court should hold that refusing to perform gender-transition surgeries is not unlawful sex discrimination under the statute.

As Defendants predicted, Hammons' argument is that any refusal to treat gender dysphoria constitutes discrimination based on sex, because only transgender individuals suffer from gender dysphoria. *See* Hammons Br. 17-18. And, according to Hammons, St. Joseph's policy is to perform hysterectomies "for any medically indicated reason, *except* to treat gender dysphoria." *Id.* at 18. Assuming *arguendo* that factual premise (*but see infra*, Part IV.B), Hammons is wrong to condemn such a policy as a facial violation of Section 1557's antidiscrimination rule.

The fatal flaw in Hammons' theory is that he was not treated "worse than others who are similarly situated" based on his gender identity. Hammons Br. 18 (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020)). Even assuming Hammons is correct that St. Joseph will allow a hysterectomy "for any medically indicated reason, *except* to treat gender

---

IV.C. But none of that matters for this argument, based on the North Dakota injunction. And if the Court enforces the injunction, it will have no occasion to address RFRA directly.

dysphoria" (Hammons Br. 18), it is the *medical purpose of the surgery* that matters – not the sex or gender identity of the patient.  That is why, as Defendants pointed out, St. Joseph *would have* done the surgery for Hammons – regardless of his transgender status – if he had an otherwise-qualifying medical indication.  Conversely, if a cisgender woman sought a hysterectomy *without* such a medical basis, St. Joseph would have refused to perform it.  *See* Defs. Br. 25.  Hammons ventures no response to these counterfactuals, which demonstrate that Defendants' alleged policy does not discriminate based on sex, unlike cases like *Grimm*, where the defendant treated cisgender individuals differently from their similarly situated transgender counterparts.  972 F.3d at 608.

Hammons ultimately appears to concede that the alleged "discrimination" here is based on *medical diagnosis*, not *sex or gender identity*.  But he maintains that because the gender dysphoria diagnosis is linked to transgender status, discriminating against the former is discriminating against the latter.  *See* Hammons Br. 18-20.  Supreme Court authority says the opposite: treating a medical condition differently is *not* intentional sex discrimination even if only one sex is susceptible to it. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976); *Geduldig v. Aiello*, 417 U.S. 484, 496-97 & n.20 (1974).  Just as treating pregnancy differently is not discrimination based on sex even though only women become pregnant, treating gender dysphoria differently is not discrimination based on sex even though only transgender individuals suffer from it.[4]

Hammons argues that *Gilbert* was "overruled" by Congress.  Hammons Br. 19.  Not quite. The specific holding of that case was superseded by statute when Congress amended Title VII to

---

[4]  Two district courts have rejected this analogy.  *Kadel v. Folwell*, No. 19-cv-272, 2022 WL 2106270, at *21 (M.D.N.C. June 10, 2022); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999-1000 (W.D. Wisc. 2018).  Neither decision binds this Court and neither is well-reasoned.  Even if gender transitions cannot "be explained without reference to sex," *Kadel*, 2022 WL 2106270, at *21, that does not mean that refusing to perform those procedures treats transgender individuals differently from similarly situated cisgender individuals.  Both classes of individuals can access the *same* surgeries for the *same* set of qualifying medical indications.

define "sex" to include "pregnancy."  But the Supreme Court, just two months ago, cited and relied on the underlying logic of *Geduldig*, reasoning that abortion regulations are not sex discrimination even though abortion is "a medical procedure that only one sex can undergo."  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022).  In another decision that same week, the Supreme Court similarly ruled that an insurance plan's limitation on reimbursement for dialysis does not violate a statute prohibiting differential treatment of "individuals having end stage renal disease," even though dialysis is overwhelmingly used to treat end stage renal disease.  *Marietta Mem. Hosp. Employee Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968, 1973-74 (2022).

It is true, as Hammons observes, that courts have construed Title IX's prohibition on sex discrimination to cover pregnancy discrimination, despite *Geduldig* and *Gilbert*.  *See* Hammons Br. 20.  But that is because, as he belatedly mentions, the Department of Education promulgated a regulation defining sex discrimination to include pregnancy discrimination for purpose of Title IX. 34 C.F.R. § 106.40(b).  Courts have found that the agency's "interpretation of § 1681's prohibition of discrimination 'on the basis of sex' to include pregnancy discrimination is reasonable" and thus deserves deference.  *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1082 (N.D. Fla. 2015); *see also Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019) (regulation "directly addresses the issue").  There is no current Section 1557 regulation that defines sex discrimination to include discrimination based on gender dysphoria, so the Title IX pregnancy cases do not help Hammons.  And without a regulation on point, the Supreme Court's interpretation in *Gilbert* and *Geduldig* remains binding.

Finally, Hammons argues that, even if St. Joseph's policy is not facially discriminatory, it has a "discriminatory purpose."  Hammons Br. 22.  But he cites nothing in the record that suggests Defendants were motivated by "sex stereotypes," animus toward transgender individuals, or any

-20-

other improper consideration.  He points to a policy document published *by a third party* and notes by *Dr. Adashek* (who only has staffing privileges at St. Joseph) – nothing that shows the subjective intent of Defendants.  *See id.*  Ultimately, Hammons admits that St. Joseph's approach to gender transitions flows from "religious belief."  *Id.*  And, as the Supreme Court has cautioned "sincere religious beliefs" must be treated with "tolerance" and "respectful consideration," not condemned as cover for discrimination.  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729, 1732 (2018).  Hammons therefore cannot conflate religious views about a medical procedure with illicit discriminatory purpose.  On this basis too, summary judgment is proper.

## IV.   AT MINIMUM, HAMMONS IS NOT ENTITLED TO SUMMARY JUDGMENT IN HIS FAVOR

In connection with Hammons' cross-motion, the facts must be viewed in the light most favorable to Defendants.  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam).  Moreover, because Hammons is the plaintiff, the burden of obtaining summary judgment on his claim is especially high.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue," such as "because he is the plaintiff, . . . he must establish *beyond peradventure* all of the essential elements of the claim . . . to warrant judgment in his favor") (emphasis added)); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive."); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) ("[T]he court must refer to the substantive allocation of the burdens of production and persuasion to determine the nature of the presentation by each party.").  Here, even looking past the fatal legal flaws of Hammons' motion laid out above, his arguments rest on multiple sets of disputed facts that, to the extent that the Court views them as *material* to the dispute, preclude summary judgment in Hammons' favor.

**A.    Corporate Relationships.**  First, Hammons relies on disputed facts about UMMS's relationship with St. Joseph.  As it relates to his theory of "direct" liability, Hammons relies on (at best) disputed facts about whether UMMS directly "caused" or "forced" St. Joseph to discriminate and whether it was the "final decisionmaker for the challenged practice."  Hammons Br. 27 (citing *Pearson*, 247 F.3d at 487).  In support of his argument, Hammons points to the fact that UMMS, in acquiring St. Joseph signed agreements in which it promised that St. Joseph would be allowed to continue its well-established Catholic identity.[5]  *Id.* at 26-27.  But this does not prove that UMMS did, in fact, *cause* or *force* St. Joseph to discriminate against Hammons.  Rather, the facts in the record show that UMMS simply agreed to "continue with [w]hat was in place" at the time of the sale with regard to Catholic identity of St. Joseph.  Ex. 3, Greskovich Tr. 37:19-38:7.  There is no evidence in the record that St. Joseph would have abandoned its adherence to the ERDs had UMMS not acquired the hospital.  To the contrary, the evidence shows that St. Joseph views abandoning the ERDs as "unfathomable."  Ex. 2, Cunningham Tr. 66:17-67:4.  St. Joseph's Catholic identity has been ingrained in its fabric since its founding and there is no evidence that it has any intention of abandoning it (regardless of what UMMS may think about that).  *See also* Ex. 4, Asobi Tr. 19:12-17 (St. Joseph has been a Catholic hospital since its founding, which "means that the practice of medicine in that hospital has to be in line with the ethical and religious directives as put together by the United States Bishop's Conference and that hospital also has to practice medicine in line with Catholic theology and Catholic identity."); *see also id.* 39:17-43:4 (testifying St. Joseph's Catholic identity – and not UMMS – is what requires adherence to the

---

[5]  Hammons also points to deposition testimony in which witnesses (all non-lawyers) were asked to confirm that the agreements reflected the words that were read back to them.

ERDs); Riddle Tr. 43:1-44:13 (ECF No. 98-11) ("To the best of my knowledge, that would be [St. Joseph's] operating board that would make sure we were abiding by the agreement itself.").

Thus, to the extent that the Court believes this dispute is "material" (which UMMS does not), it is at the very least *disputed*. That is, whether UMMS caused and/or forced St. Joseph to discriminate is an issue of fact for the jury on this record. The cases that Hammons cites confirm as much. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (finding that evidence regarding the parent company's direct involvement in decisions relating to plaintiff's employment, participation in negotiating the agreement governing his employment, and the fact that employees were directed to report harassment to the parent, among many other facts, provided a sufficient *basis for the jury to conclude* that the two companies constitutes a single employer); *Taylor v. Fluor Corp.*, 2019 WL 4727464, at *4 (D.S.C. Sept. 27, 2019) (denying summary judgment where numerous material factual disputes existed such as whether "the policies at issue are [the parent's] corporate policies; (2) the employee reporting hotline is operated by [the parent]; (3) employees of the [ ] parent entity seamlessly transition between subsidiary entities; and (4) there are interlocking corporate directors shared by [the two corporate entities]").

As it relates to the "indirect" or veil-piercing liability theory, Hammons likewise relies on disputed facts about UMMS's level of control over St. Joseph. Even assuming that such a theory of liability is appropriate here (it is not, as discussed above), at a minimum, there is certainly no basis to pierce the corporate veil *at summary judgment* on this record. In support of his position, Hammons points to UMMS's purported control over St. Joseph, again relying largely on the transaction documents and testimony concerning non-lawyers' interpretation of them.

While UMMS has the power to appoint some directors to St. Joseph's board and approve St. Joseph's annual budgets and plan, Ex. 2, Cunningham Tr. 49:19-52:9, that is not sufficient for

the Court to grant summary judgment to Hammons on his claims on a veil-piercing theory. *See Roley v. Nat'l Prof. Exchange, Inc.*, 474 F. Supp. 3d 708, 726 (D. Md. 2020); *Miller*, 2018 WL 4679730, at \*4 (declining to pierce corporate veil where the subsidiary had "some independent reason for existence"). That is especially true given the ample record evidence that St. Joseph operates "independently" and without "direct connection" to UMMS. Marion Tr. 15:7-9 (ECF 98-15); Greskovich Tr. 83:21-84:6 (ECF No. 98-10). For example, UMMS and St. Joseph each has its own CEO and president, and St. Joseph directors do not sit on UMMS's board. Operating Agreement, at UMMS00001224. St. Joseph also conducts its own board meetings, develops its own corporate strategy, and maintains its own budget and financial records. ECF No. 98-13, Defendants' Responses to Plaintiff's Second Set of Interrogatories, at 7-8; *see also* Greskovich Tr. 57:9-20 (ECF No. 98-10) (testifying that UMMS does not sign or approve each hospital's strategic plan). Further, while Hammons points to UMMS's theoretical ability to reject any decision of St. Joseph's board, there is no record evidence that UMMS has in fact *ever* rejected or overturned a decision of St. Joseph's board.

      **B.**    **St. Joseph's Practices.** Hammons also relies on disputed facts about St. Joseph's policies and motives. Specifically, he argues that St. Joseph categorically treats gender dysphoria differently from every other condition, yet in doing so, Hammons relies on disputed facts that cannot support summary judgment. There is abundant record evidence that Hammons' surgery was not cancelled *because of* his gender dysphoria. Rather, in adherence with the ERDs, St. Joseph does not perform procedures that (1) result in "[d]irect sterilization" unless the "direct effect" of the procedure is "the cure or alleviation of a present and serious pathology and simpler treatment is not available," ECF No. 98-18 at ¶ 53; Riddle Tr. 46:5-13 (ECF No. 98-11), or (2) result in the

interference or removal of a "functional" and healthy organ unless necessary to "maintain the health or life of the person." ECF No. 98-18, at ¶ 29.

There is record evidence that these directives are applied in a gender neutral manner and without regard to any diagnosis of gender dysphoria. St. Joseph does not allow "hysterectomies for women, [or] vasectomies for men" for the purpose of sterilization. Cunningham Tr. 186:6-20 (ECF No. 98-9). In addition, a hysterectomy would only be performed if the organ no longer functioned or was diseased, or presented some other "life-threatening" condition to the patient (*e.g.*, excessive bleeding). Riddle Tr. 92:23-93:10 (ECF No 98-11) ("[I]f there's excessive bleeding that can't be stopped, you don't want somebody to bleed to death. You might have to do what was absolutely necessary to preserve their life [*i.e.*, hysterectomy] and that was what we really tried to do was preserve the patient's life whether they were male, female, transgender, whatever, to the medical staff at the hospital and certainly to me.").

There is also a dispute over whether St. Joseph's policy is to *deny* hysterectomies for gender dysphoria only, or to *perform* hysterectomies only whether there is a life-threatening condition (as that term is understood under the ERDs) *or* when an organ has a physical defect of some kind. Hammons claims that "St. Joseph routinely performs hysterectomies for any medically indicated reason, *except* to treat gender dysphoria." Hammons Br. 18. But the evidence shows otherwise. For example, if a cisgender female wanted to remove her uterus because she no longer wanted to have a period, she could not have that done at St. Joseph. Buescher Tr. 91:10-92:3 (EFC No. 98-17) ("[T]here has to be some type of diagnosis attached to the reason for hysterectomy . . . . So, if there was no diagnosis for hysterectomy – right? If a physician was queried and said, no, she just doesn't want to have periods anymore and it's a way of preventing her from having children, the answer would be no. You can't post that . . . . I can't even recall a time where someone tried.").

While this policy has the *effect* of making hysterectomies for gender reassignment impermissible, that is not the *reason* they are impermissible. "[I]f there were other medical indications, the procedure could in fact take place at St. Joe's." Ex. 2, Cunningham Tr. 219:4-7.

In other words, if a patient had a diagnosis of gender dysphoria and had a uterus that was diseased in some way or presented a life-threatening condition for the patient, then the surgery would be performed *even if* the patient was transgender. Marion Tr. 63:4-14 (ECF No. 98-15) (Q: "But if the primary reason for a hysterectomy was unrelated to the gender-affirming surgery then the hysterectomy could be performed, correct?" A: "Right. If there's another diagnosis and, you know . . . the organ was diseased, so to speak, if there was some diagnosis of abnormality then, yes, if it's something that we do hysterectomies for then we would be able to do it regardless of the patient being transgender or not."); Adashek Tr. at 99:4-8 (EFC No. 98-16) ("[I]f a woman transitioning to a man came to St. Joe's with a life threatening condition that required a hysterectomy, it could be done" at St. Joseph.); *see also* ECF No. 98-19, Defendants' Second Supplemental Response to Interrogatory No. 5, at 10 ("Based on St. Joseph's reference of the ERDs, procedures that result in sterilization, such as hysterectomies and vasectomies, and procedures for cosmetic purposes, such as those that involve the removal of or interference with the functional integrity of healthy organs, are generally disallowed and cannot proceed at St. Joseph. However, such procedures may be performed at St. Joseph where the procedure is necessary to treat a life-threatening condition. This exception applies to all patients, regardless of gender and/or gender identity."). In fact, the record shows that transgender patients have received hysterectomies at St. Joseph in the past where the uterus was diseased or presented a "life-threatening" condition. Marion Tr. 54:12-76:20 (ECF No. 98-15); Riddle Tr. 92:23-93:10 (ECF No. 98-11).

Finally, for his assertions regarding "discriminatory purpose," Hammons relies on (at best) disputed facts about St. Joseph's intent behind cancelling Hammons' surgery.  Although Hammons alleges Defendants' conduct was motivated by a discriminatory purpose, that is a highly fact-bound inquiry inappropriate for resolution on summary judgment now.  *See C & H Co. v. Richardson*, 78 F. App'x 894, 905 (4th Cir. 2003) (indicating that discriminatory intent is ordinarily a factual issue for the jury).  And the evidence actually shows that Defendants' actions were not motivated by any discrimination.  *See* Riddle Tr. 86:19-23 (ECF No. 98-11) ("The staff at the hospital does not discriminate against anyone   It's just one of those thing that we kind of went out of our way to make sure we would not discriminate against any patient that came in.").  That is at least enough to present a jury question on Hammons' theory.

In short, to the extent the Court finds any of these facts to be material to its analysis, they are genuinely disputed in the record, and therefore cannot properly be resolved on summary judgment.  Hammons' cross-motion should be denied.

C.     **RFRA Defense.**  Last, Hammons cannot overcome St. Joseph's RFRA defense at summary judgment.  Because the RFRA defense is bound up with genuinely disputed facts (as explained further below), St. Joseph did not seek summary judgment on that basis.  For the same reason, however, the availability of a potential RFRA defense for St. Joseph precludes granting summary judgment in Hammons' favor on the same grounds.

Hammons does not argue – nor can he – that there is any real dispute that St. Joseph acted based on sincere religious beliefs and that holding it liable here would seriously burden those beliefs.  Nor does Hammons contend that such a burden is the least restrictive means to advance a compelling government interest.  Those are the operative substantive elements of a RFRA defense, and they are essentially undisputed in this case.

**1.** Instead, Hammons argues that "Defendants are state entities and, therefore, may not invoke a RFRA defense." Hammons Br. 35. But only St. Joseph is invoking RFRA, and the claim that St. Joseph is a state actor is factually disputed. This Court treated "Defendants" as "a single entity for the purposes of" the motion to dismiss. (ECF No. 52 at 22.) In that context, the Court assumed the truth of Hammons' allegations and, based on those allegations, determined that "Defendants" as a whole were an arm of the state. The actual facts, however, are different, particularly with respect to subsidiaries like St. Joseph, and Hammons makes no effort to show that St. Joseph independently satisfies this Court's test for being a state actor.[6] *See* Hammons Br. 35. As shown above, there are disputed facts about UMMS's level of control over St. Joseph. *See supra* Part IV.A. Accordingly, Court cannot conclude on this record that St. Joseph is also an arm of the state as a matter of fact.

In support of his position that St. Joseph must be a state actor because it is a subsidiary of UMMS, Hammons cites only *Gunter v. Long Island Power Auth./Keyspan*, No. 08-cv-498, 2011 WL 1225791, at *7-8 (E.D.N.Y. Feb. 15, 2011). Hammons Br. 35. In addition to being an unreported case from a different circuit, *Gunter* is distinguishable on its facts. In *Gunter*, the court held that the defendant, a wholly owned subsidiary of a municipally-owned utility company, was a state actor for purposes of § 1983 because it was "*controlled* by an agency of the state." *Gunter*, 2011 WL 1225791 at *8 (emphasis added). Crucial to the court's holding was the fact that the private utility there was acquired by the municipal authority through "legislative fiat" from the New York State Legislature, as well as the fact that "all of defendant's net earnings and assets are distributed to the [state entity]." *Id.* at *7. Here, by contrast, UMMS acquired St. Joseph in a

---

[6] UMMS does not concede that it or any of its subsidiaries are state actors. However, based on this Court's determination (ECF No. 52 at 22), Defendants argue here only that the availability of a RFRA defense precludes granting Hammons' cross-motion for summary judgment.

private (*i.e.*, non-governmental) transaction and does not have the same financial involvement in St. Joseph. This case therefore highlights the factual findings that would need to be made before St. Joseph could similarly be found to be a state actor on the basis of its subsidiary status. *See Untracht v. Fikri*, 454 F. Supp. 2d 289, 320 (W.D. Pa. 2006) (holding that UPMC Health System, Inc.'s, affiliation with the University of Pittsburgh alone does not convert UPMC into a state actor).

**2.** Hammons also counters that RFRA does not provide a defense against claims brought by a private party. Hammons Br. 35. To the contrary, a plain reading of the statutory text shows that RFRA's application does not turn on whether the government is a party to the proceeding.

Initially, Hammons contends that "this Court" has already recognized – in this case – that "RFRA does not apply to litigation between private parties." Hammons Br. 35. Not so. Rather, after noting that it was perhaps not "obvious how this 'defense' would apply to a claim by a private person," this Court acknowledged that the "Fourth Circuit does not appear to have weighed in." ECF No. 81 at 7. The issue thus remains open in this Court and in this Circuit.[7]

To be sure, as Hammons points out, some Circuits wrongly hold that RFRA is inapplicable in private litigation – but three other circuits have applied RFRA in precisely that context. *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006); *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996); *EEOC v. Catholic Univ.*, 83 F.3d 455, 468-69 (D.C. Cir. 1996).

Moreover, even those Circuits that limit RFRA have suggested it might apply in cases where "the government *could* have been a party." *Listecki v. Off. Comm. of Unsecured Creditors,* 780 F.3d 731, 736 (7th Cir. 2015); *see also Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,

---

[7] In separate litigation, this Court rejected a *pro se* plaintiff's attempt to assert an affirmative cause of action under RFRA against a private party. *Goddard v. Apogee Retail LLC*, 2021 WL 2589727, at *8 (D. Md. June 24, 2021). That was correct and does not impede St. Joseph's argument here. As explained further below, RFRA offers a *defense* to federal statutory claims regardless of who enforces them; but it does not create a *cause of action* for private religious discrimination.

617 F.3d 402, 411 (6th Cir. 2010) (noting absence of "EEOC-like agency that could" have brought claim); *Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826, 831 (9th Cir. 1999) (limiting holding to "circumstances presented").  Here, HHS could pursue a claim under Section 1557; as explained, Hammons is merely a third-party beneficiary standing in HHS's shoes.  *Supra* Part II. RFRA "clearly" can be "asserted as a defense" in "action[s] brought . . . by an agency" such as HHS, and a statute's scope "cannot change depending on whether it is enforced by [a government] or an aggrieved private party."  *Hankins*, 441 F.3d at 103.  Therefore, even courts that generally decline to apply RFRA to private litigation may hesitate to follow that rule here.

Authority aside, the better reading of the statute is that RFRA is a valid defense to federal statutory liability, even in cases where the government is not a party.  RFRA's express purpose is to "guarantee application [of strict scrutiny] in *all cases* where free exercise of religion is substantially burdened." 42 U.S.C. §§ 2000bb-1(b)(1) (emphasis added).  And by its terms, RFRA applies to "*all* federal law, *and the implementation of that law*." 42 U.S.C. §§ 2000bb-1(a) & (b) (emphasis added).  When federal law purports to burden religious exercise, RFRA is triggered – regardless of who happens to be enforcing the federal law.  Here, for example, Section 1557 "is federal law, the federal courts are a branch of the United States, and [this Court's] decision in the present case would involve the implementation of federal . . . law." *Young*, 82 F.3d at 1417.  It is thus of no moment that the plaintiff here is a private individual; the "government" – through the enactment of Section 1557 and its enforcement by this Court – is burdening St. Joseph's religious exercise. *See* 42 U.S.C. §§ 2000bb-2(1) (defining "government" to include "a branch, department, agency, instrumentality, [or] official" of the United States).  That implicates RFRA.

Some courts have pointed to the statutory direction that a party may assert RFRA "as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*." 42

U.S.C. § 2000bb-1(c) (emphasis added).  But far from "narrowing" the circumstances in which a party can invoke RFRA, the latter clause is "most reasonably read as broadening" available relief by abrogating state sovereign immunity.  *Hankins*, 441 F.3d at 103.[8]  In other words, § 2000bb-1(c) allows a party to do two things: (1) "assert [a violation of RFRA] as a claim or defense in a judicial proceeding"; and (2) "obtain appropriate relief against a government," notwithstanding the usual rule of sovereign immunity.  This case involves option (1), not option (2).

To read "against a government" as modifying both preceding clauses requires "convoluted" interpretation of the text, *Hankins* 441 F.3d at 103, and contradicts "the rule of the last antecedent," *i.e.*, that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Indeed, if "relief against a government" were *all* that RFRA provided, the language allowing the statute to be used as a "defense" would make no sense: "Affirmative defenses are not claims for additional relief." *Sikorsky Aircraft Corp. v. United States*, 102 Fed. Cl. 38, 48 n.14 (Fed. Cl. 2011).

That RFRA further states that "the government" must " 'demonstrate[ ] that application of the burden' " is the least restrictive means to advance a compelling government interest likewise poses no impediment to its application.  42 U.S.C. § 2000bb-1(b).  Courts routinely require private plaintiffs to satisfy heightened scrutiny when their claims trigger constitutional defenses akin to RFRA.  *See, e.g., N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659-60 (2000); *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984).  That course is again particularly appropriate where, as here, Hammons is stepping into the shoes of HHS.

---

[8]  When originally enacted, RFRA applied to both federal and state governments; its application to the latter was struck down in *City of Boerne v. Flores*, 521 U.S. 507 (1997).

Ultimately, to limit the statute to government enforcement is not only contrary to its text but also antithetical to its purpose.  That limitation would preclude the government from burdening religious freedom when it enforces its own rules – yet allow it to burden religious freedom simply by authorizing private entities to take the lead on enforcement.  There is no reason why Congress would have imposed such an easily-circumvented and self-defeating restraint.

Accordingly, a jury would be entitled to find that RFRA protects St. Joseph from liability in this case so long as it concludes that St. Joseph is not an arm of the state, and that is a final, additional reason why Hammons cannot secure summary judgment.

## **CONCLUSION**

For these reasons, Defendants respectfully request that the Court grant their motion for summary judgment and deny Hammons' cross-motion for summary judgment.

Dated: August 15, 2022

*/s/ Denise Giraudo*
Denise Giraudo (Bar No. 29015)
Paul Werner (admitted *pro hac vice*)
Danielle Vrabie (admitted *pro hac vice*)
Imad Matini (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20036
Tel: 202-747-1906
Fax: 202-747-3933
dgiraudo@sheppardmullin.com
pwerner@sheppardmullin.com
dvrabie@sheppardmullin.com
imatini@sheppardmullin.com


Yaakov M. Roth (admitted *pro hac vice*)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel: 202-879-7658
Fax: 202-626-1700
yroth@jonesday.com

-33-

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 15, 2022, Plaintiff's counsel was served with the

foregoing document through the Court's Electronic Case Filing System.

___*/s/ Denise Giraudo*_____
Denise Giraudo
