**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**


| | | |
|---|---|---|
| JESSE HAMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-2088-DKC |
| | ) | |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................II

APPENDIX OF EXHIBITS .........................................................................................VIII

PRELIMINARY STATEMENT ........................................................................................1

I.     DEFENDANTS DISCRIMINATED AGAINST MR. HAMMONS ON THE BASIS OF SEX, IN VIOLATION OF SECTION 1557. ...................................................2

     A.     Defendants Cancelled Mr. Hammons's Surgery Pursuant to Their Policy Against Providing Gender-Affirming Care. ..............................................2

     B.     Defendants' Blanket Refusal to Provide Gender-Affirming Care Is Discrimination on the Basis of Sex..................................................................4

II.     UMMS CANNOT ESCAPE LIABILITY. ...........................................................8

     A.     UMMS's Operations Include Its Actions Regarding Its Subsidiaries. ....................8

     B.     UMMS Is Directly Liable. .......................................................................10

     C.     UMMS Is Indirectly Liable.......................................................................13

III.     THE ST. JOSEPH SUBSIDIARIES CANNOT ESCAPE LIABILITY. ..........................15

     A.     RFRA Does Not Apply to This Case.....................................................................15

     B.     Defendants' Injunction-Based Defense Fails.......................................................19

IV.     THERE ARE NO DISPUTED QUESTIONS OF FACT FOR TRIAL. ...........................20

CONCLUSION....................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Compen. Plans v. Norris*,
463 U.S. 1073 (1983) ................................................................................................4

*Atherton v. FDIC*,
519 U.S. 213 (1997) ................................................................................................14

*Billard v. Charlotte Cath. High Sch.*,
No. 3:17-CV-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ...........................16, 17, 18

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020) ...........................................................................................4, 8

*Boyden v. Conlin*,
341 F. Supp. 3d 979 (W.D. Wis. 2018) .................................................................6

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ................................................................................................18

*Conley v. Nw. Fla. State Coll.*,
145 F. Supp. 3d 1073 (N.D. Fla. 2015)..................................................................5

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
142 S. Ct. 1562 (2022)...........................................................................................11, 14

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) .................................................................................15

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................................................... *passim*

*Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc.*,
256 F. Supp. 3d 658 (W.D. Va. 2017) ..................................................................15

*Doe v. Cath. Relief Servs.*,
No. CV CCB-20-1815, 2022 WL 3083439 (D. Md. Aug. 3, 2022) ........................16

*Dole v. Shenandoah Baptist Church*,
899 F.2d 1389 (4th Cir. 1990) ..............................................................................18

*Duckett v. Fuller*,
819 F.3d 740 (4th Cir. 2016) .................................................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*EEOC v. Cath. Univ.*,
   83 F.3d 455 (D.C. Cir. 1996) ................................................................17

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ................................................................18

*Equal Rts. Ctr. v. Equity Residential*,
   No. CCB-06-1060, 2016 WL 1258418 (D. Md. Mar. 31, 2016) ......................13, 14

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ................................................................14

*Fain v. Crouch*,
   No. CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022) ......................6

*FDIC v. Cashion*,
   720 F.3d 169 (4th Cir. 2013) ................................................................2

*Fitzgerald v. Barnstable Sch. Comm.*,
   555 U.S. 246 (2009) ................................................................12

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) ................................................................5, 6

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
   617 F.3d 402 (6th Cir. 2010) ................................................................16, 17

*Gen. Elec. Co. v. Gilbert*,
   429 U.S. 125 (1976) ................................................................5, 6

*Goddard v. Apogee Retail LLC*,
   No. CV DKC 19-3269, 2021 WL 2589727 (D. Md. June 24, 2021)
   (Chasanow, J.), *appeal dismissed*, No. 21-1814, 2021 WL 6689512 (4th Cir.
   Nov. 2, 2021) ................................................................16

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
   218 F.3d 337 (4th Cir. 2000) ................................................................16

*Good v. Am. Water Works Co., Inc.*,
   No. CV 2:14-01374, 2016 WL 5402230 (S.D.W. Va. Sept. 26, 2016) ......................11

*Gunter v. Long Island Power Auth./Keyspan*,
   No. 08 CV 498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011) ......................16

*Hankins v. Lyght*,
   441 F.3d 96 (2d Cir. 2006) ................................................................16, 17, 18

**TABLE OF AUTHORITIES**
**(continued)**

<u>Page(s)</u>

*Hildreth v. Tidewater Equip. Co.*,
   378 Md. 724 (2003) ..................................................................................14

*Jennings v. Univ. of N.C. at Chapel Hill*,
   240 F. Supp. 2d 492 (M.D.N.C. 2002) ...................................................11

*Kadel v. Folwell*,
   446 F. Supp. 3d 1 (M.D.N.C. 2020) ......................................................6, 7

*Kadel v. Folwell*,
   No. 1:19CV272, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022) ............6

*Keffer v. H.K. Porter Co.*,
   872 F.2d 60 (4th Cir. 1989) ...............................................................13, 15

*Kinman v. Omaha Pub. Sch. Dist.*,
   171 F.3d 607 (8th Cir. 1999) ...................................................................11

*Lange v. Houston Cty.*,
   No. 5:19-CV-392, 2022 WL 1812306 (M.D. Ga. June 2, 2022) ...............4

*Lipsett v. Univ. of P.R.*,
   864 F.2d 881 (1st Cir. 1988) ....................................................................11

*Listeki v. Off. Comm. of Unsecured Creditors*,
   780 F.3d 731 (7th Cir. 2015) .............................................................16, 17

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*,
   142 S. Ct. 1968 (2022)........................................................................6, 7, 12

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   138 S. Ct. 1719 (2018).................................................................................8

*Mathis v. Christian Heating & Air Conditioning, Inc.*,
   158 F. Supp. 3d 317 (E.D. Pa. 2016) ........................................................17

*Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
   No. CV 19- 10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019) ...............5

*NCAA v. Smith*,
   525 U.S. 459 (1999)...................................................................................20

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001) ......................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rayburn v. Seventh–Day Adventists,*
   772 F.2d 1164 (4th Cir. 1985) ............................................................................... 18

*Religious Sisters of Mercy v. Azar,*
   513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr.
   21, 2021) ................................................................................................................. 19

*Rweyemamu v. Cote,*
   520 F.3d 198 (2d Cir. 2008) .................................................................................. 16

*Silva v. Baptist Health S. Fla., Inc.,*
   856 F.3d 824 (11th Cir. 2017) ................................................................................. 9

*Smith v. Metro. Sch. Dist. Perry Twp.,*
   128 F.3d 1014 (7th Cir. 1997) ................................................................................ 11

*Sossamon v. Texas,*
   563 U.S. 277 (2011) .......................................................................................... 1, 11

*Stanford v. Fox Coll.,*
   No. 18 C3703, 2020 WL 814865 (N.D. Ill. Feb. 19, 2020) ..................................... 5

*Starbuck v. Williamsburg James City Cty. Sch. Bd.,*
   28 F.4th 529 (4th Cir. 2022) .................................................................................. 13

*Sutton v. Providence St. Joseph Med. Ctr.,*
   192 F.3d 826 (9th Cir. 1999) ................................................................................. 17

*T. S. by & through T.M.S. v. Heart of CarDon, LLC,*
   No. 120CV01699, 2021 WL 981337 (S.D. Ind. Mar. 16, 2021), *aff'd,* 43 F.4th
   737 (7th Cir. Aug. 5, 2022) ..................................................................................... 9

*Taylor v. Sturgell,*
   553 U.S. 880 (2008) ............................................................................................... 20

*Texas v. Dep't of Lab.,*
   929 F.3d 205 (5th Cir. 2019) ................................................................................. 19

*Thomas v. Peacock,*
   39 F.3d 493 (4th Cir. 1994), *rev'd on other grounds,* 516 U.S. 349 (1996) ........... 14

*Tomei v. Parkwest Med. Ctr.,*
   No. 319CV00041, 2022 WL 703656 (E.D. Tenn. Mar. 8, 2022) .............................. 9

*United States v. Bestfoods,*
   524 U.S. 51 (1998) ................................................................................................. 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Untracht v. Fikri,*
454 F. Supp. 2d 289 (W.D. Pa. 2006)..................................................16

*In re Young,*
82 F.3d 1407 (8th Cir. 1996), *cert. granted, judgment vacated,* 521 U.S. 1114
(1997)....................................................................................17

**Statutes**

42 U.S.C. § 2000bb-1 ..........................................................17, 18

42 U.S.C. § 2000bb-3 ...............................................................18

Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-
274 § 7, 114 Stat. 803 (2000)........................................................18

**Other Authorities**

34 C.F.R. § 106.31 .....................................................................10

34 C.F.R. § 106.40 ......................................................................5

45 C.F.R. § 92.3 ..........................................................................8

## APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Keith Riddle Deposition Transcript. |
| 2 | Dr. Michael J. Marion Deposition Transcript. |
| 3 | Email from Keith Riddle to Jennifer Manlapaz and attachments, UMMS000000002-017. |
| 4 | Dr. Gail Cunningham Rule 30(b)(6) and Personal Capacity Deposition Transcript. |

Plaintiff Jesse Hammons ("Plaintiff" or "Mr. Hammons") respectfully submits this memorandum of law in further support of his motion for summary judgment, ECF No. 105, against Defendants University of Maryland Medical System Corporation ("UMMS"), UMSJ Health System, LLC ("UMSJ LLC"), and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC") (all three collectively, "Defendants"; UMSJ LLC and St. Joseph LLC collectively, "St. Joseph" or "the St. Joseph subsidiaries").

## PRELIMINARY STATEMENT

Mr. Hammons explained in his motion that Defendants have a facially discriminatory policy against providing gender-affirming care of any kind at the St. Joseph hospital, that Defendants cancelled Mr. Hammons's surgery pursuant to this policy, and that all Defendants are liable for that discrimination under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. In response, Defendants do not raise a genuine dispute of material fact: their references either are beside the point, or in fact support Plaintiff's position. The undisputed record is overwhelming clear, and Defendants' own admissions demonstrate their discriminatory policy.

Mr. Hammons also explained why all Defendants are liable under Section 1557. For their part, Defendants do not dispute that UMMS would be liable under principles that apply to typical statutory violations, but argue that those general rules should not apply to Section 1557 because it was passed under the Spending Clause. Although the Supreme Court has analogized Spending Clause legislation to contract law for purposes of determining available remedies, Defendants have no authority indicating that their various twists on the contract analogy have been accepted by a single court in the context of Spending Clause legislation. To the contrary, the Supreme Court has "been clear 'not to imply… that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.'" *Sossamon v. Texas*, 563 U.S. 277, 290 (2011) (quoting *Barnes v. Gorman*, 536 U.S. 181, 189, n.2 (2002)) (cleaned up).

1

Defendants also continue to insist that St. Joseph cannot be liable because a North Dakota court found that RFRA barred the federal government from enforcing Section 1557 to require certain parties to provide particular health insurance coverage. But RFRA does not apply to government entities such as St. Joseph, or against a private plaintiff like Mr. Hammons. And Mr. Hammons is not bound by litigation to which he was not a party.

Because Defendants fail to raise a genuine dispute of material fact, there are no questions of fact to be tried in this case. All that remains is for the Court to apply legal principles to the undisputed record. Accordingly, summary judgment in favor of Mr. Hammons is warranted.

## I.  DEFENDANTS DISCRIMINATED AGAINST MR. HAMMONS ON THE BASIS OF SEX, IN VIOLATION OF SECTION 1557.

### A.  Defendants Cancelled Mr. Hammons's Surgery Pursuant to Their Policy Against Providing Gender-Affirming Care.

Mr. Hammons set out undisputed evidence that Defendants have a blanket ban on providing gender-affirming care, and that it was this policy—and not any other post-hoc rationalization—that St. Joseph applied in refusing Mr. Hammons's hysterectomy. *See* ECF No. 105 ("Mot.") at 9-17. In response, Defendants assert that these facts are actually "disputed," and that they have a facially neutral policy against performing hysterectomies except to treat "life-threatening condition[s]" or "when an organ has a physical defect," in accordance with the Ethical & Religious Directives of the United States Conference of Catholic Bishops ("ERDs") prohibiting "direct sterilization" and interference with functional, healthy organs. *See* ECF No. 111 ("Resp.") at 24-25. But Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *FDIC v. Cashion*, 720 F.3d 169, 180-81 (4th Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). They "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* The dispositive facts in this case are not subject to any genuine dispute, and Defendants' stubborn

refusal to acknowledge undisputed facts does not create a genuine question for trial.

Defendants have failed to come forward with admissible evidence of any kind to support their assertions and defeat summary judgment. Defendants cite only to deposition testimony from Mr. Riddle for the proposition that St. Joseph will perform a hysterectomy to treat life-threatening excessive bleeding. But Mr. Riddle did not testify that the *only* permissible reason for a hysterectomy is to treat a life-threatening condition. In fact, he was unable to recall the existence of any such policy. *See* Ex. 1, Riddle Tr. at 71:18-24 ("Q: Did you ever hear of any hysterectomies not being permitted except to treat a life-threatening condition? A: I don't recall."). And testimony from Defendants' other witnesses confirms that no such policy existed. *See, e.g.*, ECF No. 105-20, Buescher Tr. 87:7-13 (unaware of any such policy); Ex. 2, Marion Tr. 33:4-36:19 (same); *see also* Mot. at 11-12, 18 (collecting evidence that St. Joseph routinely performs hysterectomies for any medically indicated reason, except to treat gender dysphoria).

Defendants also assert that St. Joseph will not perform hysterectomies or vasectomies for the purpose of sterilization, and that St. Joseph will not perform a hysterectomy for a woman with "no diagnosis" who says "she just doesn't want to have periods anymore and it's a way of preventing her from having children." Resp. at 25. But those hypotheticals are not *medically indicated reasons* for performing hysterectomies at St. Joseph or anywhere else. *See* ECF No. 105-20, Buescher Tr. 27:18-28:21; ECF No. 105-6, Cunningham Tr. 85:4-86:8; ECF No. 105-21, Adashek Tr. 123:6-17. By contrast, gender dysphoria *is* a medically indicated reason for performing hysterectomies. Mot. at 4, 14.

It is no defense for Defendants to say they will perform hysterectomies for transgender patients to treat *other* medical conditions besides gender dysphoria. *See* Resp. at 25-26. As this Court has already recognized, Defendants discriminated on the basis of transgender status because "gender dysphoria [is] a condition inextricably linked to being transgender," and Defendants

cancelled Mr. Hammons's surgery "specifically *because* it was linked to this condition." ECF No. 52 at 47. The facially discriminatory policy remains illegal even if Defendants do not discriminate against transgender patients with respect to *other* medical treatments. *See Lange v. Houston Cty.*, No. 5:19-CV-392, 2022 WL 1812306, at *14 (M.D. Ga. June 2, 2022) (rejecting argument that an employer "can lawfully refuse to pay benefits because of transgender status for some conditions as long as it pays benefits to transgender[] [people] for other services."); *cf. Ariz. Governing Comm. for Tax Deferred Annuity and Deferred Compen. Plans v. Norris*, 463 U.S. 1073, 1081 n.10 (1983) ("An employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis.").

Last, Defendants contend Mr. Hammons's allegations regarding their discriminatory intent cannot be resolved on summary judgment. Resp. at 27. But the relevant "intent" in this case is simply the "intent" to use a facially discriminatory policy. Sex discrimination occurs whenever an employer "intentionally applies sex-based rules," and "nothing in Title VII"—or Section 1557— "turns on the employer's labels or any further intentions (or motivations) for its conduct." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1745 (2020). As this Court has explained, by excluding care for "gender dysphoria, a condition inextricably linked to being transgender," Defendants "'inescapably intend[ed] to rely on sex in' [their] decisionmaking." ECF No. 52 at 46-47.

## B.    Defendants' Blanket Refusal to Provide Gender-Affirming Care Is Discrimination on the Basis of Sex.

In disputing whether the harm that Mr. Hammons suffered was inflicted "on the basis of sex," Defendants double down on their strained analogy to Supreme Court cases holding that policies discriminating based on pregnancy do not facially discriminate based on sex. *See* Resp. at 19 (citing *Geduldig v. Aiello*, 417 U.S. 484 (1974) (interpreting Equal Protection Clause); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) (interpreting Title VII)). Mr. Hammons has already

explained why that analogy is flawed for at least three reasons. *See* Mot. at 19-22.

 **First,** neither *Geduldig* nor *Gilbert* applies to Section 1557. Defendants note that *Geduldig* is still good law for purposes of analyzing pregnancy discrimination under the Equal Protection Clause. Resp. at 20 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 228, 2245-46 (2022)). But, as Plaintiff explained, *Geduldig*'s reasoning does not apply to Title VII, Title IX, or Section 1557, and *Gilbert*'s attempt to extend *Geduldig* to Title VII was quickly overruled by Congress when it passed the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). Defendants do not cite any decision purporting to resurrect *Gilbert* and extend it to Title IX or other statutes prohibiting sex discrimination. To the contrary, courts have consistently held that that Title IX prohibits discrimination based on pregnancy. *See e.g.*, *Stanford v. Fox Coll.*, No. 18 C3703, 2020 WL 814865, at *6 (N.D. Ill. Feb. 19, 2020); *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19- 10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019); *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1083-84 (N.D. Fla. 2015).

 Defendants now begrudgingly acknowledge that *Gilbert* and *Geduldig* do not apply to Title IX, and that Title IX prohibits discrimination based on pregnancy as a form of discrimination based on sex. Resp. at 20. Defendants attempt to minimize the significance of that concession by asserting that Title IX covers pregnancy solely by virtue of an implementing regulation. 34 C.F.R. § 106.40(b). But that distinction does not help Defendants because the implementing regulations for Section 1557—both past and present—also prohibit discrimination based on pregnancy. *See* Mot. at 20 n.9 (citing *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160-01, at 37179-80 (June 19, 2020) (agreeing that "Section 1557's protection against discrimination 'on the basis of sex' covers women's health issues including pregnancy, uterine cancer, and prenatal and postpartum services")).

 Because Section 1557 prohibits discrimination based on pregnancy as a form of

discrimination based on sex, the entire premise of Defendants' analogy between pregnancy and gender-affirming care fails at the outset. If Defendants are correct that discrimination against gender-affirming care should be analyzed the same way as discrimination based on pregnancy, then discrimination against gender-affirming care—like discrimination based on pregnancy—must be recognized under Section 1557 as discrimination based on sex.

*Second*, even if *Geduldig* did apply to Section 1557, the refusal to provide any form of gender-affirming treatment would still facially discriminate on the basis of sex. Three courts (including two within this Circuit) have already rejected Defendants' analogy to *Geduldig* and explained that discrimination against gender-affirming care—unlike discrimination based on pregnancy—facially constitutes sex-based discrimination even under the Fourteenth Amendment. *Fain v. Crouch*, No. CV 3:20-0740, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022); *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 3226731, at *21 (M.D.N.C. Aug. 10, 2022) (summary judgment decision); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020) (denying motion to dismiss); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999-1000 (W.D. Wis. 2018).

Pivoting away from *Gilbert*, Defendants also point to the recent Supreme Court decision in *Marietta Memorial Hospital Employee Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968 (2022), but that decision once again supports Mr. Hammons, not Defendants. The Court in *DaVita* held that an insurance plan limiting coverage for kidney dialysis did not violate a Medicare statute prohibiting primary insurers from "differentiat[ing] in the benefits it provides between individuals having end stage renal disease and other individuals covered." 142 S. Ct. at 1973. In ruling that the limitations on coverage for dialysis did not violate the Medicare statute, the Court rejected the dissent's argument "that singling out outpatient dialysis is simply a proxy for singling out individuals with end-stage renal disease because those individuals disproportionately receive outpatient dialysis." *Id.* at 1974 n.2. But it did so on the narrow grounds that the statute was

6

designed "simply [to] coordinate[] payments between group health plans and Medicare," and not to prevent discrimination against patients: "This statute is a coordination-of-benefits statute, not a traditional antidiscrimination statute." *Id.* at 1974 & n.2.

Here, Mr. Hammons does not rely on a "proxy" theory because discriminating against gender-affirming care *explicitly* discriminates based on sex. *See Kadel*, 446 F. Supp. 3d at 18 (explaining that when a policy discriminates against gender-affirming care, "[t]he characteristics of sex and gender are directly implicated; it is impossible to refer to the [policy] without referring to them"). But if "proxy" discrimination were relevant here, *DaVita* indicates that "a traditional antidiscrimination statute" such as Section 1557 would indeed prohibit exclusions of gender-affirming care that serve as a proxy for discrimination based on transgender status.

**Third,** even if Defendants' policy against providing gender-affirming care were regarded as facially neutral, the evidence unequivocally shows that it was adopted based on a religious belief that people should conform to their sex assigned at birth, and that failing to do so is "intrinsically disordered." Mot. at 9-11, 22 (collecting evidence). Defendants attempt to distract from this reality by misleadingly dismissing documents from the National Catholic Bioethics Center ("NCBC") as documents "from a third party," Resp. at 21, while ignoring the fact that St. Joseph must, pursuant to contracts signed by UMMS, adhere to the NCBC's interpretation of the ERDs, Mot. at 28 (collecting evidence). Indeed, Defendants specifically consulted the "intrinsically disordered" document when discussing whether surgery for gender dysphoria could be performed at St. Joseph. Ex. 3 (email from Riddle attaching NCBC guidance stating that "Gender Transitioning of any kind is intrinsically disordered"). Defendants also errantly discount testimony from Dr. Adashek, without acknowledging that Dr. Adashek was recounting Defendants' precise explanation to him for why Mr. Hammons's surgery was cancelled. ECF No. 105-23 at 297; ECF No. 105-21, Adashek Tr. 71:13-17; ECF No. 105-6, Cunningham Tr. 270:4-9.

7

Moreover, despite Defendants' assertions to the contrary, recognizing that Defendants' policy is discriminatory does not require the Court (or anyone else) to condemn people with sincere religious beliefs as being motivated by animus or hatred. *Contra* Resp. at 20-21. Indeed, the Supreme Court has made clear that an employer can violate Title VII by applying sex-based rules even when they do not perceive themselves to be motivated by animus or "a desire to discriminate." *Bostock*, 140 S. Ct. at 1745. Religious beliefs must be treated with respect, but it is nevertheless "[a] general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable [antidiscrimination] law." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018).

## II.    UMMS CANNOT ESCAPE LIABILITY.

Mr. Hammons explained why UMMS is directly liable for forcing St. Joseph to adhere to the ERDs, and indirectly liable for St. Joseph's actions through veil piercing. Mot. at 24-31. In response, Defendants assert that these settled principles of corporate liability do not apply to suits brought pursuant to Spending Clause legislation, because such suits are effectively suits in contract. As discussed below, Defendants provide no support for their assertions that these various extensions of the contract analogy should govern suits under Section 1557, or any other Spending Clause legislation. To the contrary, Defendants' various theories have largely been outright rejected by courts. Defendants' appeals to the contract analogy should be disregarded here.

### A.    UMMS's Operations Include Its Actions Regarding Its Subsidiaries.

As Plaintiff previously explained, because UMMS accepts federal funds, it is subject to Section 1557 in "all [its] operations," including its operations with respect to St. Joseph. 45 C.F.R. § 92.3(b), Mot. at 24-26. In response, Defendants argue that UMMS cannot be liable because St. Joseph cancelled the surgery, and Section 1557 "does not extend liability beyond [an] 'entity,' for

8

discrimination in *another company's* program." Resp. at 3. Defendants provide no support for this assertion—and the only courts to address such an argument have rejected it.

For example, in *Doe One v. CVS Pharmacy, Inc.*, the court held that Section 1557 liability "may sweep across corporate entity lines" because a parent entity's "operations" may include the operations of its subsidiaries. No. 18-CV-01031, 2022 WL 3139516, at *9 (N.D. Cal. Aug. 5, 2022). The court there reasoned that "Section 1557 was intended to reach broadly," and, that "[t]o ignore the overall interrelationship among the entities which … design and implement the allegedly discriminatory program[,] and permit the [defendant] interrelated entities to escape responsibility would exalt form over substance and impair the effectiveness of the anti-discrimination provision of the ACA." *Id.* at *9-10; *see also T. S. by & through T.M.S. v. Heart of CarDon, LLC*, No. 120CV01699, 2021 WL 981337, at *9 (S.D. Ind. Mar. 16, 2021), *aff'd*, 43 F.4th 737 (7th Cir. Aug. 5, 2022) (holding that employer and its group health plan—a separate legal entity—were subject to suit under Section 1557 for discriminatory provisions within the employer's health plan); *Tomei v. Parkwest Med. Ctr.*, No. 319CV00041, 2022 WL 703656, at *7 (E.D. Tenn. Mar. 8, 2022) (parent corporation liable under Section 1557 when a plaintiff suffered harm at a subsidiary health care facility); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 842 (11th Cir. 2017) (similar, under Rehabilitation Act).

Defendants' assertions are also undermined by *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), a case repeatedly and inexplicably invoked by Defendants in support of their arguments. In finding that schools could be held liable under Title IX for students' harassment of other students, the Court held that funding recipients could be liable for the actions of third parties, and specifically noted that Title IX regulations have long prohibited funding recipients from entering into contractual arrangements that would cause students to be subjected

to discrimination at the hands of a broad range of third parties. *See id.* at 643-44.[1] Thus, instead of supporting Defendants, *Davis* confirms that "operations" can extend to legally separate entities.

### B.    UMMS Is Directly Liable.

In his motion for summary judgment, Mr. Hammons discussed the extensive case law holding a parent corporation directly liable for causing or authorizing illegal conduct to occur at its subsidiaries. *See* Mot. at 26-28. Mr. Hammons also explained why UMMS is directly liable in this case: the undisputed record establishes that UMMS created the defendant entities UMSJ LLC and St. Joseph LLC, and, through a series of contracts, required those entities to adhere to both the ERDs and the audits of the NCBC, which regards transgender people as "intrinsically disordered" and prohibits treatment of gender dysphoria. *Id.* Thus, UMMS "forced the subsidiary to take the complained-of action," and is "specifically responsible for the … practice at issue in the litigation." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001).

In opposing summary judgment, Defendants do not dispute the well-established principles of liability recounted in Mr. Hammons's motion. Instead, Defendants assert that these principles do not apply to legislation passed pursuant to the Spending Clause because "this theory of direct participation does not apply *to breaches of contract*.'" Resp. at 4 (emphasis from Defendants). But Defendants are wrong to equate a lawsuit under Section 1557 to a literal action for breach of contract. To the contrary, the Supreme Court has emphatically stated that "our cases do not treat

---

[1] *See also* 34 C.F.R. § 106.31(b) (funding recipients may not "[a]id or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees"); 34 C.F.R. § 106.31(d) (when recipient requires students to participate in activities operated by third parties, recipient "(i) [s]hall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and (ii) [s]hall not facilitate, require, permit, or consider such participation if such action occurs").

suits under Spending Clause legislation as literal 'suits in contract,' subjecting funding recipients to whatever 'governing rules' some general federal law of contracts would supply." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1573 (2022) (cleaned up); *accord Sossamon*, 563 U.S. at 290 (quoting *Barnes*, 536 U.S. at 189, n.2) ("We have been clear 'not to imply… that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.'") (cleaned up).

Far from rejecting theories of tort liability for Spending Clause statutes, the Supreme Court has specifically applied direct liability in the context of Spending Clause legislation in *Davis*. 526 U.S. at 644 (looking to Restatement (Second) of Torts when determining covered entity's liability for discrimination inflicted by nominal third parties and setting out deliberate indifference "as a theory of direct liability" under Title IX). *Davis* analyzed whether an entity (the school board) could be held directly liable based on the acts of third parties (students); it did not relate to a parent entity's liability based on actions taken by a subsidiary. In both contexts, however, "direct liability" is simply another means of saying that an entity will be liable "for its own actions" in perpetrating a wrong, notwithstanding the involvement of others. *United States v. Bestfoods*, 524 U.S. 51, 65 (1998) (analyzing parent-subsidiary context); *see also Davis*, 526 U.S. at 645-46 ("[T]he district was directly liable for its *own* failure to act.") (emphasis in original); *Good v. Am. Water Works Co., Inc.*, No. CV 2:14-01374, 2016 WL 5402230, at *9 (S.D.W. Va. Sept. 26, 2016) ("[U]nder the 'direct' theory … a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others.").[2]

---

[2] Defendants also point to cases holding that Title IX does not attach to individual school administrators, who did not receive federal funds. *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 611 (8th Cir. 1999); *Jennings v. Univ. of N.C. at Chapel Hill*, 240 F. Supp. 2d 492, 509 (M.D.N.C. 2002); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018-21 (7th Cir. 1997); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 901 (1st Cir. 1988). These cases do not discuss

In addition to their faulty legal arguments, Defendants also attempt to raise a factual dispute with respect to whether UMMS actually caused St. Joseph to adhere to its discriminatory policy, arguing that St. Joseph adhered to the ERDs prior to UMMS's acquisition of the hospital, and "St. Joseph's continued adherence to the ERDs therefore cannot be causally linked to UMMS or the acquisition documents." Resp. at 6-7, 22-23.[3] Here, Defendants make the critical error of attributing a legal identity to the hospital building, independent of the corporations that own and operate the facility. While the *hospital* known as St. Joseph adhered to the ERDs prior to UMMS's acquisition, the defendant entities—St. Joseph LLC and UMSJ LLC—were created by UMMS as part of its acquisition of the hospital.[4] Defendants are flatly incorrect in their assertion that the defendant entities already adhered to the ERDs prior to any interaction with UMMS: the defendant entities *did not exist* until UMMS created them.

Defendants do not dispute—nor could they—that UMMS holds the authority to prevent the St. Joseph subsidiaries and the hospital from changing course, and declining to adhere to the ERDs or submit to the regular audits by the NCBC. Rather, Defendants assert that UMMS has

---

directly liability principles, and UMMS, unlike the administrators, is a corporate entity that *does* receive federal funds, rendering these cases inapt. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions … that receive federal funds … but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."). Defendants also argue that "the only proper defendant in a breach of contract action is the contract's signatory." Resp. at 4-5. Even if this spurious theory were accepted, it would fail on its own terms. As discussed, UMMS itself receives federal funding. As a result, even under Defendants' view, UMMS would simply be another "signatory" to Section 1557. *Id.*

[3] Throughout the parties' briefing, both Defendants and Plaintiff have referred to the defendant entities UMSJ LLC and St. Joseph LLC collectively as "St. Joseph."

[4] *See* ECF No. 105-7 (creation document for UMSJ LLC); ECF No. 105-8 (same, St. Joseph LLC); *see also* Ex. 4, Cunningham Tr. at 38-39 (Megan Arthur, signatory on both creation documents, served as general counsel for UMMS); ECF No. 98-8 at 1035 (Catholic Identity Agreement, noting Defendants UMSJ LLC and St. Joseph LLC are "affiliate[s] of [UMMS]," and only "upon the closing date … will become the owner[s] and operator[s]" of the hospital).

never had reason to exercise this authority, because there is no indication that the St. Joseph subsidiaries "ever sought to abandon [their] Catholic heritage, much less that UMMS stood in the way." Resp. at 7. Effectively, Defendants argue that, because the St. Joseph subsidiaries willingly discriminated, UMMS's authority is irrelevant. Defendants cite no support for this proposition, nor is it the law. *Cf. Davis*, 526 U.S. 629, 646-47 (school liable for discrimination in setting "under the school's disciplinary authority"); *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, 28 F.4th 529, 535 (4th Cir. 2022) (under *Monell*, a school board's "final policymaking authority" over particular action creates municipal liability, regardless of whether the board "participate[d] in the initial constitutional violation perpetrated by subordinates").

### C.    UMMS Is Indirectly Liable.

UMMS is also indirectly liable. As explained, under the federal common law, the proper standard is whether a corporate entity may be "disregarded in the interests of public convenience, fairness and equity," after consideration of "the specific legislative policies at issue and whether piercing the corporate veil is necessary to further those policies." *Equal Rts. Ctr. v. Equity Residential*, No. CCB-06-1060, 2016 WL 1258418, at *3 (D. Md. Mar. 31, 2016) (cleaned up) (quoting *Thomas v. Peacock*, 39 F.3d 493, 503-04 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996), & *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 27 (1st Cir. 2000)). Courts must also consider, *inter alia*, whether it would be "'fundamentally unfair' to allow [a parent] to escape liability by hiding behind [a subsidiary's] corporate existence." *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir. 1989). Because UMMS is contractually obligated to enforce a discriminatory policy through the St. Joseph subsidiaries, it would be fundamentally unfair and subversive of Section 1557's nondiscrimination provision to allow UMMS to seek shelter behind the corporate form.

Defendants sidestep this test, arbitrarily asserting that Spending Clause legislation is not

susceptible to federal veil piercing because Spending Clause legislation grants particular deference to the corporate form. But, again, this view has no support in the law; Defendant cite only a literal breach of contract case. *Todd*, 2016 WL 727108; *contra Cummings*, 142 S. Ct. at 1573 ("[S]uits under Spending Clause legislation [are not] literal 'suits in contract.'").

Defendants also rely heavily on *Atherton v. FDIC*, 519 U.S. 213 (1997), observing that the circumstances justifying application of the federal common law are "few and restricted." *Id.* at 218. But the Supreme Court's holding in *Atherton*—which concerned the source of a defendant bank's substantive liability in the wake of the Court's reformation of federal common law in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), *see Atherton*, 519 U.S. at 218—is irrelevant to UMMS's indirect liability. Because the defendant-bank's standard of care had since developed under state law, and because that standard of care did not conflict with federal law, the Court found no reason to apply the federal common law. *Id.* at 225-26. In contrast, there is no question here that Defendants' liability arises under federal law. Consequently, the Court's only remaining task is to determine "*who* is liable for [the] breach[]" of federal law. *See Thomas*, 39 F.3d at 503 (piercing the corporate veil under the federal common law). In any event, even under Maryland law, veil piercing is appropriate as a matter of "paramount equity," as UMMS would otherwise be allowed to evade its legal obligations by enforcing a discriminatory policy while hiding behind the corporate form. *See, e.g.*, *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 739 (2003).

Defendants also assert that summary judgment cannot be granted because of alleged factual disputes over UMMS's level of control over the St. Joseph subsidiaries. Resp. at 23-24. They cherry-pick certain factors they claim point in their favor, "[b]ut not all … factors need be present … and [federal veil piercing] require[s] fewer of these traditional factors." *Equal Rts. Ctr.*, 2016 WL 1258418, at *4. Defendants also ignore the evidence establishing the myriad ways in which UMMS is vested by contract with controlling authority over St. Joseph, including, *inter alia*, the

14

power to control St. Joseph's budget. *See* Mot. at 6-7, 29-30; *see also Keffer*, 872 F.2d at 65 (veil piercing supported by a parent's power over subsidiary's "purse strings"). Neither UMMS's nor St. Joseph's 30(b)(6) witnesses had "any reason to believe that UMMS no longer holds" the control enumerated in its contracts. ECF No. 105-6, Cunningham Tr. at 55:8-10; ECF No. 105-10, Greskovich Tr. at 81:11-13 ("My understanding of these agreement are they're there for a reason, and so I would assume that that happens.").[5] Indeed, Defendants themselves, who have full knowledge of UMMS's relationship with the St. Joseph subsidiaries, have not come forward with any admissible evidence showing that UMMS does *not* exercise its authority. By "fail[ing] to provide evidence establishing that the factfinder could reasonably decide in [their] favor," Defendants have failed to establish a genuine dispute of material fact. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## III.    THE ST. JOSEPH SUBSIDIARIES CANNOT ESCAPE LIABILITY.

### A.    RFRA Does Not Apply to This Case.

In a final effort to shield St. Joseph from liability, Defendants contend that Mr. Hammons—a private citizen—cannot win summary judgment against St. Joseph—a state entity—because the state actor is protected under RFRA. Defendants are wrong.

To begin, while Defendants concede that state actors cannot invoke RFRA as a defense, Defendants insist that "the claim that St. Joseph is a state actor is factually disputed," pointing to their discussion on UMMS's control over the St. Joseph subsidiaries. Resp. at 28 & n.6. But, as discussed, UMMS's contractual agreements provide an undisputed record of UMMS's control over both the St. Joseph subsidiaries generally, and the specific discriminatory policy at issue here.

---

[5] In any event, an admittedly unprepared 30(b)(6) witness cannot create a genuine issue of fact. *See* Mot. at 7. Defendants also complain that their 30(b)(6) witnesses were "non-lawyers," Resp. at 22 n.5, but "[a] Rule 30(b)(6) designee speaks for the corporation," *Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc.*, 256 F. Supp. 3d 658, 667 (W.D. Va. 2017).

Further, the state-actor inquiry is primarily a *legal* inquiry. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 344 n.7 (4th Cir. 2000) ("[T]he ultimate resolution of whether an actor was a state actor or functioning under color of law is a question of law for the court."). Defendants have failed to present any argument that this Court's prior holding is legally unsound.[6]

Regardless of St. Joseph's status as a state actor, Defendants' RFRA defense fails as a matter of law because RFRA cannot be invoked as a defense against private plaintiffs. The clear weight of Circuit authority has so held, as has this Court. *See Listeki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Doe v. Cath. Relief Servs.*, No. CV CCB-20-1815, 2022 WL 3083439, at *6 (D. Md. Aug. 3, 2022); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431, at *15 (W.D.N.C. Sept. 3, 2021); *Goddard v. Apogee Retail LLC*, No. CV DKC 19-3269, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) (Chasanow, J.), *appeal dismissed*, No. 21-1814, 2021 WL 6689512 (4th Cir. Nov. 2, 2021).

The only Court of Appeals decision to apply RFRA to a lawsuit between private parties is *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), and the Second Circuit subsequently repudiated that decision in *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2, 203-04 (2d Cir. 2008) (stating, in light of the plain text of RFRA, "we do not understand how it can apply to a suit between private parties,

---

[6] Defendants attack Mr. Hammons's citation to *Gunter v. Long Island Power Authority/Keyspan*, No. 08 CV 498 (RRM) (LB), 2011 WL 1225791 (E.D.N.Y. Feb. 15, 2011) as inapt. *See* Resp. at 28-29. But contrary to Defendants' assertions, the *Gunter* court did not rely on any factors beyond the fact that the defendant was a "wholly owned subsidiary" of a state entity in holding that the defendant was likewise a state entity. *See* 2011 WL 1225791, at *7-8 (holding that, defendant "wholly owned subsidiary of the Authority," was "controlled by an agency of the state," and therefore was a state actor itself) (cleaned up). And Defendants' sole additional citation on this issue does not discuss a parent-subsidiary relationship. *Untracht v. Fikri*, 454 F. Supp. 2d 289, 319-20 (W.D. Pa. 2006).

regardless of whether the government is capable of enforcing the statute at issue"). Defendants point to two additional circuit decisions, but neither discussed RFRA's application to private parties. Moreover, the D.C. Circuit's decision in *EEOC v. Catholic University*, 83 F.3d 455, 468-69 (D.C. Cir. 1996), was a case brought by the government as a co-plaintiff through the EEOC, and *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *cert. granted, judgment vacated*, 521 U.S. 1114 (1997), was a case brought by a court-appointed bankruptcy trustee, *see Hankins*, 441 F.3d at 103 n.4 (2d Cir. 2006) (noting that a "bankruptcy trustee is arguably 'acting under color of law' and therefore falls within the RFRA's definition of 'government'").[7] The fact of the matter is that "[i]t has now been twenty-seven years" since RFRA's enactment, "and *Hankins*, a decision questioned by district courts in the Second Circuit and the Second Circuit itself, still stands alone as the only court holding RFRA applies to private parties." *Billard*, 2021 WL 4037431, at *22.

Facing insurmountable case law, Defendants twist the statute's text. Defendants point to the statute's findings, but conveniently fail to observe that the operative text requires the government to be a party. *See* 42 U.S.C. § 2000bb-1 (providing that the "*[g]overnment* shall not substantially burden a person's exercises of religion" unless it "demonstrates" certain criteria, and that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding … against the *government*") (emphasis added). Defendants argue that because RFRA applies to "all federal law, and the implementation

---

[7] Contrary to Defendants' argument other Circuits have not accepted *Hankin*'s theory that RFRA might apply in cases where the government could have been a party. *See* Resp. at 29. Of the three cases Defendants cite here, two expressly disagree with *Hankins*'s reasoning. *See Listecki*, 780 F.3d at 737; *McGill*, 617 F.3d at 412. In the third, the Ninth Circuit implicitly rejected the argument: the complained-of action was compelled and caused by the government, but the court nonetheless held that RFRA would not attach where "Plaintiff did not bring this action against the federal government [but instead] sued a private employer," with an insufficient relationship to the government itself. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 837 (9th Cir. 1999). Other courts have rejected the argument outright. *See Billard*, 2021 WL 4037431, at *21; *Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 328 (E.D. Pa. 2016).

of that law," *id.* at § 2000bb-3(a), it is applicable whenever a federal law burdens religious exercise. But the more reasonable interpretation is that "RFRA practically acts as a modifier to every federal law, and the requirement that the government be a party simply acts as a condition that must be met in order to trigger RFRA's protections." *Billard*, 2021 WL 4037431, at *19.[8]

Defendants also argue that RFRA must apply to private plaintiffs because "[c]ourts routinely require private plaintiffs to satisfy heightened scrutiny when their claims trigger constitutional defenses akin to RFRA." *See* Resp. at 31. However, RFRA, unlike the First Amendment cases on which Defendants rely, is not a constitutional defense, and thus these cases "are irrelevant." *Billard*, 2021 WL 4037431, at *15.

For all these reasons, RFRA has no application to this case. But if RFRA did apply, Mr. Hammons's claims would survive RFRA scrutiny. In cases applying RFRA's "strict scrutiny" test, the Fourth Circuit has repeatedly held that laws prohibiting religious organizations from engaging in sex discrimination serve interests "of the highest order" and survive strict scrutiny. *See Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990); *Rayburn v. Seventh–Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985). The Sixth Circuit has also held (in a case where the government was a party) that prohibiting sex discrimination against transgender employees survives RFRA scrutiny. *See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 593 (6th Cir. 2018) ("The undisputed record demonstrates that Stephens has been and would be

---

[8] Defendants argue that Section 2000bb-1(c) should be read as an abrogation of state sovereign immunity. This reading not only ignores the rest of the statute, *see Hankins*, 441 F.3d at 114-115 (Sotomayor, C.J., dissenting), but also overlooks the amendment history. Following *City of Boerne v. Flores*, 521 U.S. 507, 508-09 (1997)—which held that RFRA does not apply to state and local governments—Congress amended those portions of RFRA that applied to state and local law. *See* Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274 § 7, 114 Stat. 803 (2000). Congress, however, did not amend any portion of Section 2000bb-1, demonstrating that section does not pertain to applying federal law to the states.

harmed by the Funeral Home's discriminatory practices in this case, and the [government] has a compelling interest in eradicating and remedying such discrimination."). If the Court revisits its earlier rulings and holds that RFRA does apply to this action, the Court should allow the parties to present further submissions on whether RFRA has been satisfied here.

### B.    Defendants' Injunction-Based Defense Fails.

Despite the overwhelming authority demonstrating that RFRA cannot apply here, Defendants continue to insist that RFRA precludes St. Joseph's liability by virtue of the injunction in *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021), *appeal filed* No. 21-1890 (8th Cir. Apr. 21, 2021). But Mr. Hammons has no relation to any of the parties in that action, and thus cannot be bound by that litigation. *See Texas v. Dep't of Lab.*, 929 F.3d 205, 213 (5th Cir. 2019) (holding that injunction prohibiting the Department of Labor from enforcing new overtime rule did not apply to private parties and did not prevent them from attempting to enforce the rule through separate litigation). Moreover, the issues barring RFRA from applying here—RFRA's ineffectiveness to claims against a government entity, and in a suit brought by a private party— were not litigated in *Religious Sisters*, and thus were never decided by that court.

Defendants concede that "an injunction against the government does not preclude private litigation." Resp. at 14. Yet they contend (once again) that the Spending Clause upends this normal rule. Defendants assert that the North Dakota injunction applies to private parties because third party beneficiaries are "in privity" with contracting parties and that "if a contractual promise becomes unenforceable as to the promisee, it also cannot be enforced by a third party beneficiary." *Id.* at 15-16. As with all their other Spending Clause arguments, Defendants have no support that the Spending Clause has actually been interpreted in this manner, and, as explained, Spending Clause suits are not literal suits in contract.

Defendants also cite *NCAA v. Smith*, 525 U.S. 459, 467 n.5 (1999), and *Davis*, 526 U.S. at

641, for the proposition that the scope of a private party's right of action under Title IX is no broader than the government's own statutory enforcement authority. Resp. at 15. But those cases simply describe the scope of the statute itself; they do not somehow replace the traditional rules of privity and issue preclusion. Moreover, *Taylor v. Sturgell*, 553 U.S. 880, 892-895 (2008), squarely forecloses Defendants' attempt to invent new exceptions to the traditional rules of privity. There, the Supreme Court "provide[d] a comprehensive synthesis of the discrete exceptions that apply in limited circumstances to the fundamental…rule that a litigant is not bound by a judgment to which she was not a party," effectively ending the "privity" inquiry for these purposes. *Duckett v. Fuller*, 819 F.3d 740, 745 (4th Cir. 2016) (quoting *Taylor*, 553 U.S. at 898) (cleaned up).

## IV.    THERE ARE NO DISPUTED QUESTIONS OF FACT FOR TRIAL.

Finally, Defendants assert that even if their motion for summary judgment is denied, there are disputed facts preventing the Court form granting summary judgment to Mr. Hammons. Rep. at 22-32. As discussed above, none of these alleged factual disputes creates a genuine question for trial. *See, supra*, Section II.B at 12-13 (undisputed contractual agreements establish that UMMS directly caused the discrimination); Section II.C at 14-15 (undisputed contractual agreements establish UMMS's control over St. Joseph); Section I.A (undisputed record demonstrates that Mr. Hammons's procedure was cancelled based on facially discriminatory policy); Section III.A (RFRA does not apply as a matter of law).

## <u>CONCLUSION</u>

For these reasons, Mr. Hammons respectfully requests that the Court grant his motion for summary judgment and deny Defendants' motion for summary judgment.


Dated: September 6, 2022

                                   Respectfully submitted,

*/s/ Louis J. Ebert*
Louis J. Ebert (Fed. Bar No. 02031)
ROSENBERG MARTIN GREENBERG, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Telephone: (410) 727-6600
Fax: (410) 727-1115
lebert@rosenbergmartin.com

Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
Abigail E. Marion (*pro hac vice*)
Jonathan S. Z. Hermann (*pro hac vice*)
Edward J. Delman (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
afischer@pbwt.com
acohen@pbwt.com
amarion@pbwt.com
jhermann@pbwt.com
edelman@pbwt.com

Joshua A. Block (*pro hac vice*)
Leslie Cooper (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2627
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

Daniel Mach (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Tel: (202) 675-2330
Fax: 202-546-0738
dmach@aclu.org

*Counsel for Plaintiff Jesse Hammons*

21