# Exhibit A

**FILED UNDER SEAL**

# EXHIBIT 3

Message

| | |
|---|---|
| **From:** | Riddle, Keith |
| **Sent:** | 1/13/2020 5:23:19 PM |
| **To:** | Manlapaz, Jennifer |
| **Subject:** | RE: Question about ERDs |
| **Attachments:** | 2017-Transgender_Issues_in_Catholic_Health_Care.pdf; Gender_Transitioning_and_Catholic_Health_Care-DiCamillo.pdf |
| **Sensitivity:** | Company Confidential |

Jen,

I am aware of the recent incident involving a surgeon who scheduled a gender-reassignment surgery here and the following "mess" which occurred.

UMSJMC does not deny care to any transgender patient who comes through the ED or is seeking non-surgical care. Not long ago a transgendered pt (female to male) delivered a baby in L&D with great care from the staff.

We have had two recent instances where a surgeon posted the surgery and then had to reverse that decision which is, I am sure, extremely hard on the patient. The surgeons who are employed by us or have privileges, sign an attestation form that they will abide by the ERDs, especially here at the hospital.

In Catholic hospitals within the Archdiocese of Baltimore, gender reassignment surgery is not permitted if it is removal of healthy organs. Within the Catholic tradition that involves both mutilation of the body and direct sterilization, both of which are prohibited by the ERDs:

ERD 29: *All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity. The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.*
By this, it means we don't remove healthy organs just to remove them. If there is a threat to the person's life, such as excessive bleeding, then it MIGHT be permitted.

ERD 53: *Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.*

We are audited by the National Catholic Bioethics Center, and are under audit right now, and they have issued several directives regarding gender reassignment surgeries. I have attached some of their statements for you.

I hope this helps a wee bit and I would be glad to meet with you at any time to discuss.

Keith

---

**From:** Manlapaz, Jennifer
**Sent:** Monday, January 13, 2020 11:09 AM
**To:** Riddle, Keith
**Subject:** Question about ERDs
**Sensitivity:** Confidential

Hi Keith,

What can you tell me about the ERDs and a transgender patient who might seek a gender-related procedure here at SJMC?

Jen

Jennifer Manlapaz, BSN, RN, RNC-NIC, CPHRM
Senior Risk Manager
University of Maryland St. Joseph Medical Center
7601 Osler Drive
Towson, Maryland 21204

Maryland Medicine Comprehensive Insurance Program
250 W. Pratt Street, Suite 1200
Baltimore, MD 21201

PLEASE SEND ALL REQUESTS FOR CERTIFICATES AND CLAIMS HISTORIES TO: 



UNIVERSITY of MARYLAND
MARYLAND MEDICINE COMPREHENSIVE
INSURANCE PROGRAM

This message and all contents contain information from the office of Maryland Medicine Comprehensive Insurance Program, which may be privileged, confidential or otherwise, protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copy, distribution or use of the contents of this message is prohibited. If you have received this message in error, please notify us immediately (410-328-4704) and destroy the original message and all copies.

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

This e-mail and any accompanying attachments may be privileged, confidential, contain protected health information about an identified patient or be otherwise protected from disclosure. State and federal law protect the confidentiality of this information. If the reader of this message is not the intended recipient, you are prohibited from using, disclosing, reproducing or distributing this information; you should immediately notify the sender by telephone or e-mail and delete this e-mail.



# THE NATIONAL CATHOLIC BIOETHICS CENTER

## TRANSGENDER ISSUES IN CATHOLIC HEALTH CARE

*PREPARED BY THE ETHICISTS OF THE NCBC*
*FEBRUARY 2017*

---

"All persons served by Catholic health care have the right and duty
to protect and preserve their bodily and functional integrity. ...
The well-being of the whole person must be taken into account in deciding
about any therapeutic intervention or use of technology."
— USCCB, *Ethical and Religious Directives for Catholic Health Care Services*, 5th ed. (2009), nn. 29, 33.

---

## SUMMARY

Legitimate health concerns surrounding gender dysphoria and disorders of sexual development have been utilized to promote "gender transitioning," whereby persons of an unambiguous biological sex intend to "change" their behaviors and bodies to match a perceived, subjective sexual identity.

**Gender Transitioning Interventions:**
**Behavioral, Hormonal, and Surgical**

- *Gender transitioning* of any kind is intrinsically disordered, because it cannot conform to the true good of the human person, who is a body–soul union unalterably created male or female. Gender transitioning should never be performed, encouraged, or positively affirmed as a good in Catholic health care. This includes surgeries, the administration of cross-sex hormones or pubertal blockers, and social or behavioral modifications.

- *Direct mutilation* of healthy, functioning reproductive organs without a proportionate benefit is intrinsically immoral and very grave. Such surgical interventions should never be performed by Catholic physicians or health care entities.

**Cooperation with Evil:**
**Maintenance, Referral, Coverage, Policies, and Mandates**

- *Maintenance* of cross-sex hormone regimens or other transitioning interventions by Catholic physicians or at Catholic health care facilities—even if a patient is being treated for unrelated reasons—amounts to formal cooperation with gender transitioning and is immoral.

- *Referrals* for gender transitioning, and policies requiring such referrals to ensure patient access, amount to formal cooperation with such interventions and are immoral.

- *Insurance coverage* for gender transitioning in a Catholic organization's own insurance product or self-insured health care insurance amounts to formal cooperation and is immoral.

- *Policies* requiring affirmation of a "transitioning" person's perceived gender identity, including access to sex-specific facilities and services, amount to formal cooperation with gender transitioning and are immoral.

- *Government mandates* do not alter the immorality of gender transitioning interventions, maintenance, referrals, self-funded or owned insurance, and affirmation policies. Exemptions should be sought and litigation may be appropriate in response to unjust legal coercion.

For further information, visit the NCBC website at www.ncbcenter.org.
To request a consultation, e-mail consults@ncbcenter.org or call 215-877-2660.

CONFIDENTIAL                                                                                                       UMMS000000004

## FAQs

**Question 1.** Our Catholic hospital does not allow sex reassignment surgeries affecting the genitalia, since this would violate the prohibition on sterilization in directive 53 of the *ERDs*. We do allow double mastectomies, voice alterations, and other non-sterilizing interventions for persons who are transitioning. Is this acceptable?

*Reply:* No. While it is true that "bottom surgeries" result in sterilization by destroying healthy genitalia, any transitioning intervention is intrinsically disordered because it entails a rejection of the person's actual sexual identity in favor of a falsification. This can never serve the good of the whole person, so even less drastic surgical and hormonal transitioning procedures remain unacceptable for Catholic health care.

**Question 2.** In light of regulatory prohibitions on gender identity discrimination, our Catholic health system plans to require employees to address transgender patients with preferred pronouns, put them in rooms with other patients of their claimed sex, and grant them access to bathrooms for the claimed sex. It will not, however, perform or refer for any gender transitioning interventions at all. Is this an appropriate response?

*Reply:* The stance against all gender transitioning interventions is morally appropriate and obligatory. However, requiring "gender affirmation" of all employees by way of policy is not appropriate. Your system would be implicitly approving of and contributing to the falsehood of gender transitioning in this manner.

**Question 3.** Our Catholic organization is committed to maintaining professional standards of medicine. There are standards of care for the gender transitioning process. On what grounds can we prohibit gender transitioning when it is acknowledged as a good by major medical associations and even has accepted standards?

*Reply:* First, the data on gender transitioning do not support the claim that it is therapeutic. In fact, some medical associations make the opposing claim, that gender transitioning is harmful. Second, regardless of outcome data, male or female sexual identity is established in the human person at the time of his or her creation and cannot be changed. No amount of data or claims by medical associations can alter this.

**Question 4.** A male-to-female transgender patient who had sex reassignment surgery elsewhere was admitted to our emergency room following a car accident and needs to be kept several days for treatment. The patient has been on a regimen of female hormones to maintain the transition. The patient wants to continue the regimen to avoid interruptions. Can we allow this?

*Reply:* No. Maintenance entails approval by the physician writing orders, and makes those who administer the drugs principal agents in the transitioning. However, if cessation of the hormones would cause serious physical harm, providing a dosage necessary to avoid the harm could be legitimate.

## Resources

R. P. Fitzgibbons, P. M. Sutton, and D. O'Leary, "The Psychopathology of 'Sex Reassignment' Surgery," *National Catholic Bioethics Quarterly* 9.1 (Spring 2009): 97–125, doi: 10.5840/ncbq20099183.

C. Dhejne et al., "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS ONE* 6.2 (2011): e16885, doi: 10.1371/journal.pone.0016885.

The National Catholic Bioethics Center
6399 Drexel Road, Philadelphia, PA 19151 • 215.877.2660
www.ncbcenter.org

CONFIDENTIAL

UMMS000000005

# Gender Transitioning and Catholic Health Care

## John A. Di Camillo

*Abstract.* This essay discusses basic concepts that Catholic health care ministries should understand concerning so-called gender-transitioning interventions. Since genuine healing encompasses the whole person, transgender issues must be addressed in the full realistic terms of a body–soul union not merely in relation to experienced desires and feasible physiological modifications. For necessary clarity, the essay explains key distinctions between the terms *disorders of sex development, gender dysphoria,* and *transgender.* It argues that only bodily acceptance efforts can offer authentic healing in response to gender dysphoria, while all forms of gender transitioning, from psychological counseling to cross-sex hormones and surgical "reassignment," always contradict the good of the whole person. The essay concludes by emphasizing the significance of the educational role of Catholic health care and its call to witness even in the face of problematic recommendations by respected medical associations. *National Catholic Bioethics Quarterly* 17.2 (Summer 2017): 213–223.

Catholic health care is more than just the provision of standard health care services by organizations that happen to be Catholic. It is a work of the Church herself, an exercise of her ministry of charity. In his encyclical *Deus caritas est,* Pope Emeritus Benedict XVI calls it "a part of her nature, an indispensable expression of her very being."[1] As such, it is not merely a form of social welfare like any other, blithely

---

John A. Di Camillo, PhD, BeL, is a staff ethicist at The National Catholic Bioethics Center. This essay is the lightly modified and edited text of a paper titled "Transgender Issues in Catholic Health Care," presented February 7, 2017, at the Twenty-Sixth NCBC Workshop for Bishops in Irving, Texas.

The views expressed in the *NCBQ* do not necessarily represent those of the editor, the editorial board, the ethicists, or the staff of The National Catholic Bioethics Center.

© 2017 The National Catholic Bioethics Center           213

CONFIDENTIAL                                                                UMMS000000006

following the diktats of prevailing cultural norms, medical standards, or human laws. Benedict XVI reiterates that the agency of the Church herself works within Catholic organizations, calling them "an *opus proprium*, a task agreeable to her, in which she does not cooperate collaterally, but acts as a subject with direct responsibility, doing what corresponds to her nature."[2]

Pope Francis has applied this profound truth about the interconnectedness of the Church and her health care ministry to the concept of healing with his often-cited image of the field hospital: "I see clearly ... that the thing the church needs most today is the ability to heal wounds and to warm the hearts of the faithful; it needs nearness, proximity. I see the church as a field hospital after battle. It is useless to ask a seriously injured person if he has high cholesterol and about the level of his blood sugars! You have to heal his wounds. Then we can talk about everything else. Heal the wounds, heal the wounds. ... And you have to start from the ground up."[3] There is little question that Francis wants to draw our attention to something deeper than physical healing. We should not even be thinking about so-called gender transitioning unless we have begun healing a person's spiritual wounds, laying the foundation for any further intervention.

### Defining the Terms of the Discussion

We properly approach transgender issues in Catholic health care with two points in mind: First, the fullness of the Church's life, including her sacraments and all her teachings about the human person, is inseparable from Catholic health care ministry. Second, Christian charitable care requires attention to deeper personal wounds. Given the complexities, ambiguities, and ideological agendas affecting this topic, it cannot be stressed enough that charity demands truth. It is crucial be clear about the facts, so we turn our attention to some key terms and their meanings.

In the current cultural context, gender ideology has thrown out the gingerbread man, replacing him with the gender-neutral "genderbread person" to pictorially explain the four distinctions it applies to human sexuality: (1) *gender identity*, which is the gender I define myself as; (2) *gender expression*, which is the gender I present socially, including gender-typical clothing or behaviors; (3) *biological sex*, which refers to my chromosomes, anatomy, and other physical characteristics; and (4) *sexual orientation*, which indicates the gender identity, expression, or biological sex to which I am attracted either romantically or sexually.[4]

---

1. Benedict XVI, *Deus caritas est* (December 25, 2005), n. 25.
2. Ibid., n. 29.
3. Francis, interviewed by Antonio Spadaro, August 2013, in "A Big Heart Open to God: An Interview with Pope Francis," *America* 209.8 (September 30, 2013), http://www.americamagazine.org/.
4. Sam Killermann, "The Genderbread Person v3," *It's Pronounced Metrosexual*, accessed June 8, 2017, http://itspronouncedmetrosexual.com/. The website includes a pictorial representation of the most recent version of the genderbread person as well as explanations by the creator and links to previous versions. The genderbread person is also included in

CONFIDENTIAL                                                                                                UMMS000000007

All of these terms are subjective to some extent. With the exception of *biological sex*, they do not describe fixed, innate properties. The usage of any of them involves inconsistency and ambiguity. Even the apparently objective term *biological sex*, for example, is represented in a way that misleadingly suggests that chromosomal disorders and genital ambiguity help establish a continuum of different sexes between male and female, when these situations are more accurately described as disorders of sex development. So these terms are not settled science, much less a basis for medical or moral assessment. However, they do effectively convey the concepts basic to discussions of transgender issues.

Three more terms are essential for discussing these issues: *disorders of sex development*, *gender dysphoria*, and *transgender*. Disorders of sex development are objectively verifiable medical diagnoses that could involve chromosomal deviations from the normal male (XY) and female (XX) genotypes or some in utero interference with the sex development of a chromosomally normal child. Such disorders can result in ambiguous genitalia or other poorly defined sex characteristics. Consequently, they are also known as intersex conditions. They do not reflect a new or different sex but an error in development. Biologically, sex is determined by reproductive role, which is understood most essentially in terms of the two gametes: sperm and ova. No intersex condition introduces a new type of gamete; in fact, most people with serious intersex conditions are infertile. There is no third biological sex.

Gender dysphoria is a psychiatric diagnosis described in the fifth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-5*). The term is less objective than "disorder of sex development": the diagnosis depends on a psychiatrist's judgment based on interactions with the person. Nonetheless, it has very specific criteria that we will examine in a moment. Most importantly, a diagnosis of gender dysphoria typically excludes disorders of sex development. In uncommon cases where it does occur with a disorder of sex development, it warrants a distinct classification.[5]

This point cannot be stressed carefully enough: a person with ambiguous sex characteristics, as can happen with a disorder of sex development, typically is not diagnosed with gender dysphoria. Gender dysphoria presumes in most cases that the person's actual bodily sex is clear and accurate. The person only thinks he is, or desires to be, the other sex. In fact, prior to the publication of *DSM-5* in 2013, the same symptoms were diagnosed as gender identity disorder, which more readily denoted the problematic nature of a mental experience at odds with an indisputable bodily sex, and even required the exclusion of disorders of sex development.[6] Now it is called dysphoria, suggesting that the problem is not the person's cross-gender

---

Sam Killermann, *A Guide to Gender: The Social Justice Advocate's Handbook*, 2nd ed. (Austin, TX: Impetus Books, 2017).

    5. See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 5th ed. (Arlington, VA: APA, 2013), 455–456. Hereafter, *DSM-5*.

    6. See APA, *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed. with text revisions (*DSM-IV-TR*) (Washington, DC: APA, 2000), 533.

CONFIDENTIAL

UMMS000000008

identification as such but rather the distress he experiences, moving the focus away from the underlying cause and onto the symptoms.

Finally, we have the term *transgender*. Unlike the other two, this is not a diagnosis. Consequently, its meaning is more ambiguous, and the word is used in different ways by different people. The American Psychological Association offers the following definition: *transgender* is "an adjective that is an umbrella term used to describe the full range of people whose gender identity and/or gender role do not conform to what is typically associated with their sex assigned at birth."[7] This could include people who do not have an intersex condition but have been diagnosed with gender dysphoria, or people with ambiguous genitalia at birth who were incorrectly identified, and people with a clear biological sex who simply do not meet the cultural expectations of how men and women should dress and behave. It could include girls who are considered tomboys and boys who are particularly "sensitive," neither of which implies any problem with sexual identification.

So we need to be very careful when using the term *transgender*, because it can mean a great deal more than we might think it does. We should be very clear about whether an individual has been diagnosed with a disorder of sex development or gender dysphoria or whether he simply does not conform to cultural expectations, holds some cross-gender desires and beliefs, or has self-applied a transgender label.

Keeping in mind this caveat about the dangers of the term *transgender*, we can still acknowledge that most people use the word to mean something similar to gender dysphoria, namely, having a clearly identified bodily sex but thinking that it is somehow the "wrong" body. In simple terms, it is feeling like a man trapped in a woman's body or vice versa, regardless of any official diagnosis of gender dysphoria. All who are diagnosed with gender dysphoria without a disorder of sex development might claim to be transgender, but not all who claim to be transgender are diagnosed with gender dysphoria.

Understanding gender dysphoria more precisely can give us insight into this common understanding of transgender. According to *DSM-5*, gender dysphoria is a discrepancy between "experienced gender" and "assigned gender" that lasts more than six months and causes significant distress or social impairment.[8] So if I have been experiencing such a discrepancy for less than six months, I would not be diagnosed with dysphoria, but I might consider myself transgender. Even if it has been longer than six months, I would not be diagnosed without evidence of significant social impairment: if I am not anxious or distressed about being a man who thinks he is a woman, I could consider myself transgender without qualifying for the diagnosis of gender dysphoria.

---

7. American Psychological Association, "Guidelines for Psychological Practice with Transgender and Gender Nonconforming People," *American Psychologist* 70.9 (December 2015): 863, doi: 10.1037/a0039906.

8. *DSM-5*, 452–453. Part of this section is available online at "What Is Gender Dysphoria?," APA, reviewed February 2016, https://www.psychiatry.org/.

CONFIDENTIAL

UMMS000000009

Additionally, a diagnosis of gender dysphoria in an adult requires that the person meet at least two of six criteria.[9] The first reiterates the experience of a marked incongruence between mind and body. The other five are more telling and enumerate specific desires and convictions about sex characteristics and gender. All six criteria place the diagnosis clearly in the realm of feelings and beliefs—emotions and the mind—even at this very technical level.

Reflecting on this, we can say that the concept of transgender relies on a crucial anthropological premise: the biological sex of the body is not necessary to establish the sexual identity of a person. With or without a diagnosis of gender dysphoria, desires and beliefs take precedence over an objectively identifiable bodily reality. In this light, it may be helpful to talk of experiencing "transgender desires" or holding "transgender beliefs" which seem to fit the criteria for gender dysphoria. This avoids potentially misleading language about being a "transgender person," which implies anthropological assumptions about the origins of the desires and beliefs as being somehow innate, fixed, and inherently bound up with a person's identity.

### Health Care Responses to Transgenderism

What sorts of interventions are proposed for people with transgender desires and beliefs? If we are talking about a person without either a disorder of sex development or a diagnosis of gender dysphoria, the first reasonable response would be to prevent such desires and beliefs from reaching the level of gender dysphoria. This could mean simply waiting for them to resolve during adolescent development or intervening through corrective counseling or psychotherapy to help the person accept his or her bodily sex.[10] This, however, is not the standard approach right now. The typical response is so-called gender affirmation, perhaps more accurately called transgender affirmation, which means encouraging the adult or child to seriously question his or her sexual identity and supporting any gender-nonconforming thoughts or feelings. This might help distinguish a diagnosis of gender dysphoria, but it might also precipitate the condition when it could have been prevented.

If the transgender beliefs and desires fit the criteria for gender dysphoria, there are two basic tracks for medical intervention that can be delineated on the basis of their aims: expectant waiting or corrective psychotherapy to encourage acceptance of one's body, or so-called gender transitioning to ease anxiety, depression, and other social impairments. Gender transitioning has four tiers, each of which comes in different modalities and degrees, listed here from the least to the most invasive: (1) gender-affirming psychotherapy to foster and encourage transgender desires and beliefs, which can begin even before gender dysphoria is diagnosed; (2) gender adaptation to take on the social role, behaviors, pronouns, and clothing of the opposite gender; (3) pharmacological regimens like testosterone and estrogen to make the body better simulate that of the opposite sex; and (4) so-called sex reassignment surgery to mechanically alter bodily structures, especially breasts and genitals.

---

9. Ibid.

10. The term "corrective" is used here as a generic adjective meaning efforts to eliminate or mitigate the desires and beliefs in question.

Prestigious medical associations now promote gender transitioning in some form. In 2015, the American Psychological Association published guidelines "to assist psychologists in the provision of ... trans-affirmative psychological practice."[11] The American Academy of Pediatrics has also weighed in, given that gender affirmation may begin as early as age four, with hormonal interference at puberty and surgeries as early as age sixteen. The AAP Committee on Adolescence recommends that "pediatricians should be available to ... provide the context that being LGBTQ is normal, just different," and "transgender adolescents need to be supported and affirmed; they need education and referral for the process of transition."[12] The American Psychiatric Association announced that pharmacological and surgical transitioning can be medically necessary and beneficial to people with transgender beliefs, should be covered by public and private health insurance, and should not be categorically excluded from such coverage.[13] The association did not limit the scope of this position with its own diagnostic term "gender dysphoria"; rather, it talked about treatment access and coverage for "transgender and gender variant individuals" generally.

This should remind us that medical associations are not guaranteed to be objective arbiters of scientific facts. If physicians are not operating with the proper understanding of the human person, they can present harmful interventions as therapeutic needs. In fact, the existing data on gender-transitioning outcomes do not support the affirmation of transgender beliefs and desires, much less body-altering hormonal or surgical interventions. Over the past forty years, while some studies indicate improvements in self-reported satisfaction or well-being following surgical intervention, most find no statistically significant improvements in underlying mental, behavioral, and social health problems like depression, anxiety, suicide, and substance abuse, and several reflect significant increases in suicide.[14]

If we think for a moment beyond statistics to look at medical concepts, we also see that the medical world is well acquainted with similar afflictions that it does not hesitate to call disorders. Anorexia nervosa involves a severe discrepancy between the objective reality of the body and the person's radical misperception of it, or a

---

11. American Psychological Association, "Guidelines for Psychological Practice," 832–833.

12. American Academy of Pediatrics Committee on Adolescence, "Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth," *Pediatrics* 132.1 (July 2013): 201.

13. See APA, "Position Statement on Access to Care for Transgender and Gender Variant Individuals," May 2012, https://www.psychiatry.org/.

14. An extensive review of the medical literature can be found in Lawrence S. Meyer and Paul R. McHugh, "Sexuality and Gender: Findings from the Biological, Psychological, and Social Sciences," *New Atlantis* 50 (Fall 2016), http://www.thenewatlantis.com/. Several key findings indicate the inadequacy of existing research for sound scientific conclusions. For example, current evidence does not support the claims that gender identity is innate; that gender-atypical thinking is likely to continue after adolescence; that transgender affirmation, hormonal treatment, or surgery should be encouraged for children; or that sex reassignment surgery resolves the underlying health risks for persons with transgender beliefs and desires.

CONFIDENTIAL                                                                                       UMMS000000011

"disturbance in the way in which one's body weight or shape is experienced ... or persistent lack of recognition of the seriousness of the current low body weight."[15] No one would suggest affirming irrational and harmful beliefs of this sort. *DSM-5* defines *psychotic delusions* as "fixed beliefs that are not amenable to change in light of conflicting evidence."[16] Persistent transgender beliefs would seem to fit this definition. Body dysmorphic disorder is a "preoccupation with one or more perceived defects or flaws in physical appearance that are not observable or appear slight to others."[17] Seeing one's genitalia and other bodily sex characteristics as wrong does not seem very different.

There is even a rare disorder called apotemnophilia, or body identity integrity disorder, that involves "a desire to have a limb amputated to correct an experience of mismatch between a person's sense of body identity and his or her actual anatomy."[18] For example, people who are in good bodily health may believe they are paraplegic and seek disabling surgery. If applied to bodily sex characteristics, this is very nearly the heart of the transgender concept.

### The Practice of Catholic Health Care

What does all of this mean for Catholic health care practice? We cannot be hoodwinked by ideologically compromised science. The real transgender issue is not a technical medical one but a profound anthropological error with moral consequences. No amount of scientific data can help provide real healing if its interpreters deny God's design of each human person as an individual body–soul unity, male or female. Looking deeper, the current medical responses to transgender desires or beliefs, bodily acceptance and gender transitioning, not only have two different aims but are based on two different anthropologies.

Bodily acceptance interventions comport with Christian anthropology, which acknowledges that sexual identity is an objective, unchangeable attribute given by the Creator, manifested physically in the body, and readily identifiable when there are no disorders of sex development. I not only have a body, but I am my body—it cannot be wrong, but my thinking might be.

All gender-transitioning interventions, on the other hand, presuppose that there is no fundamental problem with radically transforming the thinking, social expression, and bodily manifestation of the person to reflect the opposite sex. I am not my body, but I happen to have this one—it can be changed if it is somehow wrong to me. I decide my sexual identity based on personal feelings and convictions.

---

15. *DSM-5*, 339.
16. Ibid., 87.
17. Ibid., 242.
18. *DSM-5*, 246–247. While it is mentioned and briefly described in *DSM-5* under the entry for body dysmorphic disorder, apotemnophilia does not have its own entry. For additional discussion of the condition, associated terminology, and etiology, see Anna Sedda and Gabrielle Bottini, "Apotemnophilia, Body Integrity Identity Disorder or Xenomelia? Psychiatric and Neurologic Etiologies Face Each Other," *Neuropsychiatric Disease and Treatment* 10 (July 7, 2014): 1255–1265, doi: 10.2147/NDT.S53385.

CONFIDENTIAL

UMMS000000012

It should be clear from this that bodily acceptance efforts can be morally sound, whether we are talking about basic human support, expectant waiting, pastoral counseling, or some form of corrective psychotherapy. By their nature, these interventions have a good end and properly ordered means that respect the integrity of the human person: they seek to eliminate or mitigate transgender beliefs and desires by acknowledging the truth of one's objective sexual identity, taking the body as given and the whole person as worthy of love. There is no guarantee of success in every case, but these methods can restore the integrity of a confused person if they succeed.

Conversely, gender-transitioning interventions can never be morally sound, because they reject the proper understanding of the person. By nature, these efforts are directed toward enabling a person to "become" the other sex and aligning his or her body and behaviors with it. This end is not proper to the subject, whose sexual identity is given and unchangeable, and so the end is disordered. The means of accomplishing a gender transition always involve the denial of one's personal identity, the encouragement of false beliefs and disordered desires, and even such extreme measures as hormonal and surgical mutilations of a healthy body. If gender transitioning is successful, it undermines the integrity of the person by further ingraining a false self-understanding. Even if it produces short-term reported satisfaction, it cannot heal the existential suffering of identity confusion—it only drives it deeper.

The most evident moral problem with gender-transitioning interventions is hormonal and surgical mutilation. *Gaudium et spes* reiterates the significance of body–soul unity for understanding how to treat our bodies: "Man is not allowed to despise his bodily life, rather he is obliged to regard his body as good and honorable since God has created it and will raise it up on the last day."[19] A firm conviction that my body is somehow wrong manifests disdain for that gift. Acting to radically reshape it, making it speak falsely, dishonors it. Directive 29 of the *Ethical and Religious Directives for Catholic Health Care Services* (*ERDs*) elucidates the duty to protect and preserve bodily and functional integrity, and directive 53 prohibits direct sterilization.[20]

Even with good therapeutic intentions, such as seeking to alleviate depression or anxiety, mutilating actions speak for themselves. They say that my body is not good and warrants disfigurement, even functional impairment, to make me feel better. It bears emphasizing, however, that no reassignment surgery or cross-sex hormones can actually transform a male body into a female one or vice versa. In the end, there is no authentic transition either anthropologically or biologically—just mutilation.

If gender-transitioning efforts, from trans-affirmative counseling to invasive surgery, always amount to a rejection of the person's body, we can say that inclinations toward transitioning, namely, transgender desires and beliefs, are disordered. As real as the experience of these feelings and convictions may be, they are ordered only to disfiguring the body and literally dis-integrating the person. But to be clear, and this is pastorally important, transgender desires and beliefs are not sins as such—just as homosexual inclinations are not sins. Only deliberate actions can be assessed in

---

19. Vatican Council II, *Gaudium et spes* (December 7, 1965), n. 14.

20. US Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, 5th ed. (Washington, DC: USCCB, 2009).

220

CONFIDENTIAL

UMMS000000013

moral terms. The desires are nonetheless objectively disordered, because acting on them can only harm the person. They call out instead for true healing.

We can summarize the ethical framework of transgender issues in health care by saying that gender-transitioning interventions are necessarily vitiated by the denial or rejection of a person's healthy, God-given body with its objective sex characteristics. Because transgender beliefs are false and transgender desires are intrinsically disordered, deliberately acting on them is intrinsically immoral and cannot be justified in any circumstances. Of course, the psychological and developmental complexities and external pressures behind the beliefs, desires, and experiences are real, and they could notably attenuate or eliminate subjective culpability, particularly in children.

Some might argue that gender-transitioning interventions could be legitimate under the principle of totality. Pope Pius XII is well-known for explaining and applying this moral principle, which admits sacrificing a part of the body in order to preserve the health or life of the whole. A gangrenous leg can be amputated. Directly therapeutic interventions expected to result in sterility can be legitimate, as noted in directive 53 of the *ERDs*. Even a healthy testicle could be removed if it exacerbates a serious health issue elsewhere in the body. Some supporters of gender transitioning argue that altering or removing healthy genitals or other sex characteristics could be legitimate and would not be immoral mutilation because it would eliminate or at least mitigate gender dysphoria.

Even assuming that all better options, including corrective psychotherapy, have been exhausted and that the data show adequate benefits to justify the risks and costs, which is not the case at present, this line of argumentation fails. While accepted applications of totality involve interventions that cause physical harm, none of them rejects the fundamental identity of the person or attempts to construct a false one. Gender transitioning always does.

Furthermore, standard applications of totality target the source of a pathology or an aggravating factor. Gender transitioning does neither. It aims only to alleviate certain symptoms without resolving their source, and concurrently acts as an aggravating factor: it affirms the disordered transgender desires and beliefs. This can only cause greater harm to the person overall.

In short, gender transitioning is intrinsically immoral and so cannot serve the good of the person, even if it provides certain short-term reported relief of dysphoric symptoms. The principle of totality and directive 53 of the *ERDs* are not applicable.

This has numerous implications for Catholic health care providers, from individual professionals to hospitals and systems. I will mention only a few. First, no Catholic provider should directly carry out gender transitioning. This means no gender-affirming counseling or psychotherapy, pubertal blockers, cross-sex hormones, or surgical reassignments of any kind. To avoid immoral cooperation, Catholic physicians and organizations should not authorize the maintenance of cross-sex hormones or other transitioning regimens if a patient receiving them comes under their care for unrelated health reasons. Likewise, no referrals should be made directing or recommending that patients undergo gender-transitioning intervention.

Furthermore, Catholic facilities should not implement gender-affirming protocols, for example, allowing patients claiming transgender beliefs to access opposite-sex bathrooms or requiring all staff to undergo sensitivity training that would pressure

CONFIDENTIAL                                                                UMMS000000014

them into using patients' preferred gender pronouns. Catholic organizations that offer their own insurance products or that are self-insured should categorically exclude sex reassignment surgeries and all other forms of gender transitioning from their coverage. Finally, recalling the intrinsic immorality of gender transitioning, no government mandate should coerce Catholic health care providers into violating the moral law.

### The Witness of Catholic Health Care

The complexity of transgender issues is a reminder of the need for education, even in health care. In his *motu proprio* "On the Service of Charity," Benedict XVI says that "in carrying out their charitable activity . . . Catholic organizations . . . should show special concern for individuals in need and exercise a valuable educational function within the Christian community."[21] In simplest terms, Catholic providers should offer health care with truth in charity.

Catholic health care cannot simply accept the standards of medical associations or legal regulations in this area, because those standards reflect a faulty anthropology. It should therefore promote the proper understanding of the human person, a body–soul unity whose sexual identity should be accepted for the gift that it is; promote sound science and medical information, including the limits of scientific data and what the facts do not tell us; provide training to health care providers and administrators; offer patients and families sound practical resources, such as well-formed Catholic mental health professionals and pediatricians; and actively support those who offer care consonant with Christian anthropology, such as corrective psychotherapy.

Catholic providers should offer health care without unjust discrimination toward any, including those with transgender beliefs and desires. This means that care should not be categorically denied based on the fact of a person's gender experience—this is a call for authentic healing and may be an opportunity to assist. Prudential accommodations, such as providing access to single-occupancy bathrooms, could be made to avoid creating counterproductive conflicts. This and other accommodations can be legitimate, provided they do not affirm transgender beliefs or convey that transgender desires are wholesome and good.

Finally, Catholic health care providers, especially organizations, have a grave responsibility to uphold the freedom to offer authentic care consistent with the life of the Church. When it comes to gender ideology, which Francis has called a "world war to destroy marriage" spread through "ideological colonization,"[22] there is no room for coercion. We must offer only authentic healing in accord with God's Word, including his creative design.

Catholic health care must clearly articulate and share its vision of the human person made in the image and likeness of God, male and female, as an unwavering foundation in health care practice. It must use clear concepts and terminology,

---

21. Benedict XVI, On the Service of Charity (November 11, 2012), introduction.

22. Francis, Address to Priests, Religious, Seminarians and Pastoral Workers (October 1, 2016). On gender ideology, see also Francis, Address to the Polish Bishops (July 27, 2016); Francis, *Laudato si'* (May 24, 2015), n. 155; and Francis, *Amoris laetitia* (March 19, 2016), n. 56.

CONFIDENTIAL UMMS000000015

distinguishing disorders of sex development from the transgender beliefs and desires of those with a clear bodily sex, while understanding that transgender claims are different from a diagnosis of gender dysphoria. It should be particularly conscious of the shift in focus from cause to symptoms when *gender dysphoria* displaced *gender identity disorder* in *DSM-5*. In sum, to truly heal wounds from the ground up as an exercise of the Church's ministry and life, Catholic health care must swim against the current, proactively affirming the Christian understanding of the human person in medical practice while refusing to perform, allow, or deliberately facilitate any form of gender transitioning.

CONFIDENTIAL                                                    UMMS000000016

CONFIDENTIAL

UMMS000000017