# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JESSE HAMMONS                          :

                                       :

    v.                                 :   Civil Action No. DKC 20-2088

UNIVERSITY OF MARYLAND MEDICAL   :
SYSTEM CORPORATION, et al.

                                       :

**MEMORANDUM OPINION**

Plaintiff Jesse Hammons, a transgender man, sought to undergo a hysterectomy as part of his treatment for gender dysphoria. Either he or his surgeon[1] elected to schedule the surgery at the University of Maryland St. Joseph Medical Center ("UMSJ," or the "Hospital"). UMSJ adheres to Catholic religious doctrine. Despite initially authorizing the scheduling of the procedure, the Hospital ultimately refused to authorize the procedure. Under Catholic doctrine, the Hospital barred surgeries that resulted in sterilization, such as a hysterectomy, except when their "direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." Plaintiff asserts that his treating physicians determined that his surgery

_____

[1]     Paragraph 2 of the Complaint alleges that Mr. Hammons's [unnamed] surgeon scheduled the procedure. But, ¶ 53 alleges that "Mr. Hammons scheduled a hysterectomy . . . ." Thus, even though Defendants put heavy emphasis on the surgeon as the "but for" cause of Plaintiff's injury in their motion and reply, it is not even clear whether the surgeon selected the hospital or simply scheduled the operation at the behest of Plaintiff.

was medically necessary under the relevant professional standards of care.  The Hospital ultimately cancelled the surgery — declaring gender dysphoria was not a "sufficient medical reason" to justify surgery in light of its sterilizing effects.  As a result, about six months later, plaintiff underwent a hysterectomy at a different hospital.

Based on the Hospital's unwillingness to permit the hysterectomy, Mr. Hammons has filed suit against Defendants University of Maryland Medical System Corporation ("UMMS") as well as UMSJ Health System, LLC ("UMSJ LLC") and University of Maryland St. Joseph Medical Center, LLC ("St. Joseph LLC," originally organized as "Northeastern Maryland Regional Health System, LLC") (collectively "Hospital LLCs").  St. Joseph LLC is a wholly owned subsidiary of UMSJ LLC, which itself is a wholly owned subsidiary of UMMS.  According to plaintiff, the State of Maryland continues to exercise authority and control over UMMS.  (ECF 1, ¶ 20).

Plaintiff has brought a three-count complaint alleging that, because UMMS is an arm of the state, Defendants impermissibly have endorsed and entangled themselves with the Catholic religion and discriminated on the basis of sex. He alleges that they violated: the Establishment Clause of the First Amendment (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and § 1557 of the Affordable Care Act ("ACA"), 42 U.S.C § 18116(a), as discrimination on the basis of sex. (Count III).  (ECF No. 1).

2

He alleges that Defendants treated Mr. Hammons—as a man who is transgender—differently from non-transgender patients who require medically necessary hysterectomies for other medical conditions. Presently pending is a motion to dismiss that complaint. (ECF No. 39). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. Background

The following facts are outlined in the complaint, including references to information in the public domain. St. Joseph Hospital was founded over a hundred years ago by the Sisters of St. Francis of Philadelphia and operated as a private Catholic hospital for most of its history. More recently, it was run by Catholic Health Initiatives, which Plaintiff describes as a "consortium" of three Catholic health care systems and ten congregations. In 2012, the Hospital was in dire financial straits and decided to put the facility up for sale. University of Maryland Medical Center ("UMMS") expressed interest but a "sticking point" in the negotiations was whether the Hospital would continue to be run as a "Catholic institution." The Hospital, prior to the sale, had operated according to the Catholic Directives ("the Directives"), a series of ethical directives created and published by the U.S. Conference of Catholic Bishops

and aimed at Catholics administering health care; the Catholic Church forbade the sale without approval of the Archdiocese of Baltimore and the Vatican, both of which were adamant that the center continue to adhere to these tenets even after it divested itself from any direct control or ownership of the Hospital.  In fact, Cardinal O'Brien publicly declared that the local Church would "do everything possible in the months and years ahead" to keep the Hospital operating as a Catholic center.  UMMS ultimately entered into a written agreement with the Catholic Church that the Hospital would continue to operate under the Directives. Ultimately, UMMS purchased the Hospital for over $200 million.

Plaintiff asserts that UMMS and its subsidiaries continue to abide by the Directives, and they link directly to them on their webpage "About UM SJMC [University of Maryland St. Joseph Medical Center]," wherein UMMS holds this center out as a "Catholic acute care hospital that observes the Ethical and Religious Directives for Catholic Health Care Services."  (ECF No. 1, at 2 n.1) (quoting http://www.umms.org/sjmc/about (last accessed July 16, 2020)). The Directives include a number of core principals, including that healthcare must "respect the sacredness of every human life from the moment of conception until death."  What this meant in practice is that the Directives prohibited a number of practices such as "contraceptive interventions" that "have the purpose, whether as an end or a means, to render procreation impossible."  In a similar

4

vein and at issue here, the Directives also declare that "[d]irect sterilization of either men or women, whether permanent or temporary, is not permitted."

Critically, the Directives contain an exception: "Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available." The complaint also highlights a later portion of the Directives, asserting, "The stated basis for this rule is the Catholic teaching that Catholic health care organizations are not permitted to engage in 'immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.'" (ECF No. 1, ¶ 3) (quoting the Directives at 19, ¶ 53 and 25, ¶ 70, which are available at http://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf (last accessed July 16, 2020)).

As a transgender man, Mr. Hammons sought to have a hysterectomy "as a medically necessary treatment of gender dysphoria."[2] A hysterectomy, the complaint explains, is "surgery

---

[2]   Plaintiff explains that this is "the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex. Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders ('DSM-V') and International Classification of Diseases ('ICD-10'). The

to remove a patient's uterus" and is a sterilizing procedure: after undergoing a hysterectomy, a patient can no longer become pregnant. "Transgender men often require a hysterectomy as a gender-affirming surgical treatment for gender dysphoria." Plaintiff argues that he met all the criteria under the "accepted standards of care for treating dysphoria" published by the World Professional Association for Transgender Health to receive a hysterectomy,[3] and his physicians recommended he receive one.

Plaintiff scheduled the surgery at UMSJ to take place on January 6, 2020. To prepare for it he "underwent pre-operative blood tests, an echocardiogram, and other health screenings with his treating physician" and arranged for the operation to take place "during a break from school" and he arranged to "to take off time from work."[4] As the complaint explains, however:

> Approximately 7-10 days before Mr. Hammons's surgery was scheduled to take place, University of Maryland St. Joseph Medical

criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85)." (ECF No. 1, at 15). Plaintiff treats the "medically necessary" designation as presumptively and implicitly satisfying the lone exception to the Directives' general ban on sterilizing operations – one that had "the direct effect" of curing or alleviating "a present and serious pathology," for which a simpler treatment was "not available."

[3] These included, among other thing, documentation of "[p]ersistent" gender dysphoria, twelve months of "continuous" hormone therapy, and two referral letters from "qualified mental health professionals." (See ECF No. 1, ¶ 52 n.26).

[4] It is not clear from the complaint if Mr. Hammons' work is school (i.e. he is a teacher), or he was both working and going to school part-time.

> Center's Senior Vice President for Medical
> Affairs and Chief Medical Officer, Gail
> Cunningham, ordered the surgery canceled. Dr.
> Cunningham told Mr. Hammons's surgeon that he
> could not perform Mr. Hammons's hysterectomy
> because the surgery conflicted with the
> hospital's Catholic religious beliefs and the
> Catholic Directives.

(ECF No. 1, ¶ 56). Plaintiff alleges that Dr. Cunningham told his
surgeon that "according to University of Maryland St. Joseph
Medical Center's religious beliefs, Mr. Hammons's gender dysphoria
did not qualify as a sufficient medical reason to authorize the
procedure." Dr. Cunningham also explained that "performing the
hysterectomy and removing an otherwise healthy organ would violate
the Catholic Directives' command to preserve the 'functional
integrity'" of the human body. While this purported reasoning was
therefore facially neutral as to Plaintiff's gender identity, Mr.
Hammons argues the Directives themselves state, "[t]he functional
integrity may be sacrificed to maintain the health or life of the
person where no other morally permissible means is available."
(*Id.*, ¶ 58) (quoting the Catholic Directives, at 14, ¶ 29).
Following such a directive, Plaintiff asserts that surgeons at
UMSJ have removed "otherwise healthy tissue to prevent cancer or
other diseases." Nonetheless, Dr. Cunningham informed Mr. Hammons
that UMSJ "did not consider Mr. Hammons's gender dysphoria to be
a valid basis under the Catholic Directives to justify disrupting
the body's 'functional integrity.'"

When he found out about the cancellation of his surgery only days before it was to take place, Mr. Hammons "felt shocked, angry, afraid, and devastated."  Mr. Hammons "was not able to have his hysterectomy performed until June 24, 2020."[5]  Moreover, because of the forced rescheduling:

> Mr. Hammons had to spend more money on an additional round of pre-operative tests; he had to spend another six months experiencing gender dysphoria without the therapeutic benefits of the surgery; and he had to spend another six months carrying the stress and anxiety of having to mentally prepare himself for the surgery all over again.

(*Id.*, ¶ 60).

The complaint asserts Establishment Clause and Equal Protection claims under § 1983 and a claim under the ACA, requesting: A) declaratory relief that Defendants violated Plaintiff's rights under all three laws, B) compensatory damages "in an amount to be determined at trial," C) nominal damages, D) "reasonable" costs and attorneys' fees under 42 U.S.C. § 1988, and E) "[s]uch other relief as the Court deems just and proper." (*Id.*, ¶¶ 61-93 and A-E).

---

[5]    Defendants characterize this gap between the originally scheduled surgery and the re-scheduled surgery as evidence that "Mr. Hammons voluntarily delayed" seeking treatment elsewhere after his operation was cancelled at UMSJ. (ECF No. 39-1, at 14 & n. 15).  As Plaintiff correctly asserts in opposition, however, such a claim goes beyond the complaint and does not cast the facts in the light most favorable to Plaintiff, which is the proper perspective at this stage of the proceeding. (ECF No. 47, at 18 n.4).

On September 25, 2020, Defendants moved to dismiss.  (ECF No. 39).  They argue that 1) Plaintiff lacks standing to bring suit, 2) Plaintiff cannot sue Defendants for § 1983 violations as they are private corporations or, if they are found to be state actors, those claims are barred by sovereign immunity, 3) Plaintiff otherwise fails to plead a valid Establishment Clause violation or 4) Equal Protection Claim, and 5) Plaintiff's ACA claim fails as a matter of law. (*See* ECF No. 39-1, at 2).  On November 23, 2020, Plaintiff responded in opposition (ECF No. 47), and on December 21, 2020, Defendants replied.  (ECF No. 48).

## II. **Standing**

Defendants first contend that that Plaintiff lacks standing to bring this suit.  It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see also Carney v. Adams*, 141 S. Ct. 493, 498 (2020); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020).  "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th

Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Uzuegbunam v. Preczewski,* 141 S. Ct. 792, 798 (2021) (citations omitted). Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc*., 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). In the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015).

In turn, Constitutional standing doctrine stems from the case or controversy requirement. *See, e.g., Trump v. New York*, 141 S. Ct. 530, 535 (2020); *Spokeo, Inc.*, 136 S. Ct. at 1547. The *Clapper* Court explained, "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." 568 U.S. at 408:

10

As explained in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992), a plaintiff must satisfy three elements to establish Article III standing:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

(internal quotation marks and citations omitted).

"For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need not be the last link in the causal chain[.]" *Id.; see also Lexmark Int'l, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing[.]"). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d

187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Defendants do not dispute that the alleged cancellation of Plaintiff's surgery constituted injury for purposes of standing. But they contend that the injury was neither traceable to nor redressable by them.

Defendants posit that Plaintiff's surgeon caused injury to Plaintiff, not the Hospital, because the surgeon arranged for the surgery to take place at UMSJ, with knowledge that the hysterectomy was impermissible under the Directives. (*See* ECF 39-1 at 10, 16-17). According to Defendants, the surgeon knew the hysterectomy was impermissible because he "voluntar[ily] agreed to comply with the ERDs [ethical and religious directives] when accepting admitting privileges at St. Joseph." Thus, they argue that Plaintiff's injuries "stem directly from his surgeon's mis-scheduling a procedure that he knew could not be performed at St. Joseph." (*Id.* at 17).

This argument fails for at least two reasons. First, the facts, seen in the light most favorable to Plaintiff, do not establish that the surgeon had actual knowledge the surgery would be prohibited by the Hospital under the Directives. Second, the argument misapplies the traceability requirement.

As to the surgeon's knowledge of the purported harm, according to the Complaint, "adherence" to the Directives is a "condition

for medical privileges and employment at the Hospital." (ECF 1, ¶ 28) (quoting the Directives at 9). Thus, it is reasonable to infer that the surgeon knew that he was required to comply with the Directives. But that does not amount to knowledge that Plaintiff's scheduled hysterectomy was — or would be found to be — contrary to the Directives. It would have been far from obvious to the surgeon or anyone reading the Directives' that the prohibition on sterilization and "command to preserve the 'functional integrity' of the human body" would necessarily bar Plaintiff's surgery. The complaint asserts that Plaintiff had satisfied the relevant standards of care to deem his operation medically necessary. Given this designation and the subsequent approval of the surgery by Plaintiff's "treating physicians," even if the surgeon knew the Directives generally barred hysterectomies, the surgeon would have every reason to believe that this particular hysterectomy fit within the Directives' sole exception to the prohibition on sterilization.

Defendants' argument around traceability also misses the mark. Traceability requires only that Plaintiff's injury be "'fairly traceable'" to Defendants' conduct; Defendants need not be "'the sole or even immediate cause'" of that injury. *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (citation omitted); *see Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (reasoning that if the defendant was "at least

13

in part responsible" for the plaintiff's injury, then traceability was satisfied).

Here, Plaintiff was to undergo a procedure at St. Joseph that, according to Plaintiff, was medically necessary. It is undisputed that the cancellation of that surgery constituted an injury in fact. Moreover, the Hospital's Chief Medical Officer "ordered the surgery canceled." (ECF 1, ¶ 56). Defendants do not contend that the conduct of the Chief Medical Officer is not attributable to them. Thus, the cancellation of the surgery was caused, "at least in part," by Defendants' reliance on the Directives and application of the Directives in this particular case. *Judd*, 718 F.3d at 316. Nothing more is required.

Defendants' citation to *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) and *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26 (1976), is also misplaced. Defendants rely on both cases for the proposition that a third-party's conduct can break the causal chain between a plaintiff and defendant(s) where the injuries can be seen to flow from that conduct. (ECF 39-1, at 17). In Defendants' view, the conduct of Plaintiff's surgeon caused Plaintiff injury and broke the "'traceability' chain." (*Id.*). Plaintiff counters that this argument makes no sense, as the surgeon's conduct preceded the cancellation of the surgery, and, even if the chain was somehow severed by the surgeon's conduct, Defendants "picked the chain back up" as the "*final actors*" in the chain of events

14

leading to the cancellation of the surgery. (ECF No. 47, at 17).
In reply, Defendants ignore this central, temporal flaw in their
argument and instead refute Plaintiff's argument (in the
alternative) that they could have "picked the [causal] chain back
up"; they argue this cannot be as the complaint establishes that
"Hammons' surgeon's conduct is *the but for cause* of St. Joseph's
cancellation." (ECF No. 48, at 11).

Plaintiff is correct that the caselaw only focuses on
*intervening* conduct of a third-party, and so these cited decisions
have no bearing here. The last act in the causal chain was the
Chief Medical Officer's cancellation of the hysterectomy, in
reliance on the Directives and the Hospital's avowed religious
beliefs. The decision to schedule the surgery at St. Joseph set
the causal chain in motion; it could not have both initiated it
and broken it, as asserted it by Defendants. Of course, as
Defendants argue, that decision was *a* but-for cause of the injury,
but an event can have multiple but-for causes. *See, e.g.*, *Bostock
v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739, (2020) ("Often,
events have multiple but-for causes."); *Guessous v. Fairview Prop.
Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (stating that "a
cause need not work in isolation to be a but-for cause"). Here,
the scheduling of the hysterectomy and the cancellation of it were
*both* but-for causes of the harm to plaintiff.

Having determined that traceability is satisfied, redressability, is easily met here. Plaintiff seeks damages based on a past injury; he does not seek prospective relief. Recently, the Supreme Court concluded "that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 141 S. Ct. at 802. For standing purposes, a judgment awarding money damages is considered sufficient to redress past harms. *See id.*; *Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) (stating that "injuries compensable in monetary damages can always be redressed by a court judgment").

Therefore, Plaintiff has standing to bring this suit.

## III. Standards of Review-Motion to Dismiss

Defendants' arguments that Plaintiff has failed to allege the necessary elements of his § 1983 or ACA claims are analyzed under Fed.R.Civ.P. 12(b)(6), while the assertion that sovereign immunity constitutes a bar to the two Constitutional claims properly is assessed under Fed.R.Civ.P. 12(b)(1).[6]

### A.    Fed.R.Civ.P. 12(b)(6)

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*,

---

[6]    Defendants only discuss Fed.R.Civ.P. 12(b)(1) in the context of their standing argument, and neither party identifies what standard applies to the sovereign immunity defense. There has been a historical lack of clarity from the Fourth Circuit on whether the existence of sovereign immunity is grounds for

16

464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, No. 19-1964, 2021 WL 1181273, at *2 (4th Cir. Oct. 27, 2020) (reversing a district court's dismissal of a complaint because "we must accept the well-pleaded facts and draw reasonable inferences in favor of the plaintiff"). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for

---

dismissal under Fed.R.Civ.P. 12(b)(6), for a failure to state a claim, or under Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. This court has said, "Judges in this district favor analysis under Fed.R.Civ.P. 12(b)(1) as the defense "functions as a block on the exercise of that jurisdiction." *See Borkowski v. Balt. Cty., Md.*, 414 F.Supp.3d 788, 804 (D.Md. 2019) (quoting *Gross v. Morgan State Univ.*, 308 F.Supp.3d 861, 865 (D.Md. 2018)) (internal quotation marks omitted).

relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. Fed.R.Civ.P. 12(b)(1)

A motion to dismiss under Rule 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In the context of such a motion, courts should "regard the pleadings as mere evidence on the issue," and "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). As a general rule, the plaintiff bears the burden of proving that subject matter jurisdiction exists. *Richmond* 945 F.2d at 768-69.

The Fourth Circuit has recently clarified that the defense of sovereign immunity is a jurisdictional bar, explaining that "sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted) (discussing sovereign immunity in the context of government contractors), *cert. denied*, 139 S. Ct. 417 (2018) (quoting *Ackerson*

18

*v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009); *see also Cunningham v. Lester*, 990 F.3d 361,365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system"). In this context, however, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

## IV. Counts I and II: Failure to State a Claim or a Jurisdictional Bar to Suit

Defendants argue that Plaintiff's "central claims" (his § 1983 claims under Count I and Count II) "are premised on a fatal paradox." Plaintiff asserts that Defendants are part of the state's "Medical System," and thus are a state actor within the ambit of § 1983. At the same time, the complaint alleges that they are private corporations and thus not entitled to sovereign immunity as a defense. Defendants, in turn, argue that Plaintiff "cannot have it both ways": Mr. Hammons either fails to state a claim under these counts pursuant to Fed.R.Civ.P. 12(b)(6), or these counts are barred by sovereign immunity as a jurisdictional matter under Fed.R.Civ.P. 12(b)(1). (ECF 39-1, at 15, 19) (citing ECF No. 1, ¶¶ 35, 62-64, and 70-72). Defendants are correct and Counts I and II must be dismissed, but it must be decided whether

19

the dismissal is because they are not governmental actors and thus the dismissal is with prejudice under Rule 12(b)(6), or because they are entitled to sovereign immunity (and not persons) and thus the dismissal is without prejudice under Rule 12(b)(1).

### A. State Action under § 1983

Count I, alleging a violation of the Establishment Clause of the of the First Amendment (as incorporated by the Fourteenth Amendment against the States), and Count II, alleging a violation of the Equal Protection Clause of the Fourteenth Amendment, are both asserted pursuant to 42 U.S.C. § 1983. (ECF 1. ¶¶ 63, 68, 71, 84). Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379 (4ᵗʰ Cir. 2014), *cert. denied sub nom*. *Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912

F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 181 (4th Cir. 2009) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).[7]

Defendants maintain that this suit targets "'merely private conduct'" rather than state action or action taken under color of state law. (ECF 39-1, at 19) (quoting *Philips*, 572 F.3d at 181). As observed by Plaintiff, however, Defendants "generally do not differentiate between" UMMS and the Hospital LLCs. (ECF 47, at 21 n.6). Rather, Defendants stake their state action defense on the

---

[7] The § 1983 "under color of state law" element "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips* 572 F.3d at 180).

character of UMMS alone. Plaintiff's complaint alleges that UMMS not only owns the Hospital LLCs as subsidiaries but is also "pervasively entwined with the[ir] management and governance." (*Id.* ¶¶ 10,11, 37). In light of the position adopted by the parties and the common ownership of the Hospital LLCs, Defendants will be treated as a single entity for purposes of this motion.

Defendants underscore that UMMS is designated by Md. Code Educ. § 13-303(m) as a "private, nonprofit, nonstock corporation . . . independent from any State agency." (*See* ECF 39-1, at 19). And, in their view, the standard for assessing whether the cancellation of Plaintiff's surgery constituted state action is taken from *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166 (4th Cir. 2009), which discusses the so-called "close nexus" test. (ECF 39-1, at 20). In *Moore*, the Fourth Circuit articulated that test as follows:

> [A] private entity's action can constitute state action if "'there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself,'" . . . . The state is deemed responsible for the private entity's action "if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest."

560 F.3d at 179 (citations omitted).

Plaintiff's rejoinder to Defendants' state action defense depends on *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374

(1995), dealing with a government created and controlled corporation. In both his complaint and opposition, he asserts that *Lebron* compels the conclusion that UMMS is an instrumentality of the State. (*See* ECF Nos. 1, ¶ 24 and 47, at 22-27). *Lebron* teaches that the statutory language calling UMMS "private" and "independent from any State agency" is not dispositive of whether UMMS is part of the State of Maryland. And, he asserts, *Lebron*, not *Moore*, supplies the proper standard for analyzing whether UMMS is part of the State. (*See* ECF No. 47, at 22-24).

In *Lebron*, the plaintiff sought to display a politically controversial advertisement on a billboard owned by the National Railroad Passenger Corporation, "commonly known as Amtrak." 513 U.S. at 376. Amtrak disapproved of the proposed message and did not allow display of the advertisement. The plaintiff filed suit against Amtrak, alleging a violation of his First Amendment rights. Amtrak contended that it was not a state actor. According to Amtrak, the plaintiff's state action theory was foreclosed by the disclaimer of governmental status in Amtrak's authorizing statute. *Id.* at 377, 392.

The Supreme Court considered whether Amtrak's conduct constituted state action and pointed out that the case differed from where a private entity is alleged to have carried out "governmental action," as the plaintiff had alleged Amtrak was "not a private entity but Government itself." Lending credibility

to that assertion, the Court observed that Amtrak was established by act of Congress "in order to avert the threatened extinction of passenger trains in the United States," and to serve "'the *public convenience and necessity*.'" By statute, Amtrak is "'a for profit corporation,'" and "its authorizing statute declares that it 'will not be an agency or establishment of the United States Government.'" But six of Amtrak's nine board members are appointed by the President of the United States. In addition, it is "required to submit three different annual reports to the President and Congress." *Id.* at 383-386, 391 (citations omitted) (emphasis in original). The Court placed the creation of Amtrak amid "the long history of corporations created and participated in by the United States for the achievement of governmental objectives." *Id.; see Sprauve v. W. Indian Co.*, 799 F.3d 226, 230 (3d Cir. 2015) (summarizing that discussion).

The Supreme Court ultimately reasoned that the statute that created Amtrak "is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control," such as deciding whether to subject Amtrak to statutes like the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and federal procurement laws. *Lebron*, 513 U.S. at 392. Similarly, the Court explained, Congress has the power to deprive Amtrak of sovereign immunity. But, of relevance here, the Court admonished:

24

> [I]t is not for Congress to make the final
> determination of Amtrak's status as a
> Government entity for purposes of determining
> the constitutional rights of citizens affected
> by its actions.  If Amtrak is, by its very
> nature, what the Constitution regards as the
> Government, congressional pronouncement that
> it is not such can no more relieve it of its
> First Amendment restrictions than a similar
> pronouncement could exempt the Federal Bureau
> of Investigation from the Fourth Amendment.

*Id.*

Recently analyzing *Lebron*, the Fourth Circuit observed that the case focused on two key factors: whether an entity served a governmental purpose and whether it was controlled by the government. *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 (4th Cir. 2017).  On the first front, because Amtrak was "'created by a special statute, explicitly for the furtherance of federal governmental goals,' it was clear that Amtrak served a government purpose."  *Id.* (quoting *Lebron,* 513 U.S. at 398).  As to the second factor, *Lebron* noted that the government "controls the operation of the corporation through its appointees," thus acting "not as a creditor but a policymaker." *Meridian Invs.,* 855 F.3d at 579 (quoting *Lebron,* 513 U.S. at 399); *see Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015) ("*Lebron* teaches that . . . the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status.").  It held "that where, as here, the Government [1] creates a corporation by special law, [2] for

25

the furtherance of governmental objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of" individual constitutional rights. *Lebron,* 513 U.S. at 399 (bracketed numbers added); *see Philips*, 572 F.3d at 186 (separating the *Lebron* test into three parts in this fashion).

Defendants assert that the Fourth Circuit has placed "limited reliance" on *Lebron* and cited the case just twice in twenty-five years. (ECF 39-1 at 22, n.18). But, as Plaintiff points out, Defendants cite three decisions of the Fourth Circuit in their motion that discuss *Lebron*: *Philips*, 572 F.3d 176; *Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 158 (4th Cir. 2018); and *Meridian Invs.*, 855 F.3d 573. Indeed, the Supreme Court recently extended *Lebron*'s holding in *Ass'n of Am. Railroads*, 575 U.S. at 46, concluding that Amtrak is a governmental entity for purposes of separation of powers issues, in addition to individual constitutional rights. And courts in multiple circuits, including the Fourth Circuit, continue to apply *Lebron* when wrestling with questions concerning the governmental status of corporate entities created by the federal government, *see, e.g.*, *Kerpen*, 907 F.3d at 159; *Meridian Invs.*, 855 F.3d at 578-79; *Herron v. Fannie Mae*, 861 F.3d 160, 167-68 (D.C.Cir. 2017), as well corporations created by states. *See, e.g.*, *Sprauve*, 799 F.3d at 231-32; *Philips*, 572 F.3d at 185-86; *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81,

83 (2ᵈ Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Potomac Construction Company, Inc., v. Washington Metro. Area Transit Auth.*, GLS-21-193, 2021 WL 1516058, at *11 (D.Md. Apr. 16, 2021); *White Coat Waste Project v. Greater Richmond Transit Co.*, 463 F.Supp.3d 661, 688-89 (E.D.Va. 2020); *Pennsylvania Pro. Liab. Joint Underwriting Ass'n v. Wolf*, 324 F.Supp.3d 519, 531 (M.D.Pa. 2018).[8]

Other courts have used *Lebron* in similar circumstances, choosing to apply its three-part test rather than other formulations of state action doctrine. *See, e.g.*, *Sprauve*, 799 F.3d at 230 (relying on *Lebron* given the plaintiff's contention that the defendant "is the government"); *Hack*, 237 F.3d at 83 (noting that "plaintiffs rely almost entirely upon *Lebron*").

---

[8]    Defendants cite *Mentavlos v. Anderson*, 249 F.3d 301, 312 (4ᵗʰ Cir. 2001) for the proposition that "the *Lebron* factors are not 'conclusive' for finding state action against" entities other than Amtrak. (ECF 48 at 13). This is a mischaracterization of *Mentavlos*. There, the Fourth Circuit addressed the status of a military college, not a corporation. *Mentavlos*, 249 F.3d at 305. In the portion of the discussion cited by defendants, the Fourth Circuit identified various circumstances in which "state action has been found . . . ." *Id.* at 312. It cited *Lebron* as one example of a determination of state action, *id.*, but did not otherwise discuss the case, as the facts did not lend themselves to analysis under *Lebron*. The court also cautioned that the presence of the various "circumstances" it identified "might not be conclusive" of the issue of state action. *Id.* Clearly, the *Mentavlos* court was describing the difficult terrain of state action doctrine generally, not the *Lebron* test specifically, as asserted by Defendants. Defendants likewise distort *Philips*, 572 F.3d at 182. They cite it for a proposition that it plainly does not contain. (*See* ECF No. 48, at 13).

In *Puerto Rico Ports Authority v. Federal Maritime Com'n*, 531 F.3d 868, 873 (D.C. Cir. 2008), the court remarked that:

> Determining whether a particular entity is an arm of the State can be a difficult exercise. The cases generally arise in three different factual settings involving: (1) agencies that are either arms of the State or political subdivisions, such as cities or counties, that are not entitled to sovereign immunity; (2) special-purpose public corporations (like PRPA) established by States to perform special functions; these may be either arms of the State or non-governmental corporations not entitled to sovereign immunity; and (3) Compact Clause entities established by two or more States by compact and approved by Congress; these are sometimes considered arms of their constituent States for sovereign immunity purposes, although the Supreme Court has recognized a presumption against sovereign immunity for Compact Clause entities, see *Hess* [*v. Port Authority*], 513 U.S. [30 (1994)] at 42.[2]
>
> _____
> [2] None of the Supreme Court's arm-of-the-state cases has considered a special purpose public corporation like PRPA that was created by the State.

As noted by then Judge Kavanaugh in *PRPA*, as of 2008, none of the Supreme Court cases dealt with a state created special purpose corporation, including *Lebron* which was decided in 1995. And the D.C. Circuit used a different test, from *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994). But, as noted above, other lower courts have used the *Lebron* analysis and it appears particularly appropriate to do so for a state created corporation.

The first two elements of the three-part *Lebron* test easily are met here. First, UMMS was created "by special law." *See* Md. Code. Educ. §§ 13-301 to 13-313. Second, UMMS was created "for the furtherance of governmental objectives." In this respect, the

28

"Legislative findings" set forth in § 13-302 are pertinent. The statute expressly states that the purposes for which UMMS was created include "provid[ing] medical care of the type unique to University medical facilities for the citizens of the State and region," *id.* § 13-302(1), and "extend to all citizens of the State . . . ." *Id.* § 13-302(1). Moreover, the Maryland legislature declared that these purposes "serve the highest public interest and are essential to the public health and welfare." *Id.* § 13-302(4). The plain language of the statute reflects the legislature's intent to advance governmental objectives. *Cf. Sprauve*, 799 F.3d at 233 (indicating that the second *Lebron* prong was satisfied where statute announced that corporation was created for "'public purposes'") (citation omitted).

The third *Lebron* element is also satisfied. This consideration concerns whether the government "retains . . . permanent authority to appoint a majority of the directors" of the corporation. *Lebron,* 513 U.S. at 399. The element reflects the *Lebron*'s concern with governmental control. *See Ass'n of Am. Railroads*, 575 U.S. at 55; *Meridian*, 855 F.3d at 579; *Herron*, 861 F.3d at 168. This test, however, does not require a court to look beyond the composition of a board of directors to ascertain governmental control; as some courts of appeal have put it, "'[w]e think *Lebron* means what it says.'" *Herron*, 861 F.3d at 168 (quoting *Hack*, 237 F.3d at 84). Here, all members of UMMS's

29

directors are appointed by the Governor of Maryland, with the advice and consent of the State Senate. Md. Code Educ. § 13-304(b). Therefore, the element is readily satisfied. Thus, under *Lebron*, UMMS is a governmental entity, that is, an arm or instrumentality of government for purposes of Plaintiff's assertion of his individual constitutional rights. Thus, the state action requirement of the Fourteenth Amendment and the color of law requirement of 42 U.S.C. § 1983 are satisfied.

Defendants assert, then, that if the Medical System is an arm of Maryland, the § 1983 claims fail because arms of a state are not "persons," citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *Clark v. Md. Dep't of Public Safety & Corr'l Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009); and *Lawson v. Green*, 2017 WL 3638431, at *4 (D.Md. Aug. 23, 2017). (ECF No. 39-1, at 16.) Defendants also contend that they are entitled to sovereign immunity. Plaintiff counters that the inquiries are congruent, and that only governmental agencies that are considered arms of the State for Eleventh Amendment immunity are not "persons" under § 1983, or on the other hand, an entity that is NOT immune under the Eleventh Amendment is a person subject to suit under § 1983. (ECF No. 47, at 30) (*citing Harter v. Vernon*, 101 F.3d. 334, 338 n. 1 (4th Cir. 1996)). The Fourth Circuit there held that "federal courts should approach these issues solely under the

rubric of the Eleventh Amendment and should not consider an argument of 'personhood' under § 1983."

**B. Sovereign Immunity**

Defendants contend that if UMMS is part of the State under *Lebron*, then it is an instrumentality of the state entitled to state sovereign immunity for Counts I and II. (ECF 39-1, at 23). Plaintiff counters that UMMS is not an arm of the state for purposes of sovereign immunity, or, in the alternative, that the Maryland legislature waived UMMS's sovereign immunity. (ECF 47, at 27-29). Defendants argue in response that UMMS cannot be the State for purposes of state action and at the same time fail to qualify as an arm of the state for purposes of sovereign immunity. Moreover, they contend that the State did not waive UMMS's immunity. (ECF 39-1, at 19).

The doctrine of state sovereign immunity predates the Eleventh Amendment as a form of immunity the States enjoyed before the ratification of the Constitution and originally encompassed a broader concept. *See Stewart v. North Carolina*, 393 F.3d 484, 487-88 (4th Cir. 2005) (citing, among others, *Alden v. Maine*, 527 U.S. 706, 724 (1999) ("The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principal") and *Hans v. Louisiana*, 134 U.S. 1, 3 (1890)) (explaining that the "Eleventh Amendment immunity is but an example

of state sovereign immunity as it applies to suits filed in federal court against unconsenting states by citizens of other states").

The Eleventh Amendment, in turn, provides that: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State." The Supreme Court has explained: "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases). Thus, "the ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Id.* Put simply, States are generally immune from suit for damages in federal court, absent consent or a valid congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012); *Va. Office for Prot. & Advocacy*, 563 U.S. at 253-54; *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 903 (2020). This expansion of the Eleventh Amendment has narrowed the gap between the two concepts considerably and eliminated it entirely in this context.

The parties refer to Eleventh Amendment immunity and state sovereign immunity interchangeably. (*See, e.g.*, ECF 47 at 27-28;

32

ECF 48 at 14). Consistent with the parties' usage, state sovereign immunity will be treated as synonymous with Eleventh Amendment immunity.

State sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, often referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

In defining its scope, the Fourth Circuit has said sovereign immunity applies when "the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Cash v. Granville Cty. Bd. Of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001) (internal quotation marks omitted). On the other hand, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v.*

33

*Md. Nat. Cap. Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979)).

Neither side cites any decisions in which a court determined that, under *Lebron*, or any other test, a corporate defendant was part of state government and then proceeded to analyze whether the defendant was entitled to state sovereign immunity. Nor is any such caselaw readily identifiable. It may seem strained to rely on *Lebron* to determine whether UMMS is part and parcel of government for purposes of state action, and then deploy a separate test to determine whether UMMS is an arm of the state for purposes of sovereign immunity. Indeed, the inquiries are really synonymous and the arm-of-the-state analysis answers both questions. Nevertheless, the court will look to caselaw specific to the sovereign immunity inquiry — albeit caselaw specifically focused on whether a unit of government was state or local — to determine if UMMS is an arm of the state pursuant to the multifactor inquiry articulated in *Ram Ditta*, 822 F.2d at 457-58.

The Fourth Circuit has explained how *Ram Ditta* laid out four essential factors as to whether an entity is entitled to "Eleventh Amendment immunity":

> [T]his court has stated the formula as a four-part, non-exclusive inquiry: (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether

34

> it is involved with local versus statewide
> concerns; and (4) how the entity is treated as
> a matter of state law.

*Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1052 n.3 (quoting *Ram Ditta*, 822 F.2d at 457-48); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (identifying and applying the above "four nonexclusive factors").

As Plaintiff points out, the first of the *Ram Ditta* factors has been described as the most important. (ECF 47, at 29-30); *see, e.g.*, *Hess*, 513 U.S. at 49 (remarking that "the state treasury factor is the most important factor to be considered") (citation omitted); *Hutto*, 773 F.3d at 543 (same). And Plaintiff notes that the Supreme Court has observed that the first factor is "generally accorded . . . dispositive weight." *Hess*, 513 U.S. at 49.[9] Here, Defendants assert that the State would not pay any judgment against UMMS. (ECF 39-1, at 20) (citing Md. Code Educ. § 13-310).[10] Thus,

---

[9] Although the *Ram Ditta* factors are referred to only obliquely in *Hess*, the Fourth Circuit quickly dispelled any suggestion that *Hess* had displaced the *Ram Ditta* test. *Gray v. Laws*, 51 F.3d 426, 431 n.2 (4th Cir. 1995) ("In the end, we do not believe that *Hess*, as it applies to single state entities, materially altered the Eleventh Amendment analysis we formulated in *Ram Ditta* . . . .").

[10] Section 13-310 is titled "Payment of obligations of Corporation." It provides:

> Obligations of [UMMS]:
> (1) Are payable only from assets of [UMMS]; and
> (2) Are not debts or obligations of the University or the State.

the first factor strongly suggests that UMMS is not an arm of the state.

The Fourth Circuit has indicated that the analysis may end if the first factor comes out the other way. "[I]f the state treasury will pay the judgment, the entity is immune from suit, and the other *Ram Ditta* factors need not be considered." *Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir. 1996). But the opposite is true here. Moreover, in *Oberg* the Fourth Circuit concluded that the first factor weighed heavily against finding that the defendant was an arm of the state, but nonetheless considered the other three factors. 745 F.3d at 139-41. Therefore, it is appropriate to address the remaining factors.

Here, the second *Ram Ditta* factor regarding UMMS's autotomy is interrelated with the fourth factor, how UMMS is treated under Maryland law, and so the two are discussed in tandem below. The third *Ram Ditta* factor suggests that UMMS is an arm of the state. The Maryland General Assembly declared that UMMS was created to "provide medical care . . . for the citizens of the State and region," Md. Code Educ. § 13-302(1), and that such care "extend[s] to all citizens of the State . . . ." *Id.* § 13-302(2).[11] This language reflects an involvement with statewide concerns, rather

---

[11] Although St. Joseph may serve a more localized population than UMMS as a whole, Defendants do not differentiate the Hospital LLCs from UMMS for purposes of this analysis.

than local ones, thus tilting the third factor in favor of Defendants.

The fourth factor, which looks to the treatment of UMMS under Maryland law, points in the same direction. To be sure, the State legislature designated UMMS a "private, nonprofit, nonstock corporation" that is "independent from any State agency." Md. Code Educ. § 13-303(m). But the Court of Appeals of Maryland has determined that UMMS is an instrumentality of the State for purposes of Maryland's Public Information Act, notwithstanding the statutory language in § 13-303(m). *Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 737 (2011). In reaching this determination, the *Napata* Court examined "[a]ll aspects of the interrelationship between the State and" UMMS. *Id.* at 733 (citation omitted) (alteration in original). The court summarized that examination as follows,

> [W]e agree with the Court of Special Appeals that "the attributes of UMMS's relationship with the State that point to its being an instrumentality of the State predominate over those pointing to its private character" . . . . UMMS did not exist until the State assets were transferred to the corporation. Its aim of providing health care to . . . Maryland residents serves a public purpose. Moreover, the State remains a visible and compelling force in UMMS's operations. All voting members on UMMS's Board of Directors are appointed by the Governor, and two of these flow from nominations by the respective leaders of each legislative chamber. Additionally, unlike an independent hospital, UMMS is not free to compete with the University for private gifts or private or

37

> federal grants, and its annual contracts must
> be approved by the Regents of the University
> [of Maryland]. Should UMMS become financially
> unstable, the Treasurer may loan State funds
> to UMMS as necessary. Finally, the Regents
> and the Board of Public Works have the power
> to dissolve UMMS if they determine that it is
> not fulfilling its purpose. In that event,
> UMMS's assets will revert to the State. These
> facts compel the conclusion that UMMS is an
> instrumentality of the State.

*Id.* at 737, (citation omitted).

*Napata*'s in-depth assessment of the relationship between UMMS and the State is also pertinent to the second *Ram Ditta* factor, which concerns the degree to which UMMS exercises autonomy from the State. It is clear from *Napata* that, although UMMS may function like an independent corporate medical system in some respects, it is nevertheless tethered to State government and subject to State oversight in important ways. Notably, Plaintiff does not offer any argument as to this factor, or any of the *Ram Ditta* factors, other than the first. (*See* ECF 47 at 29-30). Moreover, had Plaintiff contended that UMMS is sufficiently autonomous from the State to tilt the second factor in his favor, he would have undermined the allegation in his Complaint that the State "continues to exercise ultimate authority and control over the governance of UMMS." (ECF 1, ¶ 20).

UMMS is an arm of the State for purposes of sovereign immunity.

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suit against a state or an arm of a state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244, 249 (4th Cir. 2012), it said:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. [] *Garrett*, 531 U.S. [at] 363 . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides* [] 535 U.S. [at] 618 [].

(internal quotations omitted).

As to the third exception, relevant here, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see FAA v. Cooper*, 566 U.S. 284, 290 (2012) (stating that a waiver of sovereign immunity occurs "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction" and without recourse to legislative history); *accord Pense*, 926 F.3d 97, 101 (4th Cir. 2019); *Lee-Thomas*, 666 F.3d at 250-51; *see also Cunningham*. 990 F.3d at 365 (citing *Cooper*, 566 U.S. at 290)

39

(recognizing that "the Court explicitly and routinely construes ambiguous text so as to obviate any inference of waiver.")

Plaintiff contends that the Maryland legislature explicitly waived sovereign immunity for UMMS. He locates the purported waiver in Md. Code Educ. § 13-303(a)(2), which provides, in relevant part, that UMMS "shall not be a State agency . . . and is not subject to any provisions of law affecting only governmental or public entities." (*See* ECF 47 at 28). In essence, Plaintiff construes the second clause to encompass state sovereign immunity. (*See id.*).

Defendants counter that UMMS's authorizing statute expressly reserved sovereign immunity. (ECF 48, at 14). They point to Md. Code Educ. § 13-308(f), which states, "*Sovereign immunity not waived or abrogated.*- Nothing contained in this subtitle shall be deemed or construed to waive or abrogate in any way the sovereign immunity of the State or to deprive the University or any officer or employee thereof of sovereign immunity."

Of course, any waiver of sovereign immunity must be express and unequivocal.[12] *See Cunningham*, 990 F.3d at 365. Even assuming

---

[12] *Pense* is instructive on just how narrowly purported waivers are construed. 926 F.3d at 102. There, the Fourth Circuit considered whether a separate Maryland statute waived the State's sovereign immunity. That statute, Md. Code State Gov't § 20-903 provides: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title." The court explained that because that language "does not 'specify the State's intention to subject itself to suit in *federal court*,' that provision cannot be

that the provision relied upon by Defendants does not pertain to UMMS specifically, Plaintiff's argument still fails because the statutory language he cites does not contain an express waiver of sovereign immunity. According to Plaintiff, the statement in § 13-303(a)(2) that UMMS "is not subject to any provisions of law affecting only governmental or public entities" constitutes waiver. Yet, neither the term "sovereign immunity" nor any reference to suit in federal court appears in the statute. Insofar as Plaintiff is suggesting that such waiver can be implied, he does not back up his claim with any legal authority. (*See* ECF 47, at 28). He draws only on *Napata*, which construed this statutory language expressly to exempt UMMS "from laws affecting only public entities." 417 Md. at 739-40. *Napata*, however, did not concern state sovereign immunity and thus has no bearing on this specific issue. Defendants are shielded by sovereign immunity on Counts I and II.[13]

---

read to waive the State's Eleventh Amendment immunity." *Pense*, 926 F.3d at 102 (emphasis in original) (quoting *Atascadero*, 473 U.S. at 241).

[13] Defendants do not contend that sovereign immunity applies to Count III, under the ACA. Several trial courts have ruled that Congress validly conditioned receipt of federal funds on a consent to waive immunity, *see, e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 17 (M.D.N.C. 2020); *Boyden v. Conlin*, 341 F.Supp.3d 979, 999 (W.D.Wis. 2018); *Fain v. Crouch*, 2021 WL 2004793 (S.D.W.Va. May 19, 2012). The ruling in *Kadel*, however, is currently on appeal before the Fourth Circuit, which heard oral argument in March. *Kadel v. N.C. State Health Plan*, No. 20-1409 (4th Cir. argued Mar. 11, 2021).

## V.   Count III: the ACA Claim

Section 1557, through its incorporation of Title IX, prohibits, *inter alia*, discrimination on the basis of sex and the denial of benefits on the basis of sex in any health program or activity receiving federal funding.  To state a claim under Title IX, a plaintiff must also allege that he was harmed by a defendant's improper conduct.  *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020).

Here, Mr. Hammons alleges that Defendants are responsible for a health program or activity that receives federal funds.  (ECF No. 1, ¶¶ 14, 88).  And, Plaintiff alleges that he was harmed by the cancellation of his scheduled hysterectomy at St. Joseph. (*Id.*, ¶ 60).  Defendants do not take issue with the sufficiency of these allegations.  Thus, the remaining question is whether Plaintiff alleges unlawful discrimination or denial of benefits on the basis of sex.

Neither side relies on the ACA's implementing regulations. Defendants point out that although the U.S. Department of Health and Human Services, under former President Trump, promulgated regulations that could have a bearing on this case, those "regulatory changes" have been enjoined.  (*See* ECF 39-1 at 29 n.24) (citing *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020); *Walker v. Azar*, 20-cv-2834 (FB) (SMG), 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020)).  Rather

than substantively addressing the status and relevance of those regulations, Defendants chose to "reserve[] [their] right to present additional arguments based on those regulations." (ECF 39-1, at 29 n.24).

Nevertheless, during the pendency of this motion, Plaintiff submitted a "Notice of Supplemental Authority" that the Department of Health and Human Services ("HHS") has issued a new "Notification of Interpretation and Enforcement" that clarifies the protections granted under Title IX, and therefore § 1557, by extension. (ECF No. 50). It announces that, "This Notification is to inform the public that, consistent with the Supreme Court's decision in *Bostock* and Title IX, beginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." (ECF No. 50-1, at 2).

Plaintiff, in turn, states:

> HHS's position supports Mr. Hammons's claim that by refusing to perform his hysterectomy in aid of his sex reassignment, while agreeing to perform hysterectomies not associated with sex reassignment, Defendants discriminated against him on the basis of sex. The Notification is therefore relevant, post-submission authority supporting Mr. Hammons's argument that Defendants' motion to dismiss the Section 1557 claim should be denied.

43

(ECF No. 50, at 2).   He goes on to argue that "Fourth Circuit precedent also treats discrimination based on gender identity as sex-based discrimination and subject it to heightened scrutiny under the Equal Protection Clause."   *Id.* (citing *Grimm*, 972 F.3d at 606).

Defendants' response attempts to distinguish *Grimm* by arguing that the St. Joseph's policy at issue here, unlike in that case, is facially neutral.   They also argue that this recent HHS interpretation does not apply as "they were not in effect at the time Hammons alleges the conduct took place." (ECF No. 51, at 1-2).   This latter argument fails to note Plaintiff's concession that this is "post-submission authority" and his reliance on HHS's guidance as merely persuasive support to his claim, and not any kind of binding authority.

This is all beside the point, as *Bostock* already made clear that the position stated in HHS's interpretation was already binding law.   The Fourth Circuit looks to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which concerns employment, to guide the "evaluation of claims under Title IX." *Grimm*, 972 F.3d at 616; *see Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).   Thus, as the *Grimm* court explained, 972 F.3d at 616, the Supreme Court's decision in *Bostock*, 140 S. Ct. 1731, is consequential for claims brought under both statutes.

44

In *Bostock*, the Supreme Court held that discrimination on the basis of homosexuality or transgender status necessarily constitutes discrimination on the basis of sex, which is prohibited under Title VII. The plain language of Title VII, the Court observed, establishes a but-for causation standard. And, as noted, events often "have multiple but-for causes." Thus, "so long as the plaintiff's sex was one but-for cause" of an alleged discriminatory act, "that is enough to trigger the law." Further, the Court observed that transgender status and sex are inextricable. It opined, "Just as sex is necessarily a but-for *cause* when an employer discriminates against . . . transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking." (*Id.*, at 1739-44) (emphasis in original).

Here, St. Joseph's Chief Medical Officer, Dr. Cunningham, "ordered" the cancellation of Plaintiff's hysterectomy "because the surgery conflicted with the hospital's Catholic religious beliefs and the Catholic Directives." (ECF 1, ¶ 56). In particular, Dr. Cunningham informed Plaintiff's surgeon that the hysterectomy conflicted with the Directives' prohibition on sterilization, and their "command to preserve the 'functional integrity' of the human body." (*Id.*, ¶¶ 57-58).

Both the prohibition on sterilization and the imperative concerning bodily integrity permit exceptions. "Procedures that

45

induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available."  The Directives also allow the "functional integrity of the person [to] be sacrificed to maintain the health or life of the person when no other morally permissible means is available."  Directives at 14 and 19.

In Plaintiff's view, his scheduled hysterectomy fell within the scope of both exceptions.  His "treating physicians recommended," on the basis of the authoritative WPATH Standards of Care, that Plaintiff receive a hysterectomy as a medically necessary treatment for gender dysphoria."  Moreover, Plaintiff "satisfied all of the criteria for a medically necessary hysterectomy under the WPATH Standards of Care."  (ECF 1, ¶ 52). This included not only doctors' referral letters but a documented course of hormone therapy over the previous year.  Nevertheless, Dr. Cunningham informed Plaintiff's surgeon that Plaintiff's condition of "gender dysphoria did not qualify as a sufficient medical reason to authorize the procedure," and that the Hospital "did not consider Mr. Hammons's gender dysphoria to be a valid basis under the . . . Directives to justify disrupting the body's 'functional integrity.'"  (*Id*. ¶¶ 57-58).

In short, Mr. Hammons alleges that the Hospital denied Plaintiff the benefits of its services because he has gender dysphoria, a condition inextricably linked to being transgender.

46

Although Plaintiff's treating physicians had determined that hysterectomy was a medically necessary treatment for his condition, the Hospital refused to perform the surgery, specifically *because* it was linked to this condition. As explained in *Bostock*, a defendant who takes adverse action against someone for being transgender "inescapably *intends* to rely on sex in" his decisionmaking. 140 S.Ct. at 1742. Thus, Plaintiff alleges that the Hospital denied him the benefits of its services on the basis of sex, in violation of § 1557.

Moreover, Plaintiff alleges that St. Joseph recognizes the applicability of the pertinent exceptions contained in the Directives with other types of patients. For instance, surgeons at the Hospital "remove otherwise healthy tissue to prevent cancer or other diseases" and "perform purely cosmetic surgeries." (ECF 1, ¶ 58). Nonetheless, the Hospital regarded Plaintiff's medical need differently because he is transgender, and therefore cancelled his procedure. In this regard, Plaintiff alleges that the Hospital discriminated against him on the basis of sex by treating him "'worse than others who are similarly situated.'" *Grimm*, 972 F.3d at 618 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 59, (2006)); *see Bostock*, 140 S. Ct. at 1740-44; *see also Kadel*, 446 F. Supp. 3d at 17 (concluding that the transgender plaintiff stated a sex discrimination claim under § 1557); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953

47

(D.Minn. 2018) (same); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F.Supp.3d 1090, 1099-1100 (S.D.Cal. 2017) (same).

Defendants' arguments do not require a different result. For one, Defendants assert that to state a claim of sex discrimination under § 1557, a plaintiff must allege that the discrimination was intentional and that it was a "'substantial' or 'motivating factor' for" the defendant's actions. (ECF 48, at 21) (quoting *Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018), *adhered to on denial of reconsideration sub nom. Weinreb v. Xerox Bus. Servs.*, No. 16-CV-6823 (JGK), 2020 WL 4288376 (S.D.N.Y. July 27, 2020)). Of course, *Weinreb* is not binding authority on this court; the Fourth Circuit has not employed the same language when articulating the standard for sex discrimination under § 1557 and Title IX.[14] Moreover, even if Plaintiff were required to allege that discrimination was a substantial or motivating factor in Defendants' actions, the Complaint would still pass muster. Plaintiff plainly alleges that his hysterectomy was cancelled and that therefore he was denied necessary medical treatment, purely because of his transgender status, and thus because of his sex. Under the logic and

---

[14] Since *Weinreb* was decided, the Second Circuit has articulated the pertinent standard differently. *See Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (stating that under Title IX, a complaint "is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of . . . discrimination").

instruction of *Bostock*, Defendants "inescapably" intended to rely on sex in their decisionmaking.

Mr. Hammons has stated a claim for sex discrimination under § 1557 of the ACA.

## VI. Conclusion

For the foregoing reasons, the motion to dismiss will be granted as to Count I and Count II and denied as to Count III. A separate order will follow.

```
                             /s/
             DEBORAH K. CHASANOW
             United States District Judge
```